**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| D2 PHARMA CONSULTING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH MARK ENGELS and UNHA ENGELS, AND WORKUP, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. |

**D2 PHARMA CONSULTING'S MEMORANDUM IN SUPPORT OF MOTION TO VACATE ARBITRATION AWARD**

D2 Pharma Consulting LLC, through undersigned counsel, moves to vacate the Final Award entered on July 15, 2026, by Arbitrator Honorable Ronnie L. White (the "***Arbitrator***") in favor of Kenneth Engels, Unha Engels ("the ***Engels***"), and WorkUp, Inc. ("***WorkUp***") (collectively, "***Claimants***") pursuant to the Federal Arbitration Act, 9 U.S.C. § 10(a)(4), for exceeding his powers.

## Introduction

Claimants initiated an arbitration claiming that D2 breached a Settlement Agreement between D2 and WorkUp. Specifically, as part of that Settlement Agreement, D2 agreed to grant certain ownership interests (*i.e.*, membership units) to the Engels and further agreed to certain anti-dilution protection as to those membership units. The Engels were not parties to that Settlement Agreement, which expressly provided that no person other than D2 and WorkUp would be entitled to any "rights or remedies" under the agreement. A dispute arose over the anti-dilution provision, and both the Engels and WorkUp claimed damages for breach in that arbitration proceeding. On July 15, 2026, the Arbitrator issued a "Final Award", which awarded Claimants $637,182.44 in

compensatory damages based on the purported fair market value of the claimed dilution to the Engels units, as well as attorneys' fees and pre- and post-award interest on the damages.

By this motion, D2 seeks vacatur of the Final Award because the Arbitrator exceeded his authority by correctly identifying the governing law, applying that law throughout the proceeding, and then disregarding that same law when issuing the Final Award.

First, the Arbitrator correctly recognized governing Missouri law that requires contracts to be interpreted according to their plain and ordinary meaning and to avoid constructions that render contractual language meaningless. The Arbitrator also acknowledged the plain language of the Settlement Agreement, which explicitly states that non-parties to the agreement, such as Kenneth and Unha Engels, were not entitled to any "rights or remedies" under the agreement. Despite acknowledging those valid, binding contract terms, the Arbitrator awarded damages, attorneys' fees, and interest under the Settlement Agreement to the Engels without making any attempt to arguably construe or reconcile the plain language of the Settlement Agreement with that result. The Arbitrator also awarded damages to WorkUp, even though the Arbitrator expressly found that WorkUp had suffered no damages.

Second, when the Arbitrator awarded damages to the Claimants, he did so based on an argument of the units' fair market value presented for the first time in argument in the Claimants' closing brief, which referenced a document related to a different class of membership interests unrelated to what the Engels owned. The Arbitrator had already ruled that this type of valuation analysis required expert opinion. Earlier in the case when addressing the Claimants' failure to timely disclose experts, the Arbitrator correctly and expressly recognized the need for expert opinion to prove fair market value and that such opinion extended to the "interpretation, selection, and/or judgment" regarding information contained in D2's documents to determine the fair market

value of the Engels units. The Arbitrator expressly applied this law again twice at the hearing when excluding undisclosed or incompetent valuation evidence. In an unexplained turnabout, the Arbitrator then ignored the very law he consistently enforced throughout the hearing and adopted Claimants' post-hearing argument based on a number appearing in D2's operating agreements to adopt a value associated with a different class of membership units and unrelated to the transactions at issue. Critically, Claimants presented no expert evidence of fair market value of the Engels' membership interest as the Arbitrator correctly found was required by Missouri law.

While the Federal Arbitration Act does not permit a court to vacate an award simply because it believes an arbitrator reached the wrong result, it does, however, authorize vacatur where an arbitrator exceeds his powers by ignoring the plain language of the governing contract or disregarding the law he has identified as controlling. That is precisely what occurred here. For those reasons, the Final Award should be vacated pursuant to 9 U.S.C. § 10(a)(4).[1]

## <u>**Background**</u>

1. <u>*The Arbitration*</u>.

