Exhibit

1

exhibitsticker.com

**Execution Version**

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "***Agreement***") is made and entered into as of December 30, 2020 (the "***Effective Date***"), by and between D2 PHARMA CONSULTING LLC, a Delaware limited liability company ("***D2***") and WORKUP, INC., a Delaware corporation ("***WorkUp***"). D2 and WorkUp are sometimes referred to herein as, collectively, the "***Parties***" and, each, a "***Party***."

## WITNESSETH:

**WHEREAS**, D2, as "Buyer", and WorkUp, as "Seller", previously entered into that certain Asset Purchase Agreement dated July 1, 2019 (the "***APA***");

**WHEREAS**, pursuant to the APA, D2 purchased all of WorkUp's assets used or useful in WorkUp's business, including, but not limited to the "Products", the "Intellectual Property" and the "Contracts" (collectively, the "***Purchased Assets***");

**WHEREAS**, in consideration of the sale, delivery and assignment of the Purchased Assets, D2 agreed to pay the purchase price for the Purchased Assets on an installment basis, as follows: (i)(A) Eighty Thousand and 00/100 Dollars ($80,000.00) to WorkUp within sixty (60) days of the closing of the APA, which has been paid; (B) Eight Hundred Thirty Two Thousand Five Hundred and 00/100 Dollars ($832,500.00) on the first anniversary of the closing of the APA (the "***First Anniversary Payment***"); (C) Three Hundred Sixty Two Thousand Five Hundred and 00/100 Dollars ($362,500.00) on each of the second and third anniversaries of the closing of APA; and (D) Four Hundred Twelve Thousand Five Hundred and 00/100 Dollars on the fourth anniversary of the closing of the APA; and (ii) to award WorkUp up to a thirty percent (30%) phantom equity interest in D2, pursuant to the D2 Consulting Phantom Equity Award Agreement by and between D2 and WorkUp dated July 1, 2019 (the "***Phantom Equity Award Agreement***") (the items described in subclauses (i) and (ii) shall collectively be referred to as the "***Purchase Price***");

**WHEREAS**, certain claims and counterclaims relating to the APA, the Phantom Equity Award Agreement and the performance of their respective obligations thereunder have arisen between the Parties;

**WHEREAS**, on or about November 23, 2020, WorkUp, as plaintiff, filed a complaint against D2, as defendant, in the Superior Court of the State of Delaware, Case ID: N20C-11-202, regarding WorkUp's Purchase Price claims under the APA (the "***WorkUp Lawsuit***"); and

**WHEREAS**, the Parties now desire to fully and finally resolve their disputes regarding each Party's obligations under the APA and the Phantom Equity Award Agreement, including, but not limited to the dismissal of the WorkUp Lawsuit, in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, hereby agree as

follows:

1. **Incorporation of Recitals**. The above recitals are hereby incorporated into this Agreement and form a material part hereof as though set forth herein verbatim.

2. **Definitions**. The following initially capitalized terms and phrases shall, when used herein, have the following meanings ascribed to them:

a. "***Business Day***" shall mean any date, other than a Saturday, Sunday or any other day on which national banks are required or authorized by law to close in the State of Missouri.

b. "***Claim***" or "***Claims***" means any and all claims, counterclaims, actions, causes of action, litigation, demands, defenses, judgments, settlements, suits, arbitrations, proceedings (administrative or otherwise), controversies, investigations, audits, awards, decisions, injunctions, judgments, orders, rulings, subpoenas, verdicts, obligations, contracts, debts, loans, undertakings, costs, liens, damages (including, without limitation, incidental and consequential damages), losses, liabilities, obligations, indebtedness, settlement payments, penalties, assessments, citations, directives, disbursements, or expenses, of any kind or of any nature whatsoever (including, without limitation, attorneys', consultants', and experts' fees and expenses and disbursements incurred in investigating, defending against, settling, or prosecuting any claim, litigation, or proceeding), whether any of the foregoing arise out of contract, tort, violation of laws or regulations or otherwise, for, upon, or by reason of any matter, cause or thing whatsoever, either direct or consequential, whether known or unknown, from the beginning of time until the Closing Date.

c. "***Closing***" shall mean the consummation of the transactions contemplated in this Agreement.

d. "***Closing Date***" shall mean the Effective Date.

e. "***Contracts***" shall have the same meaning as set forth in the APA.

f. "***Intellectual Property***" shall have the same meaning as set forth in the APA.

g. "***Products***" shall have the same meaning as set forth in the APA.

h. "***Transaction Documents***" means this Agreement and the other agreements contemplated to be delivered pursuant to Section 17 of this Agreement.

i. "***Unit***" shall mean a unit of ownership in D2.

j. "***WorkUp Division***" shall mean the legacy WorkUp business unit.

k. "***WorkUp Investors***" shall mean the individuals and entities (as

applicable) set forth on Exhibit A.

l. "***WorkUp Investor Debt***" shall mean the aggregate outstanding debt owed by WorkUp to the WorkUp Investors as evidenced by their convertible promissory notes as of the Closing Date. The amount of principal debt owed to each WorkUp Investor is listed next to such investor's name on Exhibit A.

3. **Representations and Warranties and Covenants of WorkUp**. The representations, warranties, covenants and acknowledgments of WorkUp contained in this Agreement will survive the execution, delivery and acceptance of this Agreement. WorkUp hereby represents and warrants to D2 as follows:

a. Authority. The execution and delivery of this Agreement and the other Transaction Documents have been duly and validly authorized by all necessary organizational action in respect thereof, as applicable, on the part of WorkUp. This Agreement represents the legal, valid and binding obligation of WorkUp, enforceable against WorkUp in accordance with its terms.

b. Programs. The programs listed in Exhibit B are the only programs owned or used by WorkUp in its business from and after July 1, 2019 to the Closing Date.

c. Transfer of the Purchased Assets. As of the Closing Date, upon payment of the Closing Cash Payment, WorkUp will have:

i. Transferred and conveyed all of WorkUp's right, title and interest in and to the Purchased Assets to D2 free and clear of any and all liens, encumbrances, claims, restrictions and/or other defects;

ii. Provided full and unrestricted administrative access to the technical infrastructure of the systems listed in Exhibit B, including all hardware and software components involved in supporting, monitoring, administrating, building and deploying software development, database, testing, staging and production environments for all such systems;

iii. Shut down the WorkUp website domain, including but not limited to www.workuphealth.com;

iv. Converted the historic WorkUp email address of the individual listed below under subsection A, requested the individuals listed below under subsections B to E to convert their email addresses (all such email addresses collectively, the "***WorkUp Email Addresses***") to D2 email addresses, and shut down and terminated the WorkUp Email Addresses:

A. Unha Engels ("***Unha***")

B. Grant Schoffelen ("***Grant***");

C. Kirby Eng ("***Kirby***");

D. Irfan Baig ("***Irfan***");

E. Valerie Ogundare ("***Valerie***"); and

v. Disclosed and provided to D2 access to all systems and programs that WorkUp owned or used in its business.

4. **Representations and Warranties of D2**. The representations, warranties, covenants and acknowledgments of D2 contained in this Agreement will survive the execution, delivery and acceptance of this Agreement. D2 hereby represents and warrants to WorkUp as follows:

a. The execution and delivery of this Agreement and the other Transaction Documents have been duly and validly authorized by all necessary organizational action in respect thereof, as applicable, on the part of D2. This Agreement represents the legal, valid and binding obligation of D2, enforceable against D2 in accordance with its terms.

5. **Dismissal of WorkUp Lawsuit**. Upon the Closing, WorkUp shall promptly take any and all actions necessary to dismiss the WorkUp Lawsuit, with prejudice, no later than two (2) Business Days after the Closing Date.

6. **Purchased Assets**.

a. On or before the Closing Date, WorkUp shall execute and deliver to D2 a bill of sale (the "***Bill of Sale***") for the Purchased Assets in the form that was attached to the letter of intent dated December 23, 2020 between the Parties (the "***LOI***"). After the Closing Date, WorkUp shall use its reasonable efforts to deliver all other documents, certificates, instruments or writings requested by D2 in order to convey to D2 all of WorkUp's right, title and interest in and to the Purchased Assets.

b. WorkUp shall use its reasonable efforts to provide the same level of access as described in Section 3.b.ii, to any additional legacy WorkUp systems or programs which D2 becomes aware that it needs access to after the Closing Date.

c. WorkUp shall transfer the domain name system as described in Section 3.c.iii to D2 no later than five (5) Business Days after the date WorkUp receives the final payment of the Cash Payment (defined below).

7. **Cash Payment to WorkUp/Promissory Note**. D2 shall pay the sum of Two Million Two Hundred Seventy Thousand and 00/100 Dollars ($2,270,000.00) (the "***Cash Payment***") to WorkUp, as follows:

a. Three Hundred Thousand and 00/100 Dollars ($300,000.00) shall be paid to WorkUp on the Closing Date (the "***Closing Cash Payment***"); and

b. The balance of the Cash Payment shall be paid pursuant to a promissory note executed by D2 to WorkUp (the "***Promissory Note***") in the form that was attached to the LOI as Exhibit A.

8. **<u>WorkUp Investors</u>**.

a. WorkUp will, within one day following the Closing and receipt of the Closing Cash Payment, request from the WorkUp Investors their addresses and banking details and shall pay, immediately upon receipt thereof, at least Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) of the Closing Cash Payment to the WorkUp Investors according to an allocation sheet prepared by WorkUp and submitted to D2 at or before Closing.

b. WorkUp shall pay, without undue delay upon receipt of each monthly payment under the Promissory Note, at least seventy percent (70%) of the aggregate amount of each such monthly payment to the WorkUp Investors until the earlier to occur of (i) the full payment of the Cash Payment, or (ii) the full payment of the WorkUp Investor Debt.

c. During the period of time that any amount of the WorkUp Investor Debt remains outstanding, WorkUp shall provide D2 with a monthly list showing the then current amount of WorkUp Investor Debt owed to each of the WorkUp Investors. WorkUp shall provide such list no later than five (5) Business Days after the date that WorkUp receives a monthly payment under the Promissory Note.

d. Promptly after the Closing Date, D2 shall use its best efforts to offer the WorkUp Investors the opportunity to convert all or a portion of their respective WorkUp Investor Debt to Class B Units of D2, upon such terms and conditions as may be mutually agreed by D2 and the applicable WorkUp Investor; provided, however, that the aggregate amount of WorkUp Investor Debt that is eligible to be converted to Units of D2 shall in no event exceed the principal amount of WorkUp Investor Debt as of July 1, 2019 ($1,208,299.00). D2 shall provide evidence to WorkUp of its efforts to convert the WorkUp Investor Debt. Notwithstanding anything to the contrary in the foregoing, D2 may, in its reasonable discretion, choose to not offer a WorkUp Investor such opportunity to convert their respective WorkUp Investor Debt to Class B Units of D2, instead requiring such WorkUp Investor to receive its allocable share of payment(s) under the Promissory Note as set forth in subsections (a) and (b) above. For the purposes of this section 8 d., "Class B Units" shall mean non-voting member interests in D2 that will have the same financial features as a regular Unit.

e. The then outstanding amount of the principal amount of the Promissory Note shall be reduced on a dollar for dollar basis in an amount equal to the amount of WorkUp Investor Debt which is converted to Units of D2 on the date(s) that such debt is converted. Such reduction shall be applied to the then outstanding principal balance of the Promissory Note. The amount of the monthly payment pursuant to the Promissory Note shall remain the same.

9. **<u>Cash Payment to Grant, Kirby and Irfan</u>**. D2 shall pay the amount of Thirty Thousand and 00/100 Dollars ($30,000) to each of (i) Grant (the "***Grant Cash Payment***", (ii) Kirby (the "***Kirby Cash Payment***"), and (iii) Irfan (the "***Irfan Cash Payment***"), concurrently

with confirmation of their signing the 2021 Independent Contractor Agreement ("***ICA***"), and to be paid in accordance with the ICA payment schedule.

