Exhibit

2

JAMS

| | |
|---|---|
| Kenneth Engels, et al., | ) |
| | ) |
| Claimants, | ) |
| | ) |
| v. | ) JAMS # 5335000098 |
| | ) |
| D2 Pharma Consulting, LLC n/k/a D2 Solutions HoldCo LLC, | ) |
| | ) |
| Respondents. | ) |

# INTERIM AWARD

THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration provision of the parties' Settlement Agreement[1], and having examined the submissions, proofs, and allegations of the parties, now finds, concludes, and issues this Interim Award.

In preparing this Award, the Arbitrator has thoroughly considered the legal arguments raised and the evidence presented, and has determined the relevance, credibility, weight, and merits thereof. For efficiency and economy, the Arbitrator recites only those facts and discusses only those legal arguments he considers necessary to establish the basis for resolution of the issues in contention. If any factual assertion or legal argument is not specifically mentioned herein, the Arbitrator has concluded that it is either not persuasive and/or not essential to establish the basis for this Award.

In this arbitration, Claimants Kenneth Mark Engels and Unha Engels, together with WorkUp, Inc. (collectively, "Claimants"), allege that Respondent

[1] Settlement Agreement with Arbitration Provision, Doc. No. 380371; Hearing Exhibit 39.

D2 Pharma Consulting LLC (n/k/a D2 Solutions HoldCo, LLC; "D2" or "Respondent") violated the parties' Settlement Agreement, specifically Sections 10, by diluting Kenneth and Unha Engles' ownership interests in D2. Claimants argue that Respondent failed to issue corrective numbers of ownership units upon Respondent's grant of ownership units to a capital investor and Respondent's subsequent grant of ownership units to D2 employees and/or service providers.

Claimants seek compensatory damages in the amount of $637,182.44 and pre-award interest on the same. Alternatively, Claimants seek an award determining the correct percentage of ownership that they should each have had in D2 were it not for the improper dilution by D2's grants of ownership units to capital investor(s) and employees and/or service providers. Claimants also seek an award of reasonable attorneys' fees, and arbitration costs and expenses.

Respondent admits that Claimants' ownership interests were diluted, but denies that dilution of Claimants' ownership interest(s) breached the parties' Settlement Agreement because the dilution was unrelated to a capital raise by D2 during the six-month protected period immediately following the execution of the Settlement Agreement. Respondent also argues that Claimants have failed to establish either a breach of the Settlement Agreement or a(ny) recoverable remedy, and seeks an award in its favor.

The final evidentiary hearing was held on February 09, 2026. Parties agree that the applicable substantive law shall be the Federal Arbitration Act, 15 U.S.C. §1693a(12) and the law of the state of Missouri.

Having considered the submissions, proofs, testimony, exhibits, and arguments of the parties, the Arbitrator finds, for the reasons stated herein, that Respondent breached the requirements of the parties' Settlement Agreement. The Arbitrator further finds that Claimant is entitled to

compensatory damages as set forth in Part IV(C) herein. Finally, the parties are directed to submit briefing regarding reasonable attorney fees and costs of Claimants for this arbitral proceeding.

---

## *I. Relevant Procedural Background*

---

Claimants are represented by Todd R. Legon and William F. Rhodes of Legon Fodiman & Sudduth, P.A., 121 Alhambra Plaza, Suite 1505, Coral Gables, Florida 33134.

Respondent is represented by Tyler c. Schaeffer, David Stoeberl, and Ryan M. Prsha of Carmody Macdonald P.C., 120 South Central Avenue, Suite 1800, St. Louis Missouri 63105.

The parties submitted Pre-Hearing Briefs[2] on January 20, 2026, and Joint Exhibit List and an Amended Joint Witness List on February 08, 2026. An in-person Final Hearing was held as scheduled on February 09, 2026 at the JAMS offices located at 190 Carondelet Plaza, Suite 1450, St. Louis, Missouri 63105.

Counsel for the parties each presented opening and closing remarks. Kenneth Engels testified on behalf of Claimants. Dean Erhardt ("Erhardt," CEO and President of Respondent D2) testified on behalf Respondent. No other witnesses testified.

A transcript[3] of the Final Hearing reflects the entirety of the proceedings and the Joint Exhibits admitted into evidence. The parties subsequently submitted Post-Hearing Briefs[4] on March 06, 2026.

