Exhibit

3

exhibitsticker.com

JAMS®

| | |
|---|---|
| Kenneth Engels, et al., | ) |
| | ) |
| Claimants, | ) |
| | ) |
| v. | ) JAMS # 5335000098 |
| | ) |
| D2 Pharma Consulting, LLC n/k/a | ) |
| D2 Solutions HoldCo LLC, | ) |
| | ) |
| Respondents. | ) |

# FINAL AWARD

THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration provision of the parties' Settlement Agreement[1], and having examined the submissions, proofs, and allegations of the parties, now finds, concludes, and issues this Final Award.

In preparing this Final Award, the Arbitrator has thoroughly considered the arguments raised and evidence presented throughout this proceeding, by Claimant's Submission of Reasonable Attorneys Fees and Costs Pursuant to Order on Motion to Amend, Modify, or Clarify Interim Award[2] (the "Motion"), the Claimant's Letter to Arbitrator[3] (deemed Claimant's Response to Respondent's Motion), Claimant's Letter to Arbitrator White re Respondent D2's Opposition to Claimant's Fee Submission[4], and Respondent's Letter to Arbitrator In Response

[1] Settlement Agreement with Arbitration Provision, Doc. 380371; Hearing Exhibit 39.
[2] Claimant's Submission of Reasonable Attorneys Fees and Costs Pursuant to Order on Motion to Amend, Modify, or Clarify Interim Award, Doc. No. 1709066.
[3] D2's Response to Claimant's Submission of Reasonable Attorneys Fees and Costs Pursuant to Order on Motion to Amend, Modify, or Clarify Interim Award, Doc. No. 1726270.

[4] Letter to Arbitrator White re Respondent D2's Opposition to Claimants' Fee

to Claimant's Letter[5]. The Arbitrator has determined the merits thereof, and discusses herein only those facts, arguments, and/or factors that he considers relevant for the resolution of this proceeding.

---

***Relevant Procedural Background***

---

Claimants are represented by Todd R. Legon and William F. Rhodes of Legon Fodiman & Sudduth, P.A., 121 Alhambra Plaza, Suite 1505, Coral Gables, Florida 33134.

Respondent is represented by Tyler c. Schaeffer and David Stoeberl, of Carmody Macdonald P.C., 120 South Central Avenue, Suite 1800, St. Louis Missouri 63105.

The parties submitted Pre-Hearing Briefs[6] on January 20, 2026, and Joint Exhibit List and an Amended Joint Witness List on February 08, 2026. An in-person Final Hearing was held as scheduled on February 09, 2026 at the JAMS offices located at 190 Carondelet Plaza, Suite 1450, St. Louis, Missouri 63105.

Counsel for the parties each presented opening and closing remarks. Kenneth Engels testified on behalf of Claimants. Dean Erhardt ("Erhardt," CEO and President of Respondent D2) testified on behalf Respondent. No other witnesses testified. A transcript[7] of the Final Hearing reflects the entirety of the proceedings and the Joint Exhibits admitted into evidence.

---

Submission, Doc. No. 1726875, June 19, 2026.

[5] D2 Letter to Arbitrator in Response to June 19, 2026 Letter, Doc. No. 1662922, June 25, 2026.

[6] Claimants' Pre-Hearing Brief, Doc. No. 1521950; D2 Pre-Hearing Brief with Exhibits, Doc. No. 1522693.

[7] Final Hearing Transcript, Doc. No. 1584981.

The parties subsequently submitted Post-Hearing Briefs[8] on March 06, 2026.

On April 02, 2026, the undersigned issued an Interim Award, granting Claimants damages in the amount of $637,182.44 as well as their attorneys' fees and costs related to this arbitration. Respondent then moved the Arbitrator to Amend, Modify, or Clarify that Interim Award. The Arbitrator ruled on Respondent's Motion on May 29, 2026, specifically naming Claimants Kenneth and Una Engels as the beneficiaries of the monetary damages award, and granting Claimants Kenneth and Unha Engels reasonable attorneys' fees and costs related to Respondent's motion. The Arbitrator requested Claimants to submit their accounting of the same, and allowed Respondent an opportunity to respond to Claimants' submissions[9].

The parties complied; Claimants submitted their accounting of attorneys' costs and fees, with supporting Exhibits A-C,[10] on June 5, 2026. After requested and being granted an extension to respond, Respondent D2 filed its response in opposition to Claimants' submissions[11] on June 18, 2026.

On June 19, 2026, Claimants provided a Letter to Arbitrator White in Response to D2's opposition to their fees and costs submissions[12]. Respondent D2 replied with its own Letter to Arbitrator[13] on June 25, 2026. Now, the Arbitrator issues this FINAL AWARD.

---

[8] Claimants' Post-Hearing Brief, Doc. No. 1584962; D2 Pharma's Post-Hearing Brief, Doc. No. 1584965.

[9] Order on Respondent's Motion to Amend, Modify, or Clarify Interim Award, Doc. No. 1697609.

[10] Claimants' Submission of Reasonable Attorneys' Fees and Costs Pursuant to Order on Motion to Amend, Modify, or Clarify Interim Award, Doc. 1709066.

[11] D2's Response to Claimants' Submission of Reasonable Attorneys' Fees and Costs Pursuant to Order on Respondent's Motion to Amend, Modify, or Clarify, Doc. 1726270.

[12] Letter to Arbitrator White re Response to D2 Opposition to Claimants' Fee Submission, Doc. 1726875.

[13] D2's Letter to Arbitrator in Response to June 19, 2026 Letter, Doc. 1733918.

## *The Governing Agreement(s) and Law*

### A. The Governing Settlement Agreement

The parties' Settlement Agreement,[14] effective December 30, 2020, provided Claimants, each, with 3.5% ownership interest in D2 as consideration for settlement of their [previous] dispute with D2. Section 10, referenced as the anti-dilution provision, states:

> **10. Equity Grant.**
>
> a. On the Closing Date, and subject to the execution of a Joinder Agreement substantially in the form attached hereto as Exhibit C by each of (i) Kenneth Mark Engels ***"Kenny",*** and (ii) Unha, D2 shall issue three and one-half percent (3.5%) of the outstanding Units of D2 to each of Kenny and Unha (the ***"Closing Equity Issuance").*** The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100 Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the ***"Initial Capital Raise");*** provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date. For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise.
>
> b. Unha shall have the opportunity to earn one percent (1%) of the then outstanding Units of D2 per fiscal year during each of the Company's 2021, 2022 and 2023 fiscal years. To be eligible for such one percent (1%) Unit award for each calendar year, Unha must be continuously employed for the full calendar year (i.e., no prorations for a partial year of employment). For the avoidance of doubt,

[14] Settlement Agreement, Doc. No. 380371; Hearing Exhibit 39.

