Exhibit

7

exhibitsticker.com

**JAMS ARBITRATION**

| | | |
|---|---|---|
| KENNETH MARK ENGELS and UNHA ENGELS, and WORKUP, INC. | ) | |
| Claimants, | ) | |
| v. | ) | Case No. 5335000098 |
| D2 PHARMA CONSULTING, LLC, n/k/a D2 SOLUTIONS HOLDCO LLC, | ) | |
| Respondent. | ) | |

**DEFENDANT D2 PHARMA CONSULTING, LLC'S PRE-HEARING BRIEF**

This arbitration presents a straightforward breach of contract question. Specifically, whether Claimants Kenneth and Uhna Engels had contractual protection from dilution for Respondent D2 Pharma Consulting's issuance of certain new ownership units, which otherwise would have reduced (*i.e.*, diluted) their ownership percentages alongside all other owners of D2.

The anti-dilution provision at issue appears in a Settlement Agreement entered between D2 and the Engels' company, Claimant Workup, Inc., to resolve prior litigation. As part of that settlement, D2 granted the Engels 7% of the units in D2 and included limited anti-dilution protection. Specifically, the Settlement Agreement granted the Engels 7% of the ownership units in D2 and provided they would not be diluted by new units D2 could have issued for a then-contemplated capital raise of up to $8 million for a period of six-months.

Claimants, however, read the Settlement Agreement differently. They believe that the Settlement Agreement provides that for six months, the Engels' units could not be diluted for ***any*** reason and that after six months, the Engels' units could not be diluted by issuance of units issued for any reason other than a capital raise.

Beyond misreading the plain terms of the Settlement Agreement and defying well-founded rules of contract construction, Claimants' interpretation of the anti-dilution clause is at odds with

the parties' comprehensive letter of intent and other contemporaneous evidence reflecting the parties' shared understanding of the limited anti-dilution protection at the time of entering into the Settlement Agreement.

Putting aside Claimants misreading of the Settlement Agreement, they also seek a remedy that Missouri law does not allow. Specifically, Claimants' exclusive remedy sought in this arbitration is for D2 to be ordered to completely buy out the Engels from their units at $3,460,100. Claimants base this theory of damages on the Engels' view that their units are "worthless" given the claimed "egregiousness" of D2's breach and D2's "betrayal" towards them. Claimants' requested remedy does not seek to restore Claimants to the position they would be in but for the alleged improper dilution of their units and is therefore not a recognized remedy for the breach of contract claim remaining in this arbitration. Further, the remedy requires expert opinion as to the value of the Engels' units, which Claimants have forfeited by not disclosing such an expert opinion as required under the Scheduling Order. Also, the remedy, if it was available at all, would arise out of the Engels' status as owners of D2, not the Settlement Agreement, which falls outside the scope of this arbitration's jurisdiction.

For these reasons, and those set forth below, the evidence to be presented at the hearing compels an award in D2's favor.

## **Background**

1. D2 Purchases Assets of Workup.

D2 is a Missouri-based limited liability company that provides consulting services for pharmaceutical manufacturers, hospitals, and pharmacies. Kenneth and Uhna Engels are New York-based entrepreneurs who founded Workup, a company specializing in healthcare software.

On July 1, 2019, D2 and WorkUp entered into an Asset Purchase Agreement ("***APA***"),

under which D2 acquired WorkUp's assets in exchange for payments to be made over four years. The purchase also granted the Engels phantom equity, entitling them to a portion of the proceeds if D2 were sold.

2. D2 Misses Payment Under APA and Parties Negotiate Settlement Agreement that includes Limited Anti-Dilution Protection.

By mid-2020, D2 was simultaneously unable to make its first payment under the APA and actively seeking investors to raise approximately $8 million. WorkUp filed suit against D2 in November 2020 for breach of the APA. At the time the lawsuit was filed, the parties were already discussing modifications to the APA to address the missed payment. On November 20, 2020, D2's President, Dean Erhardt, sent the Engels a proposed Letter of Intent ("***LOI***") outlining a restructured deal that included granting the Engels equity in D2. Over the next month, counsel for both sides exchanged revisions of the LOI as they negotiated the settlement terms.

One topic in those discussions was the percentage of equity the Engels would receive. The Engels initially sought 10–11% of D2. D2, however, had been advised that the potential investors for the planned $8 million raise would not accept that level of equity for the Engels.

In his deposition, Mr. Engels testified that Mr. Erhardt proposed an "elegant solution" whereby the Engels would receive a lower equity percentage, but the Engels' percentage ownership would not be diluted by any units D2 issued to an investor for the contemplated capital raise of up to $8 million. (K. Engels Deposition attached as **Exhibit A** at 67:5-71:5.) Like all limited liability companies, D2 has the ability to issue additional ownership units, which as a practical consequence increases the total number of the company's units. When increasing the total units in the company, the percentage ownership of the units held by other owners decreases – or is "diluted". A company may issue units for a variety of legitimate business reasons, including compensating board members, consultants or for other service to the company, debt forgiveness,

employee incentives, capital raises, etc. Ordinarily, when D2 issues new units for any of these reasons, the issuance dilutes the proportionate ownership of all other outstanding units equally. Anti-dilution protection is an exception to this normal rule. In this case, anti-dilution protection from the proposed $8 million capital raise would require that, in the event D2 issued new units to compensate an investor for their capital contribution, D2 would be required to also issue the Engels additional units to ensure that the Engels continued to have the same percentage ownership in D2 and did not become "diluted" by the capital raise.

The Engels agreed to Mr. Erhardt's elegant solution. The parties added their agreement to the LOI, specifying that the Engels were to receive 7% of the outstanding units of D2 and that "[t]he above 7% will not be diluted by all or any portion of the up to $8 million capital raise currently contemplated by D2." (12/23/20 Letter of Intent attached as **Exhibit B** at 4.)

D2 and Workup executed the comprehensive five-page LOI on December 23, 2020. (*Id.*) It expressly stated that the LOI "describes the terms of the Agreement", which were to be incorporated into a definitive Settlement Agreement. (*Id.* at 1.) No further negotiations occurred regarding equity or anti-dilution after execution of the LOI.

In accordance with the LOI, D2 circulated a draft Settlement Agreement the next day, December 24, 2020. That draft incorporated the agreed terms in the LOI including the limited anti-dilution protection, which was confined to: (1) the then-contemplated up-to-$8-million capital raise, and (2) a six-month window after execution of the Settlement Agreement to achieve the contemplated capital raise.

Work Up and D2 executed the final version of the Settlement Agreement on December 30, 2020. The Settlement Agreement contained the same language included in the initial draft regarding the Engels' ownership and limited anti-dilution rights, which provided:

10. **Equity Grant**.

a. On the Closing Date, and subject to the execution of a Joinder Agreement substantially in the form attached hereto as Exhibit C by each of (i) Kenneth Mark Engels ("***Kenny***"), and (ii) Unha, D2 shall issue three and one-half percent (3.5%) of the outstanding Units of D2 to each of Kenny and Unha (the "***Closing Equity Issuance***"). The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100 Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the "***Initial Capital Raise***"); provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date. For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise.

(12/30/24 executed Settlement Agreement, attached as **Exhibit C** at § 10.a.)

Two weeks later, when sending the Engels' executed Fifth Amended and Restated Operating Agreement of D2, Mr. Engels sent Mr. Erhardt an email where he reiterated the same understanding that the anti-dilution protection in the Settlement Agreement was connected to the then-contemplated capital raise. Specifically, Mr. Engels wrote, "As just discussed, to clear up any ambiguity, we note that this is with a reservation of rights around the anti-dilution piece ***in connection with the raise*** as contemplated in the Settlement Agreement, and Exhibit A." (Kenneth Engels 1/12/21 email attached as **Exhibit D**.) (emphasis added).

3. D2 Issues New Units Not Within the Scope of the Anti-Dilution Provision in the Settlement Agreement.

In the year following the execution of the Settlement Agreement, D2 issued new units for (1) service provider compensation, (2) forgiveness of a debt obligation, and (3) a new investor's bridge loan and, later, the investor's $8 million capital raise. It is undisputed in this arbitration that issuances for service and debt relief, which occurred within the six months following the Settlement Agreement, were not for any portion of the contemplated capital raise up to $8 million.

It is also undisputed that both the bridge loan and the $8 million investment occurred in September and November 2021 after the expiration of the six-month anti-dilution period.[1]

Because none of these issuances were for any portion of the originally contemplated $8 million capital raise during the six-month period as specified in the Settlement Agreement, the Engels' interests were diluted in the same manner as every other D2 unit holder.

The Engels learned of this dilution when they received their 2021 K-1 tax documents in September 2022 showing that their 3.5% respective ownership percentages in D2 had been diluted to 2.426%. When the Engels asked D2 for additional information regarding the dilution of their units, D2 provided a detailed cap table and written explanation of the amount and reason for each issuance. (D2 2021 Cap Table attached as **Exhibit E**; October 3, 2022, Letter to Peter Flagel attached as **Exhibit F**.)

The Engels did not dispute that the September and November 2021 issuances tied to the bridge loan and later capital raise were outside the six-month period and therefore not subject to their anti-dilution protection. But, for the first time, they asserted a new interpretation that the Settlement Agreement provided them anti-dilution protection for issuances of units during the first six months for any reason – not merely units issued for the contemplated capital raise up to $8 million. Claimants also expanded their position to claim that the Settlement Agreement provided them anti-dilution protection after the initial six-month period in perpetuity for any non-capital-raise issuances, which Claimants asserted included Class D units which D2 was intending to, and eventually did, offer as part of an incentive program for employees.

[1] Notably, it is also undisputed that the new investor that contributed the $8 million capital raise was not the investor contemplated at the time D2 and WorkUp entered into the Settlement Agreement.

4. Claimants Initiate Arbitration, Later Dismiss Substantially All Their Claims, and Seek an Order that D2 Buyout All the Engels' Units.

The Engels initiated this arbitration on December 7, 2022, originally alleging breach of the anti-dilution provision Settlement Agreement based on D2's issuance of units in exchange for service and debt forgiveness within the first six months of the Settlement Agreement and the intended issuance of Class D units for the employee incentive program after the six months.[2] After years of arbitration, Claimants greatly expanded their claims culminating in their Third Amended Statement of Claim and Request for Relief setting forth a litany of allegations and theories of fraud, breach of fiduciary duty, and other claimed bad acts and grievances. In their Third Amended Statement of Claim, Claimants also sought new equitable remedies, including requesting the Arbitrator to order D2 to buy the Engels completely out of their units. D2 has consistently denied Claimants' allegations.

Over the years, the Arbitrator has dismissed several of Claimants' claims as falling outside the arbitration agreement in the Settlement Agreement because they arose out of either the Engels' status as owners of D2 or separate contracts with no arbitration provision. Initially, on July 23, 2023, Arbitrator Reagan dismissed Claimants' claim that D2 had not provided certain financials required under D2's Operating Agreement. The Arbitrator dismissed the claim as there was no arbitration clause in the Operating Agreement. Further, the Arbitrator noted that the Engels were not parties to the Settlement Agreement and concluded that "[w]hile there are situations in which a non-signatory can enforce an arbitration provision under certain circumstances, they are inapplicable here."

---

[2] Since the Engels were not parties to the Settlement Agreement that contained the applicable arbitration clause, WorkUp was added as a party in Claimants' Amended Statement of Claim filed on June 9, 2023.

On July 1, 2025, the Arbitrator also dismissed Claimants' "Breach of Post-Vistria Partnership" and "Fraudulent Misrepresentation/Promissory Fraud" claims as being not arbitrable under the arbitration clause in the Settlement Agreement. The Arbitrator further noted that Claimants' "Breach of Fiduciary Duty" claim "relates to Claimants as equity holders and attendant potential remedies including equitable remedies." The Arbitrator dismissed that claim without prejudice since Claimants did not oppose the dismissal.

Most recently, on January 5, 2026, Claimants filed their "Notice of Withdrawal of Claims from Arbitration without Prejudice" in which they voluntarily dismissed the remainder of their claims in the arbitration "except for their claim for breach of the anti-dilution provision of the Settlement Agreement, as set forth in their initial Statement of Claim dated December 7, 2022, including multiple alleged breaches arising from improper dilutive issuances, and threatened dilutive issuances."

Two days later, on January 7, 2026, testifying as an individual and corporate representative for WorkUp[3], Mr. Engels confirmed that the remaining scope of this arbitration consists of Claimants' claim for the breach of the anti-dilution provision that hinges on Claimants' assertion that D2 was prohibited under the Settlement Agreement from diluting the Engels' units (1) for any purpose during the first six months and (2) for any non-capital raise purpose after the that six-month window.

Although Claimants abandoned all their claims except the breach of the anti-dilution provision, Mr. Engels testified that Claimants are still asking the Arbitrator to order D2 to buyout the entirety of the Engels' units in the amount Mr. Engels asserts their 7% ownership was worth on January 1, 2021, which Mr. Engels testified is $3,460,100. Mr. Engels testified that he is not

[3] Claimants have stipulated that Mrs. Engels will not testify at the hearing.

an expert in business valuation but is basing his valuation on various financials received by D2, its auditors, and third parties. Mr. Engels testified that, besides attorneys' fees, Claimants are not seeking any other relief from the Arbitrator in this matter. Mr. Engels testified that Claimants are seeking the total buyout of their units not just because of D2's dilution of their units, but because he views his units in D2 as "worthless" given the "egregiousness" of D2's breach of the Settlement Agreement, D2's alleged lack of communication and transparency towards the Engels, D2's discovery in this case, and what Mr. Engels described as D2's "betrayal".

## Issues for Arbitration

The remaining issues in this arbitration are straightforward. The first issue is whether the Engels can prove a breach of the Settlement Agreement based on their interpretation regarding the scope of the Engels' anti-dilution protection. The second issue is whether Claimants, even if they could prove a breach, can also prove an available remedy for such a breach. The evidence to be presented at the hearing in this matter will confirm that Claimants can do neither.

1. The Settlement Agreement Provides Limited Anti-Dilution Protection for Six Months for Issuances of Units for Any Portion of the Contemplated Capital Raise.

The first issue is a matter of contract interpretation. Claimants advance two unsupportable readings of the Settlement Agreement's anti-dilution clause. First, they insist the Engels enjoyed absolute anti-dilution protection for the first six months. Second, they claim that after six months, they possess perpetual anti-dilution rights for every D2 issuance of units except for capital raises. Both positions collapse under basic Missouri contract-interpretation principles and the parties' documented understanding of the provision they negotiated. We address each argument in turn.

*a. The Settlement Agreement Provides Only Limited Six-Month Anti-Dilution Protection for the Then Contemplated Capital Raise.*

Claimants' assertion of six-month "absolute" protection is irreconcilable with the text and

structure of the Settlement Agreement when read as a whole. Missouri courts have long held that the "cardinal rule" of contract interpretation is to ascertain and give effect to the parties' intent. *Cheek v. Cheek*, 669 S.W.3d 155, 159 (Mo.App.E.D. 2023).[4] That intent is determined by reading the contract as a whole, applying the plain and ordinary meaning of the agreement's terms, and declining to adopt any construction that leaves language without function or sense. *Jimenez v. Cintas Corp.*, 475 S.W.3d 679, 686 (Mo.App.E.D. 2015).

The anti-dilution provision in the Settlement Agreement contains two sentences. The first sentence ("***Sentence One***") explicitly (1) narrows the anti-dilution protection to only dilution caused by the currently contemplated capital raise up to $8 million and (2) specifies that the time for the contemplated capital raise shall not extend beyond six months. Sentence One reads:

> The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100 Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the "Initial Capital Raise"); provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend longer than six (6) months after the Closing Date.

(**Exhibit C** at § 10.a.) Claimants do not dispute that this sentence limits the scope of anti-dilution protection to the capital raise. They simply suggest that the second sentence negates the limitations in the first.

The second sentence ("***Sentence Two***") goes on to read:

> For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Uhna shall each own three and on-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise.

(*Id.*)

[4] Per its terms, the Settlement Agreement is to be construed under Missouri law. (**Exhibit C** at § 30.)

Claimants' reading of his sentence violates various applicable canons of construction. Initially, Sentence Two begins with "For the avoidance of doubt", the plain language of which signals an intent to clarify Sentence One, not to nullify the limitations defined in that sentence and create entirely new rights as Claimants suggest.

Claimants' interpretation that Sentence Two grants absolute anti-dilution protection for six months is also flawed because it renders the detailed limitations to anti-dilution protection in Sentence One meaningless. It is not reasonable to infer that the parties intended to specifically define and limit the anti-dilution protection to the "Initial Capital Raise" in Sentence One only to then immediately override and render that limitation without function in the very next sentence. *Jimenez*, 475 S.W.3d at 686.

Because they are unable to do so, Claimants make no attempt to harmonize the terms of Sentence One and Sentence Two. Rather, Claimants' entire argument hinges on isolating exclusively the phrase in Sentence Two that "Kenny and Uhna shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise". But the law requires reading all terms together, not cherry-picking sentence fragments to manufacture a contradiction. When the sentences are read as a unit, Sentence One defines the limited scope of the anti-dilution protection and Sentence Two clarifies what happens when that anti-dilution protection expires. Put differently, Sentence Two is not written to alter the scope of the previously defined anti-dilution protection for the Initial Capital Raise, it is to make clear that after the period for Initial Capital Raise, the anti-dilution protection expires and the Engels' units are treated like everyone else.

Even if Sentence One and Sentence Two were interpreted as creating a conflict over the scope of the anti-dilution protection, Missouri law resolves the issue requiring that when "a

provision of a contract deals with a specific situation, it will prevail over a more general provision if there is ambiguity or inconsistency between them." *Five Star Quality Care-MO, L.L.C. v. Lawson*, 283 S.W.3d 811, 815 (Mo.App.W.D. 2009). Sentence One articulates the specific situation where anti-dilution is granted (only the Initial Capital Raise) and for how long (six months). Conversely, Sentence Two describes no events triggering dilution at all. It merely reiterates generally the right to anti-dilution during the period of the Initial Capital Raise and then makes clear that regular dilution applies thereafter. Thus, even under Claimants' hypothetical conflict, the specific situation limiting anti-dilution protection to the Initial Capital Raise in Sentence One prevails.

Furthermore, even if the terms of the Settlement Agreement were deemed ambiguous, the extrinsic evidence also uniformly confirms the parties intended only limited, capital-raise specific anti-dilution protection. The provision was deliberately negotiated as an "elegant solution" to maintain the Engels' negotiated ownership percentage when the then-contemplated capital raise would have otherwise diluted them. According to Mr. Engels, Mr. Erhardt explained to him that if D2 granted the Engels 7% of the company, "[i]t's really more than 7[%] because the money is going to come in, and you're going to be granted more shares. You're basically getting post-money valuation." (**Exhibit A** at 67:5-68:15.) The LOI memorialized this limited benefit of anti-dilution for the contemplated capital raise in which it stated only that the "7% will not be diluted by all or any portion of the up to $8 million capital raise currently contemplated by D2."[5] There

[5] Notably, the Settlement Agreement provides that "This Agreement, including the other documents referred to herein, contain the entire understanding of the Parties with respect to the subject matter contained herein and therein." (**Exhibit C** at § 35.) The Settlement Agreement expressly refers to the executed December 23, 2020, LOI, which permits consideration of the LOI to determine the understanding of the parties, even without determining that the Settlement Agreement's anti-dilution provision is ambiguous. (*Id.* at §§ 6.a., 7.b)

was no provision in the LOI granting absolute or perpetual anti-dilution protection. Immediately after signing the Settlement Agreement, Mr. Engels' own reservation-of-rights email again limited the protection to the anti-dilution piece "in connection with the raise" – a concession made by Mr. Engels when clarifying his own rights that is, again, wholly inconsistent with any belief in absolute or perpetual protection.