On July 1, 2019, D2 and WorkUp entered into an Asset Purchase Agreement ("***APA***"). After a dispute arose under the APA, D2 and WorkUp negotiated and entered into a Settlement Agreement on December 30, 2021. (Settlement Agreement attached as <u>**Ex. 1**</u>.) D2 and WorkUp were the only parties to the contract. (*Id.* at 1 and 12-13.) Among the settlement terms, the

---

[1] The parties' Settlement Agreement providing for arbitration specifies that "[a]ny dispute hereunder or related hereto shall be resolved by arbitration conducted in accordance with the Federal Arbitration Act." (<u>**Ex. 1**</u> at __.) Federal courts "will not interpret an arbitration agreement as precluding the application of the FAA unless the parties' intent that the agreement be so construed is abundantly clear." *UHC Mgmt. Co., Inc. v. Computer Scis. Corp.*, 148 F.3d 992, 997 (8th Cir. 1998).

Settlement Agreement provided that D2 was to issue 7% of its membership units to the Engels and that such units would have certain anti-dilution protection. (*Id.* at §10.)

Despite the Settlement Agreement requiring D2 to provide certain membership units to the Engels, D2 and WorkUp agreed that the "rights and remedies" under the Settlement Agreement or any transaction contemplated thereby were limited to WorkUp and D2 only. Specifically, Section 33 of the Settlement Agreement stated:

> **Rights of Third Parties**. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any person other than the Parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.

(*Id.* at §33.) The Settlement Agreement also defined "Parties" as D2 and WorkUp only. (*Id.* at 1.)

On December 7, 2022, the Engels initiated arbitration alleging that D2 had improperly diluted their units in breach of the Settlement Agreement, in which WorkUp was later added. The hearing on Claimants' breach-of-contract claim occurred on February 9, 2026. Thereafter, the Arbitrator entered an "Interim Award" finding in favor of Claimants WorkUp and the Engels. He awarded $637,182.44 in compensatory damages for the purported fair market value of the dilution of the units along with attorneys' fees. (Interim Award attached as **Ex. 2**.) Later, on July 15, 2026, the Arbitrator issued a "Final Award", which, again adopted and awarded Claimants' compensatory damages, attorneys' fees, and interest. (Final Award attached as **Ex. 3**.)

2. *Arbitrator Awards the Engels Damages Even Though They Are Not Entitled to "Rights or Remedies" Under the Plain Language of the Settlement Agreement.*

D2 consistently raised that the Engels were not entitled to any "rights or remedies" under the plain language of Section 33 of the Settlement Agreement.[2]

---

[2] *See* D2's Response to Statement of Claim and Jurisdictional Challenge (January 3, 2023) at 2; D2's Response to Amended Statement of Claim and Jurisdictional Challenge (August 14, 2023) at 3; D2's Response to Third Amended Statement of Claim and Jurisdictional Challenge (April 9,

At the hearing, Kenneth Engels provided uncontradicted testimony that all damages claimed were personal to only the Engels, not WorkUp. Specifically, Mr. Engels answered the following questions from his own counsel:

> Q. Who were issued shares of stock pursuant to that agreement?
>
> A. Unha and I.
>
> Q. Individually; correct?
>
> A. Individually.
>
> Q. All right. So to the extent that any damages have been suffered as a result of the dilution of the shares, who suffered those damages?
>
> A. Unha and I.

(Hearing Transcript at 90, attached as **<u>Ex. 9</u>**.) WorkUp sought no separate damages. (*See generally id.*)

In his Interim Award, the Arbitrator did not address Section 33 or the Engels' contractual ability to recover their claimed damages. (*See generally* **<u>Ex. 2</u>**.) Rather, the Arbitrator granted "Claimants' request" for $637,182.44 in compensatory damages without specifying which Claimant was entitled to such damages. (*Id.* at 22.)