10. **Equity Grant**.

a. On the Closing Date, and subject to the execution of a Joinder Agreement substantially in the form attached hereto as Exhibit C by each of (i) Kenneth Mark Engels ("***Kenny***"), and (ii) Unha, D2 shall issue three and one-half percent (3.5%) of the outstanding Units of D2 to each of Kenny and Unha (the "***Closing Equity Issuance***"). The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100 Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the "***Initial Capital Raise***"); provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date. For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise.

b. Unha shall have the opportunity to earn one percent (1%) of the then outstanding Units of D2 per fiscal year during each of the Company's 2021, 2022 and 2023 fiscal years. To be eligible for such one percent (1%) Unit award for each calendar year, Unha must be continuously employed for the full calendar year (i.e., no pro-rations for a partial year of employment). For the avoidance of doubt, the potential one percent (1%) Unit awards which are the subject of this subsection b. shall not have the anti-dilution protection as is provided in subsection a. above.

11. **Unha's Employment**. Unha's employment with D2 shall continue after the Closing Date pursuant to the terms of that certain D2 Consulting Offer Letter and Employee Confidentiality and Assignment Agreement of Unha Engels dated July 1, 2019. Effective as of January 1, 2021, (i) Unha's title shall be "VP Digital Engagement", (ii) Unha shall report directly to Jim Maguire with a dotted line to Dean Erhardt, (iii) Unha shall abide by all policies of D2, and (iv) Unha's annual gross salary shall be adjusted to Two Hundred and Twenty Thousand and 00/100 Dollars ($220,000.00).

12. **Kenny's Employment**. The Parties hereby acknowledge and agree that Kenny was placed on paid administrative leave as of December 23, 2020. On the Closing Date, Kenny shall submit, in writing to D2, his voluntary resignation of employment with D2 effective as of December 31, 2020. On and after the Closing Date, Kenny (i) shall, as reasonably requested by D2, make himself available to provide transfer of knowledge of and access to the legacy WorkUp systems, and (ii) shall remain subject to the covenants and restrictions set forth in that certain D2 Consulting Employee Confidentiality and Assignment Agreement of Kenneth Mark Engels dated July 1, 2019.

13. **MBO Plan**.

a. For the calendar year 2021, each of (i) Grant, (ii) Irfan, and (iii) Unha, shall be eligible to participate in a management by objective incentive plan (the "***MBO Plan***"), which is attached hereto as Exhibit D.

b. The maximum award that Unha shall be eligible to receive under the MBO Plan for the 2021 calendar year shall be Two Hundred and Forty Thousand and 00/100 Dollars ($240,000.00).

c. The maximum award that each of (i) Grant, (ii) Kirby and (iii) Irfan shall be eligible to receive under the MBO Plan for the 2021 calendar year shall be Seventy-Five Thousand and 00/100 Dollars ($75,000.00).

d. An individual is not eligible for an award under the MBO Plan for any calendar year during which such individual's agreement is terminated (i) by D2 for cause or (ii) by such individual without good reason.

14. **Gross Profit Incentive**.

a. Beginning with the 2021 calendar year, D2 shall separately track the WorkUp Division for financial purposes. The financial activities of the WorkUp Division shall solely consist of activities related to the ongoing operations of such division, including, but not limited to the following: (i) sales and business development; (ii) internal education; (iii) long-term product development; and (iv) technology strategy support, maintenance and improvement of the Purchased Assets.

b. Unha (as a 50% participant), Grant (as a 25% participant), and Irfan (as a 25% participant) shall be eligible to receive profit share payments (each a "***Profit Share Payment***"), for the 2021, 2022, 2023 and 2024 calendar years pursuant to plan ("***Profit Sharing Plan***") in the form and containing the terms as Exhibit E attached hereto.

c. The amount of the outstanding principal balance of the Promissory Note shall be reduced on a dollar-for-dollar basis in the amount of any Profit Share Payment paid to Unha. The amount of the monthly payment pursuant to the Promissory Note shall remain the same.

15. **Financial Reporting**. D2 will report to Unha within sixty (60) days after the close of (i) each fiscal quarter and (ii) each fiscal year, on the gross operating profit of the WorkUp Division and the revenue of the WorkUp Division for such fiscal quarter or fiscal year (as applicable) for purposes of the Profit Sharing Plan. Upon request, D2 will provide reasonable details to back up its calculations of gross operating profit and revenue of the WorkUp Division. In the event that the amount of a Profit Share Payment made to a participant was incorrect, whether due to an error, an adjustment to the WorkUp Division's financials or otherwise, then (i) D2 shall remit the additional amount of Profit Share Payment to such participant if the amount paid to such participant was less than the actual amount of the Profit Share Payment, and (ii) a participant shall return the excess amount of Profit Share Payment paid to such participant if the amount paid to such participant was greater than the actual amount of the Profit Share Payment.

In the event that a participant refuses to return any excess payments as required under this Section, D2 reserves the right to set-off any amounts owed to it from future Profit Share Payments due to such participant.

16. **<u>APA; Phantom Equity Award Agreement</u>**.

a. It is hereby acknowledged and agreed that the APA shall terminate and be of no further force and effect upon the Closing Date (without prejudice to the incorporation herein by reference of certain definitions of terms as provided in the APA) .

b. The Parties hereby acknowledge and agree that Phantom Equity Award Agreement shall terminate and be of no further force and effect upon the Closing on the Closing Date.

17. **<u>Closing Deliverables</u>**. Upon the satisfaction of the conditions precedent to the obligations of the Parties as expressed herein on or before Closing Date:

a. <u>WorkUp Deliveries</u>. WorkUp shall deliver the following items at or in connection with the Closing:

i. A Joinder Agreement executed by Kenny;

ii. A Joinder Agreement executed by Unha;

iii. The resignation letter of Kenny; and

iv. The executed Bill of Sale.

b. <u>D2 Deliveries</u>. D2 shall deliver the following items at Closing:

i. The Closing Cash Payment;

ii. The executed Promissory Note;

iii. An amended Exhibit A to the Fourth Amended and Restated Operating Agreement of D2 Pharma Consulting LLC which reflects the Units issued under this Agreement;

iv. The 2021 MBO Plan; and

v. The Profit Sharing Plan.

18. **<u>Mutual Releases</u>**.

a. As of the Closing Date, and in consideration of the Closing, WorkUp on behalf of itself, and its affiliates, subsidiaries, parents, shareholders, officers, directors, agents, employees, attorneys, successors and assigns (each a "***WorkUp Party***" and collectively, the "***WorkUp Parties***"), releases, remises, and forever discharges D2 and its affiliates, subsidiaries, parents, members, managers, officers, agents, employees,

attorneys, successors and assigns (each a "***D2 Released Party***" and collectively, the "***D2 Released Parties***") from any and all Claims that such WorkUp Party now has or has ever had against the respective D2 Released Parties (each an "***WorkUp Claim***" and collectively, the "***WorkUp Claims***"), whether arising contemporaneously with or prior to the Closing Date, on account of and arising out of the APA and the Phantom Equity Award Agreement; provided, however, that the WorkUp Claims shall not include, and nothing contained herein shall operate to release, (i) any obligations of any D2 Released Party relating to this Agreement or the other Transaction Documents or (ii) any Claim(s) that arise out of or relate to any breach of any covenant under this Agreement or the other Transaction Documents.

b. As of the Closing Date, and, in consideration of the Closing, D2, on behalf of itself, and its affiliates, subsidiaries, parents, members, managers, officers, agents, employees, attorneys, successors and assigns (each a "***D2 Party***" and collectively, the "***D2 Parties***"), releases, remises, and forever discharges WorkUp and its respective affiliates, subsidiaries, parents, shareholders, officers, directors, agents, employees, attorneys, successors and assigns, (each a "***WorkUp Released Party***" and collectively, the "***WorkUp Released Parties***"), from any and all Claims that such D2 Party now has or has ever had against the respective WorkUp Released Parties (each a "***D2 Claim***" and collectively, the "***D2 Claims***"), whether arising contemporaneously with or prior to the Closing Date on account of or arising out of the APA and the Phantom Equity Award Agreement; provided, however, that the D2 Claims shall not include, and nothing contained herein shall operate to release, (i) any obligations of any WorkUp Released Party relating to this Agreement or the other Transaction Documents, or (ii) any Claim(s) that arise out of covenant under this Agreement or the other Transaction Documents.

19. **No Admission of Liability**. Neither this Agreement nor any action taken in connection with this Agreement by any party hereto shall in any way be construed as an admission of any liability, wrongdoing, or violation of law, regulation, contract or policy.

20. **Confidentiality**. None of the Parties shall, without the approval of all of the other Parties, make any statement, communication, press release or other public announcement concerning this Agreement or the Transaction Documents or any other document relating hereto or thereto, except (a) that WorkUp may disclose the terms of this Agreement and the Promissory Note that are relevant to the WorkUp Investors (provided that the draft disclosure prepared by WorkUp shall first be reviewed and approved by D2), (b) as and to the extent such statement or communication is previously consented to, in writing, by each of the other Parties, (c) as and to the extent that such communication shall be required by law, in which event the other party shall be given prior notice thereof, or (d) to their professional advisors, attorney, and accountants, and, in the instance of D2, as necessary or appropriate in the process of disclosures to prospective investors in D2.

21. **Non-Disparagement**. Each Party agrees, and shall cause its respective members, shareholders, managers, directors and officers, to not disparage or defame either orally or in writing generally or in any social media outlet the other Party or its respective members, shareholders, managers, directors and officers.

22. **Specific Enforcement**. Each Party hereto acknowledges and agrees that the damages resulting from any breach of any of the covenants set forth herein may be intangible in whole or in part and that the promisees are entitled to seek specific enforcement, injunctive relief, and other equitable remedies in addition to monetary damages and legal remedies. Each party hereto hereby stipulates to the entering of such injunctive relief enforcing the provisions hereof.

23. **Survival**. The provisions of this Agreement shall survive the Closing.

24. **Prevailing Party**. If a party hereto commences a proceeding against another party to enforce and/or recover damages for breach of this Agreement, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable costs and expenses of enforcement and collection of any and all remedies and damages, or all reasonable costs and expenses of defense, as the case may be. The foregoing costs and expenses shall include reasonable attorneys' fees.

25. **Jointly Drafted**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder unless the context requires otherwise. The word "***including***" shall mean including without limitation.

26. **Severability**. If any provision of this Agreement is found or declared to be invalid or unenforceable by any arbitrator, referee, court, or other competent authority having jurisdiction, such finding or declaration shall not invalidate any other provision hereof and this Agreement shall thereafter continue in full force and effect except that such invalid or unenforceable provision, and (if necessary) other provisions hereof, shall be reformed by such arbitrator, referee, court, or other competent authority so as to effect insofar as is practicable, the intention of the Parties set forth in this Agreement, provided that if such arbitrator, referee, court, or other competent authority is unable or unwilling to effect such reformation, the invalid or unenforceable provision shall be deemed deleted to the same extent as if it had never existed.

27. **Binding Effect**. The provisions of this Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns.

28. **Amendment**. This Agreement may not be amended except in a writing signed by all of the Parties.

29. **No Assignment**. No party may assign any of their rights or obligations under this Agreement or the Transaction Documents.

30. **Governing Law and Arbitration**. This Agreement shall be governed by and construed under the laws of the State of Missouri without regard to principles of conflicts of law.

Any dispute hereunder or related hereto shall be resolved by arbitration conducted in accordance with the Federal Arbitration Act. The arbitration shall occur in St. Louis County, Missouri. Each Party agrees to follow and participate in the rules governing any such arbitration. The provisions of this Section 30 shall survive the entry of any judgment, and will not merge, or be deemed to have merged, into any judgment.

31. **Additional Documents**. All parties agree to cooperate fully and to execute and deliver any and all supplementary documents and to take any and all additional actions which may be necessary or appropriate to give effect to the terms and intent of this Agreement.

32. **No Waiver**. Failure to insist on compliance with any term, covenant or condition contained herein shall not be deemed a waiver of that term, covenant or condition, nor shall any waiver or relinquishment of any right or power contained in this Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

33. **Rights of Third Parties**. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any person other than the Parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.

34. **Counterparts; Electronic Signature**. More than one counterpart of this Agreement may be executed by any of the Parties, each of which shall be deemed an original, but all of which shall constitute one and the same Agreement. This Agreement and any other document to be executed and delivered in connection herewith may be executed and delivered by facsimile or other electronic transmission, and any document delivered in such a manner shall be binding as though an original thereof had been executed and delivered.