---

[2] Claimants' Pre-Hearing Brief, Doc. No. 1521950; D2 Pre-Hearing Brief with Exhibits, Doc. No. 1522693.
[3] Final Hearing Transcript, Doc. No. 1584981.
[4] Claimants' Post-Hearing Brief, Doc. No. 1584962; D2 Pharma's Post-Hearing Brief, Doc. No. 1584965.

### A. Claimants' Argument and Relevant Testimony

Claimant argued that this dispute requires application of the plain text of Section 10 of the parties' settlement Agreement, and does not require an interpretation of the same. Section 10 provides anti-dilution protections for the ownership interest in the Respondent company Claimants received for accepting the Settlement Agreement. Section 10 grants Claimants a 3.5% ownership interest each, for a total of 7%, which at the time of the execution of the Settlement Agreement amounted to 7,000 units each, for a total of 14,000 units.

Section 10(a) of the Settlement defined two protections for the Engels' 7%: (i) no reduction in ownership percentage for the six months from December 30, 2020 to June 30, 2021 (the "Initial Capital Raise Period") and (ii) thereafter, no reduction in ownership percentage except in connection with a capital raise.

Claimants alleged the evidence shows that Respondent breached the anti-dilution provisions in two separate phases, resulting in more than $630,000 in lost equity value for Claimants. First, Claimants argued, both Claimants and Respondent agree that Section 10(a) prohibits Respondent from diluting Claimants' ownership interests in Respondent during the Initial Capital Raise Period[5], and it is also undisputed that Respondent diluted the Engels' units during that six-month period. (Ex. 10). Second, after the Initial Capital Raise Period, § 10(a) permits dilution of the Engels' ownership interests only in connection with a capital raise. (Hearing Tr. 94:20–95:15.) However, Respondent created an employee option pool and issued options to employees and service providers—issuances that were unrelated to any capital raise but effectually diluted Claimants' ownership interest in D2. (Ex. 56.)

[5] Claimants' Post-Hearing Brief, ¶56; Doc. No. 1584962.

Claimants further argued that the Settlement Agreement's plain text and the parties' understanding was demonstrated when Respondent's Vice President of Finance updated Respondent's capitalization table after the first issuance of units for a non-capital raise to reflect the Claimants' ownership interest of 7% to then be raised from 14,000 units to 14,075.84 units, which Respondent later removed: Claimant's ownership interest remains numerically the same while the value of the units impermissibly (i.e., not due to a capital raise) dropped well below the 7% contracted amount. Additionally, Claimants argued, Respondent D2 did not timely provide them with financial documentation by which they could have become aware of the dilutions sooner, closer in time to Respondent's issuance of non-capital-raise units, and note that they initiated this arbitration shortly after discovering the dilutions and unsuccessfully seeking redress from Respondent.

Claimants seek to restore the value of the ownership interests Claimants lost from both breaches and request either (a) compensatory damages in the amount of $637,182.44, or alternatively (b) an equitable solution such as restoring Claimants to their bargained-for ownership interest in Respondent D2 LLC. Claimants also seek interest, attorneys' fees, costs, and expenses.

### B. Respondent's Argument and Relevant Testimony

Respondent argued that Section 10(a) is "simply silent" as to "noncapital" issuances of units. (Hearing Tr. 12:21–22.) Respondent states that because the units issued in January and February of 2021, within six months of the execution of the Settlement Agreement, were made to D2's service providers, and were not part of a "capital raise," the resulting dilution of Claimants' ownership percentage was not subject to the anti-dilution

provision of Section 10(a).[6]

Respondent also argued that the Settlement Agreement's § 10, both Subsections (a) and (b), should be interpreted as limited to the capital raise then-contemplated by D2 and mentioned in the parties' LOI executed prior to the execution of the parties' Settlement Agreement. Respondent's CEO, Dean Erhardt, testified to Respondent's position that the anti-dilution provision in Section 10(a) of the Settlement Agreement applied to a six-month period from the date of the execution of the agreement; however, (1) that it applied only to the "singular raise" D2 was contemplating at the time of the agreement of which Claimants were aware, and (2) on cross-examination by Claimants' counsel, agreed that D2 could have structured a capital raise deal where the capital could have been received by D2 but the stock would be issued months or even years in the future, but that this scenario was not discussed with Kenneth Engels during the parties' discussions.[7] Erhardt also agreed that under Respondent's theory of the case, the number of units issued to Claimants (7,000 each) under the Settlement Agreement should never have increased, and remain the same or less in the event of a stock grant.[8] Erhardt admitted that by issuing unit/ownership grants to two persons for doing work, including work related to the capital raise, within the six-month protected period, he "diluted [Claimants] down based on consulting advisement," which Respondent maintained was permissible under the anti-dilution clause because the dilution was not due to a capital raise.