> the potential one percent (1%) Unit awards which are the subject of this subsection b. shall not have the ant-dilution protection as is provided in subsection a. above.

Settlement Agreement, § 10 (emphasis added)[15].

Claimants alleged that Respondent impermissibly diluted their ownership interests in violation of Section 10. Claimants request, alongside compensatory damages, attorneys' fees, costs, and expenses in this arbitration. Section 24 permits such an award if the party prevails.

> 24. **Prevailing Party.** If a party hereto commences a proceeding against another party to enforce and/or recover damages for breach of this Agreement, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable costs and expenses of enforcement and collection of any and all remedies and damages, or all reasonable costs and expenses of defense, as the case may be. The foregoing costs and expenses shall include reasonable attorneys' fees.

Settlement Agreement, § 24 (emphasis added)[16].

Respondent has argued[17] and thus invoked Section 33 of the parties' Agreement in its opposition to any award of damages and/or attorneys' fees and costs:

> D2 Pharma renews its objection that only WorkUp and D2 are parties to the Settlement Agreement and that the Settlement Agreement provides that non-parties (such as the Engels) are entitled to no rights or remedies under it and that nothing in the Settlement Agreement, such as the prevailing party attorneys' provision, should be construed differently. The Settlement Agreement provides:
>
> 33. **Rights of Third Parties.** Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or given any person other than the Parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.
>
> …

---

[15] *Id.*
[16] *Id.*
[17] D2's Response to Claimants' Submission of Reasonable Attorneys' Fees and Costs Pursuant to Order on Respondent's Motion to Amend, Modify, or Clarify, p. 2; Doc. 1726270.

> Under Section 33, the Engels (as non-parties) are not entitled to any rights or remedies under the Settlement Agreement, which would include an award of attorneys' fees.

Respondent has also argued that the parties' Letter of Intent[18] ("LOI") executed during their negotiations of the Settlement Agreement is relevant to this dispute to clarify and/or contextualize the plain text of Sections 10 (a) and 10(b). Consequently, Section 35 of the Settlement Agreement is made relevant:

> 35. **Entire Agreement.** This Agreement, including the other documents referred to herein, contains the entire understanding of the Parties with respect to the subject matter contained herein and therein. This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter.

Settlement Agreement, § 35 (emphasis added)[19].

Attached and incorporated into the Settlement Agreement (as Exhibit A) is D2's Fourth Amended and Restated Operating Agreement[20] ("Operating Agreement"), dated as of October 20, 2020, with an Amended Exhibit A reflecting the Units issued under the Settlement Agreement. The Operating Agreement defines two terms relevant to this dispute[21]: "Percentage Interest" (Article I, Subsection 1.1(aa)); and "Units; Issuance of Units" (Article IV, Subsection 4.4):

> **(aa)** ***"Percentage Interest"*** means, for each Unit Owner, a percentage equal to a fraction the numerator of which is the sum of the number of Units owned by such Unit Owner and the denominator of which is the sum of the number of outstanding Units.
>
> …

[18] Final Hearing Exhibits 33-36 (evolving, redlined, and final versions).
[19] Settlement Agreement, Doc. No. 380371; Hearing Exhibit 39.
[20] Settlement Agreement, Section 17, Closing Deliverables, Subsection (b)(iii), D2 Deliveries.
[21] Neither term, "Units" and/or "Percentage Interest," is re-defined, or differently defined, in the Settlement Agreement or the Joinder Agreement.

> **4.4 Units; Issuance of Units .** The Company shall have the authority to issue up to 2,000,000 Units. <u>Each Unit shall be identical to all other Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a Unit Owner as set forth in this Agreement.</u> The Members hereby grant the necessary authorization to the Board of Managers to authorize and issue the amount of Units necessary to properly issue the Units as contemplated hereunder.

(emphasis added).

### B. The Governing Legal Standards

The parties agree that this arbitration is governed by the substantive laws of the state of Missouri and in their briefing articulated the following relevant legal standards.

#### 1. Contract Law

Missouri law requires that a contract be read as a whole, applying the plain and ordinary meaning of its terms and "declining to adopt any construction that leaves language without function or sense." *Jimenez v. Cintas Corp*., 475 S.W.3d 679, 686 (Mo. App. E.D. 2015). Further, Missouri law treats an LLC ownership percentage as a protected economic property interest and requires compensation for the fair value of a member's ownership interest even after expulsion, confirming that these economic rights are a "member's personal property". *Chadwick v. Huntoon*, 634 S.W.3d 832, 840 (Mo. App. S.D. 2021). Claimants' 7% Closing Equity Issuance is therefore a vested economic stake.

Missouri law also gives binding force to the word "shall," which appears in the concluding sentence of Section 10 of the Settlement Agreement. In *Pelopidas, LLC v. Keller*, 633 S.W.3d 383, 389–90 (Mo. Ct. App. 2021), the court held that "shall" is the language of obligation and imposes a contractual duty.

Missouri law recognizes the canon *expressio unius est exclusio alterius*: when a contract expressly specifies one type of event or circumstance, courts infer that other, unwritten type or categories of events are excluded. *Lafollette v. Liberty Mutual Insurance Co.*, 139 F.Supp.3d 1017 (W.D. Mo. 2015).

Equitable remedies, when disruptive or requiring corporate restructuring that would affect third parties, are disfavored when an adequate remedy at law exists; Missouri courts have awarded the cash value of an ownership interest. *Amalaco, LLC v. Butero*, 593 S.W.3d 647, 653 (Mo. App. E.D. 2019); *Chadwick v. Huntoon*, 634 S.W.3d 832, 837 (Mo. App. S.D. 2021); *Heifetz v. Apex Clayton Inc.*, 2017 Mo. App. LEXIS 280, at *13 (Mo. App. E.D. 2017).

Under Missouri law, a plaintiff asserting breach of contract must prove both the existence of damages and the amount of those damages with reasonable certainty. *Timberland Forest Prods., Inc. v. Franks*, 419 S.W.3d 806, 810 (Mo.App.S.D. 2013). Missouri law recognizes "money compensation" as the primary remedy for breach of contract as more practical. *Finch v. Campbell*, 541 S.W.3d 616, 634 (Mo. App. W.D. 2017). The standard in Missouri is "fair market value," the price property would bring between a willing seller and a willing buyer at the time. *Chadwick v. Huntoon*, 634 S.W.3d 832, 842 (Mo. App. S.D. 2021). It is not confined to a single rigid formula, and may be established using the method best supported by the record. *Id.*

When compensatory damages are ascertainable at the time of the breach, and are capable of exact computation, Missouri law permits prejudgment interest where damages are liquidated or readily ascertainable. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. App. W.D. 2008); *Mo. Rev. Stat.* § 408.020 (providing for interest at nine percent per annum).