Finally, even if it were determined that Sentence One and Sentence Two were hopelessly irreconcilable, Missouri applies a tie breaker rule in such circumstances in which the first sentence controls. *Campbell v. Dixon*, 647 S.W.2d 617, 624 (Mo.App.S.D. 1983) (as a last resort, "where provisions of a contract are conflicting and cannot be reconciled, the provisions appearing first in the contract will prevail.").[6] As such, even under Claimants' best case scenario in which no resolution can be reached as to the scope of the anti-dilution protection between the sentences, the limited protection in Sentence One still prevails over the claimed absolute protection in Sentence Two.[7]

*b. The Settlement Agreement Provides No Anti-Dilution Protection after Six Months.*

Claimants' second interpretation that they have perpetual anti-dilution protection after six months for non-capital raises finds, literally, zero support in the plain language of the Settlement Agreement. In support of their interpretation, Claimants cite to the portion of sentence two stating that after the first six months, the Engels' units "shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise."

[6] According the Blackstone, this tie breaker rule applied when "two clauses so totally repugnant to each other that they cannot stand together, the first shall be received and the latter rejected" and has been adopted by numerous courts across the country. *See Comment note. – Rule of priority in case of repugnant clauses in contract.* 131 A.L.R. 955.

[7] While Missouri courts will sometimes employ the rule of construing a contract against its drafter, that rule is not appliable here as the parties agreed that the Settlement Agreement "shall be construed as if drafted jointly by the Parties . . . ." (**Exhibit C** at § 25.)

From that, Claimants suggest that the parties intended to imply that the Engels' units enjoyed sweeping anti-dilution protection from all non-capital raises in perpetuity.

There is no express language anywhere in the Settlement Agreement that affirmatively grants any rights to anti-dilution protection after the six months other than to state that Claimants will be diluted like all other unit holders for capital raises after the Initial Capital Raise. It is incongruent with applicable cannons of construction and common sense to presume that the parties intended to specifically define the scope of the anti-dilution rights in Sentence One and Sentence Two, but then also silently imply a sweeping perpetual anti-dilution right without expressly stating such in the Settlement Agreement.

Claimants' interpretation also depends on their faulty premise that the first six months contained "absolute" anti-dilution protection. Once that premise fails, there is no reason to believe that the parties would have any reason to further clarify that non-capital raise issuances, which received no anti-dilution protection during the first six months, would also not receive anti-dilution protection after six months.

The interpretation becomes even weaker when measured against the extrinsic evidence. Nothing in the negotiations, the LOI, or even in Mr. Engels' own contemporaneous descriptions of his understanding of the anti-dilution protection reflects any belief, let alone agreement, that anti-dilution protection extended to non-capital raises or past the six-month capital-raise window. The record reflects the opposite and that the protection was limited to the "elegant solution" to ensure the Engels maintained their percentage ownership from the Initial Capital Raise, not to grant the Engels never-ending anti-dilution rights superior to all other D2 unit holders.

Unable to point to any supportive contractual language or extrinsic evidence for their position, Claimants plead that this perpetual anti-dilution protection is necessary or else

"unscrupulous controlling equity owners could, for no consideration, eviscerate minority positions." This concern is not true as the default rule for D2, as well as all limited liability companies, is the right to issue new units and dilute existing unit holders' units. Regardless of Claimants' purported concern, Missouri law precludes finding an implied covenant not provided in the express terms of a contract simply on the grounds that the "implied covenant is necessary to make the agreement fair or that without it, an agreement is unwise or will operate unjustly." *Giessow Restaurants, Inc. v. Richmond Restaurants, Inc.*, 232 S.W.3d 576, 579 (Mo.App.E.D. 2007).

Continuing to grasp at straws, Claimants had once claimed[8] that another section of the Settlement Agreement implies this sweeping perpetual anti-dilution right. Specifically, they point to Section 10.b., which provides that:

> Uhna shall have the opportunity to earn one percent (1%) of the then outstanding Units of D2 per fiscal year during each of the Company's 2021, 2022 and 2023 fiscal years. To be eligible for such one percent (1%) Unit award for each calendar year, Uhna must be continuously employed for the full calendar year (i.e., no pro-rations for partial year of employment). For the avoidance of doubt, the potential one percent (1%) Unit awards which are subject to this subsection b. shall not have the anti-dilution protection as is provided in subsection a. above.

(**Exhibit C** at § 10.b) Claimants argue that because Uhna could not earn her first 1% unit award until after one calendar year, the anti-dilution protection in section 10.a must have extended beyond six months. Otherwise, they say, the "For the avoidance of doubt" language in section 10.b. stating that the anti-dilution protection contained in section 10.a does not apply to Uhna's units would be superfluous. This is wrong for two reasons.

First, it is beyond a stretch to attempt to bootstrap a perpetual anti-dilution right for the Engels from a subsection governing Uhna's employment-based incentive awards. Section 10.b.

[8] Claimants abandon this argument in their Pre-Hearing Brief.

does not expand section 10.a. Rather, it merely excludes 10.a's anti-dilution protection from applying to these later-earned units. That exclusion is necessary regardless of timing because it resolves a structural question: Do these units also participate in the special anti-dilution protection afforded to the units issued in section 10.a? The answer is no, hence the clarification.

Second, Claimants' timing point misunderstands the scope of anti-dilution protection in section 10.a. 10.a's anti-dilution protection applies to dilution caused by D2's then-contemplated effort to raise up to $8 million, with a limitation that "in no event shall the Initial Capital Raise for purposes of this undertaking extend longer than six (6) months after the Closing Date." While there is a six-month limit on the Initial Capital Raise, 10.a. is silent on the timing of when D2 may issue units based on the Initial Capital Raise. Because the structure and timing of issuing units for the contemplated Initial Capital Raise was unknown at the time of drafting the Settlement Agreement, it was reasonable and prudent to clarify that the anti-dilution protection in section 10.a would not apply to the units issued under section 10.b, regardless of when D2 may issue those units in the future. There is certainly nothing in the clarifying language of section 10.b that evidences an intent by the parties to also silently create an eternal anti-dilution right for the Engels.

In short, Claimants attempt to extract a perpetual anti-dilution right from contract language that neither states nor implies one. Their interpretation is wholly unsupported by both the Settlement Agreement's plain language and the parties' actual negotiations.

2. <u>Claimants Cannot Establish an Available Remedy for Their Breach of Contract Claim</u>.

Even if Claimants could prove a breach of the Settlement Agreement – which they cannot – they cannot obtain the relief they seek. Under Missouri law, a plaintiff must prove both the existence of damages and the amount of those damages. *Timberland Forest Prods., Inc. v. Franks*, 419 S.W.3d 806, 810 (Mo.App.S.D. 2013). Here, Claimants admit the only remedy they seek is a

forced buyout of all their units for $3,460,100 and an award of attorneys' fees. (**Exhibit A** at 211-7:11 "**Q.** … Was there any other relief that you're seeking from the arbitrator, besides attorneys' fees and besides the $3.4 million buy out? **A.** No.").

But that remedy is not available for the contract theory they are pursuing. Missouri law is clear that contract damages must place the non-breaching party in the position they would have occupied had the contract been performed – not in a better position. *Pepsi MidAmerica v. Harris*, 232 S.W.3d 648, 653 (Mo.App.S.D. 2007). In other words, damages must compensate for the loss of the contractual benefit, not provide a windfall. *Morehouse v. Behlmann Pontiac-GMC Truck Serv., Inc.*, 31 S.W.3d 55, 62 (Mo.App.E.D. 2000).

If the Engels had an actionable claim for improper dilution, the correct measure of damages would be the difference in value of the number of units they currently have and the number of units they would have had they not been diluted. Alternatively, the Engels could seek an order compelling D2 to specifically perform and issue the units allegedly required under the Settlement Agreement. Claimants expressly disclaimed those remedies in this arbitration. (**Exhibit A** at 209:19–210:20.) Their decision to abandon the only remedies Missouri law makes available is fatal to their claim.

Instead, Claimants insist their units are "worthless" because of what they characterize as the "egregiousness" of D2's breach of contract, the "lack of transparency," discovery grievances, and D2's alleged "betrayal." These accusations, even if accepted at face value, are legally irrelevant. Contract damages do not increase based on the breaching party's motive or manner of breach. Missouri law squarely prohibits punitive-style contract damages "even where the breach is intentional, willful, wanton, or malicious." *Peterson v. Continental Boiler Works, Inc.*, 783 S.W.2d 896, 903 (Mo. banc 1990).

Claimants are obviously attempting to use this arbitration as a forum to litigate all their perceived slights, grievances, and conspiracy theories involving D2, none of which bears on the narrow contract breach or resulting damages in question. While D2 stands ready to rebut these allegations, they simply do not support Claimants claim for a $3.4 million buyout based on a breach-of-contract claim. At bottom, Claimants are not even intending on presenting evidence of contract-based damages at this hearing.

Their requested buyout remedy fails for another independent reason in that it requires expert valuation evidence. As detailed in D2's Motion to Strike, Claimants have not disclosed any expert opinions as mandated under the Scheduling Order. Without expert opinion, they therefore lack the evidentiary foundation required for the buyout remedy they demand.

Claimants' arguments also ignore another fundamental legal barrier in that the requested relief is not within the jurisdiction of this arbitration. The Settlement Agreement is expressly between D2 and WorkUp and per its language shall not "be construed to confer upon or give any person other than D2 and WorkUp any rights or remedies." (**Exhibit C** § 33.) As the Arbitrator already ruled in his July 23, 2023, Order, the Engels are non-signatories, and none of the exceptions permitting non-signatories to enforce the arbitration clause in the Settlement Agreement apply in this case.

All of Claimants alleged "bad acts" allegations against D2 arise, if at all, out of the duties D2 owes the Engels as owners of D2, not the Settlement Agreement. Claimants openly admit this in their Pre-Hearing Brief in which they argue exclusively for the buyout remedy based on what they believe to be protection Missouri grants to minority shareholders against shareholder oppression. Claimants explain their intention to introduce "evidence at the final hearing [that] will establish a sustained pattern of oppressive conduct that extends well beyond Respondent's breach

of Section 10(a)."[9] What Claimants contend is "evidence" amounts to little more than manufactured grievances or perceived slights. But whatever may be said about it, this "evidence' does not bear upon the breach of Section 10(a) and is not relevant. This is not a shareholder oppression case, nor could it be. As the Arbitrator has ruled several times already in this matter, claims and remedies arising out of the Engels' status as equity holders of D2 are not arbitrable.

**Conclusion**

As Claimants will be unable to prove a breach of the Settlement Agreement or recoverable remedy and any such breach, D2 respectfully request at the conclusion of the hearing an Award in its favor and for its attorneys' fees and costs.

Respectfully submitted,

CARMODY MacDONALD P.C.

By: /s/ *David P. Stoeberl*

David P. Stoeberl, #46024
Tyler C. Schaeffer, #60847
Ryan M. Prsha, #70307
120 South Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600 Telephone
(314) 854-8660 Facsimile
dps@carmodymacdonald.com
tcs@carmodymacdonald.com
rmp@carmodymacdonald.com

Attorneys for Respondent

[9] Further, in support of their buyout remedy, Claimants are citing the Missouri statute articulating the grounds for dissolving a corporation (Mo. Rev. Stat. § 351.494) and a case fashioning an equitable remedy for a shareholder oppression claim (*Robinson v. Langenbach*, 599 S.W.3d 167, 180 (Mo. banc 2020)).

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 20, 2026, a true and accurate copy of the foregoing was filed electronically with JAMS to be served by operation of their electronic filing system upon all counsel of record.

/s/ David P. Stoeberl

Planet Depos
We Make It Happen™

# Transcript of Kenneth Mark Engels, as Individually and Corporate Designee

**Date:** January 7, 2026
**Case:** Engels, et al. -v- D2 Pharma Consulting, LLC / D2 Solutions Holdco, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**EXHIBIT A**

A. I have a memory of anti-dilution being discussed on those calls. I don't have a memory specific enough to pinpoint if that -- if those terms were scoped, if the -- if the anti-dilution was scoped during the Jims calls or after. I don't recollect. I just know that they ended up in the agreement. But I don't recollect much about the Jims calls, other than how hot and heavy they were.
Q. And is it fair to say that the Jims -- again, when we say "Jims," we're talking about Jim Dever and Jim Liberman, right?
A. Yeah.
Q. When you're talking about Jim Dever and Jim Liberman's calls with you, this would have been at the beginning phases of this settlement negotiation; is that fair?
A. You know, this actually touches upon something that I think might be helpful for me to say, if we just back up for a minute.
I did not mean or intend to argue with you. I really have no true interest in arguing with you, for real, just, like, straight up --

Q. I appreciate it.
A. -- you know?
But I think -- I'll allow, when I spoke up before, these are characterizations that are so -- they're characterizations. They're subjective. And they're from something so long ago that I think they're difficult to answer in -- there is nuance, and there is context that's missing that I can't -- and I don't know.
Q. Let me ask --
A. That's why I think I spoke up because I feel like you're trying to simplify things that were very complex at the time.
Q. If there is -- like I said at the beginning, if there is a question you don't understand, just say so, and I'll rephrase it.
And I'll rephrase this one.
Is it your understanding that the telephone calls with Jim Dever and Jim Liberman that we're talking about would have occurred before the negotiation and drafting of the letter of intent and settlement agreement occurred?
A. My understanding -- my recollection

on that would be that the meat and potatoes was done with the Jims, and that what followed after that was the formalization of that which was agreed on during those calls.

Q. So we can move on from the Jims, am I accurate in saying that with respect to Jim Dever and Jim Liberman, you're not able to offer any testimony about specific anti-dilution rights that you discussed with or agreed with, with them, fair?

A. I am not.

Q. So that's a fair statement?

A. That's fair, yeah.

Q. Let's talk about Judy Rumpler. Same type of question.

Do you recall any conversations, specifically or generally, about anti-dilution as it pertained to resolving the WorkUp dispute with D2 with Judy Rumpler?

A. No.

Q. Same question. Dean Erhardt.

Did you have any conversations with Mr. Erhardt about anti-dilution protection as a part of the component of resolving --

A. I believe --

Q. Hold on.
A. Sorry --
Q. Let me finish.
A. -- Tyler. My bad.
Q. Do you have any recollection of any specific or general conversations with Dean Erhardt about anti-dilution as part of the package of resolving WorkUp's dispute with D2?
A. Very much so.
Q. What do you recall from those conversations?
A. I recall conversations where Dean said the amount of shares that we wanted in the stock grant, at a certain point in time -- like, as negotiations with the Jims were happening, and then I was checking back with Dean, and he was checking with me, to see how we were doing.
And I remember a roadblock. I remember, at one time, the conversation with the Jims had us at, you know, 10 percent or 11 percent or some number that was a bit above 7, quite a bit above 7.
And Dean said to me, "It's not going to fly. Revere won't sanction a number that

high for you guys. But the anti-dilution protection, in effect, gives you more than -- like, let's give you -- you're going to have this 7, but the anti-dilution protection, it enhances the value of your shares. It's really more than 7 because the money is going to come in, and you're going to be granted more shares. You're basically getting a post-money valuation."

And we all thought that this was a graceful and elegant solution to the problem. And we were swayed by that.

So I -- I have -- I -- yeah, I remember talking to Dean about anti-dilution on the phone.

Q. Any other conversations with Mr. Erhardt you remember about anti-dilution?

A. Yes. I think -- I think, after the deal was done --

Q. Well, let's stick with before --

A. No, but I'm saying, like, right when -- like, as it's going down, as it's happening, you know, as the -- as the deal was being struck, and we were all excited to move forward, I remember there being a kind of -- we

came back to it, you know, kind of celebrated it, in a way. And, you know, for us, it was, like, a win. It was good for Unha and I. I remember it coming up. I don't mean way after. I mean, like, at the end of December, maybe -- yeah.

Q. Okay. So when Mr. Erhardt spoke to you about anti-dilution, you had mentioned that he mentioned that Revere would not allow it, right?

I'm sorry. Let me restate that.

A. Sure.

Q. When you talked about your conversation with Mr. Erhardt, you said that Revere would not allow a 10 or 11 percent ownership for you and Mrs. Engels, right?

A. It's my memory, yeah.

Q. And who is Revere?

A. An investor. Like, a likely investor.

Q. And why wouldn't Revere allow you or Mrs. Engels to have that level of ownership?

A. I don't remember.

Q. So stated differently, Revere was a potential investor for this up to $8 million

capital raise?

A. Yes.

Q. And for a potential investor like Revere to invest the $8 million, Dean was telling you that they were not comfortable -- Revere was not comfortable with you having 10 to 11 percent of the company, right?

A. It was an optics thing. It was an optics thing. I just remember it was a discussion about optics. And I remember kind of thinking at the time, like, "Maybe Dean is just saying this. That's kind of silly."

But whatever it was, that was -- that was his way of asking me to go lower and/or -- you know, it was a negotiation.

And -- but there was no substantive reason that I could have been given and that I remember hearing.

Q. And I'm trying to make sure I'm understanding your description of the conversation well.

What you're saying is, Dean Erhardt's solution to this issue with Revere not accepting 10 or 11 percent was to -- for D2 to issue to you and Mrs. Engels a lesser

part of the D2 story.

And that, after all of these years, it's still, it's still -- it's still relevant. So I think the technology is a thing I mentioned there too.

Q. Of all of those sources, as you sit here today, do you know the underlying calculations or basis the authors of those sources used to create those numbers?

A. I don't --

Q. I'm sorry. Let me say it.

Do you know the underlying bases those sources used to create the numbers --

(Reporter clarification.)

Q. Do you know the underlying basis for how those third parties arrived at their numbers that you are now using to calculate the value of your units as of January 1st, 2021?

A. I do not know for certain. I cannot know.

Q. Okay. The other aspect of this -- and I'm just putting -- trying to pin this down so we can move on.

That's how you arrived at the actual 3.4- number. The basis under which you are

seeking an entire buyout versus simply getting the units restored that you believe were improperly diluted -- which is different, right -- you're not asking the arbitrator to just have D2 issue units that would have been -- would have happened had you not been diluted through the issuances at dispute in this case, right?

You're not asking for that?

A. That's right.

Q. You're asking the arbitrator to order that D2 buy you out at the value that existed as of January 1st, 2021, and the reason why --

(An off-the-record discussion was held at this time.)

Q. So we talked about how you arrived at this specific number.

And now the reason why you're asking the arbitrator to order D2 to buy you out at the value of your units as of January 1st, 2021, instead of just having new units issued that would have made up the difference had you never been diluted in the first place, right?

That's what you're asking the

arbitrator for, correct?
A. Mm-hmm.
Q. Is that a "yes"?
A. Yes.
Q. And the reason you're asking the arbitrator to be bought out instead of being restored those units that you're claiming were improperly diluted is because of the dilution itself, which I think -- I'm trying to understand this -- as you've testified, cannot be divorced from the transparency and communication issues you've also discussed, right?
A. That's part of it, yeah. And the dilution was so unsupportable, with regard to the -- the January-February grants, so defies business and English and contractual logic that it shows that D2 is going to do what D2 wants to do. D2 is not about agreements, at least with us.
Q. So the egregiousness of the breach, in your mind, justifies you being bought out; is that fair?
A. That's a good way to put it.
Q. All right. Let's go back to the top

**From:** "Mark B. Hillis" <mbh@carmodymacdonald.com>
**Sent:** Thu, 24 Dec 2020 15:27:44 +0000
**To:** Dean Erhardt;Judy Rumpler;Martin Engels;Flagel, Peter;Kenny Engels;Unha Engels
**Subject:** D2/WorkUp Compiled LOI
**Attachments:**
· Letter of Intent (fully-executed) (3026344x9DB39).pdf *(765 kb)*

---

Attached for your records is the compiled LOI.

Best regards.