On April 28, 2026, D2 filed its Motion to Amend, Modify, or Clarify Interim Award ("***Motion to Amend***"), in which it re-asserted Section 33's limitation of rights and remedies under the Settlement Agreement to D2 and WorkUp only. (Motion to Amend at 14-16, attached as **<u>Ex. 10</u>**.) D2 emphasized that WorkUp never argued or presented evidence that it incurred any direct, out-of-pocket or measurable damages from dilution. (*Id.*) Given that WorkUp incurred no direct

---

2025) at 3; D2's Pre-Hearing Brief (January 20, 2026) at 18; D2's Post-Hearing Brief (March 6, 2026) at 13; D2's Motion to Amend, Modify, or Clarify Interim Award (April 28, 2026) at 3, 10-11, 15-16. (attached as **Exs. 5-8**)

monetary damages, D2 contended that monetary damages were not available to WorkUp, and that, at most, specific performance of the agreement – *i.e.*, restoring the diluted units – was the only remedy available to WorkUp. (*Id.*)

In his Order on D2's Motion to Amend, the Arbitrator recognized that only the Engels, and not WorkUp, had incurred damages. (Order on Motion to Amend at 19-20, attached as **Ex. 11**.) Specifically, the Arbitrator stated:

> [U]nder the terms of the parties' Settlement Agreement, Claimants Kenneth Engels and Una Engels were issued shares of stock of equal measure, valued at 3.5% equity each. The corporate entity, WorkUp Inc., which is a party to this arbitration, was issued no shares of stock pursuant to the Settlement Agreement. Accordingly, the monetary damages awarded for dilution of the value of their equity interest are directed to the holders of said equity interest, Claimants Kenneth and Una Engels, each in equal measure.

(*Id.*) In the Order, the Arbitrator still did not address applicability of Section 33 or the Engels' standing to obtain remedies under the Settlement Agreement. (*See generally id.*)

In the Final Award, the Arbitrator for the first time expressly recognized D2's arguments invoking Section 33. Citing to an argument D2 made, the Arbitrator quoted the entirety of Section 33 in the Final Award. (**Ex. 3** at 5-6.) The Arbitrator also recognized that "Missouri law requires that a contract be read as a whole, applying the plain and ordinary meaning of its terms and 'declining to adopt any construction that leaves language without function or sense.'." (*Id.* at 7.)

Even though there was no mention of or analysis of Section 33 in the Interim Award or Order on the Motion to Amend, in the Final Award the Arbitrator stated that "[t]he Arbitrator has previously ruled that Claimants are eligible for remedies under Section 33 of the parties' Agreement; and the undersigned Arbitrator has previously ruled on the question of whether Claimants are parties (*See* Interim Award, and Order on Respondent's Motion to Amend, Modify, or Clarify Interim Award, both cited herein.)" (*Id.* at 21.) The Arbitrator added that:

> The undisputed facts as well as the governing law in which the Arbitrator's analyses were grounded remain unchanged. So do the Arbitrator's analyses and rulings, and shall neither be re-litigated nor regurgitated here.

(*Id.*)

Neither the Interim Award nor the Order on the Motion to Amend contains any analysis or ruling regarding the applicability of Section 33. (*See generally* **Exs. 2** and **11**.) Only then in the Final Award did the Arbitrator state the basis for his finding that the Engels could recover under the Settlement Agreement, in which in a single sentence the Arbitrator stated, "Claimants are, undisputedly, the intended and named beneficiaries of the Settlement Agreement breached by Respondent." (*Id.*) The Arbitrator still never reconciled the plain language of Section 33 or explained how the Engels could obtain rights and remedies under a Settlement Agreement that expressly denied non-parties any rights or remedies.

3. *Arbitrator Determines that Claimants' Interpretation, Selection, and Judgment of Numbers in D2's Documents to Ascertain the Value of the Engels' Units Constitutes Expert Opinion that Claimants Were Required to Timely Disclose.*

Prior to the Hearing, the Parties agreed to a scheduling order requiring prior disclosure of expert opinion intended to be offered at Hearing. (*See* "Procedural Order No. 6" at 3-4, attached **Ex. 12**.) After the time for Claimants to disclose expert opinion had expired, Kenneth Engels attempted to smuggle in his own opinion of the value of his and his wife's membership units in D2, even though he possessed no expertise in valuation.