35. **Entire Agreement**. This Agreement, including the other documents referred to herein, contains the entire understanding of the Parties with respect to the subject matter contained herein and therein. This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter.

***[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]***

**COUNTERPART SIGNATURE PAGE TO SETTLEMENT AGREEMENT**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date and year first written above.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.**

**"D2"**

D2 Pharma Consulting LLC, a Delaware limited liability company

DocuSigned by:
By: Dean P. Erhardt
BE3E13204FAC4B3...
Name: Dean P. Erhardt
Title: CEO and President

**"WorkUp"**

WorkUp, Inc., a Delaware Corporation

By: ______________________________
Name: Kenneth Mark Engels
Title:CEO

**COUNTERPART SIGNATURE PAGE TO
SETTLEMENT AGREEMENT**

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date and year first written above.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.**

"**D2**"

D2 Pharma Consulting LLC, a Delaware limited liability company

By: ______________________________
Name: Dean P. Erhardt
Title: CEO and President

"**WorkUp**"

WorkUp, Inc., a Delaware Corporation

DocuSigned by:
Ken Engels
ECD7F9C2FF3C473...
By: ______________________________
Name: Kenneth Mark Engels
Title:CEO

**EXHIBIT A**

**List of WorkUp Investors and WorkUp Investor Debt**

[*Attached.*]

Exhibit A

| | principal | interest as of closing | total as of closing | portion of $250K | portion of $57,290 |
|---|---|---|---|---|---|
| Adam and Kim Snyder | $105,000.00 | $18,098.63 | $123,098.63 | $19,512.71 | $3,026.67 |
| Adam Cherry | $134,478.00 | $22,620.82 | $157,098.82 | $24,990.76 | $3,860.86 |
| Dan Cohen | $25,000.00 | $5,832.88 | $30,832.88 | $4,645.88 | $762.96 |
| David McKelvey | $40,000.00 | $9,328.22 | $49,328.22 | $7,433.41 | $1,220.61 |
| Don DiPietro | $55,000.00 | $11,904.11 | $66,904.11 | $10,220.94 | $1,652.73 |
| S. Eisenberg | $39,000.00 | $9,899.84 | $48,899.84 | $7,247.58 | $1,212.45 |
| Fred Rabner | $5,000.00 | $1,062.47 | $6,062.47 | $929.18 | $149.70 |
| Gerald Skobinsky | $15,000.00 | $4,076.71 | $19,076.71 | $2,787.53 | $473.80 |
| Guy D'Andrea | $50,000.00 | $6,372.60 | $56,372.60 | $9,291.77 | $1,378.89 |
| Jake Schwartz | $88,799.00 | $15,687.01 | $104,486.01 | $16,501.99 | $2,570.25 |
| Jon Plesset | $50,000.00 | $12,964.38 | $62,964.38 | $9,291.77 | $1,561.99 |
| M. Rabner | $50,000.00 | $14,936.99 | $64,936.99 | $9,291.77 | $1,616.79 |
| Laura Reilly | $10,000.00 | $1,341.37 | $11,341.37 | $1,858.35 | $277.63 |
| Adrianne DePante | $40,000.00 | $6,855.89 | $46,855.89 | $7,433.41 | $1,151.94 |
| Mark Horvitz | $58,000.00 | $12,837.26 | $70,837.26 | $10,778.45 | $1,750.76 |
| Marty & Nancy Engels | $100,000.00 | $21,806.03 | $121,806.03 | $18,583.53 | $3,009.46 |
| Mike Miller | $50,000.00 | $12,520.55 | $62,520.55 | $9,291.77 | $1,549.66 |
| Ray Drabicki | $35,000.00 | $8,764.38 | $43,764.38 | $6,504.24 | $1,084.76 |
| R.Eisenberg | $7,500.00 | $1,980.00 | $9,480.00 | $1,393.77 | $235.28 |
| Scott Simon | $5,000.00 | $1,486.03 | $6,486.03 | $929.18 | $161.47 |
| Sebastian Luparia | $75,000.00 | $21,169.86 | $96,169.86 | $13,937.65 | $2,390.86 |
| Steven Hribar | $25,000.00 | $6,265.75 | $31,265.75 | $4,645.88 | $774.98 |
| Thomas Kramer | $117,500.00 | $28,985.75 | $146,485.75 | $21,835.65 | $3,629.55 |
| Kirby Eng | $115,000.00 | $8,192.88 | $123,192.88 | $21,371.06 | $2,991.88 |
| Nils Mellquist | $50,000.00 | $0.00 | $50,000.00 | $9,291.77 | $1,201.87 |
| Total | **$1,345,277.00** | **$264,990.41** | **$1,610,267.41** | **$250,000.00** | **$39,697.79** |

**EXHIBIT B**

**List of Programs**

- Aptible
- Atlassian
- AWS
- Axure
- BOX
- Docker
- Figma
- LogDNA
- Miro
- Pingdom
- TorGuard
- Twilio

**<u>EXHIBIT C</u>**

**Joinder Agreement**

[*Attached*.]

# JOINDER AGREEMENT

This JOINDER AGREEMENT (this "***Joinder Agreement***") to the Operating Agreement (defined below) is made as of the 30th day of December, 2020 by and between D2 PHARMA CONSULTING LLC, a Delaware limited liability company (the "***Company***") and the undersigned party hereto (the "***Joining Party***").

## RECITALS

WHEREAS, the Company is party to that certain Fourth Amended and Restated Operating Agreement of the Company, dated as of October 20, 2020 (the "***Operating Agreement***"), an executed copy of which is attached hereto as Exhibit A (capitalized terms used herein but not defined herein shall have the meanings ascribed to them in the Operating Agreement); and

WHEREAS, in connection with the receipt by the Joining Party of Units of the Company, the parties hereto desire the Joining Party to become party to the Operating Agreement as a Member (as defined in the Operating Agreement), by executing a copy of this Joinder Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Joinder to Operating Agreement. By executing this Joinder Agreement, the Joining Party hereby agrees to become a party to and be bound by the provisions of the Operating Agreement as if it were an original signatory thereto and shall be deemed to be a Member thereunder.

2. Representations and Warranties. The Joining Party hereby represents and warrants to the Company as follows:

(a) This Joinder Agreement has been duly and validly executed and delivered by the Joining Party and each of this Joinder Agreement and the Operating Agreement constitutes a legal, valid and binding obligation of the Joining Party, enforceable against such Joining Party in accordance with its respective terms.

(b) The Joining Party has received a copy of the Operating Agreement and has read and understands the terms of the Operating Agreement.

(c) The Joining Party understands that (i) the Units are not registered under the Securities Act of 1933 or any state securities law, (ii) the Units are illiquid and there is not, and will not be, an established market for the Units, (iii) he/she/it will be unable to transfer the Units, except in accordance with the Operating Agreement and applicable federal and state securities laws and regulations , and (iv) the Units cannot be expected to be readily transferred or liquidated.

3. Full Force and Effect. Except as expressly modified by this Joinder Agreement, all of the terms, covenants, agreements, conditions and other provisions of the Operating Agreement shall remain in full force and effect in accordance with its terms.

4. Governing Law. THIS JOINDER AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.

5. Severability. If any provision of this Joinder Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

6. Headings. The heading references herein are for convenience purposes only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

7. Counterparts. This Joinder Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument. A signed copy of this Joinder Agreement delivered by either facsimile or e-mail shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

[*Signature pages follow*]

IN WITNESS WHEREOF, each party has executed and delivered this Joinder Agreement as of the date first above written.

**COMPANY:**

**D2 PHARMA CONSULTING LLC, a Delaware limited liability company**

By: ______________________________
Name: Dean P. Erhardt
Title: President/CEO

**JOINING PARTY:**

__________________________________

**EXHIBIT A**

**Fourth Amended and Restated Operating Agreement of D2 Pharma Consulting LLC dated October 20, 2020**

[*Attached.*]

# FOURTH AMENDED AND RESTATED OPERATING AGREEMENT

**of**

# D2 PHARMA CONSULTING LLC

October 20, 2020

THE UNITS OR MEMBERSHIP INTERESTS IN D2 PHARMA CONSULTING LLC ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT. THE INTERESTS HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS OR UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"). NEITHER THE INTERESTS, NOR ANY PART THEREOF, MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND (1) PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES.

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I | Definitions | 1 |
| ARTICLE II | Formation of the Company | 7 |
| 2.1 | Formation | 7 |
| 2.2 | Name | 7 |
| 2.3 | Registered Office and Registered Agent | 7 |
| 2.4 | Purposes | 7 |
| 2.5 | Term | 7 |
| 2.6 | Treatment as a Partnership for Income Tax Purposes | 7 |
| ARTICLE III | Members | 8 |
| 3.1 | Members | 8 |
| 3.2 | Admission of New Members | 8 |
| 3.3 | Member Voting | 8 |
| 3.4 | Compensation for Services | 8 |
| 3.5 | Member Meetings | 8 |
| 3.6 | Action by Written Consent or Telephone/Video Conference | 8 |
| 3.7 | Restrictions on Members | 8 |
| 3.8 | Liability of Members | 9 |
| 3.9 | Indemnification | 9 |
| ARTICLE IV | Capital Contributions | 9 |
| 4.1 | Initial Capital Contributions | 9 |
| 4.2 | Additional Capital Contributions | 9 |
| 4.3 | Interest, Member Loans | 9 |
| 4.4 | Units; Issuance of Units | 9 |
| ARTICLE V | Distributions | 10 |
| 5.1 | Operating Distributions | 10 |
| 5.2 | Tax Distributions | 10 |
| 5.3 | Amounts Withheld | 10 |
| 5.4 | Distribution Limitations | 10 |
| ARTICLE VI | Tax Matters | 10 |
| 6.1 | Partnership Tax Status | 10 |
| 6.2 | Partnership Representative | 10 |
| 6.3 | Capital Accounts | 11 |
| 6.4 | Allocation of Net Profits and Net Losses | 11 |
| 6.5 | Allocation Timing, Records | 11 |
| 6.6 | Special Allocations | 11 |
| 6.7 | Section 754 Election | 12 |
| 6.8 | Section 704(c) Allocations | 13 |
| ARTICLE VII | Managers | 13 |

| | | |
|---|---|---|
| 7.1 | Board of Managers | 13 |
| 7.2 | Managers' Powers | 14 |
| 7.3 | Limitations on Managers' Powers | 15 |
| 7.4 | Meetings; Voting | 16 |
| 7.5 | Action by Written Consent or Telephone/Video Conference | 17 |
| 7.6 | Deadlock | 17 |
| 7.7 | Reliance on the Managers | 17 |
| 7.8 | Interested Transaction | 17 |
| 7.9 | Liability of the Managers | 17 |
| 7.10 | Indemnification | 18 |
| 7.11 | Officers | 19 |
| ARTICLE VIII | Assignability and Transfer of Membership Units | 19 |
| 8.1 | Transfer Restrictions | 19 |
| 8.2 | Right of First Refusal | 19 |
| 8.4 | Unauthorized Transfer Void | 20 |
| 8.5 | Effect of Transfer | 20 |
| 8.6 | Substitute Members | 20 |
| 8.7 | Rights of Purchasers | 21 |
| 8.8 | Participation in Approved Sale | 21 |
| 8.9 | Withdrawal of Members | 22 |
| ARTICLE IX | Dissolution, Liquidation | 22 |
| 9.1 | Dissolution | 22 |
| 9.2 | Liquidation and Termination | 22 |
| 9.3 | Liabilities; Settling of Accounts | 23 |
| 9.4 | Distribution of Net Proceeds | 23 |
| ARTICLE X | Books and Records | 23 |
| 10.1 | Principal Place of Business; Books and Records | 23 |
| 10.2 | Accounting and Tax Returns | 24 |
| ARTICLE XI | General Provisions | 24 |
| 11.1 | Amendments | 24 |
| 11.2 | Waiver of Partition | 24 |
| 11.3 | Binding Provisions | 25 |
| 11.4 | Severability | 25 |
| 11.5 | Entire Agreement | 25 |
| 11.6 | Nonwaiver | 25 |
| 11.7 | Governing Law | 25 |
| 11.8 | Notices | 25 |
| 11.9 | Facsimiles and Electronic Copies | 25 |
| 11.10 | Counterparts; Gender and Number | 25 |
| 11.11 | Headings | 26 |
| 11.12 | Opportunity to Review; Acknowledgements | 26 |
| EXHIBIT A - The Members | | 28 |

**FOURTH AMENDED AND RESTATED
OPERATING AGREEMENT
OF
D2 PHARMA CONSULTING LLC
A DELAWARE LIMITED LIABILITY COMPANY**

THIS FOURTH AMENDED AND RESTATED OPERATING AGREEMENT (this "***Agreement***") is made and entered into as of the 20th day of October, 2020, by and among D2 Pharma Consulting LLC, a Delaware limited liability company (the "***Company***"), and the Members listed on Exhibit A.