In sum, with respect to Section 10(a) of the Settlement Agreement, Respondent argued that (1) the nothing in the text refers to a separate six-month period of absolute protection or to anti-dilution rights that exist apart from D2's then-contemplated "Initial Capital Raise;" and (2) the Settlement

---

[6] D2 Pre-Hearing Brief with Exhibits, pp. 6-7; Doc. No. 1522693.
[7] Final Hearing Testimony, 147:20 – 150:09.
[8] Final Hearing Transcript, 153:24 – 154:04.

Agreement does not provide anti-dilution for non-capital raises after six months.

With respect to Section 10(b), Respondent's position is summarized thus: "Claimants' reliance on Section 10.b. does not change this conclusion. Section 10.b. expressly states that potential unit awards to Ms. Engels "shall not have the anti-dilution protection as is provided in subsection a. above." That language does not expand the scope of Section 10.a. Instead, it merely confirms that Section 10.b. awards are excluded from whatever anti-dilution protection Section 10.a. provides. Moreover, the record establishes that the Initial Capital Raise could occur within the six-month maximum specified in Section 10.a., while units for that raise could be issued thereafter. As a result, the timing of issuances for the Initial Capital Raise could overlap with the timing of Section 10(b) awards. (Tr. 171–72.)"[9]

Respondent requested an award in its favor.

---

## *II. Governing Agreement(s) and Law*

---

### A. The Governing Settlement Agreement

The parties' Settlement Agreement,[10] effective December 30, 2020, provided Claimants, each, with 3.5% ownership interest in D2 as consideration for settlement of their [previous] dispute with D2. Section 10, referenced as the anti-dilution provision, states:

(continued)

[9] D2 Pre-Hearing Brief with Exhibits, p. 11; Doc. No. 1522693.
[10] Settlement Agreement, Doc. No. 380371; Hearing Exhibit 39.

**10. Equity Grant.**

a. On the Closing Date, and subject to the execution of a Joinder Agreement substantially in the form attached hereto as Exhibit C by each of (i) Kenneth Mark Engels ***"Kenny",*** and (ii) Unha, D2 shall issue three and one-half percent (3.5%) of the outstanding Units of D2 to each of Kenny and Unha (the ***"Closing Equity Issuance").*** The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100 Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the ***"Initial Capital Raise");*** provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date. For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise.

b. Unha shall have the opportunity to earn one percent (1%) of the then outstanding Units of D2 per fiscal year during each of the Company's 2021, 2022 and 2023 fiscal years. To be eligible for such one percent (1%) Unit award for each calendar year, Unha must be continuously employed for the full calendar year (i.e., no pro-rations for a partial year of employment). For the avoidance of doubt, the potential one percent (1%) Unit awards which are the subject of this subsection b. shall not have the ant-dilution protection as is provided in subsection a. above.

Settlement Agreement, § 10 (emphasis added)[11].

Claimants alleged that Respondent impermissibly diluted their ownership interests in violation of Section 10. Claimants request, alongside compensatory damages, attorneys' fees, costs, and expenses in this arbitration. Section 24 permits such an award if the party prevails.

[11] *Id.*

> 24. **<u>Prevailing Party</u>.** If a party hereto commences a proceeding against another party to enforce and/or recover damages for breach of this Agreement, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable costs and expenses of enforcement and collection of any and all remedies and damages, or all reasonable costs and expenses of defense, as the case may be. The foregoing costs and expenses shall include reasonable attorneys' fees.

Settlement Agreement, § 24 (emphasis added)[12].

Respondent has argued in this proceeding that the parties' Letter of Intent[13] ("LOI") executed during their negotiations of the Settlement Agreement is relevant to this dispute to clarify and/or contextualize the plain text of Sections 10 (a) and 10(b). Consequently, Section 35 of the Settlement Agreement is made relevant:

> 35. **<u>Entire Agreement</u>.** This Agreement, including the other documents referred to herein, contains <u>the entire understanding</u> of the Parties with respect to the subject matter contained herein and therein. This Agreement <u>supersedes all prior agreements and understandings</u> between the Parties with respect to such subject matter.