**2. Parol Evidence**

Under Missouri law, contract ambiguity arises when (i) language is

reasonably susceptible to two or more interpretations, (ii) the contract promises something in one point and takes it away in another, or (iii) there is "duplicity, indistinctness or uncertainty" in the language. *STL Riverview Plaza LLC v. Metro. St. Louis Sewer Dist.,* 681 S.W.3d 290, 301 (Mo. App. E.D. 2023). "The parol evidence rule ... prohibits the contradiction of integrated contracts. It does not apply to parol testimony that does not contradict the terms of an integrated agreement." *Frontenac Bank v. T.R. Hughes, Inc*., 404 S.W.3d 272, 282 (Mo.App.E.D. 2012). In sum, presentation of parol evidence, such as the parties' LOI preceding the execution of the Settlement Agreement, when presented to *clarify* rather than *contradict* the Agreement's terms, is consistent with governing Missouri law.

### 1. The Governing Arbitral Rules

The following JAMS Comprehensive Arbitration Rules & Procedures,[22] in numerical order, have been referenced in the parties' submissions, and which the parties agree are applicable to this proceeding:

> **Rule 11. Interpretation of Rules and Jurisdictional Challenges**
>
> (a) Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.
>
> (b) Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.
>
> (c) Disputes concerning the appointment of the Arbitrator shall be resolved by JAMS.

[22] Comprehensive Arbitration Rules and Procedures | JAMS Mediation, Arbitration, ADR Services, Effective June 1, 2021; Rules 11, 22, 24, and 29.

(d) The Arbitrator may, upon a showing of good cause or sua sponte, when necessary to facilitate the Arbitration, extend any deadlines established in these Rules, provided that the time for rendering the Award may be altered only in accordance with Rules 22(i) or 24.

**Rule 22. The Arbitration Hearing**

(h) When the Arbitrator determines that all relevant and material evidence and arguments have been presented, and any interim or partial Awards have been issued, the Arbitrator shall declare the Hearing closed. The Arbitrator may defer the closing of the Hearing until a date determined by the Arbitrator in order to permit the Parties to submit post-Hearing briefs, which may be in the form of a letter, and/or to make closing arguments. If post-Hearing briefs are to be submitted or closing arguments are to be made, the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs or at the conclusion of such closing arguments, whichever is later.

…

(i) The requesting Party shall bear the cost of such stenographic record. If all other Parties agree to share the cost of the stenographic record, it shall be made available to the Arbitrator and may be used in the proceeding.

…

**Rule 29. Sanctions**

The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

---

***Undisputed Timeline of Events***

---

The following facts of record developed through the parties' submissions, deposition and/or witness testimony during arbitration hearing, and exhibits admitted into evidence.

| | |
|---|---|
| July, 2020 | Respondent failed to make a tranche of required payment of $835,000 for acquisition of Claimants' business under the parties' previous agreement |
| November 23, 2020 | Claimants filed suit in Delaware after the contractual cure period expired |
| December 23, 2020 | Parties executed a Letter of Intent (LOI) to enter into a Settlement Agreement (Ex. 36)<br>• LOI referenced a then-contemplated $8 Million capital raise |
| December 30, 2020 | Parties execute Settlement Agreement<br>• As consideration for Claimant accepting the Settlement Agreement and agreeing to dismiss, with prejudice, Claimants' lawsuit, D2 issued a 3.5% ownership interest to each Kenneth and Unha Engels<br>• Section 10(a) prohibits dilution of Engels' ownership percentage during the Initial Capital Raise Period of six (6) months, until June 30, 2020 |
| January 1st, 2021 | D2's Fifth Updated and Amended Operating Agreement reflected Claimants' equity as 14,000 units out of 200,000 total outstanding units: 7% of the company; 3.5% to each Kenneth and Unha Engels (Ex. 8, Ex. A) |
| February, 2021 | D2 issued 1,083.5 units to 4Engs Consulting LLC (Exs. 10, 47-48)<br>• D2 Vice President of Finance, applying Section 10(a)'s anti-dilution protections to maintain 7% Unit ownership of Claimants, prepared and circulated a capitalization table reflecting an increase in Claimants' total units to 14,075.84 (Ex. 57) |

| | |
|---|---|
| January-February, 2021 | D2 made six additional grants, a total of 31,223.30 new units, for non-capital raises (Exs. 56, 57) |
| November 16, 2021 | D2 adopted the Sixth Amended and Restated Operating Agreement (the "Sixth," Ex. 52) to incorporate the ownership of Viewside Capital Partners as now part of the D2 organization[23]:<br>• included an updated capitalization table reflecting the issuance of units to 4Engs Consulting LLC, and reflecting D2's six additional grants of 31,223.3 new units to 4Engs Consulting LLC and others, but did not reflect a commensurate increased number of units to Claimants to maintain a 7% ownership by Claimants<br>• The Sixth proposed a reorganization of D2's units, authorizing 42,500 "Class D" units to be awarded for services, not capital<br>• Claimants had not been asked to execute Joinders, nor provided a copy of the Sixth when the Sixth was executed<br>• Claimants received a copy of the Sixth in October, 2022 |
| September, 2022 | Claimants received their 2021 K-1 tax documents from D2's auditor (Ex. 9), reflecting ownership percentages below 3.5% each |
| October, 2022 | Claimants raised the dilution issue to Respondent's counsel, who asserted Respondent did not believe that issuances to service providers were subject to Section 10(a)'s anti-dilution provision (Ex. 10) |
| November 7, 2022 | Claimants notified D2's auditors by letter that the K-1s would require amendment in light of the dilution (Ex. 13) |

[23] Final Hearing Testimony, Erhardt, 164:23 – 165:23.

| | |
|---|---|
| December, 2022 | Claimants initiated this arbitration.<br><br>Claimants requested relief from future dilution of their ownership percentage by the issuance of new units from the newly authorized unit pool until Claimants' rights under the Settlement Agreement had been adjudicated |
| December 28, 2022 | D2 executed a Seventh Amended and Restated Operating Agreement ("Seventh"), expanding the authorization of Class D units to 72,051 units (Ex. 53) |
| January 20, 2023 | D2 issued 2,500 units to David Saunders (Ex. 56 at 305-316) |
| December, 2024 | D2's most recent capitalization reflected in this arbitral record showed that D2 had issued and vested 55,096 new units (*id.*)<br><br>• D2 did not issue additional units to Claimants to maintain their ownership percentage at 3.5% each<br><br>• Claimants' ownership interest had fallen to 1.83% each |