Carmody MacDonald
*Attorneys & Counselors at Law*

**Mark B. Hillis**
Principal • Carmody MacDonald P.C.

120 S. Central Ave., Suite 1800
St. Louis, Missouri 63105
**Main**: 314.854.8600 | **Direct**: 314.854.8650
**Email**: mbh@carmodymacdonald.com

**www.carmodymacdonald.com**

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

**Exhibit B**

CONSULTING

December 23, 2020

WorkUp, Inc. ("WU")
Mr. Kenneth Mark Engels
Mrs. Unha Engels

D2 Pharma Consulting LLC ("D2")
400 Chesterfield Center
Suite 400
Chesterfield, MO 6301

Re: Asset Purchase Agreement dated as of July 1, 2019 ("APA")

Dear Unha and Kenny:

This letter serves as our mutual nonbinding letter of intent to resolve the issues of the APA, the Phantom Equity Award Agreement, and related agreements, with a new agreement (the "Agreement") containing the following terms. This letter describes the terms of the Agreement which, upon execution, will have the consequence of terminating all of the obligations under the APA and the Phantom Equity Award Agreement and will contain language mutually releasing WU and D2. The closing of the transactions contemplated herein shall be December 29, 2020, or such earlier date as is mutually agreed between the parties ("Closing"). The parties will prepare and sign a definitive agreement reflecting the terms of this Letter of Intent on or before the Closing (the "Agreement"). D2 will expend its best efforts to submit a draft of the Agreement to WU by noon on December 24, 2020.

**1. Required Performance**

a. Within two business days of the Closing, WU will dismiss with prejudice the pending litigation filed by WU in the State of Delaware.
b. WU will, on or before Closing provide D2 with such consents, assurances, transfers, and other documents or actions to evidence in D2 good and marketable title to, ownership of, and the full benefit of the Assets (including Products and Intellectual Property), all as such terms are defined in the APA, all as evidenced by the Bill of Sale attached. After Closing, upon the request of D2, WorkUp will expend reasonable efforts to provide any additional documents necessary or appropriate to evidence the foregoing.
c. From the date hereof through the Closing, WU will cooperate with D2 to transfer access to the supporting technical infrastructure systems listed below, and will provide unrestricted administrative and management access, without, however, limiting WU's access to such systems until occurrence of the Closing. This includes all hardware and software components involved in supporting, monitoring, administrating, building, and deploying software development, database, testing, staging, and production environments - for all applications. If, subsequent to the Closing, D2 learns of other items to which it needs access, WU will provide such access.
    i. Asana has already been deleted.
    ii. Atlassian
    iii. AWS
    iv. Axure
    v. BOX
    vi. Docker

{12302/00006/3025417.DOCX.2}
2868871.8 115705-104449

vii. Figma

viii. G-Suite. Because G-Suite contains ~15 years of work and personal information, the parties will proceed as follows with respect to G-Suite Documents, Slides, Sheets and Drive: Within 24 hours of execution of the LOI, Kenny and Unha Engels will, at a time convenient to all parties, engage in a telephone call and screenshare with a representative of D2, at which time WorkUp will go through those files with content after July 1, 2019 and transfer work-product that pertains to D2's business

ix. LogDNA

x. Miro

xi. Pingdom

xii. Because Slack is a repository of personal as well as work communications, the parties will proceed in the same manner as set forth above with the G-Suite

xiii. TorGuard

xiv. Twilio

WU will represent and warrant in the Agreement that the above programs are the only programs owned or used by WU in its business on and after July 1, 2019. To further assist D2 in access, upon the signing of this letter, D2 will arrange for courier pickup of its laptop that is in the possession of Mr. Engels.

d. Unha Engels will convert to D2 e-mail. WU will request the following "historic" WU employees and contractors to convert to D2 e-mail: Grant Schoffelen, Kirby Eng, Irfan Baig, and Valerie Ogundare. The WU G-mail accounts shall be closed. The WU website (www.workuphealth.com) will be taken down and will remain down until the last payment contemplated by the Agreement is made, at which point the DNS (the technical controls of a website address) will be transferred to D2.

e. WU shall not interfere with D2 in D2's obtaining from the following "historic" WU independent consultants'/contractors' current Independent Contractor Agreements: Grant Schoffelen, Kirby Eng, Irfan Baig.

f. Unha Engels will acknowledge and abide by all policies of D2 employees.

g. The Phantom Equity Award Agreement with WU will be terminated and any vested interests thereunder extinguished upon the signing of the Agreement.

**2. Cash Payments.**

D2 to pay additional cash consideration to WU as follows:

a. Two million, two hundred seventy thousand ($2,270,000.00) (the "Contract Sum") against which D2 will pay WU $300,000.00 upon Closing. At least $250,000 of said $300,000 will be paid to the Angels as hereinafter defined. On March 15, 2021, D2 will pay WU $12,143 representing interest at the rate of 3% per annum on $1,970,000 (the "Debt") for 75 days. Also, commencing on March 15, 2021 and on the 15th day of each month thereafter (or, if the 15th day is not a business day, the next succeeding business day), D2 shall pay WU $57,290, constituting the principal and interest at the rate of 3% per annum on the outstanding Debt, payable until the Debt is paid in full. Failure to timely make such payments within five (5) business days of the due date shall result, at the option of WU, in acceleration of all outstanding Debt, which shall thereafter bear interest at the rate o12% per annum. The Debt shall be represented by a non-negotiable promissory note in the form attached hereto as Exhibit A.

CONSULTING

b. Thirty thousand ($30,000.00) will upon execution of D2's standard independent contractor agreement be individually payable to Messrs. Eng, Baig, and Schoffelen, independent contractors to D2 Pharma. Any withholding taxes or other payment with respect to foregoing will be D2's responsibility. The parties acknowledge and agree that there are no withholding taxes or other payments with respect to the Contract Sum.

WU is currently indebted to 26 noteholders (the "Angels") in varying amounts, a current list of which and of whom will be supplied to D2 promptly after the date hereof. As WU receives the above monthly payments, WU will pay the Angels 70% thereof in the aggregate until the Angels' indebtedness is fully retired. On a monthly basis, within five (5) days of receipt of the monthly Debt payment, WU will communicate to D2 proof of such payments. Promptly after execution of the Agreement, D2 will commence to use best efforts (and show proof thereof the WU) to offer the Angels the opportunity to convert all or a portion of their noteholder debt into D2 equity at terms to be agreed upon by the Angels and D2. D2 shall retain the right to approve the identity of those Angels who indicate a desire to convert, which right shall be exercised on a reasonable basis. To the extent that any Angels elect to convert, the amount of debt conversion will, on a dollar for dollar basis, concurrently reduce the Debt. The monthly payments will not be reduced.

**3. Employment**

a. Unha Engels will continue under the current employment agreement and confidentiality agreement dated as of July 1, 2019. Effective as of January 1, 2021, Mrs. Engels shall be provided the title of D2's VP Digital Engagement, with an annual salary adjustment to $220,000. She will report to Jim Maguire with a dotted line to Dean Erhardt.

b. Effective immediately upon execution of this LOI, Kenny Engels will be put on paid administrative leave. Conditioned upon the execution of the Agreement, Mr. Engels hereby voluntarily resigns as an employee of D2, effective December 31, 2020. For the avoidance of doubt, Mr. Engels shall remain subject to the covenants and restrictions as set forth in his Employee Confidentiality and Assignment Agreement dated July 1, 2019. Upon and after the signing of this LOI, Mr. Engels will make himself available on calls during the business day to provide transfer of knowledge and the above-mentioned access as deemed reasonably necessary by D2 management and will not participate in any client interactions or internal team meetings unless deemed necessary by D2.

**4. Equity**

a. Mr. And Mrs. Engels jointly will be issued 7% of the outstanding units in D2. An additional 3% of the outstanding units, at the rate of 1% per calendar year for the next three years, will be provided to Unha Engels provided she is employed by D2 continuously during the applicable calendar year. This additional equity will be earned through the calendar year and issued January 1 of the following calendar year. For example, in 2021, one percent will be earned for the twelve full months and issued on January 1, 2022. The last award will be awarded January 1, 2024, based upon ongoing employment with D2 through December 31, 2023. The above 7% will not be diluted by all or any portion of the up to $8 million capital raise currently contemplated by D2. On the date the Agreement is signed the parties will execute a joinder to the D2 operating agreement, an amendment thereto to reflect the

CONSULTING

issuance of the above equity interests, and such other document necessary to confirm such equity arrangement.

**5. Additional Consideration**

*Each award described herein is conditioned and calculated upon the participation in the full calendar year (i.e., no partial award for participation in a partial year).*

a. *Incentive Compensation*. An MBO (Management by Objectives) plan will offer for calendar 2021 up to two hundred forty thousand dollars ($240,000.00) to Unha Engels, and up to seventy-five thousand dollars ($75,000.00) each to Messrs. Baig and Schoffelen. The award will be based upon the MBOs applicable to activities across all of "D2 Technology" services. The plan may contemplate adding additional monies for the program for calendar 2022 and beyond. The MBO plan will be included as an exhibit to the Agreement and a draft will be provided together with the draft Agreement by Noon on December 24, 2020.

b. *Profit Share Payments*. In partial payment of the purchase price for the Assets as reflected in the Contract Sum, the legacy WU business unit financial activity will be separately tracked to calculate a "WU profit-sharing plan" for MBOs. The participants in the plan shall be Unha Engels (50%), Mr. Baig (25%) and Mr. Scheffelan (25%). The financial activity associated with the business unit will consist solely of activities related to the ongoing operations of the business including without limitation the following: sales and business development, internal education, long-term product, and technology strategy support, maintenance and improvement of the Assets acquired from WU as defined in Exhibit A of the APA. The profit-sharing shall be built around the following model.

   i. 50% Gross Operating Profit of the WU business unit as a percentage of WU business unit revenue qualifies for a 10% profit share.
   ii. 65% Gross Operating Profit of the WU business unit as a percentage of WU business unit revenue qualifies for an 11% profit share.
   iii. 75% Gross Operating Profit of the WU business unit as a percentage of WU business unit revenue qualifies for a 12.5% profit share.

Concurrently with any annual payments under the profit sharing plan, but only so long as any amount of the Debt remains unpaid, the amount of profit sharing plan payments made, less any payments made to Messrs. Baig and Scheffelan, will be credited to the then remaining outstanding payments due under the Debt. In no event will the amount of such credit exceed the amount of the Debt then outstanding.

**6. Method of Payment**

The parties will endeavor to execute the Agreement on or before December 29, 2020. The considerations will be in return (i) for the extinguishment of all of the outstanding obligations of D2 Pharma under the APA (and related mutual release by D2 and WU, and any residual conveyances by WU to D2 that may be warranted under the terms of the APA as above provided), and (ii) for the termination in full of the D2 Phantom Equity Award issued to WU dated July 1, 2019.

The next page is the signature page

CONSULTING

**Signature Page to Letter of Intent**

D2 Pharma Consulting LLC

By: DocuSigned by: Dean P. Erhardt
BE3F13204FAC4B3
Dean Erhardt, CEO and President

WorkUp, Inc.

By: ____________________
Kenneth Mark Engels, CEO

____________________________
Kenneth Mark Engels, individually

____________________________
Unha Engels, individually

{12302/00006/3025417.DOCX.2}
2868871.8 115705-104449

D2 CONSULTING

**Signature Page to Letter of Intent**

D2 Pharma Consulting LLC

By: ____________________

Dean Erhardt, CEO and President

DocuSigned by:
Ken Engels
D16B044FEBE842B...

Kenneth Mark Engels, individually

WorkUp, Inc.

By: DocuSigned by:
Ken Engels
D16B044FEBE842B...

Kenneth Mark Engels, CEO

DocuSigned by:
Unha Engels
899902CFD6234E2...

Unha Engels, individually

{12302/00006/3025417.DOCX.2}
2868871.8 115705-104449

CONSULTING

**EXHIBIT A**

Form of Promissory Note

{12302/00006/3025417.DOCX.2}
2868871.8 115705-104449

**PROMISSORY NOTE**

$1,982,143.00 December 29, 2020

FOR VALUE RECEIVED, D2 Pharma Consulting, LLC, a Delaware limited liability company ("Maker"), promises to pay WorkUp, Inc., a Delaware corporation, ("Payee"), on March 15, 2021, pursuant to bank wiring or other written instructions as Payee may from time to time designate, the sum of $12,143, being the payment of interest on the original principal balance hereof from December 30, 2020 through March 14, 2021. The remaining $1,970,000 balance due hereunder together with interest thereon at the annual rate of 3% per annum shall be payable per the above instructions as follows: Commencing on March 15, 2021 and on the 15th day of every month thereafter, Maker shall pay Payee $57,290.00 until all principal and interest due hereunder are paid in full. If the 15th day of a month is not a business day, the $57,290.00 payment shall be made on the next business day. All computations of interest accruing hereunder shall be made on the basis of the actual number of days elapsed over a year of 365 days.

This Note may be prepaid in whole or in part at any time without premium or penalty. The provisions of sections ______ of a certain Settlement Agreement dated December 29, 2020, between the Maker and Payee ("Settlement Agreement") with respect to the ability of Maker to cause the principal balance to be reduced are incorporated herein. Partial prepayments shall not reduce Maker's monthly payment obligations.

If payment of any installment of principal and/or interest is not paid within 5 business days of when due (an "Event of Default"), then or at any time thereafter, at the option of Payee, the whole of the principal sum then remaining unpaid hereunder, together with all interest accrued thereon, shall immediately become due and payable.

From and after the maturity of this Note, either according to its terms or as the result of a declaration of maturity made by the holder hereof from and after an Event of Default, the entire principal remaining unpaid hereunder shall bear interest at the rate of 12% per annum. Failure to exercise such option or any other rights the holder may, in the event of any such Event of Default, be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent default, whether of the same or different nature.

If this Note is placed in the hands of an attorney for collection or is collected through any legal proceedings, the losing party shall reimburse the prevailing party for all costs of collection, including reasonable attorneys' fees and court costs, including fees and costs incurred for appellate procedures. Litigation hereunder will be in Delaware courts of competent jurisdiction.

No amendment, modification, termination or waive of any provision of this Note shall be effective unless the same shall be in writing and signed by Payee and Maker.

Notice, requests, and other communications required under this Note shall be in writing and shall be delivered in person or sent by a reputable overnight courier service or by certified mail, return receipt requested, addressed as follows unless otherwise directed in

writing by one party to the other:

If to D2 Pharma: D2 Pharma Consulting LLC
Attention: Dean Erhardt
400 Chesterfield Center
Suite 400
Chesterfield, MO 63017

If to WorkUp: WorkUp, Inc.
Attention: Kenneth Engels
82 72nd Street
Brooklyn, NY 11209

Other than as is provided in this Note, the undersigned waives presentment, protest and demand, notice of protest, demand, maturity and dishonor and nonpayment of this Note. This Note is not negotiable and neither Maker nor Payee shall assign or transfer its respective rights and obligations hereunder without the prior written consent of the other.

D2 Pharma Consulting LLC

________________________________
By: Dean Erhardt, CEO and President

**Execution Version**

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "***Agreement***") is made and entered into as of December 30, 2020 (the "***Effective Date***"), by and between D2 PHARMA CONSULTING LLC, a Delaware limited liability company ("***D2***") and WORKUP, INC., a Delaware corporation ("***WorkUp***"). D2 and WorkUp are sometimes referred to herein as, collectively, the "***Parties***" and, each, a "***Party***."

## WITNESSETH:

**WHEREAS**, D2, as "Buyer", and WorkUp, as "Seller", previously entered into that certain Asset Purchase Agreement dated July 1, 2019 (the "***APA***");

**WHEREAS**, pursuant to the APA, D2 purchased all of WorkUp's assets used or useful in WorkUp's business, including, but not limited to the "Products", the "Intellectual Property" and the "Contracts" (collectively, the "***Purchased Assets***");

**WHEREAS**, in consideration of the sale, delivery and assignment of the Purchased Assets, D2 agreed to pay the purchase price for the Purchased Assets on an installment basis, as follows: (i)(A) Eighty Thousand and 00/100 Dollars ($80,000.00) to WorkUp within sixty (60) days of the closing of the APA, which has been paid; (B) Eight Hundred Thirty Two Thousand Five Hundred and 00/100 Dollars ($832,500.00) on the first anniversary of the closing of the APA (the "***First Anniversary Payment***"); (C) Three Hundred Sixty Two Thousand Five Hundred and 00/100 Dollars ($362,500.00) on each of the second and third anniversaries of the closing of APA; and (D) Four Hundred Twelve Thousand Five Hundred and 00/100 Dollars on the fourth anniversary of the closing of the APA; and (ii) to award WorkUp up to a thirty percent (30%) phantom equity interest in D2, pursuant to the D2 Consulting Phantom Equity Award Agreement by and between D2 and WorkUp dated July 1, 2019 (the "***Phantom Equity Award Agreement***") (the items described in subclauses (i) and (ii) shall collectively be referred to as the "***Purchase Price***");

**WHEREAS**, certain claims and counterclaims relating to the APA, the Phantom Equity Award Agreement and the performance of their respective obligations thereunder have arisen between the Parties;

**WHEREAS**, on or about November 23, 2020, WorkUp, as plaintiff, filed a complaint against D2, as defendant, in the Superior Court of the State of Delaware, Case ID: N20C-11-202, regarding WorkUp's Purchase Price claims under the APA (the "***WorkUp Lawsuit***"); and

**WHEREAS**, the Parties now desire to fully and finally resolve their disputes regarding each Party's obligations under the APA and the Phantom Equity Award Agreement, including, but not limited to the dismissal of the WorkUp Lawsuit, in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, hereby agree as

follows:

1. **Incorporation of Recitals**. The above recitals are hereby incorporated into this Agreement and form a material part hereof as though set forth herein verbatim.

2. **Definitions**. The following initially capitalized terms and phrases shall, when used herein, have the following meanings ascribed to them:

a. "***Business Day***" shall mean any date, other than a Saturday, Sunday or any other day on which national banks are required or authorized by law to close in the State of Missouri.

b. "***Claim***" or "***Claims***" means any and all claims, counterclaims, actions, causes of action, litigation, demands, defenses, judgments, settlements, suits, arbitrations, proceedings (administrative or otherwise), controversies, investigations, audits, awards, decisions, injunctions, judgments, orders, rulings, subpoenas, verdicts, obligations, contracts, debts, loans, undertakings, costs, liens, damages (including, without limitation, incidental and consequential damages), losses, liabilities, obligations, indebtedness, settlement payments, penalties, assessments, citations, directives, disbursements, or expenses, of any kind or of any nature whatsoever (including, without limitation, attorneys', consultants', and experts' fees and expenses and disbursements incurred in investigating, defending against, settling, or prosecuting any claim, litigation, or proceeding), whether any of the foregoing arise out of contract, tort, violation of laws or regulations or otherwise, for, upon, or by reason of any matter, cause or thing whatsoever, either direct or consequential, whether known or unknown, from the beginning of time until the Closing Date.

c. "***Closing***" shall mean the consummation of the transactions contemplated in this Agreement.

d. "***Closing Date***" shall mean the Effective Date.

e. "***Contracts***" shall have the same meaning as set forth in the APA.

f. "***Intellectual Property***" shall have the same meaning as set forth in the APA.

g. "***Products***" shall have the same meaning as set forth in the APA.

h. "***Transaction Documents***" means this Agreement and the other agreements contemplated to be delivered pursuant to Section 17 of this Agreement.

i. "***Unit***" shall mean a unit of ownership in D2.

j. "***WorkUp Division***" shall mean the legacy WorkUp business unit.

k. "***WorkUp Investors***" shall mean the individuals and entities (as

applicable) set forth on Exhibit A.

l. "***WorkUp Investor Debt***" shall mean the aggregate outstanding debt owed by WorkUp to the WorkUp Investors as evidenced by their convertible promissory notes as of the Closing Date. The amount of principal debt owed to each WorkUp Investor is listed next to such investor's name on Exhibit A.