Thereafter, on January 20, 2026, D2 filed its Motion to Strike Claimants' Undisclosed Valuation Expert. ("Motion to Strike" attached as **Ex. 13**.) In that motion, D2 requested an order to strike Mr. Engels' incompetent testimony regarding the value of his units by utilizing documents D2 produced during discovery. (*Id.*) D2 cited Missouri law requiring that "When a fact at issue is so technical or complex that no fact finder could resolve the issue without expert testimony,

expert testimony is 'necessary' and, therefore, required". (*Id.* at 2.)

On February 4, 2026, the Arbitrator entered his Order granting D2's Motion to Strike. ("February 4 Order", attached as **Ex. 14**.) The Arbitrator acknowledged that Claimants had not timely disclosed Mr. Engels as an expert as required under Procedural Order No. 6. (*Id.* at 7-8.)

In the February 4 Order, the Arbitrator rejected Claimants' characterization that "Mr. Engels' testimony is admissible because it is rightly characterized as 'lay testimony' relying on D2's own documents produced in discovery . . . ." (*Id.* at 7-8.) Specifically, the Arbitrator concluded that Mr. Engels' testimony of valuation – even when relying on D2's own documents or using simple math – constituted expert opinion, which he was not qualified to offer. The Arbitrator explained that Mr. Engels' use of D2's documents to establish valuation was expert opinion that had to be disclosed because:

> firstly, Mr. Engels' potential testimony appears to **rely on his interpretation, selection, and/or judgment** regarding pertinence of Respondent's financial information and documents produced in discovery, regardless of how complex the mathematical processes utilized in final calculations regarding financial damages; secondly, **any expert opinion** that would have been timely and properly disclosed, thus affording Respondent its right to examine and conduct discovery, would have also been based upon the financial documents produced in this Arbitration.

(*Id.* at 8.) (emphasis added).

At the Hearing, Claimants attempted twice to introduce evidence of the valuation of their units, which the Arbitrator barred based on his determination that it constituted expert opinion.

For their first try, Claimants attempted to elicit valuation testimony from Mr. Engels based on statements in D2's financial statements. When Claimants argued that those statements constituted admissions rather than expert opinion, the Arbitrator barred the testimony, stating "But my ruling was that he was not going to be allowed to talk about the value, **because that's expert testimony**. Now, **if you wanted to call an expert to explain this document**, or whoever wrote

this document, we could get there, but we can't get there through him." (**Ex. 9** at 63.) (emphasis added).

For their second try, Claimants attempted again to introduce evidence of valuation by questioning D2's corporate representative as to statements made in a draft term sheet between D2 and an investor. D2's counsel objected again and Claimants' counsel argued that he merely intended to ask D2's representative as a fact witness "what the value of his company was, as contained in this document that he is familiar with." (*Id.* at 164.) The Arbitrator questioned Claimants' counsel, "**So you're trying to get the valuation out of an adverse witness … that that's evidence of what it was worth**?" (*Id.*) (emphasis added). Claimants' counsel answered, "Correct", and the Arbitrator ruled, "**Sustained**." (*Id.*) (emphasis added). The Hearing concluded with no evidence elicited as to the fair market value of the Engels' units in D2. (*See generally id.*)

Yet, in their Post-Hearing Brief, Claimants argued for the first time that the value of the Engels' units could be ascertained through the "Class A-1 Issue Price" of **$142.397** per unit provided in the definition section of two of D2's operating agreements. (Claimants' Post-Hearing Brief at 18-19, attached as **Ex. 15**.) The "Class A-1 Issue Price" definition in the operating agreement was not mentioned once at the hearing, much less utilized as a measure of the fair market value of the Engels' Class B membership units. (*See generally* **Ex. 9**.)