WHEREAS, on September 11, 2008, the Company was formed by the filing of a certificate of formation (the "***Certificate***") with the Delaware Secretary of State;

WHEREAS, the Company, Bio Launch Strategies, LLC, a Missouri limited liability company ("***Bio Launch***") and Teth-Rx Consulting and Capital Ventures LLC, a Florida limited liability company ("***TethRxccv***") entered into that certain Third Amended and Restated Operating Agreement of D2 Pharma Consulting LLC dated September 28, 2020 (the "***Existing Agreement***"); and

WHEREAS, the Company and the Members desire to amend and restate the Existing Agreement in its entirety.

NOW, THEREFORE, the Members hereby adopt this Agreement as the "limited liability company agreement" of the Company under the Act to supersede and replace the Existing Agreement and all prior limited liability company and/or operating agreements and to set forth the rules, regulations and provisions regarding the management and business of the Company, the governance of the Company, the conduct of its business, and the rights and privileges of its Members, and in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

**ARTICLE I
Definitions**

**1.1** **Definitions**. The capitalized terms used in this Agreement shall, unless the context otherwise requires or unless otherwise expressly provided herein, have the meanings set forth below:

(a) "***Act***" means the Delaware Limited Liability Company Act, codified in the Delaware Code, Title 6, Chapter 18, Sections 101 et seq., as amended, or any successor statute thereto.

(b) "***Affiliate***" means: (i) any Person which, directly or indirectly, is in control of, is controlled by or is under common control with the party in question; (ii) any Person who is a director, officer or manager (or comparable position) of any Person described in clause (i) above or of the party for whom an affiliate is being determined. For purposes hereof, control of a Person means the power, direct or indirect, to: (a) vote

10% or more of the securities having ordinary voting power for the election of directors (or comparable positions) of such Person; or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise and either alone or in conjunction with others.

(c) "***Agreement***" has the meaning set forth in the preamble.

(d) "***Approved Sale***" has the meaning set forth in Section 8.8.

(e) "***Assumed Income Tax Rate***" means, with respect to any Fiscal Year, the sum of the highest marginal federal individual income tax rate for such Fiscal Year plus the highest marginal State of Missouri individual income tax rate for such Fiscal Year.

(f) "***Available Cash***" means, at the time of determination, the Company's cash reduced by such amounts as the Board of Managers shall deem reasonably necessary to meet reasonably anticipated expenditures or liabilities of the Company, including, but not limited to, debts to Members who are creditors of the Company and reserves for which adequate provision has not otherwise been made in the reasonable judgment of the Board of Managers.

(g) "***Bio Launch***" has the meaning set forth in the preamble.

(h) "***Board of Managers***" has the meaning set forth in Section 7.1.

(i) "***Capital Account***" has the meaning set forth in Section 6.3.

(j) "***Capital Contribution***" means any contribution to the capital of the Company in cash or property by a Unit Owner, from time to time.

(k) "***Certificate***" has the meaning set forth in the preamble.

(l) "***Code***" means the Internal Revenue Code of 1986, as amended, and any successor thereto.

(m) "***Company***" has the meaning set forth in the preamble.

(n) "***Depreciation***" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

(o) "*Event of Dissolution*" has the meaning set forth in Section 9.1.

(p) "*Existing Agreement*" has the meaning set forth in the preamble.

(q) "*Fiscal Year*" means the Company's accounting, tax and fiscal year, which shall be the calendar year.

(r) "*Gross Asset Value*" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

i. the initial Gross Asset Value of any asset contributed (or deemed contributed under Code Sections 704(b) and 752 and the Treasury Regulations promulgated thereunder) by a Unit Owner to the Company will be the fair market value of the asset on the date of the contribution;

ii. the Gross Asset Values of all of the Company assets may be adjusted to equal the respective fair market values of the assets, as of (A) the acquisition of an additional interest in the Company by any new or existing Unit Owner in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Unit Owner of more than a de minimis amount of Company property as consideration for an interest in the Company; (C) in connection with the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Unit Owner acting in a member capacity or by a new Unit Owner acting in a member capacity in anticipation of being a Member; or (D) the liquidation of the Company within the meaning of Treasury Regulations § 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (A), (B), and (C) above shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Unit Owner;

iii. the Gross Asset Value of any Company asset distributed to any Unit Owner will be the gross fair market value of the asset on the date of distribution; and

iv. the Gross Asset Value of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining capital accounts under Treasury Regulations § 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values will not be adjusted hereunder to the extent that the Board of Managers determines that an adjustment under clause (ii) of this definition is necessary or appropriate in connection with a transaction which would otherwise result in an adjustment under this clause;

after the Gross Asset Value of any asset has been determined or adjusted under clause (i), (ii) or (iv) of this definition, Gross Asset Value shall thereafter be adjusted by the

depreciation taken into account with respect to the asset for purposes of computing Net Profit or Net Loss.

(s) "***Majority Interest***" shall mean the Member(s) who hold more than fifty percent (50%) of the outstanding Units entitled to vote.

(t) "***Manager***" or "***Managers***" means those Persons serving on the Board of Managers.

(u) "***Member***" means each of those Persons listed on **Exhibit A**, attached hereto and incorporated herein, as a Member and each other Person who qualifies and has been admitted as such in accordance with the terms of this Agreement.

(v) "***Modified Capital Account***" at any time shall equal the Unit Owner's Capital Account at such time, modified as follows: (A) increased by the sum of (i) the amount of any limited deficit restoration obligation which such Unit Owner has voluntarily undertaken in the manner provided by Treasury Regulation Section 1.704-1(b)(2)(ii)(c), (ii) the amount of the Unit Owner's share of Company minimum gain (as defined in Treasury Regulation Section 1.704-2(g)) and (iii) the amount of the Unit Owner's share of member nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(5)); and (B) decreased by reasonably expected adjustments, allocations and distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), but in the case of distributions, only to the extent they exceed offsetting increases to such Unit Owner's Capital Account that are reasonably expected to occur prior to or during the Fiscal Years in which such distributions are reasonably expected to be made.

(w) "***Net Profit***" and "***Net Loss***" mean for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in Net Profit or Net Loss), with the following adjustments:

i. any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

ii. any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*) and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

iii. in the event the Gross Asset Value of any Company asset is adjusted pursuant to clauses (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain

or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

iv. gain or loss resulting from any disposition of a Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

v. in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of Depreciation;

vi. to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses; and

vii. notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 6.6 shall not be taken into account in computing Net Profits or Net Losses.

(x) "***Non-Transferring Members***" means, as applicable, the Members exclusive of the Transferring Member(s).

(y) "***Offer Notice***" has the meaning set forth in Section 8.2.

(z) "***Partnership Representative***" has the meaning set forth in Section 6.2.

(aa) "***Percentage Interest***" means, for each Unit Owner, a percentage equal to a fraction the numerator of which is the sum of the number of Units owned by such Unit Owner and the denominator of which is the sum of the number of outstanding Units.

(bb) "***Person***" includes a natural person, limited liability company, corporation, partnership, limited partnership, association, business trust, estate, trust, enterprise, and any other legal or commercial entity.

(cc) "***Purchaser***" means a Person that desires to acquire Units in the Company and is not the Company or a Member.

(dd) "***Subsidiary***" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a

corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of the membership, partnership or other similar ownership interest thereof or the power to elect or appoint a majority of the managers or governing body thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, and without limitation, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of the limited liability company, partnership, association or other business entity gains or losses or shall be or control the sole, or a majority of the, managing director(s), managing member(s), manager(s), board of managers or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless indicated otherwise, the term "Subsidiary" refers to a Subsidiary of the Company.

(ee) "***Substitute Member***" means a transferee of Units that satisfies the requirements of Section 8.6 to be admitted to the Company as a Substitute Member

(ff) "***Supermajority Interest***" shall mean the Member(s) who hold at least seventy-five percent (75%) of the outstanding Units entitled to vote.

(gg) **Error! Reference source not found.**"***Tax Distributions***" has the meaning set forth in Section 5.2.

(hh) "***Tax Liability***" of a Unit Owner means, an amount equal to the product of (i) the excess, if any, of the cumulative amount of income and gain items of the Company which are reported or reportable on such Unit Owner's Schedule K-1 (IRS Form 1065) for any period, over the sum of the deduction and loss items of the Company reported or reportable on such Unit Owner's Schedule K-1 for such period, and (ii) the Assumed Income Tax Rate.

(ii) "***TethRxccv***" has the meaning set forth in the preamble.

(jj) "***Third Party Offer***" has the meaning set forth in Section 8.2.

(kk) "***Transfer***" means any sale, assignment, transfer, conveyance, gift, encumbrance, pledge, bequest, devise, hypothecation, or other disposition of a Unit (whether voluntary, involuntary, or otherwise) including permitting a levy or attachment on the Unit.

(ll) "***Transferring Member***" means any Member that Transfers, or proposes to Transfer, one or more Units.

(mm) "***Treasury Regulation***" means any permanent, temporary, proposed, or proposed and temporary regulations of the United States Department of the Treasury promulgated under the Code, as such regulations may be modified from time to time.

(nn) "***Unit***" means a unit of ownership, which represents a Person's ownership interest and rights in the Company. The number of Units authorized to be issued by the Company may be adjusted from time to time by the Board of Managers. No certificates or other evidence of ownership will be issued in respect to the ownership of any Units except for **Exhibit A** to this Agreement which will solely represent and evidence the ownership of the Unit(s).

(oo) "***Unit Owner***" means a Person that owns Units, including any Member or assignee.

## ARTICLE II
## Formation of the Company

**2.1** **Formation**. The Company was formed as a Delaware limited liability company under the laws of the State of Delaware by the filing of the Certificate. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

**2.2** **Name**. The name of the Company is "D2 Pharma Consulting LLC." The Company may conduct business under that name or any other name approved by the Board of Managers.

**2.3** **Registered Office and Registered Agent.** The Company shall continuously maintain an office and registered agent in the State of Delaware. The principal office of the Company shall be located at 400 Chesterfield Center, Suite 400, Chesterfield, MO 63017 or at such other location as the Board of Managers may determine. The Company may also have such offices, anywhere within and without the State of Delaware, as the Board of Managers may determine from time to time or as the business of the Company may require. The registered agent shall be as stated in the Certificate or as the Board of Managers may otherwise determine.

**2.4** **Purposes.** The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act.

**2.5** **Term.** The term of the Company commenced upon the filing of the Certificate in accordance with the Act and shall continue in full force and effect until dissolved pursuant to the terms of this Agreement.

**2.6** **Treatment as a Partnership for Income Tax Purposes.** The Members intend that the Company is, and will continue to be, an entity taxable as a partnership for federal and state income tax purposes. The Members will do all things requisite to the maintenance of the Company as an entity taxable as a partnership for federal and state income tax purposes.

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

Nothing contained in this Section affects, or is intended to affect, the status of the Company as a limited liability company under the Act.

## ARTICLE III
## Members

**3.1** **Members.** The names and addresses of the Members of the Company are as set forth on Exhibit A attached hereto and made a part of this Agreement. Each Member shall own such Units as are set forth opposite the Member's name on Exhibit A.

**3.2** **Admission of New Members.** New Members may be admitted to the Company upon the approval of a Supermajority Interest of the Members and on such terms and conditions as shall be agreed upon by a Supermajority Interest of the Members and any new Members. Upon the admission of any new Member, Exhibit A shall be amended to reflect any changes or revision in the number of Units outstanding.