Settlement Agreement, § 35 (emphasis added)[14].

Attached and incorporated into the Settlement Agreement (as Exhibit A) is D2's Fourth Amended and Restated Operating Agreement[15] ("Operating Agreement"), dated as of October 20, 2020, with an Amended Exhibit A reflecting the Units issued under the Settlement Agreement. The Operating Agreement defines two terms relevant to this dispute[16]: "Percentage Interest" (Article I, Subsection 1.1(aa)); and "Units; Issuance of Units" (Article IV, Subsection 4.4):

---

[12] *Id.*
[13] Final Hearing Exhibits 33-36 (evolving, redlined, and final versions).
[14] Settlement Agreement, Doc. No. 380371; Hearing Exhibit 39.
[15] Settlement Agreement, Section 17, Closing Deliverables, Subsection (b)(iii), D2 Deliveries.
[16] Neither term, "Units" and/or "Percentage Interest," is re-defined, or differently defined, in the Settlement Agreement or the Joinder Agreement.

> **(aa)** ***"Percentage Interest"*** means, for each Unit Owner, a percentage equal to a fraction the numerator of which is the sum of the number of Units owned by such Unit Owner and the denominator of which is the sum of the number of outstanding Units.
>
> ...
>
> **4.4 Units; Issuance of Units .** The Company shall have the authority to issue up to 2,000,000 Units. Each Unit shall be identical to all other Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a Unit Owner as set forth in this Agreement. The Members hereby grant the necessary authorization to the Board of Managers to authorize and issue the amount of Units necessary to properly issue the Units as contemplated hereunder.

(emphasis added).

## B. The Governing Legal Standards

The parties agree that this arbitration is governed by the substantive laws of the state of Missouri and in their briefing articulated the following relevant legal standards.

### 1. Contract Law

Missouri law requires that a contract be read as a whole, applying the plain and ordinary meaning of its terms and "declining to adopt any construction that leaves language without function or sense." *Jimenez v. Cintas Corp.*, 475 S.W.3d 679, 686 (Mo. App. E.D. 2015). Further, Missouri law treats an LLC ownership percentage as a protected economic property interest and requires compensation for the fair value of a member's ownership interest even after expulsion, confirming that these economic rights are a "member's personal property". *Chadwick v. Huntoon*, 634 S.W.3d 832, 840 (Mo. App. S.D. 2021). Claimants' 7% Closing Equity Issuance is therefore a vested economic stake.

Missouri law also gives binding force to the word "shall," which appears in the concluding sentence of Section 10 of the Settlement Agreement. In *Pelopidas, LLC v. Keller*, 633 S.W.3d 383, 389–90 (Mo. Ct. App. 2021), the

court held that "shall" is the language of obligation and imposes a contractual duty.

Missouri law recognizes the canon *expressio unius est exclusio alterius*: when a contract expressly specifies one type of event or circumstance, courts infer that other, unwritten type or categories of events are excluded. *Lafollette v. Liberty Mutual Insurance Co.*, 139 F.Supp.3d 1017 (W.D. Mo. 2015).

Equitable remedies, when disruptive or requiring corporate restructuring that would affect third parties, are disfavored when an adequate remedy at law exists; Missouri courts have awarded the cash value of an ownership interest. *Amalaco, LLC v. Butero*, 593 S.W.3d 647, 653 (Mo. App. E.D. 2019); *Chadwick v. Huntoon*, 634 S.W.3d 832, 837 (Mo. App. S.D. 2021); *Heifetz v. Apex Clayton Inc.*, 2017 Mo. App. LEXIS 280, at *13 (Mo. App. E.D. 2017).

Under Missouri law, a plaintiff asserting breach of contract must prove both the existence of damages and the amount of those damages with reasonable certainty. *Timberland Forest Prods., Inc. v. Franks*, 419 S.W.3d 806, 810 (Mo.App.S.D. 2013). Missouri law recognizes "money compensation" as the primary remedy for breach of contract as more practical. *Finch v. Campbell*, 541 S.W.3d 616, 634 (Mo. App. W.D. 2017). The standard in Missouri is "fair market value," the price property would bring between a willing seller and a willing buyer at the time. *Chadwick v. Huntoon*, 634 S.W.3d 832, 842 (Mo. App. S.D. 2021). It is not confined to a single rigid formula, and may be established using the method best supported by the record. *Id.*

When compensatory damages are ascertainable at the time of the breach, and are capable of exact computation, Missouri law permits prejudgment interest where damages are liquidated or readily ascertainable. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. App. W.D. 2008); *Mo. Rev. Stat.* § 408.020 (providing for interest at nine percent per annum).