---

***Analysis***

---

**A. The Letter Of Intent as Parol Evidence**

Prior to the Final Hearing, Claimants moved *in limine* to exclude evidence of the parties' negotiations and/or discussions leading up to the disputed Settlement Agreement as extrinsic to the Settlement Agreement and inadmissible during the Final Hearing. Respondent had argued that some of the evidence and/or documents at issue is part of Claimants' own non-rebuttal trial exhibit list, and that such evidence in this Arbitration was the result of Claimants expressly seeking that [extrinsic] evidence in their discovery

requests to Respondent, which Respondent produced. Claimants' motion was denied. During the Final Hearing, the Arbitrator admitted the LOI into evidence. Both witnesses offered testimony related to the LOI, and both counsel had the opportunity to argue what effect, if any, the contents of the LOI may have on the analysis of the meaning of the plain text of Section 10 of the parties' Settlement Agreement.

Respondent argued that the plain text of the Settlement Agreement should be read as ambiguous regarding protecting Claimants' units from dilution by D2's issuance of units to others for non-capital raises. Because the LOI did not include the parties' intention to apply anti-dilution terms for units issued by D2 for reason(s) other than then-contemplated-initial-capital-raise, the text of the Settlement Agreement should be interpreted such that it provides anti-dilution protection only for units issued by D2 for a capital raise within 6 (six) months of the execution of the Settlement Agreement.

Respondent's argument is unavailing for two reasons. First, the LOI is on its face a "non-binding" document. Secondly, Section 35 of the Settlement Agreement is an integration clause which specifies that the Settlement Agreement "contain[s] the entire understanding of the Parties."[24] Both documents were jointly drafted[25] and contain no apparent contradiction in the relevant terms. Therefore, the LOI is not relevant to the analysis here.

## B. Breach of the Settlement Agreement

This dispute turns on two determinations: (1) whether Section 10(a) of the Settlement Agreement provided a six-month anti-dilution protective period only for dilution due to issuance of units for a capital raise; and (2) whether Respondent breached the anti-dilution provisions of Section 10(b).

---

[24] Settlement Agreement, Doc. No. 380371; Hearing Exhibit 39.
[25] *Id.*, Section 25, "Jointly Drafted."

The plain text of the Settlement Agreement, under the governing law of the state of Missouri, is unambiguous: Missouri law recognizes the canon *expressio unius est exclusio alterius*, i.e., when a contract expressly specifies one type of event or circumstance, courts infer that other, unwritten type or categories of events are excluded. *Lafollette v. Liberty Mutual Insurance Co.*,-----. Here, Section 10 of the Settlement Agreement's anti-dilution provision expressly specifies potential dilution, *after* the six-month protected period, for one type or category for issuance of ownership interest (units), i.e., the initial or any other *capital raise*. This tribunal shall consider this dispute in light of the plain text of the parties' agreement and governing law.

The Settlement Agreement's Section 10 specifies potential dilution for "capital raises" only. It does not allow, assume, infer, or consider potential dilution of Claimants' ownership interests for myriad other possibilities like issuances of ownership interests to employees and/or vendors. specifies only one category or type of ownership interest: a *percentage* amount (not numerical units). Here, the benefit of the bargain for Claimants was a total of 7% ownership of Respondent D2 company, to whatever the number of units that percentage may amount at a given point in time. Accordingly, when Respondent issued units to a third party for reasons other than a capital raise, Respondent's Vice President of Finance followed the plain text of the Settlement Agreement and issued an updated capitalization table which reflected a larger number of units allocated to Claimants in order to maintain their percentage ownership interests.

Next, the Settlement Agreement's Section 10(b) confirms that 10(a) retained operative protection after six months. Section 10(b) provides that Claimant Unha Engels' contingent one-percent annual awards "shall not have the anti-dilution protection as is provided in subsection a." That carve-out and specificity would be unnecessary if 10(a) provided no post–six-month protection at all. Reading 10(a) as a complete waiver renders 10(b)'s cross-

reference without function, contrary to the rule that contracts must be construed to give effect to all provisions. *Pelopidas, LLC v. Keller*, 633 S.W.3d at 395.

Finally, the plain text of the Settlement Agreement includes the obligation of maintaining Claimants' ownership interests at 7%. Missouri law gives binding force to the word "shall," which appears in the concluding sentence of the controlling section. *Pelopidas,* 633 S.W.3d 383, 389–90 (Mo. Ct. App. 2021) ("shall" is the language of obligation and imposes a contractual duty). Section 10(a) states that Claimants "shall each own 3.5%" ownership interest. The parties' agreement and Respondent's obligation should be enforced.

The Arbitrator finds Claimants' arguments persuasive in light of the facts and testimony in evidence in this proceeding. Applying Missouri law which requires that a contract be read as a whole, applying the plain and ordinary meaning of its terms and "declining to adopt any construction that leaves language without function or sense" (*Jimenez v. Cintas Corp.*, 475 S.W.3d 679, 686 (Mo. App. E.D. 2015), the Arbitrator finds that the interpretation requested by Respondent violates that principle of law, and of justice, by treating the six-month protection as operative against a capital raise while permitting the same ownership percentage to be reduced through discretionary issuances during the identical period, thereby depriving Claimants' of their bargained-for ownership interests.

Respondent diluted the percentage of Claimants' ownership interests for reasons other than an "initial" and "future" capital raise(s), and thereby breached the parties' Settlement Agreement. Respondent is liable to Claimants for the resultant damages.

### C. Damages

Missouri law treats an LLC ownership percentage as a protected economic property interest. *Chadwick v. Huntoon*, 634 S.W.3d 832, 840 (Mo. App. S.D. 2021) (compensation for the fair value of a member's ownership interest even after expulsion; economic rights are a "member's personal property".). Claimants' 7% Closing Equity Issuance is therefore a vested economic stake.