3. **Representations and Warranties and Covenants of WorkUp**. The representations, warranties, covenants and acknowledgments of WorkUp contained in this Agreement will survive the execution, delivery and acceptance of this Agreement. WorkUp hereby represents and warrants to D2 as follows:

a. Authority. The execution and delivery of this Agreement and the other Transaction Documents have been duly and validly authorized by all necessary organizational action in respect thereof, as applicable, on the part of WorkUp. This Agreement represents the legal, valid and binding obligation of WorkUp, enforceable against WorkUp in accordance with its terms.

b. Programs. The programs listed in Exhibit B are the only programs owned or used by WorkUp in its business from and after July 1, 2019 to the Closing Date.

c. Transfer of the Purchased Assets. As of the Closing Date, upon payment of the Closing Cash Payment, WorkUp will have:

i. Transferred and conveyed all of WorkUp's right, title and interest in and to the Purchased Assets to D2 free and clear of any and all liens, encumbrances, claims, restrictions and/or other defects;

ii. Provided full and unrestricted administrative access to the technical infrastructure of the systems listed in Exhibit B, including all hardware and software components involved in supporting, monitoring, administrating, building and deploying software development, database, testing, staging and production environments for all such systems;

iii. Shut down the WorkUp website domain, including but not limited to www.workuphealth.com;

iv. Converted the historic WorkUp email address of the individual listed below under subsection A, requested the individuals listed below under subsections B to E to convert their email addresses (all such email addresses collectively, the "***WorkUp Email Addresses***") to D2 email addresses, and shut down and terminated the WorkUp Email Addresses:

A. Unha Engels ("***Unha***")

B. Grant Schoffelen ("***Grant***");

C. Kirby Eng ("***Kirby***");

D. Irfan Baig ("***Irfan***");

E. Valerie Ogundare ("***Valerie***"); and

v. Disclosed and provided to D2 access to all systems and programs that WorkUp owned or used in its business.

4. **Representations and Warranties of D2**. The representations, warranties, covenants and acknowledgments of D2 contained in this Agreement will survive the execution, delivery and acceptance of this Agreement. D2 hereby represents and warrants to WorkUp as follows:

a. The execution and delivery of this Agreement and the other Transaction Documents have been duly and validly authorized by all necessary organizational action in respect thereof, as applicable, on the part of D2. This Agreement represents the legal, valid and binding obligation of D2, enforceable against D2 in accordance with its terms.

5. **Dismissal of WorkUp Lawsuit**. Upon the Closing, WorkUp shall promptly take any and all actions necessary to dismiss the WorkUp Lawsuit, with prejudice, no later than two (2) Business Days after the Closing Date.

6. **Purchased Assets**.

a. On or before the Closing Date, WorkUp shall execute and deliver to D2 a bill of sale (the "***Bill of Sale***") for the Purchased Assets in the form that was attached to the letter of intent dated December 23, 2020 between the Parties (the "***LOI***"). After the Closing Date, WorkUp shall use its reasonable efforts to deliver all other documents, certificates, instruments or writings requested by D2 in order to convey to D2 all of WorkUp's right, title and interest in and to the Purchased Assets.

b. WorkUp shall use its reasonable efforts to provide the same level of access as described in Section 3.b.ii, to any additional legacy WorkUp systems or programs which D2 becomes aware that it needs access to after the Closing Date.

c. WorkUp shall transfer the domain name system as described in Section 3.c.iii to D2 no later than five (5) Business Days after the date WorkUp receives the final payment of the Cash Payment (defined below).

7. **Cash Payment to WorkUp/Promissory Note**. D2 shall pay the sum of Two Million Two Hundred Seventy Thousand and 00/100 Dollars ($2,270,000.00) (the "***Cash Payment***") to WorkUp, as follows:

a. Three Hundred Thousand and 00/100 Dollars ($300,000.00) shall be paid to WorkUp on the Closing Date (the "***Closing Cash Payment***"); and

b. The balance of the Cash Payment shall be paid pursuant to a promissory note executed by D2 to WorkUp (the "***Promissory Note***") in the form that was attached to the LOI as Exhibit A.

8. **<u>WorkUp Investors</u>**.

a. WorkUp will, within one day following the Closing and receipt of the Closing Cash Payment, request from the WorkUp Investors their addresses and banking details and shall pay, immediately upon receipt thereof, at least Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) of the Closing Cash Payment to the WorkUp Investors according to an allocation sheet prepared by WorkUp and submitted to D2 at or before Closing.

b. WorkUp shall pay, without undue delay upon receipt of each monthly payment under the Promissory Note, at least seventy percent (70%) of the aggregate amount of each such monthly payment to the WorkUp Investors until the earlier to occur of (i) the full payment of the Cash Payment, or (ii) the full payment of the WorkUp Investor Debt.

c. During the period of time that any amount of the WorkUp Investor Debt remains outstanding, WorkUp shall provide D2 with a monthly list showing the then current amount of WorkUp Investor Debt owed to each of the WorkUp Investors. WorkUp shall provide such list no later than five (5) Business Days after the date that WorkUp receives a monthly payment under the Promissory Note.

d. Promptly after the Closing Date, D2 shall use its best efforts to offer the WorkUp Investors the opportunity to convert all or a portion of their respective WorkUp Investor Debt to Class B Units of D2, upon such terms and conditions as may be mutually agreed by D2 and the applicable WorkUp Investor; provided, however, that the aggregate amount of WorkUp Investor Debt that is eligible to be converted to Units of D2 shall in no event exceed the principal amount of WorkUp Investor Debt as of July 1, 2019 ($1,208,299.00). D2 shall provide evidence to WorkUp of its efforts to convert the WorkUp Investor Debt. Notwithstanding anything to the contrary in the foregoing, D2 may, in its reasonable discretion, choose to not offer a WorkUp Investor such opportunity to convert their respective WorkUp Investor Debt to Class B Units of D2, instead requiring such WorkUp Investor to receive its allocable share of payment(s) under the Promissory Note as set forth in subsections (a) and (b) above. For the purposes of this section 8 d., "Class B Units" shall mean non-voting member interests in D2 that will have the same financial features as a regular Unit.

e. The then outstanding amount of the principal amount of the Promissory Note shall be reduced on a dollar for dollar basis in an amount equal to the amount of WorkUp Investor Debt which is converted to Units of D2 on the date(s) that such debt is converted. Such reduction shall be applied to the then outstanding principal balance of the Promissory Note. The amount of the monthly payment pursuant to the Promissory Note shall remain the same.

9. **<u>Cash Payment to Grant, Kirby and Irfan</u>**. D2 shall pay the amount of Thirty Thousand and 00/100 Dollars ($30,000) to each of (i) Grant (the "***Grant Cash Payment***", (ii) Kirby (the "***Kirby Cash Payment***"), and (iii) Irfan (the "***Irfan Cash Payment***"), concurrently

with confirmation of their signing the 2021 Independent Contractor Agreement ("***ICA***"), and to be paid in accordance with the ICA payment schedule.

10. **Equity Grant**.

a. On the Closing Date, and subject to the execution of a Joinder Agreement substantially in the form attached hereto as Exhibit C by each of (i) Kenneth Mark Engels ("***Kenny***"), and (ii) Unha, D2 shall issue three and one-half percent (3.5%) of the outstanding Units of D2 to each of Kenny and Unha (the "***Closing Equity Issuance***"). The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100 Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the "***Initial Capital Raise***"); provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date. For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise.

b. Unha shall have the opportunity to earn one percent (1%) of the then outstanding Units of D2 per fiscal year during each of the Company's 2021, 2022 and 2023 fiscal years. To be eligible for such one percent (1%) Unit award for each calendar year, Unha must be continuously employed for the full calendar year (i.e., no pro-rations for a partial year of employment). For the avoidance of doubt, the potential one percent (1%) Unit awards which are the subject of this subsection b. shall not have the anti-dilution protection as is provided in subsection a. above.

11. **Unha's Employment**. Unha's employment with D2 shall continue after the Closing Date pursuant to the terms of that certain D2 Consulting Offer Letter and Employee Confidentiality and Assignment Agreement of Unha Engels dated July 1, 2019. Effective as of January 1, 2021, (i) Unha's title shall be "VP Digital Engagement", (ii) Unha shall report directly to Jim Maguire with a dotted line to Dean Erhardt, (iii) Unha shall abide by all policies of D2, and (iv) Unha's annual gross salary shall be adjusted to Two Hundred and Twenty Thousand and 00/100 Dollars ($220,000.00).

12. **Kenny's Employment**. The Parties hereby acknowledge and agree that Kenny was placed on paid administrative leave as of December 23, 2020. On the Closing Date, Kenny shall submit, in writing to D2, his voluntary resignation of employment with D2 effective as of December 31, 2020. On and after the Closing Date, Kenny (i) shall, as reasonably requested by D2, make himself available to provide transfer of knowledge of and access to the legacy WorkUp systems, and (ii) shall remain subject to the covenants and restrictions set forth in that certain D2 Consulting Employee Confidentiality and Assignment Agreement of Kenneth Mark Engels dated July 1, 2019.

13. **MBO Plan**.

a. For the calendar year 2021, each of (i) Grant, (ii) Irfan, and (iii) Unha, shall be eligible to participate in a management by objective incentive plan (the "***MBO Plan***"), which is attached hereto as Exhibit D.

b. The maximum award that Unha shall be eligible to receive under the MBO Plan for the 2021 calendar year shall be Two Hundred and Forty Thousand and 00/100 Dollars ($240,000.00).

c. The maximum award that each of (i) Grant, (ii) Kirby and (iii) Irfan shall be eligible to receive under the MBO Plan for the 2021 calendar year shall be Seventy-Five Thousand and 00/100 Dollars ($75,000.00).

d. An individual is not eligible for an award under the MBO Plan for any calendar year during which such individual's agreement is terminated (i) by D2 for cause or (ii) by such individual without good reason.

14. **Gross Profit Incentive**.

a. Beginning with the 2021 calendar year, D2 shall separately track the WorkUp Division for financial purposes. The financial activities of the WorkUp Division shall solely consist of activities related to the ongoing operations of such division, including, but not limited to the following: (i) sales and business development; (ii) internal education; (iii) long-term product development; and (iv) technology strategy support, maintenance and improvement of the Purchased Assets.

b. Unha (as a 50% participant), Grant (as a 25% participant), and Irfan (as a 25% participant) shall be eligible to receive profit share payments (each a "***Profit Share Payment***"), for the 2021, 2022, 2023 and 2024 calendar years pursuant to plan ("***Profit Sharing Plan***") in the form and containing the terms as Exhibit E attached hereto.

c. The amount of the outstanding principal balance of the Promissory Note shall be reduced on a dollar-for-dollar basis in the amount of any Profit Share Payment paid to Unha. The amount of the monthly payment pursuant to the Promissory Note shall remain the same.

15. **Financial Reporting**. D2 will report to Unha within sixty (60) days after the close of (i) each fiscal quarter and (ii) each fiscal year, on the gross operating profit of the WorkUp Division and the revenue of the WorkUp Division for such fiscal quarter or fiscal year (as applicable) for purposes of the Profit Sharing Plan. Upon request, D2 will provide reasonable details to back up its calculations of gross operating profit and revenue of the WorkUp Division. In the event that the amount of a Profit Share Payment made to a participant was incorrect, whether due to an error, an adjustment to the WorkUp Division's financials or otherwise, then (i) D2 shall remit the additional amount of Profit Share Payment to such participant if the amount paid to such participant was less than the actual amount of the Profit Share Payment, and (ii) a participant shall return the excess amount of Profit Share Payment paid to such participant if the amount paid to such participant was greater than the actual amount of the Profit Share Payment.

In the event that a participant refuses to return any excess payments as required under this Section, D2 reserves the right to set-off any amounts owed to it from future Profit Share Payments due to such participant.

16. **APA; Phantom Equity Award Agreement**.

a. It is hereby acknowledged and agreed that the APA shall terminate and be of no further force and effect upon the Closing Date (without prejudice to the incorporation herein by reference of certain definitions of terms as provided in the APA) .

b. The Parties hereby acknowledge and agree that Phantom Equity Award Agreement shall terminate and be of no further force and effect upon the Closing on the Closing Date.

17. **Closing Deliverables**. Upon the satisfaction of the conditions precedent to the obligations of the Parties as expressed herein on or before Closing Date:

a. WorkUp Deliveries. WorkUp shall deliver the following items at or in connection with the Closing:

i. A Joinder Agreement executed by Kenny;

ii. A Joinder Agreement executed by Unha;

iii. The resignation letter of Kenny; and

iv. The executed Bill of Sale.

b. D2 Deliveries. D2 shall deliver the following items at Closing:

i. The Closing Cash Payment;

ii. The executed Promissory Note;

iii. An amended Exhibit A to the Fourth Amended and Restated Operating Agreement of D2 Pharma Consulting LLC which reflects the Units issued under this Agreement;

iv. The 2021 MBO Plan; and

v. The Profit Sharing Plan.

18. **Mutual Releases**.

a. As of the Closing Date, and in consideration of the Closing, WorkUp on behalf of itself, and its affiliates, subsidiaries, parents, shareholders, officers, directors, agents, employees, attorneys, successors and assigns (each a "***WorkUp Party***" and collectively, the "***WorkUp Parties***"), releases, remises, and forever discharges D2 and its affiliates, subsidiaries, parents, members, managers, officers, agents, employees,

attorneys, successors and assigns (each a "***D2 Released Party***" and collectively, the "***D2 Released Parties***") from any and all Claims that such WorkUp Party now has or has ever had against the respective D2 Released Parties (each an "***WorkUp Claim***" and collectively, the "***WorkUp Claims***"), whether arising contemporaneously with or prior to the Closing Date, on account of and arising out of the APA and the Phantom Equity Award Agreement; provided, however, that the WorkUp Claims shall not include, and nothing contained herein shall operate to release, (i) any obligations of any D2 Released Party relating to this Agreement or the other Transaction Documents or (ii) any Claim(s) that arise out of or relate to any breach of any covenant under this Agreement or the other Transaction Documents.

b. As of the Closing Date, and, in consideration of the Closing, D2, on behalf of itself, and its affiliates, subsidiaries, parents, members, managers, officers, agents, employees, attorneys, successors and assigns (each a "***D2 Party***" and collectively, the "***D2 Parties***"), releases, remises, and forever discharges WorkUp and its respective affiliates, subsidiaries, parents, shareholders, officers, directors, agents, employees, attorneys, successors and assigns, (each a "***WorkUp Released Party***" and collectively, the "***WorkUp Released Parties***"), from any and all Claims that such D2 Party now has or has ever had against the respective WorkUp Released Parties (each a "***D2 Claim***" and collectively, the "***D2 Claims***"), whether arising contemporaneously with or prior to the Closing Date on account of or arising out of the APA and the Phantom Equity Award Agreement; provided, however, that the D2 Claims shall not include, and nothing contained herein shall operate to release, (i) any obligations of any WorkUp Released Party relating to this Agreement or the other Transaction Documents, or (ii) any Claim(s) that arise out of covenant under this Agreement or the other Transaction Documents.

19. **No Admission of Liability**. Neither this Agreement nor any action taken in connection with this Agreement by any party hereto shall in any way be construed as an admission of any liability, wrongdoing, or violation of law, regulation, contract or policy.

20. **Confidentiality**. None of the Parties shall, without the approval of all of the other Parties, make any statement, communication, press release or other public announcement concerning this Agreement or the Transaction Documents or any other document relating hereto or thereto, except (a) that WorkUp may disclose the terms of this Agreement and the Promissory Note that are relevant to the WorkUp Investors (provided that the draft disclosure prepared by WorkUp shall first be reviewed and approved by D2), (b) as and to the extent such statement or communication is previously consented to, in writing, by each of the other Parties, (c) as and to the extent that such communication shall be required by law, in which event the other party shall be given prior notice thereof, or (d) to their professional advisors, attorney, and accountants, and, in the instance of D2, as necessary or appropriate in the process of disclosures to prospective investors in D2.

21. **Non-Disparagement**. Each Party agrees, and shall cause its respective members, shareholders, managers, directors and officers, to not disparage or defame either orally or in writing generally or in any social media outlet the other Party or its respective members, shareholders, managers, directors and officers.

22. **Specific Enforcement**. Each Party hereto acknowledges and agrees that the damages resulting from any breach of any of the covenants set forth herein may be intangible in whole or in part and that the promisees are entitled to seek specific enforcement, injunctive relief, and other equitable remedies in addition to monetary damages and legal remedies. Each party hereto hereby stipulates to the entering of such injunctive relief enforcing the provisions hereof.

23. **Survival**. The provisions of this Agreement shall survive the Closing.

24. **Prevailing Party**. If a party hereto commences a proceeding against another party to enforce and/or recover damages for breach of this Agreement, the prevailing party in such proceeding shall be entitled to recover from the other party all reasonable costs and expenses of enforcement and collection of any and all remedies and damages, or all reasonable costs and expenses of defense, as the case may be. The foregoing costs and expenses shall include reasonable attorneys' fees.

25. **Jointly Drafted**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder unless the context requires otherwise. The word "***including***" shall mean including without limitation.

26. **Severability**. If any provision of this Agreement is found or declared to be invalid or unenforceable by any arbitrator, referee, court, or other competent authority having jurisdiction, such finding or declaration shall not invalidate any other provision hereof and this Agreement shall thereafter continue in full force and effect except that such invalid or unenforceable provision, and (if necessary) other provisions hereof, shall be reformed by such arbitrator, referee, court, or other competent authority so as to effect insofar as is practicable, the intention of the Parties set forth in this Agreement, provided that if such arbitrator, referee, court, or other competent authority is unable or unwilling to effect such reformation, the invalid or unenforceable provision shall be deemed deleted to the same extent as if it had never existed.

27. **Binding Effect**. The provisions of this Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns.

28. **Amendment**. This Agreement may not be amended except in a writing signed by all of the Parties.

29. **No Assignment**. No party may assign any of their rights or obligations under this Agreement or the Transaction Documents.

30. **Governing Law and Arbitration**. This Agreement shall be governed by and construed under the laws of the State of Missouri without regard to principles of conflicts of law.

Any dispute hereunder or related hereto shall be resolved by arbitration conducted in accordance with the Federal Arbitration Act. The arbitration shall occur in St. Louis County, Missouri. Each Party agrees to follow and participate in the rules governing any such arbitration. The provisions of this Section 30 shall survive the entry of any judgment, and will not merge, or be deemed to have merged, into any judgment.

31. **Additional Documents**. All parties agree to cooperate fully and to execute and deliver any and all supplementary documents and to take any and all additional actions which may be necessary or appropriate to give effect to the terms and intent of this Agreement.

32. **No Waiver**. Failure to insist on compliance with any term, covenant or condition contained herein shall not be deemed a waiver of that term, covenant or condition, nor shall any waiver or relinquishment of any right or power contained in this Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

33. **Rights of Third Parties**. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any person other than the Parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.

34. **Counterparts; Electronic Signature**. More than one counterpart of this Agreement may be executed by any of the Parties, each of which shall be deemed an original, but all of which shall constitute one and the same Agreement. This Agreement and any other document to be executed and delivered in connection herewith may be executed and delivered by facsimile or other electronic transmission, and any document delivered in such a manner shall be binding as though an original thereof had been executed and delivered.

35. **Entire Agreement**. This Agreement, including the other documents referred to herein, contains the entire understanding of the Parties with respect to the subject matter contained herein and therein. This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter.