In the Interim Award, without mentioning any of his prior rulings barring evidence of valuation, the Arbitrator adopted Claimants' "Class A-1 Issue Price" valuation theory to calculate and award $637,182.44 in compensatory damages. (**Ex. 2** at 20.)

In D2's Motion to Amend, D2 argued that Claimants' Class A-1 Issue Price theory was precisely the type of interpretation of numbers from D2's documents that must be offered through required expert opinion. (**Ex. 10** at 11-12.) D2 also argued that the Class A-1 Issue Price did not

represent the fair market value of the Engels' units who held Class B units with substantially different rights at the relevant time. (*Id.* at 12-14.)

In his Order on the Motion to Amend, the Arbitrator stated that the use of the Class A-1 Issue Price theory raised in Claimants' post-hearing brief did not violate Procedural Order No. 6 "because it does not involve an(y) expert opinion." (**Ex. 11** at 15.) The Arbitrator asserted that D2's operating agreements were admitted into evidence without objection. (*Id.* at 16.) The Arbitrator then restated the "analysis" adopting the Claimants' Class A-1 Issue Price theory. (*Id.* at 16-18.) But, again, the Arbitrator never explained why this "analysis" drawn from Claimants' post-hearing brief was not the very type of "interpretation, selection, and/or judgment" regarding D2's documents that he had repeatedly ruled constituted expert opinion.

In the Final Award, the Arbitrator acknowledged the governing Missouri law that "a plaintiff asserting breach of contract must prove both the existence of damages and the amount of those damages with reasonable certainty." (**Ex. 3** at 8.) Yet, the Arbitrator again adopted the Class A-1 Issue Price theory – absent any necessary and required expert opinion – as proof of the amount of damages to award Claimants $637,182.44 in compensatory damages.[3] (*Id.* at 24-26.)

**Standard for Vacating Arbitration Award**

While the FAA does not permit a court to substitute a judicial determination for an arbitrator's decision, "[d]eference is not unlimited." *Zeidman v. Lindell Mgmt. LLC*, 145 F.4th 820, 825 (8th Cir. 2025), cert. denied, 146 S. Ct. 1472, 223 L. Ed. 2d 512 (2026).

Grounds exist to vacate an arbitration award "where the arbitrators exceed their powers". 9 U.S.C. § 10(a)(4). Arbitrators will exceed their powers when they "ignore the plain language of the contract or impose [their] own notions of 'industrial justice.'" *Id.* at 826. This is because an

[3] Notably, there is confusion in the record as to whether the "Class **A** Issue Price" or "Class **A-1** Issue Price" was the correct unit price. *Compare* **Ex. 15**. at 18 with **Ex. 3** at 20.)

arbitrator ignoring the plain language of a contract "would, in effect, amend the contract". *Id.* at 827 (quoting *Keebler Co. v. Milk Drivers & Dairy Emps. Union, Loc. No. 471*, 80 F.3d 284, 288 n.4 (8th Cir. 1996)). Put differently, "if the arbitrator interprets unambiguous language in any way different from its plain meaning, the arbitrator amends or alters the agreement and acts without authority". *Id.* (quoting *Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187 (8th Cir. 1988) (cleaned up)).

Additionally, arbitrators exceed their powers when they "clearly identif[ied] the applicable, governing law and then proceed[ed] to ignore it." *Id.* (quoting *Hoffman v. Cargill Inc.*, 236 F.3d 458, 462 (8th Cir. 2001)).

## **Argument**

1. *The Arbitrator Exceeded His Powers by Awarding the Engels Contractual Remedies Contrary to Section 33's Unambiguous Limitation on Rights and Remedies.*

The Final Award expressly recognizes the applicable Missouri law requiring a contract to be construed according to the plain and ordinary meaning of its terms while avoiding any interpretation that renders contractual language meaningless. Yet the Final Award ignores both the governing contract law it cites and the plain language of Section 33.