**3.3** **Member Voting.** Each Member shall have one vote for each Unit such Members owns at the time any vote is taken on a particular matter, unless expressly stated otherwise herein. Unless otherwise expressly stated herein or required by the Act, the affirmative vote of a Majority Interest of the Members shall be required for all decisions and approvals of the Members. Any Unit Owner that is not a Member shall not have any right to participate in any vote of the Members or otherwise direct the management and business of the Company.

**3.4** **Compensation for Services.** No Member shall be entitled to receive compensation for services rendered to or on behalf of the Company unless approved by the Board of Managers.

**3.5** **Member Meetings.** Meetings of the Members of the Company shall be held on notice of not less than five (5) days prior to any meeting, or on such shorter notice as may be mutually agreeable to the Members, on the call of a Majority Interest of the Members or the Board of Managers. Notice of the time and place of each meeting shall be given in writing to each Member by the Person(s) calling the meeting.

**3.6** **Action by Written Consent or Telephone/Video Conference.** Any action permitted or required by the Act or this Agreement to be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by the Members holding the number of Units required to take the action. Subject to the requirements of this Agreement for notice of meetings, Members may participate in and hold a meeting of the Members by means of a telephone or video conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**3.7** **Restrictions on Members.** Unless authorized to do so by this Agreement or by the prior written consent of a Majority Interest of the Members, no Member shall have any power or authority to:

(a) Bind the Company in any way or assign, transfer, pledge, compromise, or release any claim of the Company, or arbitrate or consent to the arbitration of any disputes or controversies involving the Company, or use the name, credit, or property of the Company for any purpose;

(b) Expand the business of the Company; or

(c) Do any act in conflict with the Company business or which would make it impossible to carry on that business.

**3.8 Liability of Members.** No Member shall be liable, responsible, or accountable in damages or otherwise to any Person, Manager, other Member, or the Company for any act or omission performed or omitted by the Member in connection with the business of the Company, except for acts of gross negligence or intentional wrongdoing. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company. No Member shall be liable as such for the liabilities of the Company.

**3.9 Indemnification.** The Members shall be indemnified by the Company for all costs, losses, liabilities, and damages paid or accrued by such Member for any act or omission performed or omitted by them in connection with the business of the Company for which they are not liable pursuant Section 3.8 or under any provision of the Act.

## ARTICLE IV
## Capital of the Company

**4.1 Capital Contributions.** The Members have made Capital Contributions to the Company in cash or other property as set forth in the Company's books and records.

**4.2 Additional Capital Contributions.** No additional Capital Contribution has been agreed to be made by any Member. The Members may make additional Capital Contributions and/or loans to the Company at such time or times, and upon such conditions as determined by the Board of Managers.

**4.3 Interest, Member Loans.** No interest shall be paid on the initial or any additional Capital Contributions. Any Member may, however, loan to the Company additional funds upon such terms and conditions as approved by the Board of Managers. Such funds shall represent a debt from the Company to the Member or Members making such advances, payable at such time and bearing interest at such rates as may be determined by the Board of Managers at the time such loan is made. Any interest so paid shall be charged as an expense of the Company business.

**4.4 Units; Issuance of Units .** The Company shall have the authority to issue up to 2,000,000 Units. Each Unit shall be identical to all other Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a Unit Owner as set forth in this Agreement. The Members hereby grant the necessary authorization to the Board of

Managers to authorize and issue the amount of Units necessary to properly issue the Units as contemplated hereunder.

**ARTICLE V**
**Distributions**

**5.1 <u>Operating Distributions</u>.** Available Cash may be distributed to the Unit Owners at such intervals as the Board of Managers determines appropriate, in its sole discretion. If, as and when, the Board of Managers determines to make distributions of Available Cash, then such distributions shall be made to the Unit Owners in accordance with their respective Percentage Interest.

**5.2 <u>Tax Distributions</u>.** Notwithstanding anything contained in this Agreement to the contrary, for each Fiscal Year, the Company shall, to the extent of Available Cash, make distributions to the Unit Owners in accordance with this Section ("***Tax Distributions***") prior to making any distributions pursuant to Section 5.1. To the extent Tax Distributions are to be made, such Tax Distributions should be made to each Unit Owner in the amount of the Tax Liability applicable to such Unit Owner within ninety (90) days after the last day of such Fiscal Year. Tax Distributions shall be charged against current or future distributions to which such Unit Owner would otherwise have been entitled under Sections 5.1 or 9.4. The provisions of this Section shall also apply to Company taxable income allocated to the Unit Owners as a result of a final adjustment by a taxing authority to the Company's taxable income

**5.3 <u>Amounts Withheld</u>.** All amounts withheld pursuant to the Code or any provision of any state or local tax laws respecting payment, distribution or allocation to the Company or the Unit Owners shall be treated as amounts distributed to the Unit Owners pursuant to this Article for all purposes under this Agreement. The Board of Managers is authorized to withhold from any distributions and pay over to any federal, state or local government any amounts required to be so withheld and paid over pursuant to the Code or any other applicable law or regulation.

**5.4 <u>Distribution Limitations</u>.** The Company shall not make any distribution to the Unit Owners, and no Unit Owner shall be entitled to receive any such distribution to the extent that, after giving effect to the distribution: (i) the Company would not be able to pay its debts as they become due in the usual course of business or (ii) the Company's total assets would be less than the sum of its total liabilities.

**ARTICLE VI**
**Tax Matters**

**6.1 <u>Partnership Tax Status</u>.** The Members intend the Company to be classified as a partnership for federal tax purposes and agree that the Company will not, without obtaining the prior written consent of a Supermajority Interest of the Members and the recommendation of the Company's Chief Financial Officer, elect to be classified as an association taxable as a corporation (pursuant to Treasury Regulation Section 301.7701-3 or successor provision).

**6.2 <u>Partnership Representative</u>.** The Board of Managers shall designate a "Partnership Representative" of the Company within the meaning of Code Section 6223 (the

"***Partnership Representative***"). The Partnership Representative may be removed or replaced by the Board of Managers.

**6.3 Capital Accounts.** An individual capital account ("***Capital Account***") shall be established and maintained on the books of the Company for each Unit Owner in compliance with Treasury Regulation Section 1.704-1(b)(2)(iv). Each Unit Owner's Capital Account shall be increased by (a) the amount of any money actually contributed by the Unit Owner to the capital of the Company, (b) the Gross Asset Value of any property contributed (net of liabilities assumed by the Company or subject to which the Company takes such property, within the meaning of Section 752 of the Code), and (c) the Unit Owner's distributive share of Net Profit and of any separately allocated items of income or gain except adjustments required by Section 704 of the Code (including any gain and income from unrealized income with respect to accounts receivable allocated to the Unit Owner to reflect the difference between the book value and tax basis of assets contributed by the Unit Owner). Each Unit Owner's Capital Account shall be decreased by (i) the amount of any money distributed to the Unit Owner by the Company, (ii) the Gross Asset Value of any property distributed to the Unit Owner (net of liabilities of the Company assumed by the Unit Owner or subject to which the Unit Owner takes such property within the meaning of Section 752 of the Code), and (iii) the Unit Owner's share of Net Loss and of any separately allocated items of deduction or loss (including any loss or deduction allocated to the Unit Owner to reflect the difference between the book value and tax basis of assets contributed by the Unit Owner)

**6.4 Allocation of Net Profits and Net Losses.** After making any special allocations required under Section 6.6 and accounting for distributions that have been made pursuant to Sections 5.1, 5.2 and 9.4, the items of income, expense, gain and loss of the Company comprising Net Profits or Net Losses for a Fiscal Year shall be allocated among the Persons who were Unit Owners during such Fiscal Year in accordance with their respective Percentage Interest.

**6.5 Allocation Timing, Records.** For each Fiscal Year, all Net Profit and Net Loss of the Company shall be allocated at and as of the end of that Fiscal Year. Unless the Board of Managers determines to separate the Company's Fiscal Year into segments, if the Company admits a new Member to the Company or if a Unit Owner sells, exchanges, or otherwise disposes of all or any portion of the Unit Owner's Units to any Person, then Net Profit and Net Loss shall be allocated between the new Unit Owner and the existing Unit Owners, by assigning an equal portion of the Net Profit and Net Loss to each day of the Fiscal Year and then allocating that portion according to the number of Units each Unit Owner owned on such day; provided, however, that in the event of any extraordinary non-recurring event, Net Profit and Net Loss shall be allocated among Unit Owners according to the number of Units owned on the date of such event. Notwithstanding the foregoing, allocations hereunder shall at all times comply with the requirements of Code Section 706 and the regulations promulgated thereunder.

**6.6 Special Allocations.**

(a) Net Loss and Deduction Limitation. Notwithstanding anything contained in this Agreement to the contrary, a Unit Owner shall not be allocated any item of loss, deduction, or nondeductible noncapital expenditure, to the extent that such allocation

would create or increase a deficit balance in such Unit Owner's Modified Capital Account. Any amount to which this limitation applies shall be reallocated to those Unit Owners who have a positive balance in their Modified Capital Accounts, in proportion to their respective Units.

(b) Qualified Income Offset. If during any Fiscal Year a Unit Owner unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), that causes or increases a deficit balance in the Unit Owner's Modified Capital Account, there shall be allocated to the Unit Owner items of Company income and gain (consisting of a pro rata portion of each item of Company income for such year, including gross income) in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. The contingent priority allocation prescribed by this Section is intended to meet the requirements of a "qualified income offset" (as defined in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)) and shall be interpreted and applied in accordance that intention.

(c) Nonrecourse Deduction Allocation and Minimum Gain Chargeback. Nonrecourse deductions (as defined in Treasury Regulation Section 1.704-2(b)(1)) shall be allocated to the Unit Owners in proportion to their respective Units. If there is a net decrease in partnership minimum gain (as defined in Treasury Regulation Section 1.704-2(b)(2)) for a Fiscal Year (determined in accordance with Treasury Regulation Section 1.704-2(d)(1)) each Unit Owner shall be allocated items of Company income and gain for such year equal to that Unit Owner's share of the net decrease in partnership minimum gain (determined in accordance with Treasury Regulation Section 1.704-2(g)(2)). The contingent priority allocation prescribed by this Section is intended to meet the requirements of a "minimum gain chargeback" (pursuant to Treasury Regulation Section 1.704-2(f)) and shall be interpreted and applied in accordance that intention.

(d) Member Nonrecourse Deductions. Partner nonrecourse deductions (determined in accordance with Treasury Regulation Section 1.704-2(i)(2)) shall be allocated to the Unit Owner(s) who bear economic risk of loss for the liability. If there is a net decrease in partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(2)) during a Fiscal Year, each Unit Owner who had a share of that partner nonrecourse debt minimum gain at the beginning of the year shall be allocated items of income and gain equal to that Unit Owner's share of the net decrease in partner nonrecourse debt minimum gain, as determined by applying the definitions and rules set forth in Treasury Regulation Section 1.704-2(i).

**6.7 Section 754 Election.** The Company may make and file a timely election under Code Section 754 (and a corresponding election under applicable state or local law) in the event of a Transfer of an interest in the Company permitted hereunder or the distribution of property to a Unit Owner, as the Board of Managers may determine appropriate. Any adjustments resulting from such an election shall be reflected in the Capital Accounts of the Unit Owners only to the extent provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(m). Any Unit Owner or transferee first requesting an election hereunder shall reimburse the Company for reasonable out-of-pocket expenses incurred by the Company in connection with such election, including, without limitation, any legal or accountants' fees;

thereafter, each transferee shall reimburse such expenses with respect to adjustments under Code Section 743 in the proportion which the interest of each transferee bears to the sum of the interests of all transferees; the Company shall bear the expenses of any adjustments under Code Section 734.