### 2. Parol Evidence

Under Missouri law, contract ambiguity arises when (i) language is reasonably susceptible to two or more interpretations, (ii) the contract promises something in one point and takes it away in another, or (iii) there is "duplicity, indistinctness or uncertainty" in the language. *STL Riverview Plaza LLC v. Metro. St. Louis Sewer Dist.,* 681 S.W.3d 290, 301 (Mo. App. E.D. 2023). "The parol evidence rule ... prohibits the contradiction of integrated contracts. It does not apply to parol testimony that does not contradict the terms of an integrated agreement." *Frontenac Bank v. T.R. Hughes, Inc.*, 404 S.W.3d 272, 282 (Mo.App.E.D. 2012). In sum, presentation of parol evidence, such as the parties' LOI preceding the execution of the Settlement Agreement, when presented to *clarify* rather than *contradict* the Agreement's terms, is consistent with governing Missouri law.

---

## *III. Undisputed Timeline of Events*

---

The following facts of record developed through the parties' submissions, deposition and/or witness testimony during arbitration hearing, and exhibits admitted into evidence.

| | |
|---|---|
| July, 2020 | Respondent failed to make a tranche of required payment of $835,000 for acquisition of Claimants' business under the parties' previous agreement |
| November 23, 2020 | Claimants filed suit in Delaware after the contractual cure period expired |
| December 23, 2020 | Parties executed a Letter of Intent (LOI) to enter into a Settlement Agreement (Ex. 36)<br>• LOI referenced a then-contemplated $8 Million capital raise |

| | |
|---|---|
| December 30, 2020 | Parties execute Settlement Agreement<br>• As consideration for Claimant accepting the Settlement Agreement and agreeing to dismiss, without prejudice, Claimants' lawsuit, D2 issued a 3.5% ownership interest to each Kenneth and Unha Engels<br>• Section 10(a) prohibits dilution of Engels' ownership percentage during the Initial Capital Raise Period of six (6) months, until June 30, 2020 |
| January 1st, 2021 | D2's Fifth Updated and Amended Operating Agreement reflected Claimants' equity as 14,000 units out of 200,000 total outstanding units: 7% of the company; 3.5% to each Kenneth and Unha Engels (Ex. 8, Ex. A) |
| February, 2021 | D2 issued 1,083.5 units to 4Engs Consulting LLC (Exs. 10, 47-48)<br>• D2 Vice President of Finance, applying Section 10(a)'s anti-dilution protections to maintain 7% Unit ownership of Claimants, prepared and circulated a capitalization table reflecting an increase in Claimants' total units to 14,075.84 (Ex. 57) |
| January-February, 2021 | D2 made six additional grants, a total of 31,223.30 new units, for non-capital raises (Exs. 56, 57) |
| November 16, 2021 | D2 adopted the Sixth Amended and Restated Operating Agreement (the "Sixth," Ex. 52) to incorporate the ownership of Viewside Capital Partners as now part of the D2 organization[17]: |

[17] Final Hearing Testimony, Erhardt, 164:23 – 165:23.

| | |
|---|---|
| | • included an updated capitalization table reflecting the issuance of units to 4Engs Consulting LLC, and reflecting D2's six additional grants of 31,223.3 new units to 4Engs Consulting LLC and others -but did not reflect a commensurate increased number of units to Claimants to maintain a 7% ownership by Claimants<br>• The Sixth proposed a reorganization of D2's units, authorizing 42,500 "Class D" units to be awarded for services, not capital<br>• Claimants had not been asked to execute Joinders, nor provided a copy of the Sixth when the Sixth was executed<br>• Claimants received a copy of the Sixth in October, 2022 |
| September, 2022 | Claimants received their 2021 K-1 tax documents from D2's auditor (Ex. 9), reflecting ownership percentages below 3.5% each |
| October, 2022 | Claimants raised the dilution issue to Respondent's counsel, who asserted Respondent did not believe that issuances to service providers were subject to Section 10(a)'s anti-dilution provision (Ex. 10) |
| November 7, 2022 | Claimants notified D2's auditors by letter that the K-1s would require amendment in light of the dilution (Ex. 13) |
| December, 2022 | Claimants initiated this arbitration.<br><br>Claimants requested relief from future dilution of their ownership percentage by the issuance of new units from the newly authorized unit pool until Claimants' rights under the Settlement Agreement had been adjudicated |
| December 28, 2022 | D2 executed a Seventh Amended and Restated Operating Agreement ("Seventh"), expanding the authorization of Class D units to 72,051 units (Ex. 53) |