Claimants have argued the "[r]estoring the 7% Closing Equity Issuance through additional units would require amendments to capitalization tables and governance documents and would affect approximately thirty-one (31) other unitholders. Missouri law disfavors such disruptive equitable remedies where an adequate remedy at law exists."[26] Respondent has argued that specific performance of the contract, i.e., restoring Claimants' ownership interests to comply with the Settlement Agreement is not available. Missouri law accepts an award of damages in lieu of specific performance of the contract. transaction and price are reflected in the Sixth Amended and Restated Operating Agreement. Missouri law further recognizes "money compensation" as the primary remedy for breach of contract. *Finch v. Campbell*, 541 S.W.3d 616, 634 (Mo. App. W.D. 2017). With consideration of the foregoing, the Arbitrator awards damages as discussed below.

In this dispute, the percentage of ownership interest, when converted to a specific number of units for the purposes of calculating the number of units Claimants' un-diluted ownership interest, makes relevant Respondent D2's structure of units of ownership. As cited above and recounted here, attached and incorporated into the Settlement Agreement (as Exhibit A) is D2's Fourth Amended and Restated Operating Agreement[27] ("Operating Agreement"), dated

[26] Claimants' Post-Hearing Brief, p. 17; Doc. No. 1584962.
[27] Settlement Agreement, §17, Subsection (b)(iii), D2 Deliveries; Doc. No. 380371, Hearing Exhibit 39.

as of October 20, 2020, with an Amended Exhibit A reflecting the Units issued under the Settlement Agreement. The Operating Agreement defines two terms relevant to this dispute[28]: "Percentage Interest" (Article I, Subsection 1.1(aa)); and "Units; Issuance of Units" (Article IV, Subsection 4.4):

> **(aa)** ***"Percentage Interest"*** means, for each Unit Owner, a percentage equal to a fraction the numerator of which is the sum of the number of Units owned by such Unit Owner and the denominator of which is the sum of the number of outstanding Units.
>
> ...
>
> **4.4 Units; Issuance of Units .** The Company shall have the authority to issue up to 2,000,000 Units. Each Unit shall be identical to all other Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a Unit Owner as set forth in this Agreement. The Members hereby grant the necessary authorization to the Board of Managers to authorize and issue the amount of Units necessary to properly issue the Units as contemplated hereunder.

(emphasis added).

Following the above definitions, all units issued by Respondent are to be considered "identical to all other Units in all respects." Consequently, the tribunal considers the two categories of damages articulated by Claimant: (1) damages for Respondent's issuance of non-capital units during the time period subject to Section 10(a) of the Settlement Agreement, and (2) as subject to Section 10(b), damages for Respondent's subsequent issuances of ownership interests/units to employees and/or vendors for non-capital raises.

In their Post-Hearing Brief, Claimants applied the above definition of "Percentage Interest" to calculate the number of units to which Claimants were entitled but for the impermissible dilution of their ownership percentage(s) at

[28] Neither term, "Units" nor "Percentage Interest," is differently defined in the Settlement Agreement or the Joinder Agreement.

two points in time corresponding to the end of the anti-dilution period subject to Section 10(a), and the subsequent period of additional non-capital grants and awards of units to employees and/or vendors. Claimants utilized Respondent's own, undisputed, capitalization schedules and operating agreements to establish both the number of units owed to Claimants, as well as the per-unit issue price(s) set by Respondent at the time the dilution(s) and issuances of units for non-capital raises. *See Claimants' Post-Hearing Brief, pp. 15-19.*

**1. "New Valuation Theory" In Claimants' Post-Hearing Brief**

Respondent alleged that Claimants impermissibly put forth new evidence and a new "valuation theory" in its Post-Hearing Brief, and that this purported "new valuation theory" was accepted by the Arbitrator without the Respondent having had the opportunity to test or examine Claimants regarding the same. Respondent's argument implicates both Rule 22 *and* the facts in the conduct of this arbitration (discussed further below herein). In this section, the Arbitrator determines the effect of Rule 22 upon Respondent's argument.

Procedurally, Rule 22(h), cited in full above, directs that "[w]hen the Arbitrator determines that all relevant and material evidence and arguments have been presented, and any interim or partial Awards have been issued, the Arbitrator shall declare the Hearing closed" and "[i]f post-Hearing briefs are to be submitted or closing arguments are to be made, the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs or at the conclusion of such closing arguments, whichever is later."

Here, the parties were given leave to file their respective post-hearing briefs. The Hearing, therefore, was considered closed only once the post-hearing briefs were submitted on March 06, 2026. Any arguments made by either party in the post-hearing briefs were timely, to be evaluated on their merits in the Interim Award and any future award.

### 2. Issue Price of Units At The Time Of Dilution

Respondent has not challenged nor moved to revisit any factual findings, nor the determination of liability, in the Interim Award. Respondent does move to amend, modify, or clarify the amount of, and calculation thereof, the monetary damages awarded to Claimant.

Respondent has argued and alleged that the per unit price of units Respondent issued to Claimants utilized to calculate the monetary damages amount does not comport with the Class A-1 units issued to Claimants, and the price of said units as reflected in the Sixth Amended and Restated Operation Agreement and the Seventh Amended Operating Agreement. Alas, as Claimants note in their Letter Response to Respondent's Motion, there is no "Class A-1" issue price in the Sixth Amended and Restated Operating Agreement (Joint Exhibit 52): this Agreement defines a single Class A Issue Price. The designations of units as Class A-1 and Class A-2 appear only in the Seventh Amended and Restated Operating Agreement, which Respondent would be expected to know since Respondent drafted both Agreements.

Additionally, the Seventh Amended Operating Agreement further impermissibly diluted the Claimants' equity share by issuance of greater numbers of units, creating more classes of units thereby demoted the value of Claimants' units, which eroded value of Claimants' units to nearly half of their bargained-for equity amount of 3.5% each (for a total of 7%) as provided in the parties' Settlement Agreement. Use of an issue price as set by the Seventh Amended Agreement would, therefore, wrongly depress the value of Claimants' units, and would reflect a price *after* the point in time when Respondent had already diluted the equity value of the units including by creating new classes of units further depressing the value of Claimants' units—and may not be utilized to calculate a "fair market value" of Claimants' units prior to the dilution and devaluation of same. Respondent's argument is

unavailing.

### 3. Monetary Damages Versus Specific Performance

The governing legal standards, iterated in the Interim Award and reiterated above in this Order, have not been disputed by the parties. Missouri law favors monetary damages when ascertainable and as based on the fair market value at the time of the breach. *See above, Governing Agreement(s) and Law.*

Nevertheless, Respondent requested that the Arbitrator (1) [a]mend the Interim Award to eliminate reliance on the issue price found it its relevant Operating Agreement, and vacate the portion of the Award granting money damages to Claimants, and (2) issue a Final Award limiting any relief to Claimants ordering specific performance by restoration of a particular Class and number of units to Claimants to offset the dilution of their equity interests.