***[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]***

**COUNTERPART SIGNATURE PAGE TO SETTLEMENT AGREEMENT**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date and year first written above.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.**

**"D2"**

D2 Pharma Consulting LLC, a Delaware limited liability company

By: DocuSigned by: Dean P. Erhardt
BE3E13204FAC4B3...
Name: Dean P. Erhardt
Title: CEO and President

**"WorkUp"**

WorkUp, Inc., a Delaware Corporation

By: ______________________________
Name: Kenneth Mark Engels
Title:CEO

**COUNTERPART SIGNATURE PAGE TO SETTLEMENT AGREEMENT**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date and year first written above.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.**

"**D2**"

D2 Pharma Consulting LLC, a Delaware limited liability company

By: ______________________________
Name: Dean P. Erhardt
Title: CEO and President

"**WorkUp**"

WorkUp, Inc., a Delaware Corporation

DocuSigned by:
By: Ken Engels
ECD7F9C2FF3C473...
Name: Kenneth Mark Engels
Title:CEO

# EXHIBIT A

**List of WorkUp Investors and WorkUp Investor Debt**

[*Attached.*]

Exhibit A

| | principal | interest as of closing | total as of closing | portion of $250K | portion of $57,290 |
|---|---|---|---|---|---|
| Adam and Kim Snyder | $105,000.00 | $18,098.63 | $123,098.63 | $19,512.71 | $3,026.67 |
| Adam Cherry | $134,478.00 | $22,620.82 | $157,098.82 | $24,990.76 | $3,860.86 |
| Dan Cohen | $25,000.00 | $5,832.88 | $30,832.88 | $4,645.88 | $762.96 |
| David McKelvey | $40,000.00 | $9,328.22 | $49,328.22 | $7,433.41 | $1,220.61 |
| Don DiPietro | $55,000.00 | $11,904.11 | $66,904.11 | $10,220.94 | $1,652.73 |
| S. Eisenberg | $39,000.00 | $9,899.84 | $48,899.84 | $7,247.58 | $1,212.45 |
| Fred Rabner | $5,000.00 | $1,062.47 | $6,062.47 | $929.18 | $149.70 |
| Gerald Skobinsky | $15,000.00 | $4,076.71 | $19,076.71 | $2,787.53 | $473.80 |
| Guy D'Andrea | $50,000.00 | $6,372.60 | $56,372.60 | $9,291.77 | $1,378.89 |
| Jake Schwartz | $88,799.00 | $15,687.01 | $104,486.01 | $16,501.99 | $2,570.25 |
| Jon Plesset | $50,000.00 | $12,964.38 | $62,964.38 | $9,291.77 | $1,561.99 |
| M. Rabner | $50,000.00 | $14,936.99 | $64,936.99 | $9,291.77 | $1,616.79 |
| Laura Reilly | $10,000.00 | $1,341.37 | $11,341.37 | $1,858.35 | $277.63 |
| Adrianne DePante | $40,000.00 | $6,855.89 | $46,855.89 | $7,433.41 | $1,151.94 |
| Mark Horvitz | $58,000.00 | $12,837.26 | $70,837.26 | $10,778.45 | $1,750.76 |
| Marty & Nancy Engels | $100,000.00 | $21,806.03 | $121,806.03 | $18,583.53 | $3,009.46 |
| Mike Miller | $50,000.00 | $12,520.55 | $62,520.55 | $9,291.77 | $1,549.66 |
| Ray Drabicki | $35,000.00 | $8,764.38 | $43,764.38 | $6,504.24 | $1,084.76 |
| R.Eisenberg | $7,500.00 | $1,980.00 | $9,480.00 | $1,393.77 | $235.28 |
| Scott Simon | $5,000.00 | $1,486.03 | $6,486.03 | $929.18 | $161.47 |
| Sebastian Luparia | $75,000.00 | $21,169.86 | $96,169.86 | $13,937.65 | $2,390.86 |
| Steven Hribar | $25,000.00 | $6,265.75 | $31,265.75 | $4,645.88 | $774.98 |
| Thomas Kramer | $117,500.00 | $28,985.75 | $146,485.75 | $21,835.65 | $3,629.55 |
| Kirby Eng | $115,000.00 | $8,192.88 | $123,192.88 | $21,371.06 | $2,991.88 |
| Nils Mellquist | $50,000.00 | $0.00 | $50,000.00 | $9,291.77 | $1,201.87 |
| Total | **$1,345,277.00** | **$264,990.41** | **$1,610,267.41** | **$250,000.00** | **$39,697.79** |

# EXHIBIT B

**List of Programs**

- Aptible
- Atlassian
- AWS
- Axure
- BOX
- Docker
- Figma
- LogDNA
- Miro
- Pingdom
- TorGuard
- Twilio

**EXHIBIT C**

**Joinder Agreement**

[*Attached.*]

# JOINDER AGREEMENT

This JOINDER AGREEMENT (this "***Joinder Agreement***") to the Operating Agreement (defined below) is made as of the 30th day of December, 2020 by and between D2 PHARMA CONSULTING LLC, a Delaware limited liability company (the "***Company***") and the undersigned party hereto (the "***Joining Party***").

## RECITALS

WHEREAS, the Company is party to that certain Fourth Amended and Restated Operating Agreement of the Company, dated as of October 20, 2020 (the "***Operating Agreement***"), an executed copy of which is attached hereto as Exhibit A (capitalized terms used herein but not defined herein shall have the meanings ascribed to them in the Operating Agreement); and

WHEREAS, in connection with the receipt by the Joining Party of Units of the Company, the parties hereto desire the Joining Party to become party to the Operating Agreement as a Member (as defined in the Operating Agreement), by executing a copy of this Joinder Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Joinder to Operating Agreement. By executing this Joinder Agreement, the Joining Party hereby agrees to become a party to and be bound by the provisions of the Operating Agreement as if it were an original signatory thereto and shall be deemed to be a Member thereunder.

2. Representations and Warranties. The Joining Party hereby represents and warrants to the Company as follows:

(a) This Joinder Agreement has been duly and validly executed and delivered by the Joining Party and each of this Joinder Agreement and the Operating Agreement constitutes a legal, valid and binding obligation of the Joining Party, enforceable against such Joining Party in accordance with its respective terms.

(b) The Joining Party has received a copy of the Operating Agreement and has read and understands the terms of the Operating Agreement.

(c) The Joining Party understands that (i) the Units are not registered under the Securities Act of 1933 or any state securities law, (ii) the Units are illiquid and there is not, and will not be, an established market for the Units, (iii) he/she/it will be unable to transfer the Units, except in accordance with the Operating Agreement and applicable federal and state securities laws and regulations , and (iv) the Units cannot be expected to be readily transferred or liquidated.

3. Full Force and Effect. Except as expressly modified by this Joinder Agreement, all of the terms, covenants, agreements, conditions and other provisions of the Operating Agreement shall remain in full force and effect in accordance with its terms.

4. Governing Law. THIS JOINDER AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.

5. Severability. If any provision of this Joinder Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

6. Headings. The heading references herein are for convenience purposes only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

7. Counterparts. This Joinder Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument. A signed copy of this Joinder Agreement delivered by either facsimile or e-mail shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

[*Signature pages follow*]

IN WITNESS WHEREOF, each party has executed and delivered this Joinder Agreement as of the date first above written.

**COMPANY:**

**D2 PHARMA CONSULTING LLC, a Delaware limited liability company**

By: ______________________________
Name: Dean P. Erhardt
Title: President/CEO

**JOINING PARTY:**

______________________________________

**EXHIBIT A**

**Fourth Amended and Restated Operating Agreement of D2 Pharma Consulting LLC dated October 20, 2020**

[*Attached.*]

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

# FOURTH AMENDED AND RESTATED OPERATING AGREEMENT

**of**

# D2 PHARMA CONSULTING LLC

October 20, 2020

THE UNITS OR MEMBERSHIP INTERESTS IN D2 PHARMA CONSULTING LLC ARE SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT. THE INTERESTS HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER ANY STATE SECURITIES LAWS OR UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"). NEITHER THE INTERESTS, NOR ANY PART THEREOF, MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND (1) PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES.

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I | Definitions | 1 |
| ARTICLE II | Formation of the Company | 7 |
| 2.1 | Formation | 7 |
| 2.2 | Name | 7 |
| 2.3 | Registered Office and Registered Agent | 7 |
| 2.4 | Purposes | 7 |
| 2.5 | Term | 7 |
| 2.6 | Treatment as a Partnership for Income Tax Purposes | 7 |
| ARTICLE III | Members | 8 |
| 3.1 | Members | 8 |
| 3.2 | Admission of New Members | 8 |
| 3.3 | Member Voting | 8 |
| 3.4 | Compensation for Services | 8 |
| 3.5 | Member Meetings | 8 |
| 3.6 | Action by Written Consent or Telephone/Video Conference | 8 |
| 3.7 | Restrictions on Members | 8 |
| 3.8 | Liability of Members | 9 |
| 3.9 | Indemnification | 9 |
| ARTICLE IV | Capital Contributions | 9 |
| 4.1 | Initial Capital Contributions | 9 |
| 4.2 | Additional Capital Contributions | 9 |
| 4.3 | Interest, Member Loans | 9 |
| 4.4 | Units; Issuance of Units | 9 |
| ARTICLE V | Distributions | 10 |
| 5.1 | Operating Distributions | 10 |
| 5.2 | Tax Distributions | 10 |
| 5.3 | Amounts Withheld | 10 |
| 5.4 | Distribution Limitations | 10 |
| ARTICLE VI | Tax Matters | 10 |
| 6.1 | Partnership Tax Status | 10 |
| 6.2 | Partnership Representative | 10 |
| 6.3 | Capital Accounts | 11 |
| 6.4 | Allocation of Net Profits and Net Losses | 11 |
| 6.5 | Allocation Timing, Records | 11 |
| 6.6 | Special Allocations | 11 |
| 6.7 | Section 754 Election | 12 |
| 6.8 | Section 704(c) Allocations | 13 |
| ARTICLE VII | Managers | 13 |

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC


| | | |
|---|---|---|
| 7.1 | Board of Managers | 13 |
| 7.2 | Managers' Powers | 14 |
| 7.3 | Limitations on Managers' Powers | 15 |
| 7.4 | Meetings; Voting | 16 |
| 7.5 | Action by Written Consent or Telephone/Video Conference | 17 |
| 7.6 | Deadlock | 17 |
| 7.7 | Reliance on the Managers | 17 |
| 7.8 | Interested Transaction | 17 |
| 7.9 | Liability of the Managers | 17 |
| 7.10 | Indemnification | 18 |
| 7.11 | Officers | 19 |
| ARTICLE VIII | Assignability and Transfer of Membership Units | 19 |
| 8.1 | Transfer Restrictions | 19 |
| 8.2 | Right of First Refusal | 19 |
| 8.4 | Unauthorized Transfer Void | 20 |
| 8.5 | Effect of Transfer | 20 |
| 8.6 | Substitute Members | 20 |
| 8.7 | Rights of Purchasers | 21 |
| 8.8 | Participation in Approved Sale | 21 |
| 8.9 | Withdrawal of Members | 22 |
| ARTICLE IX | Dissolution, Liquidation | 22 |
| 9.1 | Dissolution | 22 |
| 9.2 | Liquidation and Termination | 22 |
| 9.3 | Liabilities; Settling of Accounts | 23 |
| 9.4 | Distribution of Net Proceeds | 23 |
| ARTICLE X | Books and Records | 23 |
| 10.1 | Principal Place of Business; Books and Records | 23 |
| 10.2 | Accounting and Tax Returns | 24 |
| ARTICLE XI | General Provisions | 24 |
| 11.1 | Amendments | 24 |
| 11.2 | Waiver of Partition | 24 |
| 11.3 | Binding Provisions | 25 |
| 11.4 | Severability | 25 |
| 11.5 | Entire Agreement | 25 |
| 11.6 | Nonwaiver | 25 |
| 11.7 | Governing Law | 25 |
| 11.8 | Notices | 25 |
| 11.9 | Facsimiles and Electronic Copies | 25 |
| 11.10 | Counterparts; Gender and Number | 25 |
| 11.11 | Headings | 26 |
| 11.12 | Opportunity to Review; Acknowledgements | 26 |
| EXHIBIT A - The Members | | 28 |

# FOURTH AMENDED AND RESTATED OPERATING AGREEMENT OF D2 PHARMA CONSULTING LLC A DELAWARE LIMITED LIABILITY COMPANY

THIS FOURTH AMENDED AND RESTATED OPERATING AGREEMENT (this "***Agreement***") is made and entered into as of the 20th day of October, 2020, by and among D2 Pharma Consulting LLC, a Delaware limited liability company (the "***Company***"), and the Members listed on Exhibit A.

WHEREAS, on September 11, 2008, the Company was formed by the filing of a certificate of formation (the "***Certificate***") with the Delaware Secretary of State;

WHEREAS, the Company, Bio Launch Strategies, LLC, a Missouri limited liability company ("***Bio Launch***") and Teth-Rx Consulting and Capital Ventures LLC, a Florida limited liability company ("***TethRxccv***") entered into that certain Third Amended and Restated Operating Agreement of D2 Pharma Consulting LLC dated September 28, 2020 (the "***Existing Agreement***"); and

WHEREAS, the Company and the Members desire to amend and restate the Existing Agreement in its entirety.

NOW, THEREFORE, the Members hereby adopt this Agreement as the "limited liability company agreement" of the Company under the Act to supersede and replace the Existing Agreement and all prior limited liability company and/or operating agreements and to set forth the rules, regulations and provisions regarding the management and business of the Company, the governance of the Company, the conduct of its business, and the rights and privileges of its Members, and in consideration of the premises and the mutual agreements contained herein, the parties hereto agree as follows:

## ARTICLE I
## Definitions

**1.1** Definitions. The capitalized terms used in this Agreement shall, unless the context otherwise requires or unless otherwise expressly provided herein, have the meanings set forth below:

(a) "***Act***" means the Delaware Limited Liability Company Act, codified in the Delaware Code, Title 6, Chapter 18, Sections 101 et seq., as amended, or any successor statute thereto.

(b) "***Affiliate***" means: (i) any Person which, directly or indirectly, is in control of, is controlled by or is under common control with the party in question; (ii) any Person who is a director, officer or manager (or comparable position) of any Person described in clause (i) above or of the party for whom an affiliate is being determined. For purposes hereof, control of a Person means the power, direct or indirect, to: (a) vote

10% or more of the securities having ordinary voting power for the election of directors (or comparable positions) of such Person; or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise and either alone or in conjunction with others.

(c) "***Agreement***" has the meaning set forth in the preamble.

(d) "***Approved Sale***" has the meaning set forth in Section 8.8.

(e) "***Assumed Income Tax Rate***" means, with respect to any Fiscal Year, the sum of the highest marginal federal individual income tax rate for such Fiscal Year plus the highest marginal State of Missouri individual income tax rate for such Fiscal Year.

(f) "***Available Cash***" means, at the time of determination, the Company's cash reduced by such amounts as the Board of Managers shall deem reasonably necessary to meet reasonably anticipated expenditures or liabilities of the Company, including, but not limited to, debts to Members who are creditors of the Company and reserves for which adequate provision has not otherwise been made in the reasonable judgment of the Board of Managers.

(g) "***Bio Launch***" has the meaning set forth in the preamble.

(h) "***Board of Managers***" has the meaning set forth in Section 7.1.

(i) "***Capital Account***" has the meaning set forth in Section 6.3.

(j) "***Capital Contribution***" means any contribution to the capital of the Company in cash or property by a Unit Owner, from time to time.

(k) "***Certificate***" has the meaning set forth in the preamble.

(l) "***Code***" means the Internal Revenue Code of 1986, as amended, and any successor thereto.

(m) "***Company***" has the meaning set forth in the preamble.

(n) "***Depreciation***" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

(o) "***Event of Dissolution***" has the meaning set forth in Section 9.1.

(p) "***Existing Agreement***" has the meaning set forth in the preamble.

(q) "***Fiscal Year***" means the Company's accounting, tax and fiscal year, which shall be the calendar year.

(r) "***Gross Asset Value***" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

i. the initial Gross Asset Value of any asset contributed (or deemed contributed under Code Sections 704(b) and 752 and the Treasury Regulations promulgated thereunder) by a Unit Owner to the Company will be the fair market value of the asset on the date of the contribution;

ii. the Gross Asset Values of all of the Company assets may be adjusted to equal the respective fair market values of the assets, as of (A) the acquisition of an additional interest in the Company by any new or existing Unit Owner in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Unit Owner of more than a de minimis amount of Company property as consideration for an interest in the Company; (C) in connection with the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Unit Owner acting in a member capacity or by a new Unit Owner acting in a member capacity in anticipation of being a Member; or (D) the liquidation of the Company within the meaning of Treasury Regulations § 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (A), (B), and (C) above shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Unit Owner;

iii. the Gross Asset Value of any Company asset distributed to any Unit Owner will be the gross fair market value of the asset on the date of distribution; and

iv. the Gross Asset Value of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining capital accounts under Treasury Regulations § 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values will not be adjusted hereunder to the extent that the Board of Managers determines that an adjustment under clause (ii) of this definition is necessary or appropriate in connection with a transaction which would otherwise result in an adjustment under this clause;

after the Gross Asset Value of any asset has been determined or adjusted under clause (i), (ii) or (iv) of this definition, Gross Asset Value shall thereafter be adjusted by the

depreciation taken into account with respect to the asset for purposes of computing Net Profit or Net Loss.

(s) "***Majority Interest***" shall mean the Member(s) who hold more than fifty percent (50%) of the outstanding Units entitled to vote.

(t) "***Manager***" or "***Managers***" means those Persons serving on the Board of Managers.

(u) "***Member***" means each of those Persons listed on **Exhibit A**, attached hereto and incorporated herein, as a Member and each other Person who qualifies and has been admitted as such in accordance with the terms of this Agreement.

(v) "***Modified Capital Account***" at any time shall equal the Unit Owner's Capital Account at such time, modified as follows: (A) increased by the sum of (i) the amount of any limited deficit restoration obligation which such Unit Owner has voluntarily undertaken in the manner provided by Treasury Regulation Section 1.704-1(b)(2)(ii)(c), (ii) the amount of the Unit Owner's share of Company minimum gain (as defined in Treasury Regulation Section 1.704-2(g)) and (iii) the amount of the Unit Owner's share of member nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(5)); and (B) decreased by reasonably expected adjustments, allocations and distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), but in the case of distributions, only to the extent they exceed offsetting increases to such Unit Owner's Capital Account that are reasonably expected to occur prior to or during the Fiscal Years in which such distributions are reasonably expected to be made.

(w) "***Net Profit***" and "***Net Loss***" mean for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in Net Profit or Net Loss), with the following adjustments:

i. any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

ii. any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*) and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

iii. in the event the Gross Asset Value of any Company asset is adjusted pursuant to clauses (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain

or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

iv. gain or loss resulting from any disposition of a Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

v. in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of Depreciation;

vi. to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Profits or Net Losses; and

vii. notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Section 6.6 shall not be taken into account in computing Net Profits or Net Losses.

(x) "***Non-Transferring Members***" means, as applicable, the Members exclusive of the Transferring Member(s).

(y) "***Offer Notice***" has the meaning set forth in Section 8.2.

(z) "***Partnership Representative***" has the meaning set forth in Section 6.2.

(aa) "***Percentage Interest***" means, for each Unit Owner, a percentage equal to a fraction the numerator of which is the sum of the number of Units owned by such Unit Owner and the denominator of which is the sum of the number of outstanding Units.

(bb) "***Person***" includes a natural person, limited liability company, corporation, partnership, limited partnership, association, business trust, estate, trust, enterprise, and any other legal or commercial entity.

(cc) "***Purchaser***" means a Person that desires to acquire Units in the Company and is not the Company or a Member.

(dd) "***Subsidiary***" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a

corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of the membership, partnership or other similar ownership interest thereof or the power to elect or appoint a majority of the managers or governing body thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, and without limitation, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of the limited liability company, partnership, association or other business entity gains or losses or shall be or control the sole, or a majority of the, managing director(s), managing member(s), manager(s), board of managers or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless indicated otherwise, the term "Subsidiary" refers to a Subsidiary of the Company.

(ee) "***Substitute Member***" means a transferee of Units that satisfies the requirements of Section 8.6 to be admitted to the Company as a Substitute Member

(ff) "***Supermajority Interest***" shall mean the Member(s) who hold at least seventy-five percent (75%) of the outstanding Units entitled to vote.

(gg) **Error! Reference source not found.**"***Tax Distributions***" has the meaning set forth in Section 5.2.

(hh) "***Tax Liability***" of a Unit Owner means, an amount equal to the product of (i) the excess, if any, of the cumulative amount of income and gain items of the Company which are reported or reportable on such Unit Owner's Schedule K-1 (IRS Form 1065) for any period, over the sum of the deduction and loss items of the Company reported or reportable on such Unit Owner's Schedule K-1 for such period, and (ii) the Assumed Income Tax Rate.

(ii) "***TethRxccv***" has the meaning set forth in the preamble.

(jj) "***Third Party Offer***" has the meaning set forth in Section 8.2.