Section 33 provides that no person other than D2 and WorkUp may receive any "rights or remedies" under the Settlement Agreement or by reason of any transaction contemplated by it. The provision is neither technical nor ambiguous. It directly answers the question presented here: as non-parties, the Engels may not obtain contractual remedies under the Settlement Agreement.

Notwithstanding the clarity of Section 33, the Arbitrator nevertheless awarded the Engels compensatory damages, attorneys' fees, and interest under the Settlement Agreement. More importantly, the Arbitrator never construed the language of Section 33 to reach that result despite knowing of its existence. The Interim Award does not discuss Section 33. The Order on D2's

Motion to Amend does not discuss Section 33. Although the Final Award acknowledges D2's argument that Section 33 bars non-parties from obtaining rights and remedies under the Settlement Agreement, the Arbitrator does not analyze the provision, identify any ambiguity in it, or explain how the Engels' recovery can be reconciled with its text. Instead, the Arbitrator simply states that the Engels are "intended and named beneficiaries" of the Settlement Agreement without explaining how that conclusion can be reconciled with Section 33's express denial of rights and remedies to non-parties.

The Arbitrator's conclusion is not a construction of Section 33. The issue was not whether the Engels benefitted from the Settlement Agreement. The issue was whether Section 33 permits non-parties to obtain rights and remedies under it. Section 33 specifically addresses that circumstance and expressly provides that they may not. By concluding that the Engels could recover because they were "beneficiaries" without analyzing how that conclusion could coexist with Section 33, the Arbitrator did not interpret Section 33. He bypassed it. The Final Award assumes the answer to the very question Section 33 was written to resolve and, in doing so, reads the provision out of the contract altogether.

The Eighth Circuit's recent decision in *Zeidman,* 145 F.4th 820 (8th Cir. 2025), demonstrates why that exceeds an arbitrator's powers. There, the Court vacated an arbitration award that similarly ignored plain language in the contract. 145 F.4th 820. A company created by Mike Lindell – the "My Pillow Guy" – held a contest to prove whether data he compiled purporting to prove China's interference in the 2020 Presidential election was false. *Id.* The contest represented that Mr. Lindell's company would reveal "cyber data and packet captures from the 2020 November election." *Id.* at 823. "Packet capture data" or "PCAP files" that Mr. Lindell's company promised is a type of file in which data is typically stored, especially data from the

internet. *Id.* There, the contract provided for a $5 million prize if the contestant could prove that the data *"does NOT reflect information related to the November 2020 election*." *Id.*

Like here, the Arbitration panel stated that it was interpreting the provisions in the contract and recited the governing principles contract law requiring "the intent of the parties [to be] determined from the plain language of the written agreement, so long as it is clear and unambiguous." *Id.* at 824.

The Arbitration panel then purported to construe the contract's phrase "data . . . related to the November 2020 election" as meaning the data had to be PCAP data. *Id.* at 824-25. Specifically, the Arbitration panel reasoned:

> These terms require the data not merely be about the election, but must be from the election process itself.... [T]his would be packet capture data. Thus, if data is not PCAP data, it is not from the election, and it therefore cannot be "related to the November 2020 election"....

*Id*. Because the contestant proved that the data provided by Lindell's company was not PCAP data, the Arbitration panel awarded him the $5 million. *Id.* at 825.

Despite the Arbitration Panel's statement that it was ostensibly construing the contract, the Eighth Circuit vacated the award and concluded that Arbitration Panel had, in fact, ignored the plain language of the contract and thereby exceeded its authority. Specifically, the Court held:

> From the four corners of the Challenge contract as defined by the Official Rules, there is no way to read "information *related to* the November 2020 election" as meaning only information that is "PCAP data." The panel thus did more than construe an ambiguous contract term. Adding a form-of-data requirement imposed a new obligation upon LMC, effectively "amending the [contract]." Keebler, 80 F.3d at 288. Fair or not, agreed-to contract terms may not be modified by the panel or by this court. On this record, "[t]he conclusion is inescapable that the panel simply imposed its own conception of sound policy."