**6.8** **Section 704(c) Allocations**. For federal, state and local income tax purposes, Company income, gain, loss, deduction or expense (or any item thereof) for each Fiscal Year shall be allocated to and among the Unit Owners to reflect any adjustments to Gross Asset Value. In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Unit Owners so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Gross Asset Value of the property using "traditional allocations," "curative allocations," or the "remedial allocation method" under Treasury Regulations § 1.704-3. If the Gross Asset Value of any Company asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to such asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the related Regulations using "traditional allocations," "curative allocations," or the "remedial allocation method" under Treasury Regulations § 1.704-3. Allocations under this paragraph are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Unit Owner's Capital Account or share of profits, losses or other items or distributions under any provision of this Agreement.

## ARTICLE VII
## Managers

**7.1** **Board of Managers**. The management of the Company shall be vested in a board of managers (the "***Board of Managers***") who shall have the right and authority to manage the affairs of the Company and make decisions with respect thereto as provided in this Agreement. The Board of Managers may consult with advisory committees established by the Board of Managers from time to time.

(a) Number. The Board shall consist of two (2) managers (each, a "***Manager***").

(b) Appointment. The following individuals shall be appointed to the Board:

(i) one (1) manager shall be Dean Erhardt; and

(ii) one (1) Manager shall be David Suchanek.

(c) Term. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Company. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. A Manager may be removed by a Supermajority Interest of the Members.

(d) Vacancies. Any vacancy on the Board of Managers because of the resignation, death or removal of a Manager shall be filled by the vote of a Majority Interest of the Members.

(e) Subsidiary Board of Managers or Board of Directors. The Company shall at all times, unless otherwise determined by the Board of Managers, in its sole discretion, cause the board of managers or board of directors of each of the Company's Subsidiaries (if any) to be composed of the same persons who are then managers of the Board of Managers of the Company pursuant to this Section. All subsections of this Section 7.1 shall apply to such boards of directors or boards of managers with any references to "board of directors" or "director" to be read to apply to "board of managers" or "manager" as the case may be.

(f) Compensation. The Managers, in their capacity as Managers, shall not be entitled to receive compensation for services rendered to or on behalf of the Company unless approved by a Supermajority Interest of the Members. The Company shall reimburse the Managers for all reasonable out-of-pocket expenses incurred by them on behalf of the Company directly in connection with the discharge of their duties and obligations hereunder within a reasonable time after receipt of proper documentation therefor; provided, however, that the Company shall not reimburse the Managers for expenses incurred outside of the Company's usual course of business unless such expenses were authorized or ratified by the Members.

**7.2 Managers' Powers.** The Managers shall have all specific rights and powers required or appropriate to manage the Company's business, subject, however, in all events to the specific limitations set forth under in this Agreement, including, but not limited to, the limitations of the Section 7.3.

The Members hereby agree that, except as otherwise provided herein, only the Managers and authorized agents of the Company shall have the authority to bind the Company (and with respect to agents, only to the extent of the authority granted). No Member, other than a Member who is a Manager or Officer acting as such, shall take any action to bind the Company. Except those conferred on or reserved to the Members hereunder, the Managers have the exclusive power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company, including, without limitation:

(a) The institution, prosecution, and defense of any legal proceeding in the Company's name;

(b) The purchase, receipt, lease, or other acquisition, ownership, holding, improvement, use, and other dealing with real or personal, tangible or intangible property, wherever located;

(c) The sale, conveyance, mortgage, pledge, lease, exchange, and other disposition of property in the ordinary course of the Company's business;

(d) The entering into contracts and guaranties; incurring of liabilities; borrowing money, issuance of notes, bonds, and other obligations; and the securing of

any of its obligations by mortgage or pledge of any of the property or income of Company;

(e) The lending of money, investment and reinvestment of the Company's funds, and receipt and holding of property as security for repayment, including, without limitation, the loaning of money to Members, Officers, employees, and agents;

(f) The conduct of the Company's business, the establishment of Company offices, and the exercise of the powers of the Company;

(g) The appointment of employees and agents of the Company, defining of their duties, the establishment of their compensation;

(h) The payment of pensions and establishment of pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, employees, and agents of the Company;

(i) The making of donations to the public welfare or for religious, charitable, scientific, literary, or educational purposes;

(j) The payment or donation, or any other act that furthers the business and affairs of the Company;

(k) The payment of compensation, or additional compensation to any or all Members, and employees on account of services rendered to the limited liability company;

(l) The purchase of insurance on the life of any of its Members, or employees for the benefit of the Company;

(m) The participation in partnership agreements, joint ventures, or other associations of any kind with any person or persons; and

(n) Any other actions that do not specifically require Member approval hereunder.

Notwithstanding the foregoing, no Manager shall do any of the foregoing if and to the extent that such transaction or series of related transactions (i) involves consideration in excess of Fifty Thousand Dollars ($50,000) or (ii) represents an obligation binding upon the Company for longer than one (1) year without the approval of all of the Managers.

**7.3 <u>Limitations on Managers' Powers</u>.** In addition to the limitations set forth elsewhere herein, no Manager or Officer shall, without the consent of a Supermajority Interest of the Members:

(a) Do any act in contravention of this Agreement;

(b) Do any act which would make it impossible to carry on the usual business of the Company;

(c) Confess a judgment against the Company, or settle a claim against the Company;

(d) Possess Company property or assign the rights of the Company in specific Company property for other than Company purposes;

(e) Continue the business with the Company property after the dissolution of the Company, if the Members elect not to continue the business of the Company in the manner as provided herein;

(f) Issue additional Units or create a new class of Units or ownership interests in the Company; or

(g) Sell, exchange, or otherwise dispose of (other than by way of a pledge, mortgage, deed of trust, or trust indenture) all or substantially all of the Company's property and assets (with or without goodwill), other than in the usual or regular course of the Company's business, or cause the merger or consolidation of the Company with any other entity.

Notwithstanding the foregoing, the Managers and Officers may be authorized by the Members to execute and deliver any and all documents, and to take any and all actions on behalf of the Company as may be necessary to accomplish any actions requiring the authorization of the Members pursuant to this Agreement.

**7.4 Meetings; Voting.**

(a) Unless otherwise required by law or provided in this Agreement, (i) a majority of the Managers in office shall constitute a quorum for the transaction of business of the Managers, and (ii) with respect to any act to be taken by the Board pursuant to this Agreement, the unanimous vote of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. If a quorum is initially present at a meeting but ceases to be so present, the meeting may not continue to transact business. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his or her dissent or abstention shall be entered in the minutes of the meeting or unless he or she shall file his or her written dissent or abstention to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent or abstention to the Company promptly after the adjournment of the meeting. Such right to dissent or abstain shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting

for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) Meetings of the Managers may be called by any Manager, on at least three (3) business days' notice to each Manager and the Company. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting.

**7.5 <u>Action by Written Consent or Telephone/Video Conference</u>.** Any action permitted or required by the Act or this Agreement to be taken at a meeting of the Board of Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by the Managers having not less than the minimum number of votes necessary to authorize such action. Such consent shall have the same force and effect as a unanimous vote at a meeting and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board of Managers. Subject to the requirements of this Agreement for notice of meetings, Managers may participate in and hold a meeting of the Board of Managers by means of a telephone or video conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**7.6 <u>Deadlock</u>.** Any dispute of the Managers which has failed to be resolved by informal discussions shall be decided by the vote of a Majority Interest of the Members.

**7.7 <u>Reliance on the Managers</u>.** Any person doing business with or otherwise dealing in any transaction whatsoever with a Managers acting as such shall be entitled to rely fully on the Managers' power and authority to bind the Company in that business or transaction.

**7.8 <u>Interested Transaction</u>.** Notwithstanding anything contained in this Agreement to the contrary, a contract or other transaction between the Company and any Member or Manager, an Affiliate of any Member or Manager or a Person in which the Member or Manager has a substantial financial interest shall not be void or voidable for such reason alone or because the Member or Manager was present at the meeting approving such contract or transaction and its vote counted for such purpose, if the material facts and any material conflicts of interest with respect to such contract or transaction are disclosed in good faith or known to the Members entitled to vote thereon, and the Members approve the contract or transaction. If the requirements of this Section are not met, the Company may void a contract or transaction unless the parties thereto establish that it was fair and reasonable to the Company at the time of its approval. Without limiting the foregoing, and with respect to any contract, agreement or arrangement between the Company and any Person in which the Manager or its Affiliates has a financial interest, all such contracts, agreements or arrangements shall be reasonably disclosed to the Members and shall be conducted on a reasonable, arms-length basis.

**7.9 <u>Liability of the Managers</u>.** No Manager nor any Officer, director, agent, employee, or other representative of a Manager shall be liable to the Company or to any Member for losses sustained or liabilities incurred as a result of any act or omission if such act or omission did not constitute fraud, gross negligence, or willful or wanton misconduct.

**7.10 Indemnification.** Every Person (and the heirs, executors, and administrators of such person) who serves, or has served as a Manager, Officer, or employee of the Company or of any other entity when requested by this Company, and of which this Company directly or indirectly is or was a security holder or creditor, or otherwise interested, may in accordance with the Act be indemnified by the Company against any and all liability and reasonable expense that may be incurred by him in connection with or resulting from any claim, action, suit, or proceeding (whether brought by or in the right of the Company or such other company or otherwise), civil or criminal, or in connection with an appeal relating thereto, in which he may become involved, as a party or otherwise, by reason of his being or having been a Manager, Officer, or employee of the Company or such other entity, or by reason of any action taken or not taken by him in such capacity, whether he continues to be such Manager, Officer, or employee at the time such liability or expense shall have been incurred, provided he acted in good faith in what he reasonably believed to be the best interest of the Company or such other entity, as the case may be, and, in addition, in any criminal action or proceeding, had no reasonable cause to believe that his conduct was unlawful.

As used herein, the terms "***liability***" and "***expense***" shall include, but shall not be limited to, counsel fees and disbursements and amounts of judgments, fines, or penalties against, and amounts paid and settlements by or for such person. The termination of any claim, action, suit, or proceeding, civil or criminal, by judgment, settlement (whether with or without court approval) or conviction shall not create a presumption that such person does not meet the standards of conduct set forth herein. Except in the case of an action or suit by or in the right of the Company to procure a judgment in its favor, no indemnification shall be made in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable for gross negligence or intentional wrongdoing in the performance of his duty to the Company unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper.

Any indemnification hereunder shall be made at the discretion of the Company, but only if the Members (with no Member who is a party to or interested in such claim, action, suit, or proceeding, participating) shall find that such person has met the standards of conduct set forth in the preceding paragraphs.

Expenses incurred with respect to any such claim, action, suit, or proceeding may be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of such person to repay such amount if and to the extent that it shall ultimately be determined that he is not entitled to indemnification hereunder.

The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was a Manager, Officer, employee, or agent of the Company, or is or was serving at the request of the Company as a director, Officer, partner, employee, or agent of another company, corporation, partnership, joint venture, trust, or other enterprise, against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Company would have the power to indemnify him against such liability under the provisions of this Agreement.

The rights of indemnification provided in this Agreement shall be in addition to any rights to which any such person may otherwise be entitled.

**7.11 Officers.** The Board of Managers may appoint officers of the Company, from time to time, including, but not limited to a President, a Chief Executive Officer, one or more Vice Presidents, a Secretary, and a Treasurer (collectively, the "***Officers***," individually an "***Officer***"). Each Officer, if any, shall be subject to the general supervision and control of the Managers and shall carry out the policy decisions made by the Managers, and shall report to the Managers on the operations of the Company or any other matters as the Managers may request.

## ARTICLE VIII
## Assignability and Transfer of Membership Units

**8.1 Transfer Restrictions.** Except in accordance with the terms of this Article VIII, no Unit Owner shall be entitled to directly or indirectly Transfer all or any part of its Units or any interest therein without the prior written consent of a Supermajority Interest of the Members.

**8.2 Right of First Refusal.**

(a) If any Member desires to Transfer its Units to a Purchaser, it shall obtain from the Purchaser a bona fide written offer (the "***Third Party Offer***") to purchase some or all of Transferring Member's Units, stating the Purchaser's name, the price, and the other terms and conditions upon which the Transfer is to be made. If the Transferring Member wishes to accept the Third Party Offer, the Transferring Member shall deliver written notice ("***Offer Notice***"), which shall include the Third Party Offer, to the Company and the Non-Transferring Members indicating its desire to Transfer some or all of its Units to the Purchaser.