| | |
|---|---|
| January 20, 2023 | D2 issued 2,500 units to David Saunders (Ex. 56 at 305-316) |
| December, 2024 | D2's most recent capitalization reflected in this arbitral record showed that D2 had issued and vested 55,096 new units (*id.*)<br>• D2 did not issue additional units to Claimants to maintain their ownership percentage at 3.5% each<br>• Claimants' ownership interest had fallen to 1.83% each |

---

*3. Analysis*

---

**A. The LOI as Parol Evidence**

Prior to the Final Hearing, Claimants moved *in limine* to exclude evidence of the parties' negotiations and/or discussions leading up to the disputed Settlement Agreement as extrinsic to the Settlement Agreement and inadmissible during the Final Hearing. Respondent had argued that some of the evidence and/or documents at issue is part of Claimants' own non-rebuttal trial exhibit list, and that such evidence in this Arbitration was the result of Claimants expressly seeking that [extrinsic] evidence in their discovery requests to Respondent, which Respondent produced. Claimants' motion was denied. During the Final Hearing, the Arbitrator admitted the LOI into evidence. Both witnesses offered testimony related to the LOI, and both counsel had the opportunity to argue what effect, if any, the contents of the LOI may have on the analysis of the meaning of the plain text of Section 10 of the parties' Settlement Agreement.

Respondent argued that the plain text of the Settlement Agreement should be read as ambiguous regarding protecting Claimants' units from dilution by D2's issuance of units to others for non-capital raises. Because the

LOI did not include the parties' intention to apply anti-dilution terms for units issued by D2 for reason(s) other than then-contemplated-initial-capital-raise, the text of the Settlement Agreement should be interpreted such that it provides anti-dilution protection only for units issued by D2 for a capital raise within 6 (six) months of the execution of the Settlement Agreement.

Respondent's argument is unavailing for two reasons. First, the LOI is on its face a "non-binding" document. Secondly, Section 35 of the Settlement Agreement is an integration clause which specifies that the Settlement Agreement "contain[s] the entire understanding of the Parties."[18] Both documents were jointly drafted[19] and contain no apparent contradiction in the relevant terms. Therefore, the LOI is not relevant to the analysis here.

### B. Breach of the Settlement Agreement

This dispute turns on two determinations: (1) whether Section 10(a) of the Settlement Agreement provided a six-month anti-dilution protective period only for dilution due to issuance of units for a capital raise; and (2) whether Respondent breached the anti-dilution provisions of Section 10(b).

The plain text of the Settlement Agreement, under the governing law of the state of Missouri, is unambiguous: Missouri law recognizes the canon *expressio unius est exclusio alterius*, i.e., when a contract expressly specifies one type of event or circumstance, courts infer that other, unwritten type or categories of events are excluded. *Lafollette v. Liberty Mutual Insurance Co.*,------. Here, Section 10 of the Settlement Agreement's anti-dilution provision expressly specifies potential dilution, *after* the six-month protected period, for one type or category for issuance of ownership interest (units), i.e., the initial or any other *capital raise*. This tribunal shall consider this dispute in light of the plain text of the parties' agreement and governing law.

---

[18] Settlement Agreement, Doc. No. 380371; Hearing Exhibit 39.
[19] *Id.*, Section 25, "Jointly Drafted."

The Settlement Agreement's Section 10 specifies potential dilution for "capital raises" only. It does not allow, assume, infer, or consider potential dilution of Claimants' ownership interests for myriad other possibilities like issuances of ownership interests to employees and/or vendors. specifies only one category or type of ownership interest: a *percentage* amount (not numerical units). Here, the benefit of the bargain for Claimants was a total of 7% ownership of Respondent D2 company, to whatever the number of units that percentage may amount at a given point in time. Accordingly, when Respondent issued units to a third party for reasons other than a capital raise, Respondent's Vice President of Finance followed the plain text of the Settlement Agreement and issued an updated capitalization table which reflected a larger number of units allocated to Claimants in order to maintain their percentage ownership interests.