### 4. Claimants Kenneth and Una Engels Are Eligible for Remedies Under Section 33

The undersigned Arbitrator's authority under the parties' agreed upon governing JAMS Rules (see above), specifically Rule 11, includes construction and interpretation of the parties' Settlement Agreement. The Arbitrator has previously ruled that Claimants are eligible for remedies under Section 33 of the parties' Agreement; and the undersigned Arbitrator has previously ruled on the question of whether Claimants are parties. (*See* Interim Award, and Order on Respondent's Motion to Amend, Modify, or Clarify Interim Award, both cited herein.) The undisputed facts as well as the governing law in which the Arbitrator's analyses were grounded remain unchanged. So do the Arbitrator's analyses and rulings, and shall neither be re-litigated nor regurgitated here.

Claimants are, undisputedly, the intended and named beneficiaries of the Settlement Agreement breached by Respondent. Claimants, as prevailing parties in this proceeding, are entitled to their attorneys' fees and costs in securing their

rights under the Settlement Agreement.

**5. Monetary Damages Directed In Specific**

Respondent argued that "[c]larification is required regarding who is eligible to receive any remedy under the Settlement Agreement."[29] Clarification is provided by the terms of the parties' Settlement Agreement, subsequent and amended agreements, witness testimony, and Joint Exhibit 4 presented during the Final Hearing:[30] under the terms of the parties' Settlement Agreement, Claimants Kenneth Engels and Una Engels were issued shares of stock of equal measure, valued at 3.5% equity each. The corporate entity, WorkUp Inc., which is a party to this arbitration, was issued no shares of stock pursuant to the Settlement Agreement. Accordingly, the monetary damages awarded for dilution of the value of their equity interest are directed to the holders of said equity interest, Claimants Kenneth and Una Engels, each in equal measure.

**6. Damages Analysis Consistent with Procedural Order No. 6**

Respondent has alleged that in the Interim Award, the Arbitrator accepted a calculation method mentioned in Claimants' Post-Hearing Brief that should have been barred by, and is inconsistent with, Procedural Order No. 6 issued previously in this arbitral proceeding. Respondent also argues that it made its decisions regarding arguments and evidence based on the Arbitrator's continued holdings consistent with Procedural Order No. 6 when the Arbitrator barred Claimants from presenting untimely expert evidence and/or expert testimony regardless of the underlying documents or information upon which that expert opinion may have been based.

Respondent is either mistaken as to the content of Procedural Order No. 6, specifically Section 9(f) which it cited, or Respondent has overlooked the source

[29] D2 Pharma's Motion to Amend Modify or Clarify Interim Award, Doc. No. 1655743, p. 3.
[30] Transcript of Final Hearing, Doc. No. 1584981, pp. 90-91.

of the calculation of the damages award. The Arbitrator clarifies both potential scenarios here in demonstration that the Interim Award is consistent with Procedural Order No. 6 because it does not involve an(y) expert opinion.

Procedural Order No. 6, as Claimants' Letter Response Brief points out, states in its entirety that "[t]he Interim and Final Awards shall be prepared in accordance with the Agreement, and the Rules." Perhaps Respondent meant to reference Section 7(e) which references Expert Discovery[31] and sets a schedule for disclosure of experts and disclosure of expert opinions if offered into evidence. Respondent's apparent understanding and argument that the calculation methodology used to ascertain a portion of the monetary damages award is a novel expert opinion presented as a "new valuation theory," advanced by Claimants for the first time in their Post-Hearing Brief—thus unable to have been examined or tested by Respondent—may inform Respondent's apparent understanding and argument that said calculation methodology should have been barred as untimely pursuant to Procedural Order No. 6. However, the facts, evidence, and testimony of record in this proceeding simply do not comport with Respondent's stated view.

The Interim Award recognized, and explained in detail, the source and application of the calculation methodology employed in determining a portion of the monetary award were the parties' relevant Amended Operating Agreements in effect at the time of the breach of contract (Respondent's issuance of units that diluted the value of Claimants' share to below the bargained-for amount of 3.5% equity interest each). Each Amended Operating Agreement was drafted by Respondent, entered into evidence without objection, and tested during witness examination during the Final Hearing.

For ease of reference, that section of the Interim Award is recounted below,

[31] Procedural Order No. 6, Doc. No. 1327894, pp. 3-4.

with emphases added to the relevant parts:

> Missouri law treats an LLC ownership percentage as a protected economic property interest. *Chadwick v. Huntoon*, 634 S.W.3d 832, 840 (Mo. App. S.D. 2021) (compensation for the fair value of a member's ownership interest even after expulsion; economic rights are a "member's personal property".). Claimants' 7% Closing Equity Issuance is therefore a vested economic stake.
>
> Claimants have argued the "[r]estoring the 7% Closing Equity Issuance through additional units would require amendments to capitalization tables and governance documents and would affect approximately thirty-one (31) other unitholders. Missouri law disfavors such disruptive equitable remedies where an adequate remedy at law exists."[32] Respondent has argued that specific performance of the contract, i.e., restoring Claimants' ownership interests to comply with the Settlement Agreement is not available. Missouri law accepts an award of damages in lieu of specific performance of the contract. transaction and price are reflected in the Sixth Amended and Restated Operating Agreement. Missouri law further recognizes "money compensation" as the primary remedy for breach of contract. *Finch v. Campbell*, 541 S.W.3d 616, 634 (Mo. App. W.D. 2017). With consideration of the foregoing, the Arbitrator awards damages as discussed below.
>
> In this dispute, the percentage of ownership interest, when converted to a specific number of units for the purposes of calculating the number of units Claimants' un-diluted ownership interest, makes relevant Respondent D2's structure of units of ownership. As cited above and recounted here, attached and incorporated into the Settlement Agreement (as Exhibit A) is <u>D2's Fourth Amended and Restated Operating Agreement</u>[33] ("Operating Agreement"), dated as of October 20, 2020, with an Amended Exhibit A reflecting the Units issued under the Settlement Agreement. <u>The Operating Agreement defines two terms relevant to this dispute[34]: "Percentage Interest" (Article I,</u>

---

[32] Claimants' Post-Hearing Brief, Doc. No. 1584962, p. 17.

[33] Settlement Agreement, §17, Subsection (b)(iii), D2 Deliveries; Doc. No. 380371, Hearing Exhibit 39.

[34] Neither term, "Units" nor "Percentage Interest," is differently defined in the Settlement Agreement or the Joinder Agreement.