(kk) "***Transfer***" means any sale, assignment, transfer, conveyance, gift, encumbrance, pledge, bequest, devise, hypothecation, or other disposition of a Unit (whether voluntary, involuntary, or otherwise) including permitting a levy or attachment on the Unit.

(ll) "***Transferring Member***" means any Member that Transfers, or proposes to Transfer, one or more Units.

(mm) "***Treasury Regulation***" means any permanent, temporary, proposed, or proposed and temporary regulations of the United States Department of the Treasury promulgated under the Code, as such regulations may be modified from time to time.

(nn) "***Unit***" means a unit of ownership, which represents a Person's ownership interest and rights in the Company. The number of Units authorized to be issued by the Company may be adjusted from time to time by the Board of Managers. No certificates or other evidence of ownership will be issued in respect to the ownership of any Units except for **Exhibit A** to this Agreement which will solely represent and evidence the ownership of the Unit(s).

(oo) "***Unit Owner***" means a Person that owns Units, including any Member or assignee.

## ARTICLE II
## Formation of the Company

**2.1 Formation**. The Company was formed as a Delaware limited liability company under the laws of the State of Delaware by the filing of the Certificate. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

**2.2 Name**. The name of the Company is "D2 Pharma Consulting LLC." The Company may conduct business under that name or any other name approved by the Board of Managers.

**2.3 Registered Office and Registered Agent**. The Company shall continuously maintain an office and registered agent in the State of Delaware. The principal office of the Company shall be located at 400 Chesterfield Center, Suite 400, Chesterfield, MO 63017 or at such other location as the Board of Managers may determine. The Company may also have such offices, anywhere within and without the State of Delaware, as the Board of Managers may determine from time to time or as the business of the Company may require. The registered agent shall be as stated in the Certificate or as the Board of Managers may otherwise determine.

**2.4 Purposes.** The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act.

**2.5 Term.** The term of the Company commenced upon the filing of the Certificate in accordance with the Act and shall continue in full force and effect until dissolved pursuant to the terms of this Agreement.

**2.6 Treatment as a Partnership for Income Tax Purposes.** The Members intend that the Company is, and will continue to be, an entity taxable as a partnership for federal and state income tax purposes. The Members will do all things requisite to the maintenance of the Company as an entity taxable as a partnership for federal and state income tax purposes.

Nothing contained in this Section affects, or is intended to affect, the status of the Company as a limited liability company under the Act.

**ARTICLE III**
**Members**

**3.1 Members.** The names and addresses of the Members of the Company are as set forth on Exhibit A attached hereto and made a part of this Agreement. Each Member shall own such Units as are set forth opposite the Member's name on Exhibit A.

**3.2 Admission of New Members.** New Members may be admitted to the Company upon the approval of a Supermajority Interest of the Members and on such terms and conditions as shall be agreed upon by a Supermajority Interest of the Members and any new Members. Upon the admission of any new Member, Exhibit A shall be amended to reflect any changes or revision in the number of Units outstanding.

**3.3 Member Voting.** Each Member shall have one vote for each Unit such Members owns at the time any vote is taken on a particular matter, unless expressly stated otherwise herein. Unless otherwise expressly stated herein or required by the Act, the affirmative vote of a Majority Interest of the Members shall be required for all decisions and approvals of the Members. Any Unit Owner that is not a Member shall not have any right to participate in any vote of the Members or otherwise direct the management and business of the Company.

**3.4 Compensation for Services.** No Member shall be entitled to receive compensation for services rendered to or on behalf of the Company unless approved by the Board of Managers.

**3.5 Member Meetings.** Meetings of the Members of the Company shall be held on notice of not less than five (5) days prior to any meeting, or on such shorter notice as may be mutually agreeable to the Members, on the call of a Majority Interest of the Members or the Board of Managers. Notice of the time and place of each meeting shall be given in writing to each Member by the Person(s) calling the meeting.

**3.6 Action by Written Consent or Telephone/Video Conference.** Any action permitted or required by the Act or this Agreement to be taken at a meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by the Members holding the number of Units required to take the action. Subject to the requirements of this Agreement for notice of meetings, Members may participate in and hold a meeting of the Members by means of a telephone or video conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**3.7 Restrictions on Members.** Unless authorized to do so by this Agreement or by the prior written consent of a Majority Interest of the Members, no Member shall have any power or authority to:

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

(a) Bind the Company in any way or assign, transfer, pledge, compromise, or release any claim of the Company, or arbitrate or consent to the arbitration of any disputes or controversies involving the Company, or use the name, credit, or property of the Company for any purpose;

(b) Expand the business of the Company; or

(c) Do any act in conflict with the Company business or which would make it impossible to carry on that business.

**3.8 Liability of Members.** No Member shall be liable, responsible, or accountable in damages or otherwise to any Person, Manager, other Member, or the Company for any act or omission performed or omitted by the Member in connection with the business of the Company, except for acts of gross negligence or intentional wrongdoing. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities of the Company. No Member shall be liable as such for the liabilities of the Company.

**3.9 Indemnification.** The Members shall be indemnified by the Company for all costs, losses, liabilities, and damages paid or accrued by such Member for any act or omission performed or omitted by them in connection with the business of the Company for which they are not liable pursuant Section 3.8 or under any provision of the Act.

## ARTICLE IV
## Capital of the Company

**4.1 Capital Contributions.** The Members have made Capital Contributions to the Company in cash or other property as set forth in the Company's books and records.

**4.2 Additional Capital Contributions.** No additional Capital Contribution has been agreed to be made by any Member. The Members may make additional Capital Contributions and/or loans to the Company at such time or times, and upon such conditions as determined by the Board of Managers.

**4.3 Interest, Member Loans.** No interest shall be paid on the initial or any additional Capital Contributions. Any Member may, however, loan to the Company additional funds upon such terms and conditions as approved by the Board of Managers. Such funds shall represent a debt from the Company to the Member or Members making such advances, payable at such time and bearing interest at such rates as may be determined by the Board of Managers at the time such loan is made. Any interest so paid shall be charged as an expense of the Company business.

**4.4 Units; Issuance of Units .** The Company shall have the authority to issue up to 2,000,000 Units. Each Unit shall be identical to all other Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a Unit Owner as set forth in this Agreement. The Members hereby grant the necessary authorization to the Board of

Managers to authorize and issue the amount of Units necessary to properly issue the Units as contemplated hereunder.

## ARTICLE V
## Distributions

**5.1 Operating Distributions.** Available Cash may be distributed to the Unit Owners at such intervals as the Board of Managers determines appropriate, in its sole discretion. If, as and when, the Board of Managers determines to make distributions of Available Cash, then such distributions shall be made to the Unit Owners in accordance with their respective Percentage Interest.

**5.2 Tax Distributions.** Notwithstanding anything contained in this Agreement to the contrary, for each Fiscal Year, the Company shall, to the extent of Available Cash, make distributions to the Unit Owners in accordance with this Section ("***Tax Distributions***") prior to making any distributions pursuant to Section 5.1. To the extent Tax Distributions are to be made, such Tax Distributions should be made to each Unit Owner in the amount of the Tax Liability applicable to such Unit Owner within ninety (90) days after the last day of such Fiscal Year. Tax Distributions shall be charged against current or future distributions to which such Unit Owner would otherwise have been entitled under Sections 5.1 or 9.4. The provisions of this Section shall also apply to Company taxable income allocated to the Unit Owners as a result of a final adjustment by a taxing authority to the Company's taxable income

**5.3 Amounts Withheld.** All amounts withheld pursuant to the Code or any provision of any state or local tax laws respecting payment, distribution or allocation to the Company or the Unit Owners shall be treated as amounts distributed to the Unit Owners pursuant to this Article for all purposes under this Agreement. The Board of Managers is authorized to withhold from any distributions and pay over to any federal, state or local government any amounts required to be so withheld and paid over pursuant to the Code or any other applicable law or regulation.

**5.4 Distribution Limitations.** The Company shall not make any distribution to the Unit Owners, and no Unit Owner shall be entitled to receive any such distribution to the extent that, after giving effect to the distribution: (i) the Company would not be able to pay its debts as they become due in the usual course of business or (ii) the Company's total assets would be less than the sum of its total liabilities.

## ARTICLE VI
## Tax Matters

**6.1 Partnership Tax Status.** The Members intend the Company to be classified as a partnership for federal tax purposes and agree that the Company will not, without obtaining the prior written consent of a Supermajority Interest of the Members and the recommendation of the Company's Chief Financial Officer, elect to be classified as an association taxable as a corporation (pursuant to Treasury Regulation Section 301.7701-3 or successor provision).

**6.2 Partnership Representative.** The Board of Managers shall designate a "Partnership Representative" of the Company within the meaning of Code Section 6223 (the

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

"***Partnership Representative***"). The Partnership Representative may be removed or replaced by the Board of Managers.

**6.3** **<u>Capital Accounts</u>.** An individual capital account ("***Capital Account***") shall be established and maintained on the books of the Company for each Unit Owner in compliance with Treasury Regulation Section 1.704-1(b)(2)(iv). Each Unit Owner's Capital Account shall be increased by (a) the amount of any money actually contributed by the Unit Owner to the capital of the Company, (b) the Gross Asset Value of any property contributed (net of liabilities assumed by the Company or subject to which the Company takes such property, within the meaning of Section 752 of the Code), and (c) the Unit Owner's distributive share of Net Profit and of any separately allocated items of income or gain except adjustments required by Section 704 of the Code (including any gain and income from unrealized income with respect to accounts receivable allocated to the Unit Owner to reflect the difference between the book value and tax basis of assets contributed by the Unit Owner). Each Unit Owner's Capital Account shall be decreased by (i) the amount of any money distributed to the Unit Owner by the Company, (ii) the Gross Asset Value of any property distributed to the Unit Owner (net of liabilities of the Company assumed by the Unit Owner or subject to which the Unit Owner takes such property within the meaning of Section 752 of the Code), and (iii) the Unit Owner's share of Net Loss and of any separately allocated items of deduction or loss (including any loss or deduction allocated to the Unit Owner to reflect the difference between the book value and tax basis of assets contributed by the Unit Owner)

**6.4** **<u>Allocation of Net Profits and Net Losses</u>.** After making any special allocations required under Section 6.6 and accounting for distributions that have been made pursuant to Sections 5.1, 5.2 and 9.4, the items of income, expense, gain and loss of the Company comprising Net Profits or Net Losses for a Fiscal Year shall be allocated among the Persons who were Unit Owners during such Fiscal Year in accordance with their respective Percentage Interest.

**6.5** **<u>Allocation Timing, Records</u>.** For each Fiscal Year, all Net Profit and Net Loss of the Company shall be allocated at and as of the end of that Fiscal Year. Unless the Board of Managers determines to separate the Company's Fiscal Year into segments, if the Company admits a new Member to the Company or if a Unit Owner sells, exchanges, or otherwise disposes of all or any portion of the Unit Owner's Units to any Person, then Net Profit and Net Loss shall be allocated between the new Unit Owner and the existing Unit Owners, by assigning an equal portion of the Net Profit and Net Loss to each day of the Fiscal Year and then allocating that portion according to the number of Units each Unit Owner owned on such day; <u>provided, however</u>, that in the event of any extraordinary non-recurring event, Net Profit and Net Loss shall be allocated among Unit Owners according to the number of Units owned on the date of such event. Notwithstanding the foregoing, allocations hereunder shall at all times comply with the requirements of Code Section 706 and the regulations promulgated thereunder.

**6.6** **<u>Special Allocations</u>.**

(a) <u>Net Loss and Deduction Limitation</u>. Notwithstanding anything contained in this Agreement to the contrary, a Unit Owner shall not be allocated any item of loss, deduction, or nondeductible noncapital expenditure, to the extent that such allocation

would create or increase a deficit balance in such Unit Owner's Modified Capital Account. Any amount to which this limitation applies shall be reallocated to those Unit Owners who have a positive balance in their Modified Capital Accounts, in proportion to their respective Units.

(b) Qualified Income Offset. If during any Fiscal Year a Unit Owner unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), that causes or increases a deficit balance in the Unit Owner's Modified Capital Account, there shall be allocated to the Unit Owner items of Company income and gain (consisting of a pro rata portion of each item of Company income for such year, including gross income) in an amount and manner sufficient to eliminate such deficit balance as quickly as possible. The contingent priority allocation prescribed by this Section is intended to meet the requirements of a "qualified income offset" (as defined in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)) and shall be interpreted and applied in accordance that intention.

(c) Nonrecourse Deduction Allocation and Minimum Gain Chargeback. Nonrecourse deductions (as defined in Treasury Regulation Section 1.704-2(b)(1)) shall be allocated to the Unit Owners in proportion to their respective Units. If there is a net decrease in partnership minimum gain (as defined in Treasury Regulation Section 1.704-2(b)(2)) for a Fiscal Year (determined in accordance with Treasury Regulation Section 1.704-2(d)(1)) each Unit Owner shall be allocated items of Company income and gain for such year equal to that Unit Owner's share of the net decrease in partnership minimum gain (determined in accordance with Treasury Regulation Section 1.704-2(g)(2)). The contingent priority allocation prescribed by this Section is intended to meet the requirements of a "minimum gain chargeback" (pursuant to Treasury Regulation Section 1.704-2(f)) and shall be interpreted and applied in accordance that intention.

(d) Member Nonrecourse Deductions. Partner nonrecourse deductions (determined in accordance with Treasury Regulation Section 1.704-2(i)(2)) shall be allocated to the Unit Owner(s) who bear economic risk of loss for the liability. If there is a net decrease in partner nonrecourse debt minimum gain (as defined in Treasury Regulation Section 1.704-2(i)(2)) during a Fiscal Year, each Unit Owner who had a share of that partner nonrecourse debt minimum gain at the beginning of the year shall be allocated items of income and gain equal to that Unit Owner's share of the net decrease in partner nonrecourse debt minimum gain, as determined by applying the definitions and rules set forth in Treasury Regulation Section 1.704-2(i).

**6.7 Section 754 Election.** The Company may make and file a timely election under Code Section 754 (and a corresponding election under applicable state or local law) in the event of a Transfer of an interest in the Company permitted hereunder or the distribution of property to a Unit Owner, as the Board of Managers may determine appropriate. Any adjustments resulting from such an election shall be reflected in the Capital Accounts of the Unit Owners only to the extent provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(m). Any Unit Owner or transferee first requesting an election hereunder shall reimburse the Company for reasonable out-of-pocket expenses incurred by the Company in connection with such election, including, without limitation, any legal or accountants' fees;

thereafter, each transferee shall reimburse such expenses with respect to adjustments under Code Section 743 in the proportion which the interest of each transferee bears to the sum of the interests of all transferees; the Company shall bear the expenses of any adjustments under Code Section 734.

**6.8** __Section 704(c) Allocations__. For federal, state and local income tax purposes, Company income, gain, loss, deduction or expense (or any item thereof) for each Fiscal Year shall be allocated to and among the Unit Owners to reflect any adjustments to Gross Asset Value. In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Unit Owners so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Gross Asset Value of the property using "traditional allocations," "curative allocations," or the "remedial allocation method" under Treasury Regulations § 1.704-3. If the Gross Asset Value of any Company asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to such asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the related Regulations using "traditional allocations," "curative allocations," or the "remedial allocation method" under Treasury Regulations § 1.704-3. Allocations under this paragraph are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Unit Owner's Capital Account or share of profits, losses or other items or distributions under any provision of this Agreement.

## ARTICLE VII
## Managers

**7.1** __Board of Managers__. The management of the Company shall be vested in a board of managers (the "***Board of Managers***") who shall have the right and authority to manage the affairs of the Company and make decisions with respect thereto as provided in this Agreement. The Board of Managers may consult with advisory committees established by the Board of Managers from time to time.

(a) __Number__. The Board shall consist of two (2) managers (each, a "***Manager***").

(b) __Appointment__. The following individuals shall be appointed to the Board:

(i) one (1) manager shall be Dean Erhardt; and

(ii) one (1) Manager shall be David Suchanek.

(c) __Term__. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Company. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. A Manager may be removed by a Supermajority Interest of the Members.

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

(d) Vacancies. Any vacancy on the Board of Managers because of the resignation, death or removal of a Manager shall be filled by the vote of a Majority Interest of the Members.

(e) Subsidiary Board of Managers or Board of Directors. The Company shall at all times, unless otherwise determined by the Board of Managers, in its sole discretion, cause the board of managers or board of directors of each of the Company's Subsidiaries (if any) to be composed of the same persons who are then managers of the Board of Managers of the Company pursuant to this Section. All subsections of this Section 7.1 shall apply to such boards of directors or boards of managers with any references to "board of directors" or "director" to be read to apply to "board of managers" or "manager" as the case may be.

(f) Compensation. The Managers, in their capacity as Managers, shall not be entitled to receive compensation for services rendered to or on behalf of the Company unless approved by a Supermajority Interest of the Members. The Company shall reimburse the Managers for all reasonable out-of-pocket expenses incurred by them on behalf of the Company directly in connection with the discharge of their duties and obligations hereunder within a reasonable time after receipt of proper documentation therefor; provided, however, that the Company shall not reimburse the Managers for expenses incurred outside of the Company's usual course of business unless such expenses were authorized or ratified by the Members.

**7.2 Managers' Powers.** The Managers shall have all specific rights and powers required or appropriate to manage the Company's business, subject, however, in all events to the specific limitations set forth under in this Agreement, including, but not limited to, the limitations of the Section 7.3.

The Members hereby agree that, except as otherwise provided herein, only the Managers and authorized agents of the Company shall have the authority to bind the Company (and with respect to agents, only to the extent of the authority granted). No Member, other than a Member who is a Manager or Officer acting as such, shall take any action to bind the Company. Except those conferred on or reserved to the Members hereunder, the Managers have the exclusive power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company, including, without limitation:

(a) The institution, prosecution, and defense of any legal proceeding in the Company's name;

(b) The purchase, receipt, lease, or other acquisition, ownership, holding, improvement, use, and other dealing with real or personal, tangible or intangible property, wherever located;

(c) The sale, conveyance, mortgage, pledge, lease, exchange, and other disposition of property in the ordinary course of the Company's business;

(d) The entering into contracts and guaranties; incurring of liabilities; borrowing money, issuance of notes, bonds, and other obligations; and the securing of

any of its obligations by mortgage or pledge of any of the property or income of Company;

(e) The lending of money, investment and reinvestment of the Company's funds, and receipt and holding of property as security for repayment, including, without limitation, the loaning of money to Members, Officers, employees, and agents;

(f) The conduct of the Company's business, the establishment of Company offices, and the exercise of the powers of the Company;

(g) The appointment of employees and agents of the Company, defining of their duties, the establishment of their compensation;

(h) The payment of pensions and establishment of pension plans, pension trusts, profit sharing plans, and benefit and incentive plans for all or any of the current or former Members, employees, and agents of the Company;

(i) The making of donations to the public welfare or for religious, charitable, scientific, literary, or educational purposes;

(j) The payment or donation, or any other act that furthers the business and affairs of the Company;

(k) The payment of compensation, or additional compensation to any or all Members, and employees on account of services rendered to the limited liability company;

(l) The purchase of insurance on the life of any of its Members, or employees for the benefit of the Company;

(m) The participation in partnership agreements, joint ventures, or other associations of any kind with any person or persons; and

(n) Any other actions that do not specifically require Member approval hereunder.

Notwithstanding the foregoing, no Manager shall do any of the foregoing if and to the extent that such transaction or series of related transactions (i) involves consideration in excess of Fifty Thousand Dollars ($50,000) or (ii) represents an obligation binding upon the Company for longer than one (1) year without the approval of all of the Managers.