*Id.* at 828.

Like the arbitration panel in *Zeidman*, the Arbitrator did not construe a contract. He reached a result that the contract's plain language forecloses. There is "no way" to read Section

33 in a manner that permits the Engels to receive rights and remedies under the Settlement Agreement. By awarding the Engels contractual rights and remedies that Section 33 expressly forbids, the Arbitrator effectively rewrote the parties' agreement to impose his own conception of sound policy. Under *Zeidman*, that is not contract interpretation. It is contract amendment. Because the Final Award cannot be reconciled with the plain language of Section 33, the Arbitrator exceeded his powers under 9 U.S.C. § 10(a)(4), and the Final Award should be vacated.

2. <u>The Arbitrator Exceeded His Powers by Recognizing that Evidence of Fair Market Value Required Expert Opinion and Then Disregarding That Ruling.</u>

The Arbitrator's damages award cannot be reconciled with the Arbitrator's recognition that expert opinion was required for a determination of the fair market value of the Engels' units.

In granting D2's Motion to Strike, the Arbitrator first recognized that valuation of membership unit interests necessarily required expert opinion. He further found that such expert opinion was required when the theory of damage is based on a party's "interpretation, selection, and/or judgment" of D2's documents. He further explained that this was true "regardless of how complex the mathematical processes utilized in final calculations regarding financial damages." The Arbitrator correctly recognized that the standard for expert opinion was not how complex the math was or whether the opinion derived from a party's documents – it was that the fair market value of a company is beyond the understanding of a lay person and, thus, required expert opinion. That principle was recognized and enforced by the Arbitrator twice more during the hearing.

Yet the damages award rests entirely on the same type of interpretation of D2's documents the Arbitrator had previously recognized as expert opinion. Claimants' Class A-1 Issue Price theory was not evidence of value – it was an argument about value. Claimants selected a number appearing in D2's operating agreements, argued that number represented the fair market value of the Engels' different Class B units, and urged the Arbitrator to adopt that interpretation. No witness

testified that the Class A-1 Issue Price represented the fair market value of the Engels' Class B units, no expert offered such an opinion, and no evidence established that the defined issue price of one class of units reflected the fair market value of the different class of units held by the Engels.

The Arbitrator expressly recognized that a plaintiff asserting breach of contract must prove both the existence and the amount of those damages. The Arbitrator also expressly recognized that the interpretation of numbers from D2's documents to derive fair market value constituted expert opinion. Yet, the Arbitrator ignored both principles of law by allowing post-hearing attorney argument to serve as the expert interpretive explanation of D2's documents as to the fair market value of the Engels' units necessary to prove the amount of damages claimed.

Thereafter, faced with D2's objection that the Class A-1 Issue Price theory was the very type of expert opinion previously identified by the Arbitrator, the Arbitrator did not reconcile the theory with his prior rulings. Instead, he simply declared that it "does not involve an(y) expert opinion." But that conclusion cannot be squared with his earlier rulings recognizing that assigning valuation significance to figures contained in D2's documents constitutes expert opinion. Having identified that governing legal standard and enforced it throughout the proceeding, the Arbitrator could not disregard it to determine the amount of damages. By allowing attorney argument to constitute proof of fair market value of the Engels units, the Arbitrator ignored the very law he had identified as what constitutes expert opinion. The Final Award therefore exceeds his powers under 9 U.S.C. § 10(a)(4) and should be vacated.

## **CONCLUSION**

For the foregoing reasons, D2 respectfully requests that the Court vacate the Arbitrator's Final Award and for all other relief the Court deems fair and just.

Respectfully submitted,

CARMODY MacDONALD P.C.

By: /s/ *David P. Stoeberl*

David P. Stoeberl, #46024
Tyler C. Schaeffer, #60847
120 South Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600 Telephone
(314) 854-8660 Facsimile
dps@carmodymacdonald.com
tcs@carmodymacdonald.com

Attorneys for D2 Pharma Consulting LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

/s/ *David P. Stoeberl*