(b) The Company, or, if the Company fails to so exercise its right under this paragraph, then some or all of the Non-Transferring Members, pro rata in accordance with their Units (or as they may otherwise agree), shall have a right of first refusal to collectively purchase all, but not less than all, of the Units covered by the Third Party Offer, for the same price and other terms and conditions (or, at the option of the Company or the Non-Transferring Members, as may be the case, the net cash equivalent thereof) as stated in the Third Party Offer. If the Company exercises its right, it shall notify the Transferring Member and the Non-Transferring Members of its intention to exercise such right within thirty (30) days following its receipt of the Offer Notice. If the Company fails or chooses not to exercise its right within such thirty (30) day period, the Non-Transferring Members shall notify the Transferring Member of their intentions to exercise such right within fifteen (15) days after expiration of the Company's thirty (30) day exercise period.

(c) If the Company or the Non-Transferring Members, as may be the case, elect to exercise its or their right of first refusal as set forth in paragraph (b) of this Section, the closing for the Transfer shall take place on a date, which shall be within sixty (60) days after the Transferring Member receives notice from the Company or the Non-

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

Transferring Members of its or their election to exercise such right, time and place agreed by the parties.

(d) If the Company and Non-Transferring Members fail or choose not to elect to exercise its or their right of first refusal as set forth in paragraph (b) of this Section, the Transferring Member may Transfer its Units to the Purchaser in accordance with the Third Party Offer, within sixty (60) days following the expiration of the exercise period in Section 8.2(b) provided, however, such Purchaser shall not be admitted as a Member except in accordance with the provisions of Section 8.6. If not sold within such sixty (60) day period, such Units shall once again be subject to the requirements of this Section.

**8.3 Not Used.**

**8.4 Unauthorized Transfer Void.** Any Transfer or attempted Transfer of a Unit in violation of the terms of this Agreement shall be null and void and of no force and effect. However, if a court of competent jurisdiction determines that any restrictions on Transfer contained herein are void or otherwise unenforceable, such restrictions shall be treated as though they were not included herein; provided, however, the Person holding such Units and that Person's successors and assigns shall become an assignee of such Units, with no right to participate in the management of the business of the Company or otherwise exercise any of the rights or privileges of a Member under this Agreement. Each Transferring Member shall indemnify and hold harmless the Company and the Non-Transferring Members against any and all loss, liabilities, damages and expenses, including, without limitation, tax liabilities or loss of tax benefits, arising directly or indirectly out of any Transfer or purported Transfer in violation of this Agreement.

**8.5 Effect of Transfer.** A Transfer by a Unit Owner of Units does not of itself permit the Purchaser to participate in the business and affairs of the Company or to become a Member or exercise any rights or powers of a Member unless such Purchaser has been admitted as a Substitute Member, in the manner as provided herein.

**8.6 Substitute Members.** A Purchaser of Member Units shall have the right to be admitted as a Member in place of a Transferring Member (a "***Substitute Member***") only upon occurrence of all of the following:

(a) The Transferring Member shall designate in writing satisfactory to the Non-Transferring Members the intention that the Purchaser is to become a Substitute Member;

(b) The Purchaser shall agree in writing to be bound by all of the terms of this Agreement (as amended and/or restated from time to time);

(c) A Majority Interests of the Non-Transferring Members consent in writing to the admission of the Purchaser as a Substitute Member, which consent may be withheld in their absolute discretion;

(d) The Purchaser shall execute and/or deliver such instruments as the Members deem necessary or desirable to affect such Purchaser's admission as a

Substitute Member and to evidence the Purchaser's acceptance of the terms of this Agreement; and

(e) The Purchaser shall pay all reasonable expenses in connection with the Purchaser's admission as a Substitute Member.

**8.7** **Rights of Purchasers.** A Purchaser who does not become a Substitute Member shall succeed only to the rights of the Transferring Member to receive allocations and distributions from the Company and shall not have any other rights of the Transferring Member as a Member, including but not limited to, the right to vote to the extent of the transferred Unit(s).

**8.8** **Participation in Approved Sale.**

(a) Notwithstanding anything contained in this Agreement to the contrary, if the Members, pursuant to Sections 7.3 or 8.1 of this Agreement, approve a proposal for a bona fide transaction with an unaffiliated third party providing for (i) the sale of more than fifty percent (50%) of the Units to any Person, (ii) the merger or consolidation of the Company with any Person, or (iii) the sale by the Company of all or substantially all of its assets to any Person (an "***Approved Sale***"), then the Board of Managers shall notify the Unit Owners of an Approved Sale by delivery of written notice. Each Unit Owner shall take all such actions and execute and deliver such documents as may be reasonably requested by the Board of Managers to effect an Approved Sale and each Member agrees to waive any dissenter's rights in respect of an Approved Sale.

(b) Each Unit Owner will be severally obligated to join (pro rata in accordance with their Percentage Interest) in any indemnification or other obligations (other than any such obligations that relate specifically to a particular Unit Owner, such as indemnification with respect to representations and warranties given by a Unit Owner regarding such Unit Owner's title to and ownership of its Units, as to which obligations each such Unit Owner will be solely liable); provided that no Member will be obligated in connection with an Approved Sale to agree to indemnify or hold harmless the prospective acquiror with respect to an amount in excess of the net cash proceeds to be paid to such Unit Owner in connection with such Approved Sale.

(c) The obligations of the Unit Owners under this Section are subject to the satisfaction of the following conditions: (i) the consideration payable upon consummation of an Approved Sale to all Unit Owners must be allocated among the Unit Owners in accordance with the provisions of Section 9.4; and (ii) upon the consummation of an Approved Sale, all of the Unit Owners must receive the same form of consideration or, if any Unit Owners are given an option as to the form of consideration to be received, all Unit Owners must be given the same option (excluding any employment, consulting, non-competition or other related contractual arrangement that any Unit Owner may enter into.

(d) Each Unit Owner will bear its pro rata share (based upon their Percentage Interest) of the reasonable costs of any sale of its Units pursuant to an Approved Sale (but

only if such Approved Sale is actually consummated) to the extent such costs are incurred for the benefit of all Unit Owners and are not otherwise paid by the Company or the acquiring party. Costs incurred by or on behalf of a Unit Owner for its sole benefit will not be considered costs of the transaction.

(e) In the event of an Approved Sale, each Unit Owner shall receive an offer to participate in the Approved Sale on the same terms and conditions as the other participates, as sellers, in the Approved Sale. Each Unit Owner shall receive a notice of the proposed Approved Sale, and the terms thereof, at least thirty (30) days in advance of the proposed closing date, whereupon the Unit Owner receiving such notice shall have twenty (20) days after receipt to decide whether to be a selling participant in the Approved Sale. Each Unit Owner participating in the Approved Sale shall receive the same pro-rata consideration after deduction of each selling Unit Owner's proportionate share of the expenses of sale as contemplated by sub-section (d) above.

**8.9 Withdrawal of Members.** No Member shall have the right to: (1) withdraw its Capital Contribution; or (2) receive any return or interest on any portion of its Capital Contribution except, as otherwise provided herein. No Member shall have the power or right to withdraw or otherwise resign from the Company prior to the dissolution and winding up of the Company pursuant to Article IX without the prior unanimous written approval of the other Members. A Member shall cease to be a Member at the time such Member no longer holds any Units of the Company. Notwithstanding anything contained herein to the contrary, upon the withdrawal or resignation of any Member, the remaining Members shall have the right to continue the business and affairs of the limited liability company, provided, within ninety (90) days after the withdrawal of a Member, a Majority Interest of the remaining Members agree in writing to continue the business and affairs of the Company.

## ARTICLE IX
## Dissolution, Liquidation

**9.1 Dissolution.** The Company shall be dissolved upon the happening of any of the following events (each, an "***Event of Dissolution***"): (i) upon the vote or written consent of a Supermajority Interest of the Members; (ii) an event of withdrawal with respect to the sole remaining Member; (iii) an entry of a decree of dissolution pursuant to Section 18-802 of the Act, or successor provision; (iv) when the Company is not the surviving entity in a merger or consolidation; or (v) when the Company disposes of substantially all of the Company assets and property.

**9.2 Liquidation and Termination.** Upon the occurrence of an Event of Dissolution, the Company shall cease to engage in any further business, except to the extent necessary to perform existing obligations, and shall wind up its affairs and liquidate its assets. The Members acting by the approval of a Supermajority Interest of the Members shall appoint a liquidator (who may, but need not, be a Member) who shall have sole authority and control over the winding up and liquidation of the Company's business and affairs and shall diligently pursue the winding up and liquidation of the Company. During the course of liquidation, Net Profit and Net Loss shall continue to be allocated pursuant to Article VI of this Agreement.

**9.3** **<u>Liabilities; Settling of Accounts</u>.** Subject to any applicable provisions of the Act, the proceeds of liquidation shall be applied as follows: (i) first, to pay all expenses of liquidation and winding up; (ii) second, to pay all debts, obligations and liabilities of the Company in the order of priority as provided by law; and (iii) to establish reasonable reserves for any remaining contingent or unforeseen liabilities of the Company not otherwise provided for, which reserves shall be maintained by the liquidator on behalf of the Company in a regular interest-bearing trust account for a reasonable period of time as determined by the liquidator. If any excess funds remain in such reserve at the end of such reasonable time, then such remaining funds shall be distributed by the Company to the Unit Owners pursuant to Section 9.4

**9.4** **<u>Distribution of Net Proceeds</u>.** Subject to any restrictions contained in the Act, upon final liquidation of the Company the net proceeds of liquidation (after the settlement of accounts pursuant to Section 9.3 shall be distributed to the Unit Owners as in accordance with their respective Percentage Interest.

## ARTICLE X
## Books and Records

**10.1** **<u>Principal Place of Business; Books and Records</u>.** The Board of Managers shall maintain physical possession of the books and records of the Company at the Company's principal place of business. The following items shall at all times be maintained at the Company's principal place of business:

(a) A current and a past list of the full name and last known mailing address of each Member and Manager setting forth the amount of cash each Member contributed, if any, a description and statement of the agreed value of the other property and services each Member has contributed or agreed to contribute in the future, if any, and the date on which each became a Member;

(b) A copy of the Certificate and any amendments and any restatements thereto, together with executed copies of powers of attorney, if any, pursuant to which any applications or certificates have been executed;

(c) Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent years or, if such returns and reports were not prepared for any reason, copies of the information and records provided to, or which should have been provided to the Members to enable them to prepare their federal, state, and local tax returns for such period;

(d) Copies of any effective written operating agreement for the Company, and all amendments thereto, and copies of any operating agreements for the Company that are no longer in effect;

(e) Copies of any financial statements of the Company for the three (3) most recent years;

(f) Copies of any written agreement by a Member to make a Capital Contribution to the Company;

(g) Copies of written consents by the Members to the admission of any Person as a Member of the Company; and

(h) Copies of any other instruments or documents reflecting matters required to be in writing pursuant to this Agreement.

Such records are subject to inspection and copying at the reasonable request and at the expense of any Member during ordinary business hours upon the request by at least three (3) business days' advance written notice. The information and records received by the requesting Member shall be held in the strictest confidence by such Member, and such undertaking by the requesting Member shall be evidenced in a written agreement so providing.

**10.2 Accounting and Tax Returns.** The Board of Managers shall maintain or cause to be maintained adequate accounting records of all Company business. Such records shall be kept at the principal place of business of the Company or any mutually agreed upon place and shall, upon reasonable demand, be open to inspection by any Member at all reasonable times. The Company shall maintain its accounting records and shall report for income tax purposes on the cash or accrual method of accounting, as determined by the Members. After the end of each Fiscal Year and at the expense of the Company, the Board of Managers or Partnership Representative shall cause to be prepared a complete accounting of the affairs of the Company, together with whatever tax information is reasonably required by each Member for federal, state, and local income tax reporting purposes for that year, which accounting shall be completed and such information shall be furnished to each Member promptly after the close of such Fiscal Year of the Company. The Board of Managers shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) all federal, state, and local tax returns required to be filed by the Company. The Board of Managers shall cause the Company to pay any taxes payable by the Company; provided, however, that the Board of Managers shall not be required to cause the Company to pay any tax so long as the Board of Managers or the Company is in good faith and by appropriate legal proceedings contesting the validity, applicability, or amount thereof and such contest does not materially endanger any right or interest of the Members.