Next, the Settlement Agreement's Section 10(b) confirms that 10(a) retained operative protection after six months. Section 10(b) provides that Claimant Unha Engels' contingent one-percent annual awards "shall not have the anti-dilution protection as is provided in subsection a." That carve-out and specificity would be unnecessary if 10(a) provided no post–six-month protection at all. Reading 10(a) as a complete waiver renders 10(b)'s cross-reference without function, contrary to the rule that contracts must be construed to give effect to all provisions. *Pelopidas, LLC v. Keller*, 633 S.W.3d at 395.

Finally, the plain text of the Settlement Agreement includes the obligation of maintaining Claimants' ownership interests at 7%. Missouri law gives binding force to the word "shall," which appears in the concluding sentence of the controlling section. *Pelopidas,* 633 S.W.3d 383, 389–90 (Mo. Ct. App. 2021) ("shall" is the language of obligation and imposes a contractual duty). Section 10(a) states that Claimants "shall each own 3.5%" ownership interest. The parties' agreement and Respondent's obligation should be

enforced.

The Arbitrator finds Claimants' arguments persuasive in light of the facts and testimony in evidence in this proceeding. Applying Missouri law which requires that a contract be read as a whole, applying the plain and ordinary meaning of its terms and "declining to adopt any construction that leaves language without function or sense" (*Jimenez v. Cintas Corp.*, 475 S.W.3d 679, 686 (Mo. App. E.D. 2015), the Arbitrator finds that the interpretation requested by Respondent violates that principle of law, and of justice, by treating the six-month protection as operative against a capital raise while permitting the same ownership percentage to be reduced through discretionary issuances during the identical period, thereby depriving Claimants' of their bargained-for ownership interests.

Respondent diluted the percentage of Claimants' ownership interests for reasons other than an "initial" and "future" capital raise(s), and thereby breached the parties' Settlement Agreement. Respondent is liable to Claimants for the resultant damages.

**C. Damages**

Missouri law treats an LLC ownership percentage as a protected economic property interest. *Chadwick v. Huntoon*, 634 S.W.3d 832, 840 (Mo. App. S.D. 2021) (compensation for the fair value of a member's ownership interest even after expulsion; economic rights are a "member's personal property".). Claimants' 7% Closing Equity Issuance is therefore a vested economic stake.

Claimants have argued the "[r]estoring the 7% Closing Equity Issuance through additional units would require amendments to capitalization tables and governance documents and would affect approximately thirty-one (31) other unitholders. Missouri law disfavors such disruptive equitable remedies where an

adequate remedy at law exists."[20] Respondent has argued that specific performance of the contract, i.e., restoring Claimants' ownership interests to comply with the Settlement Agreement is not available. Missouri law accepts an award of damages in lieu of specific performance of the contract. transaction and price are reflected in the Sixth Amended and Restated Operating Agreement. Missouri law further recognizes "money compensation" as the primary remedy for breach of contract. *Finch v. Campbell*, 541 S.W.3d 616, 634 (Mo. App. W.D. 2017). With consideration of the foregoing, the Arbitrator awards damages as discussed below.

In this dispute, the percentage of ownership interest, when converted to a specific number of units for the purposes of calculating the number of units Claimants' un-diluted ownership interest, makes relevant Respondent D2's structure of units of ownership. As cited above and recounted here, attached and incorporated into the Settlement Agreement (as Exhibit A) is D2's Fourth Amended and Restated Operating Agreement[21] ("Operating Agreement"), dated as of October 20, 2020, with an Amended Exhibit A reflecting the Units issued under the Settlement Agreement. The Operating Agreement defines two terms relevant to this dispute[22]: "Percentage Interest" (Article I, Subsection 1.1(aa)); and "Units; Issuance of Units" (Article IV, Subsection 4.4):

> **(aa)** ***"Percentage Interest"*** means, for each Unit Owner, a percentage equal to a fraction the numerator of which is the sum of the number of Units owned by such Unit Owner and the denominator of which is the sum of the number of outstanding Units.
>
> ...

[20] Claimants' Post-Hearing Brief, p. 17; Doc. No. 1584962.

[21] Settlement Agreement, §17, Subsection (b)(iii), D2 Deliveries; Doc. No. 380371, Hearing Exhibit 39.