Subsection 1.1(aa)); and "Units; Issuance of Units" (Article IV, Subsection 4.4):

**(aa)** ***"Percentage Interest"*** means, for each Unit Owner, a percentage equal to a fraction the numerator of which is the sum of the number of Units owned by such Unit Owner and the denominator of which is the sum of the number of outstanding Units.

...

**4.4 Units; Issuance of Units .** The Company shall have the authority to issue up to 2,000,000 Units. Each Unit shall be identical to all other Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a Unit Owner as set forth in this Agreement. The Members hereby grant the necessary authorization to the Board of Managers to authorize and issue the amount of Units necessary to properly issue the Units as contemplated hereunder.

(emphasis added).

Following the above definitions, all units issued by Respondent are to be considered "identical to all other Units in all respects." Consequently, the tribunal considers the two categories of damages articulated by Claimant: (1) damages for Respondent's issuance of non-capital units during the time period subject to Section 10(a) of the Settlement Agreement, and (2) as subject to Section 10(b), damages for Respondent's subsequent issuances of ownership interests/units to employees and/or vendors for non-capital raises.

In [their] Post-Hearing Brief, Claimants have applied the above definition of "Percentage Interest" to calculate the number of units to which Claimants were entitled but for the impermissible dilution of their ownership percentage(s) at two points in time corresponding to the end of the anti-dilution period subject to Section 10(a), and the subsequent period of additional non-capital grants and awards of units to employees and/or vendors. Claimants utilized Respondent's own, undisputed, capitalization schedules and operating agreements to establish both the number of units owed to Claimants, as well as the per-unit issue price(s) set by Respondent at the time the dilution(s) and issuances of units for non-capital raises. *See Claimants' Post-Hearing Brief, pp. 15-19.*

Accordingly, Claimants are awarded $334,652.89 in compensatory damages, the economic value of the units withheld from Claimants in violation of 10(a); and Claimants are

> awarded $302,529.55 in compensatory damages, the economic value of the units withheld from Claimants in violation of Section 10(b).
>
> Claimants argue that because the above damages were ascertainable at the time of dilution and are capable of exact computation, applicable Missouri law permits prejudgment interest where damages are [liquidated or] readily ascertainable. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. App. W.D. 2008); Mo. Rev. Stat. § 408.020 (providing for interest at nine percent per annum). Claimants' position is valid. Claimants are awarded pre-award interest at the applicable statutory rate from the date of each wrongful dilution, and post-award interest until paid.

Respondent appeared to have overlooked or disregarded the above analysis underpinning the calculation of damages awarded. Nevertheless, as the record evidence and the Interim Award reflect, Claimants did not introduce, and the Arbitrator did not accept, a(ny) "new," "untested," or "valuation theory" in Claimants' Post-Hearing Brief.

The Interim Award was grounded its finding of liability on a thorough analysis of the record under agreed governing law, undisputed facts, joint exhibits in evidence, and witness testimony of record including testimony during the Final Hearing. Therefore, the analyses, conclusions, and damages calculations in the Interim Award are retained.

---

***Conclusions Related to Damages***

---

Accordingly, Claimants are due to be awarded $334,652.89 in compensatory damages, the economic value of the units withheld from Claimants in violation of 10(a); and Claimants are due to be awarded $302,529.55 in compensatory damages, the economic value of the units withheld from Claimants in violation of Section 10(b).

Claimants argued that because the above damages were ascertainable at the time of dilution and are capable of exact computation, applicable Missouri law permits prejudgment interest where damages are [liquidated or] readily ascertainable. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. App. W.D. 2008); Mo. Rev. Stat. § 408.020 (providing for interest at nine percent per annum). Claimants' position is valid. Claimants are due to be awarded pre-award interest at the applicable statutory rate from the date of each wrongful dilution, and post-award interest until paid.

---

***Attorneys' Fees and Costs***

---

The parties' Settlement Agreement, noted previously herein and recounted here, provides:

> 24. **Prevailing Party.** If a party hereto commences a proceeding against another party to enforce and/or recover damages for breach of this Agreement, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable costs and expenses of enforcement and collection of any and all remedies and damages, or all reasonable costs and expenses of defense, as the case may be. The foregoing costs and expenses shall include reasonable attorneys' fees.

Settlement Agreement, Section 24. As Claimants are the prevailing party in this arbitral proceeding, Claimants are entitled to the benefit of the contractual term. Claimants are awarded reasonable costs and expenses, including reasonable attorneys' fees, related to this arbitration.

**Claimants' Attorneys' Fees and Costs Submissions**

Claimants submitted their attorneys' fees and Westlaw costs in responding to Respondent's motion in the amount of $6,079.55[35], and JAMS forum costs in

[35] Exhibit A to Claimants' Submissions, Doc. 1709066.

the amount of $10,000[36].

**Respondent's Opposition to Claimants' Fees and Costs**

Respondent has not objected as to the reasonableness of the particular amount of attorneys' fees and costs as submitted by Claimants. Rather, Respondent objected to a grant of such an award in any amount: Respondent restated its objection that only WorkUp and D2 are parties to the governing Settlement Agreement, therefore the Claimants Kenneth and Unha Engels should be considered "non-parties" under the terms of the governing Settlement Agreement, and as "non-parties" to the Agreement, they are not entitled to rights or remedies including attorneys' fees and costs that the Settlement Agreement provides to a prevailing party. Respondent argued[37]:

> D2 Pharma renews its objection that only WorkUp and D2 are parties to the Settlement Agreement and that the Settlement Agreement provides that non-parties (such as the Engels) are entitled to no rights or remedies under it and that nothing in the Settlement Agreement, such as the prevailing party attorneys' provision, should be construed differently. The Settlement Agreement provides:
>
> 33. **Rights of Third Parties.** Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or given any person other than the Parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.
>
> Under Missouri law, where a contract is clear and unambiguous, the tribunal must enforce it as written. Bringer v. Bringer, 728 S.W.3d 631, 642 (Mo.App.E.D. 2025).
>
> Under Section 33, the Engels (as non-parties) are not entitled to any rights or remedies under the Settlement Agreement, which would include an award of attorneys' fees.
>
> Under Section 24, WorkUp (as the only Claimant that is a party to the Settlement Agreement) is no longer a "prevailing party" as the Arbitrator has now denied it any monetary award. *Brooke Drywall of Columbia, Inc. v. Bldg. Const. Enterprises, Inc.*, 361 S.W.3d 22, 27 (Mo.App.W.D. 2011) (in order to be deemed the prevailing party entitled to attorneys' fees the party must receive at least "some relief" from

[36] Exhibits B and C to Claimants' Submissions, Doc. 1709066.