**7.3 <u>Limitations on Managers' Powers</u>.** In addition to the limitations set forth elsewhere herein, no Manager or Officer shall, without the consent of a Supermajority Interest of the Members:

(a) Do any act in contravention of this Agreement;

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

(b) Do any act which would make it impossible to carry on the usual business of the Company;

(c) Confess a judgment against the Company, or settle a claim against the Company;

(d) Possess Company property or assign the rights of the Company in specific Company property for other than Company purposes;

(e) Continue the business with the Company property after the dissolution of the Company, if the Members elect not to continue the business of the Company in the manner as provided herein;

(f) Issue additional Units or create a new class of Units or ownership interests in the Company; or

(g) Sell, exchange, or otherwise dispose of (other than by way of a pledge, mortgage, deed of trust, or trust indenture) all or substantially all of the Company's property and assets (with or without goodwill), other than in the usual or regular course of the Company's business, or cause the merger or consolidation of the Company with any other entity.

Notwithstanding the foregoing, the Managers and Officers may be authorized by the Members to execute and deliver any and all documents, and to take any and all actions on behalf of the Company as may be necessary to accomplish any actions requiring the authorization of the Members pursuant to this Agreement.

**7.4 <u>Meetings; Voting</u>.**

(a) Unless otherwise required by law or provided in this Agreement, (i) a majority of the Managers in office shall constitute a quorum for the transaction of business of the Managers, and (ii) with respect to any act to be taken by the Board pursuant to this Agreement, the unanimous vote of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. If a quorum is initially present at a meeting but ceases to be so present, the meeting may not continue to transact business. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his or her dissent or abstention shall be entered in the minutes of the meeting or unless he or she shall file his or her written dissent or abstention to such action with the person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent or abstention to the Company promptly after the adjournment of the meeting. Such right to dissent or abstain shall not apply to a Manager who voted in favor of such action.

(b) Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) Meetings of the Managers may be called by any Manager, on at least three (3) business days' notice to each Manager and the Company. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting.

**7.5 Action by Written Consent or Telephone/Video Conference.** Any action permitted or required by the Act or this Agreement to be taken at a meeting of the Board of Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by the Managers having not less than the minimum number of votes necessary to authorize such action. Such consent shall have the same force and effect as a unanimous vote at a meeting and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board of Managers. Subject to the requirements of this Agreement for notice of meetings, Managers may participate in and hold a meeting of the Board of Managers by means of a telephone or video conference or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**7.6 Deadlock.** Any dispute of the Managers which has failed to be resolved by informal discussions shall be decided by the vote of a Majority Interest of the Members.

**7.7 Reliance on the Managers.** Any person doing business with or otherwise dealing in any transaction whatsoever with a Managers acting as such shall be entitled to rely fully on the Managers' power and authority to bind the Company in that business or transaction.

**7.8 Interested Transaction.** Notwithstanding anything contained in this Agreement to the contrary, a contract or other transaction between the Company and any Member or Manager, an Affiliate of any Member or Manager or a Person in which the Member or Manager has a substantial financial interest shall not be void or voidable for such reason alone or because the Member or Manager was present at the meeting approving such contract or transaction and its vote counted for such purpose, if the material facts and any material conflicts of interest with respect to such contract or transaction are disclosed in good faith or known to the Members entitled to vote thereon, and the Members approve the contract or transaction. If the requirements of this Section are not met, the Company may void a contract or transaction unless the parties thereto establish that it was fair and reasonable to the Company at the time of its approval. Without limiting the foregoing, and with respect to any contract, agreement or arrangement between the Company and any Person in which the Manager or its Affiliates has a financial interest, all such contracts, agreements or arrangements shall be reasonably disclosed to the Members and shall be conducted on a reasonable, arms-length basis.

**7.9 Liability of the Managers.** No Manager nor any Officer, director, agent, employee, or other representative of a Manager shall be liable to the Company or to any Member for losses sustained or liabilities incurred as a result of any act or omission if such act or omission did not constitute fraud, gross negligence, or willful or wanton misconduct.

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

**7.10** **Indemnification.** Every Person (and the heirs, executors, and administrators of such person) who serves, or has served as a Manager, Officer, or employee of the Company or of any other entity when requested by this Company, and of which this Company directly or indirectly is or was a security holder or creditor, or otherwise interested, may in accordance with the Act be indemnified by the Company against any and all liability and reasonable expense that may be incurred by him in connection with or resulting from any claim, action, suit, or proceeding (whether brought by or in the right of the Company or such other company or otherwise), civil or criminal, or in connection with an appeal relating thereto, in which he may become involved, as a party or otherwise, by reason of his being or having been a Manager, Officer, or employee of the Company or such other entity, or by reason of any action taken or not taken by him in such capacity, whether he continues to be such Manager, Officer, or employee at the time such liability or expense shall have been incurred, provided he acted in good faith in what he reasonably believed to be the best interest of the Company or such other entity, as the case may be, and, in addition, in any criminal action or proceeding, had no reasonable cause to believe that his conduct was unlawful.

As used herein, the terms "***liability***" and "***expense***" shall include, but shall not be limited to, counsel fees and disbursements and amounts of judgments, fines, or penalties against, and amounts paid and settlements by or for such person. The termination of any claim, action, suit, or proceeding, civil or criminal, by judgment, settlement (whether with or without court approval) or conviction shall not create a presumption that such person does not meet the standards of conduct set forth herein. Except in the case of an action or suit by or in the right of the Company to procure a judgment in its favor, no indemnification shall be made in respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable for gross negligence or intentional wrongdoing in the performance of his duty to the Company unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper.

Any indemnification hereunder shall be made at the discretion of the Company, but only if the Members (with no Member who is a party to or interested in such claim, action, suit, or proceeding, participating) shall find that such person has met the standards of conduct set forth in the preceding paragraphs.

Expenses incurred with respect to any such claim, action, suit, or proceeding may be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of such person to repay such amount if and to the extent that it shall ultimately be determined that he is not entitled to indemnification hereunder.

The Company shall have the power to purchase and maintain insurance on behalf of any person who is or was a Manager, Officer, employee, or agent of the Company, or is or was serving at the request of the Company as a director, Officer, partner, employee, or agent of another company, corporation, partnership, joint venture, trust, or other enterprise, against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Company would have the power to indemnify him against such liability under the provisions of this Agreement.

The rights of indemnification provided in this Agreement shall be in addition to any rights to which any such person may otherwise be entitled.

**7.11 Officers.** The Board of Managers may appoint officers of the Company, from time to time, including, but not limited to a President, a Chief Executive Officer, one or more Vice Presidents, a Secretary, and a Treasurer (collectively, the "***Officers***," individually an "***Officer***"). Each Officer, if any, shall be subject to the general supervision and control of the Managers and shall carry out the policy decisions made by the Managers, and shall report to the Managers on the operations of the Company or any other matters as the Managers may request.

## ARTICLE VIII
## Assignability and Transfer of Membership Units

**8.1 Transfer Restrictions.** Except in accordance with the terms of this Article VIII, no Unit Owner shall be entitled to directly or indirectly Transfer all or any part of its Units or any interest therein without the prior written consent of a Supermajority Interest of the Members.

**8.2 Right of First Refusal.**

(a) If any Member desires to Transfer its Units to a Purchaser, it shall obtain from the Purchaser a bona fide written offer (the "***Third Party Offer***") to purchase some or all of Transferring Member's Units, stating the Purchaser's name, the price, and the other terms and conditions upon which the Transfer is to be made. If the Transferring Member wishes to accept the Third Party Offer, the Transferring Member shall deliver written notice ("***Offer Notice***"), which shall include the Third Party Offer, to the Company and the Non-Transferring Members indicating its desire to Transfer some or all of its Units to the Purchaser.

(b) The Company, or, if the Company fails to so exercise its right under this paragraph, then some or all of the Non-Transferring Members, pro rata in accordance with their Units (or as they may otherwise agree), shall have a right of first refusal to collectively purchase all, but not less than all, of the Units covered by the Third Party Offer, for the same price and other terms and conditions (or, at the option of the Company or the Non-Transferring Members, as may be the case, the net cash equivalent thereof) as stated in the Third Party Offer. If the Company exercises its right, it shall notify the Transferring Member and the Non-Transferring Members of its intention to exercise such right within thirty (30) days following its receipt of the Offer Notice. If the Company fails or chooses not to exercise its right within such thirty (30) day period, the Non-Transferring Members shall notify the Transferring Member of their intentions to exercise such right within fifteen (15) days after expiration of the Company's thirty (30) day exercise period.

(c) If the Company or the Non-Transferring Members, as may be the case, elect to exercise its or their right of first refusal as set forth in paragraph (b) of this Section, the closing for the Transfer shall take place on a date, which shall be within sixty (60) days after the Transferring Member receives notice from the Company or the Non-

Transferring Members of its or their election to exercise such right, time and place agreed by the parties.

(d) If the Company and Non-Transferring Members fail or choose not to elect to exercise its or their right of first refusal as set forth in paragraph (b) of this Section, the Transferring Member may Transfer its Units to the Purchaser in accordance with the Third Party Offer, within sixty (60) days following the expiration of the exercise period in Section 8.2(b) provided, however, such Purchaser shall not be admitted as a Member except in accordance with the provisions of Section 8.6. If not sold within such sixty (60) day period, such Units shall once again be subject to the requirements of this Section.

**8.3 Not Used.**

**8.4 Unauthorized Transfer Void.** Any Transfer or attempted Transfer of a Unit in violation of the terms of this Agreement shall be null and void and of no force and effect. However, if a court of competent jurisdiction determines that any restrictions on Transfer contained herein are void or otherwise unenforceable, such restrictions shall be treated as though they were not included herein; provided, however, the Person holding such Units and that Person's successors and assigns shall become an assignee of such Units, with no right to participate in the management of the business of the Company or otherwise exercise any of the rights or privileges of a Member under this Agreement. Each Transferring Member shall indemnify and hold harmless the Company and the Non-Transferring Members against any and all loss, liabilities, damages and expenses, including, without limitation, tax liabilities or loss of tax benefits, arising directly or indirectly out of any Transfer or purported Transfer in violation of this Agreement.

**8.5 Effect of Transfer.** A Transfer by a Unit Owner of Units does not of itself permit the Purchaser to participate in the business and affairs of the Company or to become a Member or exercise any rights or powers of a Member unless such Purchaser has been admitted as a Substitute Member, in the manner as provided herein.

**8.6 Substitute Members.** A Purchaser of Member Units shall have the right to be admitted as a Member in place of a Transferring Member (a "***Substitute Member***") only upon occurrence of all of the following:

(a) The Transferring Member shall designate in writing satisfactory to the Non-Transferring Members the intention that the Purchaser is to become a Substitute Member;

(b) The Purchaser shall agree in writing to be bound by all of the terms of this Agreement (as amended and/or restated from time to time);

(c) A Majority Interests of the Non-Transferring Members consent in writing to the admission of the Purchaser as a Substitute Member, which consent may be withheld in their absolute discretion;

(d) The Purchaser shall execute and/or deliver such instruments as the Members deem necessary or desirable to affect such Purchaser's admission as a

Substitute Member and to evidence the Purchaser's acceptance of the terms of this Agreement; and

(e) The Purchaser shall pay all reasonable expenses in connection with the Purchaser's admission as a Substitute Member.

**8.7 Rights of Purchasers.** A Purchaser who does not become a Substitute Member shall succeed only to the rights of the Transferring Member to receive allocations and distributions from the Company and shall not have any other rights of the Transferring Member as a Member, including but not limited to, the right to vote to the extent of the transferred Unit(s).

**8.8 Participation in Approved Sale.**

(a) Notwithstanding anything contained in this Agreement to the contrary, if the Members, pursuant to Sections 7.3 or 8.1 of this Agreement, approve a proposal for a bona fide transaction with an unaffiliated third party providing for (i) the sale of more than fifty percent (50%) of the Units to any Person, (ii) the merger or consolidation of the Company with any Person, or (iii) the sale by the Company of all or substantially all of its assets to any Person (an "***Approved Sale***"), then the Board of Managers shall notify the Unit Owners of an Approved Sale by delivery of written notice. Each Unit Owner shall take all such actions and execute and deliver such documents as may be reasonably requested by the Board of Managers to effect an Approved Sale and each Member agrees to waive any dissenter's rights in respect of an Approved Sale.

(b) Each Unit Owner will be severally obligated to join (pro rata in accordance with their Percentage Interest) in any indemnification or other obligations (other than any such obligations that relate specifically to a particular Unit Owner, such as indemnification with respect to representations and warranties given by a Unit Owner regarding such Unit Owner's title to and ownership of its Units, as to which obligations each such Unit Owner will be solely liable); provided that no Member will be obligated in connection with an Approved Sale to agree to indemnify or hold harmless the prospective acquiror with respect to an amount in excess of the net cash proceeds to be paid to such Unit Owner in connection with such Approved Sale.

(c) The obligations of the Unit Owners under this Section are subject to the satisfaction of the following conditions: (i) the consideration payable upon consummation of an Approved Sale to all Unit Owners must be allocated among the Unit Owners in accordance with the provisions of Section 9.4; and (ii) upon the consummation of an Approved Sale, all of the Unit Owners must receive the same form of consideration or, if any Unit Owners are given an option as to the form of consideration to be received, all Unit Owners must be given the same option (excluding any employment, consulting, non-competition or other related contractual arrangement that any Unit Owner may enter into.

(d) Each Unit Owner will bear its pro rata share (based upon their Percentage Interest) of the reasonable costs of any sale of its Units pursuant to an Approved Sale (but

only if such Approved Sale is actually consummated) to the extent such costs are incurred for the benefit of all Unit Owners and are not otherwise paid by the Company or the acquiring party. Costs incurred by or on behalf of a Unit Owner for its sole benefit will not be considered costs of the transaction.

(e) In the event of an Approved Sale, each Unit Owner shall receive an offer to participate in the Approved Sale on the same terms and conditions as the other participates, as sellers, in the Approved Sale. Each Unit Owner shall receive a notice of the proposed Approved Sale, and the terms thereof, at least thirty (30) days in advance of the proposed closing date, whereupon the Unit Owner receiving such notice shall have twenty (20) days after receipt to decide whether to be a selling participant in the Approved Sale. Each Unit Owner participating in the Approved Sale shall receive the same pro-rata consideration after deduction of each selling Unit Owner's proportionate share of the expenses of sale as contemplated by sub-section (d) above.

**8.9 Withdrawal of Members.** No Member shall have the right to: (1) withdraw its Capital Contribution; or (2) receive any return or interest on any portion of its Capital Contribution except, as otherwise provided herein. No Member shall have the power or right to withdraw or otherwise resign from the Company prior to the dissolution and winding up of the Company pursuant to Article IX without the prior unanimous written approval of the other Members. A Member shall cease to be a Member at the time such Member no longer holds any Units of the Company. Notwithstanding anything contained herein to the contrary, upon the withdrawal or resignation of any Member, the remaining Members shall have the right to continue the business and affairs of the limited liability company, provided, within ninety (90) days after the withdrawal of a Member, a Majority Interest of the remaining Members agree in writing to continue the business and affairs of the Company.

## ARTICLE IX
## Dissolution, Liquidation

**9.1 Dissolution.** The Company shall be dissolved upon the happening of any of the following events (each, an "***Event of Dissolution***"): (i) upon the vote or written consent of a Supermajority Interest of the Members; (ii) an event of withdrawal with respect to the sole remaining Member; (iii) an entry of a decree of dissolution pursuant to Section 18-802 of the Act, or successor provision; (iv) when the Company is not the surviving entity in a merger or consolidation; or (v) when the Company disposes of substantially all of the Company assets and property.

**9.2 Liquidation and Termination.** Upon the occurrence of an Event of Dissolution, the Company shall cease to engage in any further business, except to the extent necessary to perform existing obligations, and shall wind up its affairs and liquidate its assets. The Members acting by the approval of a Supermajority Interest of the Members shall appoint a liquidator (who may, but need not, be a Member) who shall have sole authority and control over the winding up and liquidation of the Company's business and affairs and shall diligently pursue the winding up and liquidation of the Company. During the course of liquidation, Net Profit and Net Loss shall continue to be allocated pursuant to Article VI of this Agreement.

**9.3** **Liabilities; Settling of Accounts.** Subject to any applicable provisions of the Act, the proceeds of liquidation shall be applied as follows: (i) first, to pay all expenses of liquidation and winding up; (ii) second, to pay all debts, obligations and liabilities of the Company in the order of priority as provided by law; and (iii) to establish reasonable reserves for any remaining contingent or unforeseen liabilities of the Company not otherwise provided for, which reserves shall be maintained by the liquidator on behalf of the Company in a regular interest-bearing trust account for a reasonable period of time as determined by the liquidator. If any excess funds remain in such reserve at the end of such reasonable time, then such remaining funds shall be distributed by the Company to the Unit Owners pursuant to Section 9.4

**9.4** **Distribution of Net Proceeds.** Subject to any restrictions contained in the Act, upon final liquidation of the Company the net proceeds of liquidation (after the settlement of accounts pursuant to Section 9.3 shall be distributed to the Unit Owners as in accordance with their respective Percentage Interest.

## ARTICLE X
## Books and Records

**10.1** **Principal Place of Business; Books and Records.** The Board of Managers shall maintain physical possession of the books and records of the Company at the Company's principal place of business. The following items shall at all times be maintained at the Company's principal place of business:

(a) A current and a past list of the full name and last known mailing address of each Member and Manager setting forth the amount of cash each Member contributed, if any, a description and statement of the agreed value of the other property and services each Member has contributed or agreed to contribute in the future, if any, and the date on which each became a Member;

(b) A copy of the Certificate and any amendments and any restatements thereto, together with executed copies of powers of attorney, if any, pursuant to which any applications or certificates have been executed;

(c) Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent years or, if such returns and reports were not prepared for any reason, copies of the information and records provided to, or which should have been provided to the Members to enable them to prepare their federal, state, and local tax returns for such period;

(d) Copies of any effective written operating agreement for the Company, and all amendments thereto, and copies of any operating agreements for the Company that are no longer in effect;

(e) Copies of any financial statements of the Company for the three (3) most recent years;

(f) Copies of any written agreement by a Member to make a Capital Contribution to the Company;

(g) Copies of written consents by the Members to the admission of any Person as a Member of the Company; and

(h) Copies of any other instruments or documents reflecting matters required to be in writing pursuant to this Agreement.

Such records are subject to inspection and copying at the reasonable request and at the expense of any Member during ordinary business hours upon the request by at least three (3) business days' advance written notice. The information and records received by the requesting Member shall be held in the strictest confidence by such Member, and such undertaking by the requesting Member shall be evidenced in a written agreement so providing.

**10.2 Accounting and Tax Returns.** The Board of Managers shall maintain or cause to be maintained adequate accounting records of all Company business. Such records shall be kept at the principal place of business of the Company or any mutually agreed upon place and shall, upon reasonable demand, be open to inspection by any Member at all reasonable times. The Company shall maintain its accounting records and shall report for income tax purposes on the cash or accrual method of accounting, as determined by the Members. After the end of each Fiscal Year and at the expense of the Company, the Board of Managers or Partnership Representative shall cause to be prepared a complete accounting of the affairs of the Company, together with whatever tax information is reasonably required by each Member for federal, state, and local income tax reporting purposes for that year, which accounting shall be completed and such information shall be furnished to each Member promptly after the close of such Fiscal Year of the Company. The Board of Managers shall prepare or cause to be prepared and shall file on or before the due date (or any extension thereof) all federal, state, and local tax returns required to be filed by the Company. The Board of Managers shall cause the Company to pay any taxes payable by the Company; provided, however, that the Board of Managers shall not be required to cause the Company to pay any tax so long as the Board of Managers or the Company is in good faith and by appropriate legal proceedings contesting the validity, applicability, or amount thereof and such contest does not materially endanger any right or interest of the Members.

## ARTICLE XI
## General Provisions

**11.1 Amendments.** This Agreement may be modified or amended or restated from time to time upon the written consent of a Supermajority Interest of the Members, provided, however, that any amendment or restatement that materially and adversely diminishes the rights of any Member in a disproportionate manner shall require the consent of such Member. For purposes of the foregoing, "disproportionate" refers to a change in specifically enumerated rights hereunder of one Member while not similarly changing the same or corresponding specifically enumerated rights held by another Member.

**11.2 Waiver of Partition.** The Members hereby waive any right of partition or any right to take any other action that otherwise might be available to them for the purpose of severing their relationship with the Company or their interest in the assets held by the Company from the interest of other Members.