## ARTICLE XI
## General Provisions

**11.1 Amendments.** This Agreement may be modified or amended or restated from time to time upon the written consent of a Supermajority Interest of the Members, provided, however, that any amendment or restatement that materially and adversely diminishes the rights of any Member in a disproportionate manner shall require the consent of such Member. For purposes of the foregoing, "disproportionate" refers to a change in specifically enumerated rights hereunder of one Member while not similarly changing the same or corresponding specifically enumerated rights held by another Member.

**11.2 Waiver of Partition.** The Members hereby waive any right of partition or any right to take any other action that otherwise might be available to them for the purpose of severing their relationship with the Company or their interest in the assets held by the Company from the interest of other Members.

**11.3** **Binding Provisions.** The covenants and agreements contained in this Agreement shall be binding upon the heirs, personal representatives, successors, and assigns of the respective parties to this Agreement.

**11.4** **Severability.** Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement that are valid.

**11.5** **Entire Agreement.** This Agreement constitutes the entire understanding and agreement among the parties with respect to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, express or implied, oral or written, except as contained in this Agreement.

**11.6** **Nonwaiver.** The failure of any Member to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**11.7** **Governing Law.** This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**11.8** **Notices.** All notices provided for in this Agreement shall be in writing and shall be given either sufficiently given if delivered in person; by courier (including overnight delivery service), obtaining written receipt of delivery; sent by U.S. registered or certified mail, return receipt requested, first class, postage prepaid; or sent by facsimile or email (with a copy promptly sent thereafter by one of the other permitted methods). A Member may change its address for the purpose of this Section by notice to the Company at its principal office in the manner provided above. All such notices, consents, waivers or other communications will, when sent in accordance with this Section 11.8, be considered to be delivered (i) immediately upon delivery by in person or by courier, (ii) immediately upon sending by facsimile or email, and (iii) three (3) days after deposit to U.S. mail. Written confirmation mechanically or electronically generated by the sender's facsimile machine containing the time, date and recipient facsimile number shall be rebuttable evidence of receipt by facsimile. A copy of the e-mail transmission containing the time, date and recipient e-mail address shall be rebuttable evidence of receipt by e-mail.

**11.9** **Facsimiles and Electronic Copies.** Facsimile and electronic signatures and copies of this Agreement and any notice required to be delivered hereunder shall be deemed to be originals, and shall serve to bind the Members and otherwise have the same force and effect as would non-facsimile and non-electronic signatures and documents.

**11.10** **Counterparts; Gender and Number.** This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which when taken together,

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

constitute one and the same instrument, binding on the Members. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. As used herein, whenever appropriate, the masculine gender includes the feminine gender, and the neuter includes both the masculine and feminine.

**11.11 <u>Headings.</u>** The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**11.12 <u>Opportunity to Review; Acknowledgements.</u>** Each of the Members acknowledges and agrees that it has read and fully understands the Agreement, that it intends to be legally bound, and that it is fully and duly authorized to enter into and execute this Agreement. The signatories hereto represent and warrant that they have the authority and approval to execute this Agreement on behalf of the entities which are Members to this Agreement. EACH PARTY SIGNING THIS AGREEMENT (a) UNDERSTANDS THAT THIS AGREEMENT CONTAINS LEGALLY BINDING PROVISIONS, (b) HAS HAD THE OPPORTUNITY TO CONSULT WITH A LAWYER, AND (c) HAS EITHER CONSULTED A LAWYER OR CONSCIOUSLY DECIDED NOT TO CONSULT A LAWYER. EACH PARTY SIGNING THIS AGREEMENT EXPRESSLY ACKNOWLEDGES AND AGREES THAT: (a) THE COMPANY HAS RETAINED CARMODY MACDONALD P.C. ("***CM***") AS ITS LEGAL COUNSEL IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, (b) CM IS NOT REPRESENTING AND WILL NOT REPRESENT ANY MEMBER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY DISPUTE WHICH MAY ARISE BETWEEN THE MEMBERS, (c) SUCH MEMBER WILL, IF HE/SHE/IT WISHES COUNSEL ON THE TRANSACTIONS CONTEMPLATED HEREBY, RETAIN THEIR OWN INDEPENDENT COUNSEL, AND (d) CM MAY REPRESENT THE COMPANY IN CONNECTION WITH ANY AND ALL MATTERS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, ANY DISPUTE BETWEEN THE COMPANY, ON THE ONE HAND, AND ANY OTHER MEMBER, ON THE OTHER HAND) AND SUCH MEMBER HEREBY WAIVES ANY CONFLICT OF INTEREST IN CONNECTION WITH SUCH REPRESENTATION BY CM.



**CL 103**

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

**IN WITNESS WHEREOF**, the undersigned acknowledge that this Agreement is their act, and further acknowledge to the best of their knowledge, information, and belief, that the matters and facts set forth herein are true in all material respects, and that they have executed this Agreement as of the day and year first above written.

**COMPANY:**

**D2 PHARMA CONSULTING LLC**, a Delaware limited liability company

DocuSigned by:
By: Dean P. Erhardt
BE3E13204FAC4B3...
Name: Dean P. Erhardt
Its: President and CEO

**MEMBERS:**

**BIO LAUNCH STRATEGIES, LLC**, a Missouri limited liability company

DocuSigned by:
By: Dean P. Erhardt
BE3E13204FAC4B3...
Name: Dean P. Erhardt
Title: President

**TETH-RX CONSULTING AND CAPITAL VENTURES LLC**, a Florida limited liability company

DocuSigned by:
By: David Suchanek
F0T560DA8059400C...
Name: David Suchanek
Title: Manager

The provisions of this Agreement hereby are agreed to and accepted by the Managers, who by their signatures below hereby acknowledge their acceptance of such designation.

**MANAGERS:**

DocuSigned by:
Dean P. Erhardt
BE3E13204FAC4B3...
Dean P. Erhardt

DocuSigned by:
David Suchanek
F0d5600A8059400...
David Suchanek

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

# EXHIBIT A

***The Members***
**(as of October 20, 2020)**

This constitutes Exhibit A to the Operating Agreement of the Company.

| Members | Number of Units | Percentage Interest |
|---|---|---|
| Bio Launch Strategies, LLC<br>Attn: Dean P. Erhardt<br>5439 Guinevere Drive<br>Weldon Spring, MO 63304 | 62,500 | 62.5% |
| Teth-Rx Consulting and Capital Ventures LLC<br>Attn: David Suchanek<br>9790 Poplar Place<br>Orlando, FL 32827 | 37,500 | 37.5% |
| **Totals** | **100,000** | **100%** |

**EXHIBIT D**

**MBO Plan**

[*Attached.*]

## D2 Digital Engagement

### CY 2021 MBO's with Payment Allocation

| CY 2021 Individual MBO Opportunity | |
|---|---|
| Unha Engels: CY 2021 MBO Bonus opportunity | $ 240,000.00 |
| Irfan Baig: CY 2021 MBO Bonus opportunity | $ 75,000.00 |
| Grant Schoffelen: CY 2021 MBO Bonus opportunity | $ 75,000.00 |

| *CY 2021 MBO DESCRIPTION AND PAYMENT ALLOCATION* | *% Allocation* | *Unha* | *Irfan* | *Grant* |
|---|---|---|---|---|
| ***Tech Knowledge Transfer***<br>a. Understanding of Platform (Architecture & Internals)<br>b. Deployment lifecycle (Development/Staging/Production)<br>c. External supporting services / Assets Transfer<br>i. All external relationships transfer to Jim (or other designated team member)<br>d. Develop a strategy to have campaigns configurable by end-users and upon approval, develop and implement to meet the customer requirements. | *5%* | *$ 12,000.00* | *$ 3,750.00* | *$ 3,750.00* |
| ***Product Development***<br>a. Document and report Product Roadmap monthly<br>b. Working within D2, create a three-year plan for client and market requirements, features, functions, and benefits.<br>c. Prioritize, scope for time and budget, and work with the D2 team to estimate the market for the product and revenue plan. Report Monthly. | *20%* | *$ 48,000.00* | *$ 15,000.00* | *$ 15,000.00* |
| ***Infrastructure and Architecture***<br>a. Semi-annual Pen testing with appropriate mitigation and remediation.<br>b. Implementation of agile software development/project management with organizational reporting on demand.<br>c. Disaster recovery plan documented and testing in place. Semi-Annual testing to be completed and certified. Surprise testing. | *10%* | *$ 24,000.00* | *$ 7,500.00* | *$ 7,500.00* |
| ***Application Development***<br>a. Adheres to product plan functionality and reporting.<br>b. Meet corporate IT architecture and tech spec integration.<br>c. Development initiatives done on-time and on-budget<br>d. Complete documentation to be included in all development projects. | *10%* | *$ 24,000.00* | *$ 7,500.00* | *$ 7,500.00* |
| ***Deliverables***<br>a. Hub Helper/ SP Helper products implemented in at least 2 customers.<br>b. Integration with D2 Accreditation Platform.<br>c. FIS API and Batch Integration completed.<br>d. Maintain on-demand product demos for the organization with current functionality.<br>e. Develop a strategy to have campaigns configurable by end-users and upon approval, develop and implement to meet the customer requirements. | *15%* | *$ 36,000.00* | *$ 11,250.00* | *$ 11,250.00* |
| ***Financial 2021-2024***<br>a. Meet ongoing Year over Year Financial goals at a minimum of 90%<br>b. Meet ongoing Year over Year MBO goals at an average of 85% | *25%* | *$ 60,000.00* | *$ 18,750.00* | *$ 18,750.00* |
| ***Client Satisfaction***<br>a. Client satisfaction is measured and maintained with rolling monthly D2 approved surveys. Each client will be surveyed at least twice a year and key clients quarterly. Internal clients will be surveyed monthly. Grade of 90% or better to qualify for incentive payment. | *15%* | *$ 36,000.00* | *$ 11,250.00* | *$ 11,250.00* |
| ***Total MBO Payment Opportunity*** | *100%* | *$ 240,000.00* | *$ 75,000.00* | *$ 75,000.00* |

*The timeline for the deliverable outlined herein will be mutually determined between the parties. These timelines will need to be hit to qualify for the payments outlined. The agreement that MBOs have been attained shall be mutually agreed between Jim Maguire and members of the historic WorkUp team.*

**CL 107**

**EXHIBIT E**

**Profit Sharing Plan**

[*Attached.*]

## D2 Digital Engagement - Profit Share Model

Unha Engels, Irfan Baig and Grant Schoffelen shall be able to participate in a profit share model based upon the Profitability of the historic WorkUp division. To qualify for the profit share, the division must hit a minimum of 75% of the targeted sales numbers as mutually agreed between the parties as of October 20, 2020.

Sales goals for CY 2021 – CY 2024

- CY 2021 $8,398,080.00
- CY 2022 $13,996,800.00
- CY 2023 $23,328,000.00
- CY 2024 $38,880,000.00

Profit Share Calculation shall be calculated on the following scale, based on the actual profitability of the historic WorkUp division.

- If Profit Margin is a minimum of 50% Payout of 10% of sales
- If profit Margin is a minimum of 65% Payout of 11% of sales
- If Profit Margin is a minimum of 75% Payout of 12.5% of sales

Profit Share Payout shall be calculated based on the operating profit of the division calculated as follows:

- Total sales – total costs = Operating profit (Cost to include all costs to deliver the historic WorkUp services including but not limited to product development, sales, security, hosting, other 3rd party costs etc.)
- Unha Engels component of the Profit Share Model shall be paid against the Promissory Note until such time as the Note is completely paid after which Ms. Engels Profit Share component shall be paid directly to Ms. Engels.

Payments

In accordance with the current D2 payment process for MBOs and bonus payments, such payments will be made 60 days following the close of the quarter in which such achievement(s) have been attained.

D2 reserves the right to make any adjustments to the Profit Share Payments based on end of year financial obligations potentially including but not limited to:

  - End of Year Bonus Payments
  - Tax obligations
  - Shareholder obligations
  - Other financial, legal, regulatory obligations.

CL 109