[22] Neither term, "Units" nor "Percentage Interest," is differently defined in the Settlement Agreement or the Joinder Agreement.

> **4.4 Units; Issuance of Units .** The Company shall have the authority to issue up to 2,000,000 Units. Each Unit shall be identical to all other Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a Unit Owner as set forth in this Agreement. The Members hereby grant the necessary authorization to the Board of Managers to authorize and issue the amount of Units necessary to properly issue the Units as contemplated hereunder.

(emphasis added).

Following the above definitions, all units issued by Respondent are to be considered "identical to all other Units in all respects." Consequently, the tribunal considers the two categories of damages articulated by Claimant: (1) damages for Respondent's issuance of non-capital units during the time period subject to Section 10(a) of the Settlement Agreement, and (2) as subject to Section 10(b), damages for Respondent's subsequent issuances of ownership interests/units to employees and/or vendors for non-capital raises.

In its Post-Hearing Brief, Claimants have applied the above definition of "Percentage Interest" to calculate the number of units to which Claimants were entitled but for the impermissible dilution of their ownership percentage(s) at two points in time corresponding to the end of the anti-dilution period subject to Section 10(a), and the subsequent period of additional non-capital grants and awards of units to employees and/or vendors. Claimants utilized Respondent's own, undisputed, capitalization schedules and operating agreements to establish both the number of units owed to Claimants, as well as the per-unit issue price(s) set by Respondent at the time the dilution(s) and issuances of units for non-capital raises. *See Claimants' Post-Hearing Brief, pp. 15-19.*

Accordingly, Claimants are awarded $334,652.89 in compensatory damages, the economic value of the units withheld from Claimants in violation of 10(a); and Claimants are awarded $302,529.55 in compensatory damages,

the economic value of the units withheld from Claimants in violation of Section 10(b).

Claimants argue that because the above damages were ascertainable at the time of dilution and are capable of exact computation, applicable Missouri law permits prejudgment interest where damages are [liquidated or] readily ascertainable. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. App. W.D. 2008); Mo. Rev. Stat. § 408.020 (providing for interest at nine percent per annum). Claimants' position is valid. Claimants are awarded pre-award interest at the applicable statutory rate from the date of each wrongful dilution, and post-award interest until paid.

### D. Attorneys' Fees, Costs, and Expenses

The parties' Settlement Agreement, noted previously herein and recounted here, provides:

> 24. **Prevailing Party.** If a party hereto commences a proceeding against another party to enforce and/or recover damages for breach of this Agreement, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable costs and expenses of enforcement and collection of any and all remedies and damages, or all reasonable costs and expenses of defense, as the case may be. The foregoing costs and expenses shall include reasonable attorneys' fees.

Settlement Agreement, Section 24. As Claimants are the prevailing party in this arbitral proceeding, Claimants are entitled to the benefit of the contractual term. Claimants are awarded reasonable costs and expenses, including reasonable attorneys' fees, related to this arbitration.

## *4. Conclusions and **INTERIM AWARD***

Upon consideration of the relevant undisputed facts, arguments, testimony, the governing agreements and law, under the totality of the circumstances of this dispute, the Arbitrator finds that Claimants' ownership interests in Respondent's company were diluted by Respondent's non-capital grants and awards of ownership interests (units) to employees and/or vendors. Respondent breached the parties' Settlement Agreement, and is liable to Claimants for monetary damages. Claimants are awarded interest on the amounts owed as allowed under the governing law. Finally, Claimants are awarded reasonable attorneys' fees and costs related to this arbitration.

**INTERIM AWARD**

Pursuant to the foregoing and conclusions,

(i) Respondent's request for an award in its favor is ***DENIED;***

(ii) Claimants' request for compensatory damages in the amount of $637,182.44 is ***GRANTED***;

(iii) Claimants' request for attorneys' fees, costs, and expenses in this arbitration is ***GRANTED****;*

(iv) Claimant is instructed to submit, within 14 days of the issuance of this Interim Award, briefing on the sole issue of Claimant's reasonable attorneys' fees, costs, and expenses in this arbitration.

(v) Respondent may respond to Claimant's brief regarding Claimants' reasonable fees, costs, and expenses within 28 days of the issuance of this Interim Award.

*SO ORDERED.*
*Dated: April 1, 2026*

Ronnie L. White

*Hon. Ronnie L. White (Ret.)*
*JAMS Arbitrator*