[37] D2's Response to Claimants' Submission of Reasonable Attorneys' Fees and Costs Pursuant to Order on Respondent's Motion to Amend, Modify, or Clarify, p. 2; Doc. 1726270.

> the tribunal.)
>
> Based on the plain terms of the Settlement Agreement, the Engels individually are not contractually permitted to receive any remedy or rights and WorkUp has not recovered for itself…

Respondent opposed an(y) award of attorneys' fees and costs.

**Claimants' Response to Respondent's Opposition**

In their Letter to the undersigned Arbitrator, Claimants stated that Section 33 of the Settlement Agreement, invoked by Respondent, does not apply to Claimants because Claimants **are** parties to the Agreement, *directly named* in Section 10(a) of the Agreement which issued ownership units in Respondent D2 directly to Claimants Kenneth and Unha Engels: "[th]ey are parties hereto, named and bound by the very agreement D2 now cites to escape accountability for breaching it."[38]

Further, Claimants argued, that Respondent D2 has waived this argument through its conduct:

> "Even if the contractual text left any doubt — and it does not — D2's conduct across this entire proceeding estops it from taking the position it now asserts, and renders the Opposition vexatious.
>
> *First*, the Engels filed their claims as individuals because their equity grants under the Settlement Agreement were unlawfully diluted by Respondent. D2 raised Section 33 at the threshold — and then voluntarily consented to JAMS jurisdiction over the merits (Doc. No. 393493) and litigated them to conclusion. Having chosen to litigate the merits rather than stand on that objection, D2 cannot now resurrect it selectively to strip the prevailing parties of fees.
>
> *Second*, in March 2023, after Claimants moved to stay this arbitration to pursue additional individual claims in Delaware, D2 opposed that motion (Doc. No. 456875) and won (Doc. No. 475098). D2 cannot extinguish an alternative forum and then deny the Engels the full benefit of their standing in the forum D2 chose to preserve.

[38] Letter to Arbitrator White re Response to D2 Opposition to Claimants' Fee Submission, p. 1; Doc. 1726875.

> A party that litigates the merits to conclusion, and blocks an alternative forum to do so, has forfeited the right to invoke a threshold objection only when it loses."[39]

Claimants also pointed out that Respondent's argument regarding the application of Section 33 had already been answered in the May 29, 2026 Order on Respondent's Motion to Amend, Modify, or Clarify the Interim Award, which ruled that "the monetary damages awarded for the dilution of the value of their equity interest are directed to the holders of said equity interest, Claimants Kenneth and Una Engels, each in equal measure." (Id. at 19-20, also see, Order ¶(iv).)"[40]

Claimants requested an additional $4,000.00 in sanctions against Respondent for its re-litigation of contractual interpretation theories that have been previously settled in this proceeding.

### Respondent's Reply

Respondent reiterated its argument that Claimants are not parties to the Settlement Agreement as defined in the opening paragraph which lists only D2 Pharma Consulting LLC and WorkUp, Inc.[41] Respondent also denied that it has waived its rights to enforce Section 33 of the Settlement Agreement's contractual limitation, citing to its invocation of Section 33 in its previous briefings and submissions during the conduct of this arbitration proceeding.[42] Respondent requested that Claimants be granted no award(s) of attorneys' fees, costs, or sanctions.

### Claimants' Request for Sanctions

Claimants have requested an additional amount of $4,000.00 in sanctions against Respondent for re-asserting arguments that have previously been heard, litigated, and adjudicated. The Arbitrator finds, in addition, that

[39] *Id.*, p. 2.
[40] *Id.*
[41] D2's Letter to Arbitrator in Response to June 19, 2026 Letter, p. 1; Doc. 1733918.
[42] D2's Letter to Arbitrator in Response to June 19, 2026 Letter, p. 3; Doc. 1733918.

Respondent did not maintain the scope of its permitted response to the subject of reasonableness of Claimants' submitted amount(s) in attorneys' fees and costs.

---

### *Conclusions Regarding Attorneys' Fees and Costs, and Sanctions*

---

The parties' governing Agreements and legal standards[43] direct an award to Claimants, as the prevailing party on the merits in this arbitral proceeding, of reasonable attorneys' fees and costs related to responding to Respondent's Motion to Amend, Modify, or Clarify Interim Award. Claimants are due to be granted their requested fees and costs.

Claimants' submissions pursuant to the Order of May 29, 2026, including the amount of attorneys' fees and costs incurred with supporting Exhibits A-C, are reasonable. Respondent has not objected to Claimants' submissions of the total amount of their fees and costs. Claimants are due to be granted their requested fees and costs in the total amount of $16,079.55.

The record of this proceeding, discussed above, does reflect that Respondent raised objections and brought a motion that in substance sought to reargue and/or reassert arguments previously briefed, litigated, and rejected by the Arbitrator. Claimants' request of sanctions in the amount of $4000.00 is also due to be granted.

---

## *FINAL AWARD*

---

Upon consideration of the relevant undisputed facts, the parties' submissions, testimony of record, legal standards, the governing agreements,

[43] See Interim Award, Doc. No. 1621180, pp. 7-12.

and the governing JAMS Rules, taken in the totality of the circumstances of this dispute, the Arbitrator finds that:

(i) Claimants' request for compensatory damages in the amount of $637,182.44 is ***GRANTED***; Claimants are awarded pre-award interest at the applicable statutory rate from the date of each wrongful dilution, and post-award interest until paid in full.

(ii) Claimants' request for reasonable attorneys' fees and costs is ***GRANTED***; Claimants are awarded fees and costs in the amount of $16,079.55.

(iii) Claimants' request for sanctions is ***GRANTED;*** Claimants are granted an award of sanctions in the amount of $4000.00.

(iv) Claimants' unopposed request to correct proposed a typographical correction to the Undisputed Timeline of Events as it appears on page 9 of 21 of the Interim Award and reprinted in the May 29, 2026 Order, noted immediately below:

> "the bullet point of the timeline entry for December 30, 2020. The Claimants' December 30, 2020 dismissal of the Delaware lawsuit filed November 23, 2020 was *with* prejudice, not without.1 The word "without" should read "with."

is ***GRANTED***: the arbitral record is hereby corrected, and reflected on page eleven (11) herein.

(v) This Hearing is now ***CLOSED***.

*SO ORDERED.*
*Dated: July 15, 2026*

Ronnie L. White

*Hon. Ronnie L. White (Ret.)*
*JAMS Arbitrator*