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

**11.3** **Binding Provisions.** The covenants and agreements contained in this Agreement shall be binding upon the heirs, personal representatives, successors, and assigns of the respective parties to this Agreement.

**11.4** **Severability.** Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement that are valid.

**11.5** **Entire Agreement.** This Agreement constitutes the entire understanding and agreement among the parties with respect to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, express or implied, oral or written, except as contained in this Agreement.

**11.6** **Nonwaiver.** The failure of any Member to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**11.7** **Governing Law.** This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**11.8** **Notices.** All notices provided for in this Agreement shall be in writing and shall be given either sufficiently given if delivered in person; by courier (including overnight delivery service), obtaining written receipt of delivery; sent by U.S. registered or certified mail, return receipt requested, first class, postage prepaid; or sent by facsimile or email (with a copy promptly sent thereafter by one of the other permitted methods). A Member may change its address for the purpose of this Section by notice to the Company at its principal office in the manner provided above. All such notices, consents, waivers or other communications will, when sent in accordance with this Section 11.8, be considered to be delivered (i) immediately upon delivery by in person or by courier, (ii) immediately upon sending by facsimile or email, and (iii) three (3) days after deposit to U.S. mail. Written confirmation mechanically or electronically generated by the sender's facsimile machine containing the time, date and recipient facsimile number shall be rebuttable evidence of receipt by facsimile. A copy of the e-mail transmission containing the time, date and recipient e-mail address shall be rebuttable evidence of receipt by e-mail.

**11.9** **Facsimiles and Electronic Copies.** Facsimile and electronic signatures and copies of this Agreement and any notice required to be delivered hereunder shall be deemed to be originals, and shall serve to bind the Members and otherwise have the same force and effect as would non-facsimile and non-electronic signatures and documents.

**11.10** **Counterparts; Gender and Number.** This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which when taken together,

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

constitute one and the same instrument, binding on the Members. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. As used herein, whenever appropriate, the masculine gender includes the feminine gender, and the neuter includes both the masculine and feminine.

**11.11** **Headings.** The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**11.12** **Opportunity to Review; Acknowledgements.** Each of the Members acknowledges and agrees that it has read and fully understands the Agreement, that it intends to be legally bound, and that it is fully and duly authorized to enter into and execute this Agreement. The signatories hereto represent and warrant that they have the authority and approval to execute this Agreement on behalf of the entities which are Members to this Agreement. EACH PARTY SIGNING THIS AGREEMENT (a) UNDERSTANDS THAT THIS AGREEMENT CONTAINS LEGALLY BINDING PROVISIONS, (b) HAS HAD THE OPPORTUNITY TO CONSULT WITH A LAWYER, AND (c) HAS EITHER CONSULTED A LAWYER OR CONSCIOUSLY DECIDED NOT TO CONSULT A LAWYER. EACH PARTY SIGNING THIS AGREEMENT EXPRESSLY ACKNOWLEDGES AND AGREES THAT: (a) THE COMPANY HAS RETAINED CARMODY MACDONALD P.C. ("***CM***") AS ITS LEGAL COUNSEL IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY, (b) CM IS NOT REPRESENTING AND WILL NOT REPRESENT ANY MEMBER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY DISPUTE WHICH MAY ARISE BETWEEN THE MEMBERS, (c) SUCH MEMBER WILL, IF HE/SHE/IT WISHES COUNSEL ON THE TRANSACTIONS CONTEMPLATED HEREBY, RETAIN THEIR OWN INDEPENDENT COUNSEL, AND (d) CM MAY REPRESENT THE COMPANY IN CONNECTION WITH ANY AND ALL MATTERS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, ANY DISPUTE BETWEEN THE COMPANY, ON THE ONE HAND, AND ANY OTHER MEMBER, ON THE OTHER HAND) AND SUCH MEMBER HEREBY WAIVES ANY CONFLICT OF INTEREST IN CONNECTION WITH SUCH REPRESENTATION BY CM.

DocuSign Envelope ID: D1C384B8-4608-48F1-A765-3C469F5254EC

**IN WITNESS WHEREOF**, the undersigned acknowledge that this Agreement is their act, and further acknowledge to the best of their knowledge, information, and belief, that the matters and facts set forth herein are true in all material respects, and that they have executed this Agreement as of the day and year first above written.

**COMPANY:**

**D2 PHARMA CONSULTING LLC**, a Delaware limited liability company

DocuSigned by:
By: Dean P. Erhardt
BE3E13204FAC4B3...
Name: Dean P. Erhardt
Its: President and CEO

**MEMBERS:**

**BIO LAUNCH STRATEGIES, LLC**, a Missouri limited liability company

DocuSigned by:
By: Dean P. Erhardt
BE3E13204FAC4B3...
Name: Dean P. Erhardt
Title: President

**TETH-RX CONSULTING AND CAPITAL VENTURES LLC**, a Florida limited liability company

DocuSigned by:
By: David Suchanek
F0T5600A805940C...
Name: David Suchanek
Title: Manager

The provisions of this Agreement hereby are agreed to and accepted by the Managers, who by their signatures below hereby acknowledge their acceptance of such designation.

**MANAGERS:**

DocuSigned by:
Dean P. Erhardt
BE3E13204FAC4B3...
Dean P. Erhardt

DocuSigned by:
David Suchanek
F0C5600A805940C...
David Suchanek

**EXHIBIT A**

***The Members***
**(as of October 20, 2020)**

This constitutes Exhibit A to the Operating Agreement of the Company.

| **Members** | **Number of Units** | **Percentage Interest** |
|---|---|---|
| Bio Launch Strategies, LLC<br>Attn: Dean P. Erhardt<br>5439 Guinevere Drive<br>Weldon Spring, MO 63304 | 62,500 | 62.5% |
| Teth-Rx Consulting and Capital Ventures LLC<br>Attn: David Suchanek<br>9790 Poplar Place<br>Orlando, FL 32827 | 37,500 | 37.5% |
| **Totals** | **100,000** | **100%** |

**<u>EXHIBIT D</u>**

**MBO Plan**

[*Attached.*]

## D2 Digital Engagement

## CY 2021 MBO's with Payment Allocation

| CY 2021 Individual MBO Opportunity | |
|---|---|
| Unha Engels: CY 2021 MBO Bonus opportunity | $ 240,000.00 |
| Irfan Baig: CY 2021 MBO Bonus opportunity | $ 75,000.00 |
| Grant Schoffelen: CY 2021 MBO Bonus opportunity | $ 75,000.00 |

| *CY 2021 MBO DESCRIPTION AND PAYMENT ALLOCATION* | *% Allocation* | *Unha* | *Irfan* | *Grant* |
|---|---|---|---|---|
| ***Tech Knowledge Transfer*** | *5%* | *$ 12,000.00* | *$ 3,750.00* | *$ 3,750.00* |
| a. Understanding of Platform (Architecture & Internals) | | | | |
| b. Deployment lifecycle (Development/Staging/Production) | | | | |
| c. External supporting services / Assets Transfer | | | | |
| i. All external relationships transfer to Jim (or other designated team member) | | | | |
| d. Develop a strategy to have campaigns configurable by end-users and upon approval, develop and implement to meet the customer requirements. | | | | |
| ***Product Development*** | *20%* | *$ 48,000.00* | *$ 15,000.00* | *$ 15,000.00* |
| a. Document and report Product Roadmap monthly | | | | |
| b. Working within D2, create a three-year plan for client and market requirements, features, functions, and benefits. | | | | |
| c. Prioritize, scope for time and budget, and work with the D2 team to estimate the market for the product and revenue plan. Report Monthly. | | | | |
| ***Infrastructure and Architecture*** | *10%* | *$ 24,000.00* | *$ 7,500.00* | *$ 7,500.00* |
| a. Semi-annual Pen testing with appropriate mitigation and remediation. | | | | |
| b. Implementation of agile software development/project management with organizational reporting on demand. | | | | |
| c. Disaster recovery plan documented and testing in place. Semi-Annual testing to be completed and certified. Surprise testing. | | | | |
| ***Application Development*** | *10%* | *$ 24,000.00* | *$ 7,500.00* | *$ 7,500.00* |
| a. Adheres to product plan functionality and reporting. | | | | |
| b. Meet corporate IT architecture and tech spec integration. | | | | |
| c. Development initiatives done on-time and on-budget | | | | |
| d. Complete documentation to be included in all development projects. | | | | |
| ***Deliverables*** | *15%* | *$ 36,000.00* | *$ 11,250.00* | *$ 11,250.00* |
| a. Hub Helper/ SP Helper products implemented in at least 2 customers. | | | | |
| b. Integration with D2 Accreditation Platform. | | | | |
| c. FIS API and Batch Integration completed. | | | | |
| d. Maintain on-demand product demos for the organization with current functionality. | | | | |
| e. Develop a strategy to have campaigns configurable by end-users and upon approval, develop and implement to meet the customer requirements. | | | | |
| ***Financial 2021-2024*** | *25%* | *$ 60,000.00* | *$ 18,750.00* | *$ 18,750.00* |
| a. Meet ongoing Year over Year Financial goals at a minimum of 90% | | | | |
| b. Meet ongoing Year over Year MBO goals at an average of 85% | | | | |
| ***Client Satisfaction*** | *15%* | *$ 36,000.00* | *$ 11,250.00* | *$ 11,250.00* |
| a. Client satisfaction is measured and maintained with rolling monthly D2 approved surveys. Each client will be surveyed at least twice a year and key clients quarterly. Internal clients will be surveyed monthly. Grade of 90% or better to qualify for incentive payment. | | | | |
| ***Total MBO Payment Opportunity*** | *100%* | *$ 240,000.00* | *$ 75,000.00* | *$ 75,000.00* |

*The timeline for the deliverable outlined herein will be mutually determined between the parties. These timelines will need to be hit to qualify for the payments outlined. The agreement that MBOs have been attained shall be mutually agreed between Jim Maguire and members of the historic WorkUp team.*

**<u>EXHIBIT E</u>**

**Profit Sharing Plan**

[*Attached.*]

**D2 Digital Engagement - Profit Share Model**

Unha Engels, Irfan Baig and Grant Schoffelen shall be able to participate in a profit share model based upon the Profitability of the historic WorkUp division. To qualify for the profit share, the division must hit a minimum of 75% of the targeted sales numbers as mutually agreed between the parties as of October 20, 2020.

Sales goals for CY 2021 – CY 2024

- CY 2021 $8,398,080.00
- CY 2022 $13,996,800.00
- CY 2023 $23,328,000.00
- CY 2024 $38,880,000.00

Profit Share Calculation shall be calculated on the following scale, based on the actual profitability of the historic WorkUp division.

- If Profit Margin is a minimum of 50% Payout of 10% of sales
- If profit Margin is a minimum of 65% Payout of 11% of sales
- If Profit Margin is a minimum of 75% Payout of 12.5% of sales

Profit Share Payout shall be calculated based on the operating profit of the division calculated as follows:

- Total sales – total costs = Operating profit (Cost to include all costs to deliver the historic WorkUp services including but not limited to product development, sales, security, hosting, other 3rd party costs etc.)
- Unha Engels component of the Profit Share Model shall be paid against the Promissory Note until such time as the Note is completely paid after which Ms. Engels Profit Share component shall be paid directly to Ms. Engels.

Payments

In accordance with the current D2 payment process for MBOs and bonus payments, such payments will be made 60 days following the close of the quarter in which such achievement(s) have been attained.

D2 reserves the right to make any adjustments to the Profit Share Payments based on end of year financial obligations potentially including but not limited to:

- End of Year Bonus Payments
- Tax obligations
- Shareholder obligations
- Other financial, legal, regulatory obligations.

**From:** Kenny Engels <kennyengels@gmail.com>
**Sent:** Tue, 12 Jan 2021 08:49:56 -0500
**To:** Dean Erhardt <dean.erhardt@d2rx.com>
**CC:** Unha Engels <unha.engels@d2rx.com>
**Subject:** Fwd: Completed: Please DocuSign: Fifth Amended and Restated Operating Agreement of D2 Pharma Consulting LLC_PE.pdf

---

Dean, here it is. As just discussed, to clear up any ambiguity, we note that this is with a reservation of rights around the anti-dilution piece in connection with the raise as contemplated in the Settlement Agreement, and Exhibit A.

Thanks,

Kenny and Unha

---------- Forwarded message ---------
From: **Dean P. Erhardt via DocuSign** <dse@docusign.net>
Date: Tue, Jan 12, 2021 at 8:46 AM
Subject: Completed: Please DocuSign: Fifth Amended and Restated Operating Agreement of D2 Pharma Consulting LLC_PE.pdf
To: Kenny Engels <kennyengels@gmail.com>

DocuSign

Your document has been completed

VIEW COMPLETED DOCUMENT

**EXHIBIT D**

**Dean P. Erhardt**

dean.erhardt@d2rx.com

All parties have completed Please DocuSign: Fifth Amended and Restated Operating Agreement of D2 Pharma Consulting LLC_PE.pdf.

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
1D195E426CDD4DC783C74094B986079C1

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

**Stop receiving this email**
Report this email or read more about Declining to sign and Managing notifications.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Dean P. Erhardt who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

| | | D2 Pharma Consulting, LLC | 21-Jan | 21-Feb | 21-Sep | 21-Oct | 21-Nov | 21-Dec |
|---|---|---|---|---|---|---|---|---|
| | | Total Units Outstanding | 206,203.50 | 231,223.30 | 231,223.30 | 232,417.14 | 288,597.94 | 288,597.94 |
| CLASS B | 100% | Bio Launch | 116,250.00 | 116,250.00 | 116,250.00 | 116,250.00 | 116,250.00 | 116,250.00 |
| | | | 56.38% | 50.28% | 50.28% | 50.02% | 40.28% | 40.28% |
| CLASS B | 100% | Teth RXCVV | 69,750.00 | 69,750.00 | 69,750.00 | 69,750.00 | 69,750.00 | 69,750.00 |
| | | | 33.83% | 30.17% | 30.17% | 30.01% | 24.17% | 24.17% |
| CLASS B | 100% | MK Engels | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 |
| | | | 3.40% | 3.03% | 3.03% | 3.01% | 2.43% | 2.43% |
| CLASS B | 100% | U Engels | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 |
| | | | 3.40% | 3.03% | 3.03% | 3.01% | 2.43% | 2.43% |
| CLASS B | 100% | J Dever | 2,060.00 | 2,060.00 | 2,060.00 | 2,060.00 | 2,060.00 | 2,060.00 |
| | | | 1.00% | 0.89% | 0.89% | 0.89% | 0.71% | 0.71% |
| CLASS B | 100% | J Liberman | 2,060.00 | 2,060.00 | 2,060.00 | 2,060.00 | 2,060.00 | 2,060.00 |
| | | | 1.00% | 0.89% | 0.89% | 0.89% | 0.71% | 0.71% |
| CLASS C | 100% | GCS Consulting LLC | 500 | 500 | 500 | 500 | 500 | 500 |
| | | | 0.24% | 0.22% | 0.22% | 0.22% | 0.17% | 0.17% |
| CLASS C | 100% | I Baig | 500 | 500 | 500 | 500 | 500 | 500 |
| | | | 0.24% | 0.22% | 0.22% | 0.22% | 0.17% | 0.17% |
| CLASS C | 100% | 4Engs Consulting LLC | 1,083.50 | 1,083.50 | 1,083.50 | 1,083.50 | 1,083.50 | 1,083.50 |
| | | | 0.53% | 0.47% | 0.47% | 0.47% | 0.38% | 0.38% |
| CLASS B | 91.67% | Revokable Propper Family Trust | | 8,164.80 | 8,164.80 | 8,164.80 | 8,164.80 | 8,164.80 |
| | | | | 3.53% | 3.53% | 3.51% | 2.83% | 2.83% |
| CLASS B | 91.67% | Curegrail | | 16,855.00 | 16,855.00 | 16,855.00 | 16,855.00 | 16,855.00 |
| | | | | 7.29% | 7.29% | 7.25% | 5.84% | 5.84% |
| CLASS B | 25.00% | JW SR VCP, LLC | | | | 1,193.84 | 1,193.84 | 1,193.84 |
| | | | | | | 0.51% | 0.41% | 0.41% |
| CLASS A | 16.67% | VCP D2, LP | | | | | 56,180.80 | 56,180.80 |
| | | | | | | | 19.47% | 19.47% |

**Exhibit E**

Carmody MacDonald

Carmody MacDonald P.C.
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105-1705
314-854-8600 Fax 314-854-8660
www.carmodymacdonald.com

Ronald E. Rucker
rer@carmodymacdonald.com
Direct Dial: (314) 854-8677

October 3, 2022

**Via Email: pflagel@gibbonslaw.com and Federal Express**

Peter Flagel
Director - Corporate Group
Gibbons P.C.
One Pennsylvania Plaza, 37th Floor
New York, NY 10119-3701

Mr. Flagel:

We received your letter dated September 28, 2022, and my responses below correspond to your numbered questions and requests:

1. D2 Pharma Consulting LLC ("***D2***") has engaged a new accounting firm to conduct an audit of its 2021 financial statements. As of today's date, this audit is still ongoing. D2 will provide audited financial statements to Kenny and Unha Engels, per your request, as soon as such audited financial statements are available to D2.

Judy Rumpler, D2's V.P., Finance, will separately provide D2's unaudited quarterly and year-end financial statements for 2021.

2. Contrary to the assertions in your letter, we do not believe that the provisions of Section 10(a) of the Settlement Agreement have been breached. For ease of reference, I have copied Section 10(a) of the Settlement Agreement below:

> "On the Closing Date, and subject to the execution of a Joinder Agreement substantially in the form attached hereto as Exhibit C by each of (i) Kenneth Mark Engels ("***Kenny***"), and (ii) Unha, D2 shall issue three and one-half percent (3.5%) of the outstanding Units of D2 to each of Kenny and Unha (the "***Closing Equity Issuance***"). The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100 Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the

"***Initial Capital Raise***"); provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date. For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) [i.e. 7,000 Units] of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise."

The 2021 equity issuances are also briefly described below:

(a) 1/1/2021: Grant Schoffelen and Irfan Baig are each issued 500 Class B units*;

(b) 1/21/2021: 4Engs forgives debt owed by WorkUp in exchange for 1,083.5 Class B units*;

(c) 1/8/2021: James Dever and James Liberman are each issued 2,060 Class A units as advisors to the D2 board of directors*;

(d) 2/26/2021: Richard Propper, MD is issued 8,164.80 Class A units as a member of the D2 board of directors*;

(e) 2/26/2021 CureGrail, LLC, an entity affiliated with Steven Kirchhof - a member of the D2 board of directors, is issued 16,855 Class A units*;

(f) 9/27/2021: JWSR VCP, LLC is issued 1,193.842 Class A Units per terms of bridge loan to D2*; and

(g) 11/16/2021: VCP D2 LP is issued 56,180.8 Class A units in exchange for $8,000,000.00.

*Pursuant to that certain Sixth Amended and Restated Operating Agreement of D2 Pharma Consulting LLC dated November 16, 2021, the Class A units of D2 issued prior to such date were re-named as Class B Units and the Class B units of D2 issued prior to such date were re-named as Class C units.

All of the issuances of equity relate to service providers (see (a) through (e) above) or to a new Capital Raise occurring after the six (6) month period described in Section 10(a) of the Settlement Agreement expired. Thus, none of those equity issuances trigger the anti–dilution provisions of the second sentence of Section 10.(a) of the Settlement Agreement. The K-1s do not, therefore, need to be amended.

3. The distributions made to Dean Erhardt and David Suchanek relate to the IRC Section 754 step down required after the 2018 purchase of the D2 interest from Virmedica which results in an offset to depreciation. When this depreciation was offset it lead to positive taxable income to Dean Erhardt & David Souchanek That taxable income flows to their personal returns where they ultimately paid tax on the income. The tax distributions were made in accordance with Section 5.2 of the Operating Agreement.

I will follow up with a phone call.

Sincerely,

CARMODY MacDONALD P.C.

Ronald E. Rucker