Exhibit 8

**JAMS ARBITRATION**

| | | |
|---|---|---|
| KENNETH MARK ENGELS and UNHA ENGELS, and WORKUP, INC. | ) | |
| Claimants, | ) | Case No. 5335000098 |
| v. | ) | |
| D2 PHARMA CONSULTING, LLC, n/k/a D2 SOLUTIONS HOLDCO LLC, | ) | |
| Respondent. | ) | |

**DEFENDANT D2 PHARMA'S POST-HEARING BRIEF**

This arbitration rises and falls on the reading of Section 10.a of D2 and WorkUp's Settlement Agreement stating:

> The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100 Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the 'Initial Capital Raise'); provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date. For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise.

Claimants ask the Arbitrator to read into Section 10(a) contractual rights that do not appear in its text – namely, a fixed six-month "protective period" of absolute anti-dilution protection and perpetual anti-dilution protection thereafter for non-capital-raise issuances.

The plain language of Section 10(a) grants the Engels a defined equity interest subject only to limited, event-specific anti-dilution protection tied to a contemplated capital raise. No language in Section 10(a) creates a fixed six-month protected period on dilution, specifies anti-dilution protection for any event other than the contemplated capital raise, or grants any anti-dilution protection after that capital raise event. Claimants' interpretation would require the Arbitrator to

add terms the parties did not include and to transform a narrow, single event-based protection into a sweeping and perpetual restriction.

Even if Claimants could establish a breach, which they cannot, the relief they seek independently requires judgment in D2's favor. Claimants request a forced buyout of all of the Engels' units, a remedy that would place them in a better position than if no alleged breach had occurred and is therefore unavailable as a matter of Missouri contract law. Claimants also presented no evidence of the value of their units to support such a buyout.

Nor have Claimants proven any alternative remedy. They introduced no evidence supporting contract damages, including the value of any alleged improper dilution. They likewise failed to establish entitlement to specific performance, offering no evidence that money damages would be inadequate and no evidence of the methodology, number of units, or mechanics by which any alleged dilution could be remedied. Claimants further acknowledge that any alleged dilution damages are personal to the Engels, who are neither parties to the Settlement Agreement nor third-party beneficiaries.

For these reasons, and those set forth below, the Arbitrator should enter an Award in favor of D2.

## EVIDENCE ADDUCED AT HEARING

### A. The Parties and the Asset Purchase Agreement.

1. D2 is a consulting company that provides services to pharmaceutical manufacturers, hospitals, and pharmacies. (Tr. 101-02.)

2. WorkUp is a healthcare technology company founded by Kenneth Mark Engels and Unha Engels. (Tr. 19–21.)

3. In July 2019, D2 and WorkUp entered into an Asset Purchase Agreement ("APA")

pursuant to which D2 acquired WorkUp's assets. As part of that transaction, the parties contemplated both cash consideration and phantom equity-related components tied to WorkUp's continued involvement with D2. (Ex. 15; Tr. 24-25, 88.)

4. Following execution of the APA, disputes arose concerning D2's performance under that agreement, including the timing of installment payments. In November 2020, WorkUp filed suit against D2 in Delaware relating to those disputes. (Tr. 28–31.)

**B. Negotiation and Execution of the Settlement Agreement.**

5. While the Delaware litigation was pending, the parties engaged in negotiations to resolve their disputes and restructure their relationship. As part of those negotiations, D2 and WorkUp executed a Letter of Intent dated December 23, 2020. (Ex. 36; Tr. 66–69.)

6. The Letter of Intent contemplated a revised structure that included the issuance of equity to Kenneth and Unha Engels. With respect to anti-dilution, the Letter of Intent stated that "the above 7% will not be diluted by all or any portion of the up to $8 million capital raise currently contemplated by D2." (Ex. 36 §4; Tr. 67–68.)

7. The Letter of Intent did not state that the Engels' equity would be immune from dilution for all reasons, did not reference service-provider or compensation-related issuances, and did not provide for perpetual anti-dilution protection. (Ex. 36 §4; Tr. 68–69.)

8. Kenneth Engels acknowledged that the anti-dilution protection described in the Letter of Intent was limited only to the contemplated capital raise. (Tr. 68–69.)

9. The Letter of Intent provided "The parties will prepare and sign a definitive agreement reflecting the terms of this Letter of Intent on or before the Closing." (Ex. 36.)

10. Mr. Engels agreed that this was the purpose of the Letter of Intent. (Tr. 69-70.)

11. Following execution of the Letter of Intent, counsel for the parties prepared a

formal Settlement Agreement. A first draft of that agreement was circulated the next day on December 24, 2020. (Ex. 37; Tr. 70–71.)

12. The anti-dilution language in the initial draft of the Settlement Agreement was the same as the language ultimately included in the executed agreement. (Ex. 37 §10.a and 39 §10.a; Tr. 70–71.)

13. On December 30, 2020, D2 and WorkUp executed the Settlement Agreement, thereby resolving the Delaware litigation. (Ex. 39; Tr. 32.)

14. The Settlement Agreement was entered into between D2 and WorkUp. Kenneth and Unha Engels were not parties to the agreement. Rather, they executed joinder agreements for the limited purpose of receiving equity interests pursuant to Section 10(a). (Tr. 73–75; 91.)

**C. The Equity Grant and Anti-Dilution Provision.**

15. Section 10(a) of the Settlement Agreement governs the equity issued to Kenneth and Unha Engels and provides, in relevant part:

> On the Closing Date, and subject to the execution of a Joinder Agreement … D2 shall issue three and one-half percent (3.5%) of the outstanding Units of D2 to each of Kenny and Unha (the 'Closing Equity Issuance'). The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100 Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the 'Initial Capital Raise'); provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date. For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise.

(Ex. 39 §10(a).)

**D. D2 Issuances within Six Months of Settlement Agreement.**

16. In the first six months following the execution of the Settlement Agreement, D2

issued units to certain individuals and entities in connection with services rendered to the company, advisory and board roles, and the forgiveness of debt obligations. These issuances were not made for any portion of any capital raise and did not involve the receipt of capital investment by D2. (Ex. 11; Tr. 55–57; 124-29.)

17. The specific issuances during the first six months were as follows:

a. On or about January 8, 2021, D2 issued units to James Dever and James Liberman in connection with their roles as advisors to D2 and members of its board. These issuances were compensation for services and advisory functions, not investments of capital. (Ex. 11; Tr. 124-25.)

b. On or about January 1, 2021, D2 issued units to Grant Schoffelen and Irfan Baig in connection with their service roles to D2. These issuances were made as compensation for services rendered and were not tied to any capital contribution. (Ex. 11; Tr. 125-26.)

c. On or about January 21, 2021, D2 issued units to 4Engs in connection with the forgiveness of debt owed to that entity. The issuance reflected a non-cash transaction resolving an existing obligation and did not involve any infusion of new capital into D2. (Ex. 11; Tr. 126-27.)

d. On or about February 26, 2021, D2 issued units to the Revocable Propper Family Trust and to CureGrail, LLC, each in connection with board service, advisory roles, or related service arrangements. These issuances were likewise compensation- or service-related and not capital investments. (Ex. 11; Tr. 127-28.)

18. The issuances identified above resulted in a proportional change in ownership percentages among all unit holders, consistent with ordinary equity issuances for services, governance, and debt resolution. (Ex. 11.)

19. Claimants are challenging the dilution of their interest due to these issuances.

**E. D2 Issuances for Non-Capital Raises More Than Six Months After Settlement Agreement**.

20. Following the Settlement Agreement, D2 implemented an employee and service-provider incentive program that included the issuance of a separate class of equity referred to as Class D units. (Ex. 56; Tr. 140–142.)

21. The Class D units were issued as part of an incentive and compensation program for employees and service providers and were not issued in exchange for investment capital. (Tr. 141–142; Ex. 56.)

22. The Class D units were created and issued more than six-months after the execution of the Settlement Agreement. (Tr. 140.)

23. The issuance of Class D units resulted in a proportional dilution of ownership percentages among all existing unit holders, including Kenneth and Unha Engels, in the same manner and to the same extent as other unit holders. (Exs. 55–56.)

24. Claimants are challenging the dilution of their interest due to these issuances.

**F. D2 Issuances for Capital Raises More Than Six Months After Settlement Agreement.**

25. D2 completed the $8 million capital raise through a bridge loan and an investment by Viewside Capital Partners that occurred in October and November 2021 after the six months for Initial Capital Raise referenced in Section 10(a) of the Settlement Agreement had expired. (Tr. 54–55, 130-31.) The issuance of units to Viewside Capital Partners resulted in a proportional dilution of ownership percentages among all existing unit holders, including Kenneth and Unha Engels, in the same manner and to the same extent as other unit holders. (Ex. 11.)

26. Claimants are not challenging the dilution of their interest due to these issuances.

27. After the Viewside capital raise was completed in November 2021, D2 completed a subsequent capital raise in or around December 2022, in which additional equity was issued to Viewside Capital Partners and other investors. This transaction constituted a capital raise, occurred after the six-month period following the Settlement Agreement. The transaction was reflected in D2's official cap tables and corporate records. (Tr. 144–145; Ex. 55.)

28. Claimants are not challenging the dilution of their interest due to these issuances.

**G. Post-Settlement Agreement Conduct of Parties.**

29. On January 12, 2021, Kenneth Engels transmitted his and his wife's executed Operating Agreement and stated that he was signing "with a reservation of rights around the antidilution piece in connection with the raise as contemplated in the Settlement Agreement." Engels did not reference or reserve rights as to advisor, service-provider, or other non-capital-raise issuances, and expressly tied his reservation to the contemplated capital raise. (Tr. 78–80; Ex. 40.)

30. In February 2021, a prospective board member Dr. Richard Propper forwarded an email chain attaching what he said was draft cap table that he reported receiving from Judy Rumpler, reflecting an apparent adjustment to Kenneth Engels' units. The statement was not authored or sworn to by Ms. Rumpler, was not communicated by D2 as an interpretation of the Settlement Agreement. D2's CEO testified that the draft was an internal, non-authoritative document and that D2's governing cap tables did not adopt the draft adjustment. (Tr. 154–156, 168–169; Ex. 57.)

## ISSUES FOR DECISION

### A. Claimants Have Not Established a Breach of Section 10(a) of the Settlement Agreement.

Claimants' breach of contract claim depends on their interpretation that Section 10.a of Settlement Agreement granted the Engels (1) absolute anti-dilution protection for all issuances of units during the first six months after execution of the Settlement Agreement; and (2) continuing anti-dilution protection in perpetuity for issuances for non-capital raises. The plain language of the Settlement Agreement supports neither of these interpretations.

Missouri courts have long held that the "cardinal rule" of contract interpretation is to ascertain and give effect to the parties' intent. *Cheek v. Cheek*, 669 S.W.3d 155, 159 (Mo.App.E.D.

2023).[1] That intent is determined by reading the contract as a whole, applying the plain and ordinary meaning of the agreement's terms, and declining to adopt any construction that leaves language without function or sense. *Jimenez v. Cintas Corp.*, 475 S.W.3d 679, 686 (Mo.App.E.D. 2015).

1. *Settlement Agreement Does Not Provide Absolute Anti-Dilution for Six Months*.

Section 10(a) of the Settlement Agreement does not create an absolute six-month period during which the Engels' units could not be diluted for any reason. It also does not provide anti-dilution protection for any issuance other than the specifically defined "Initial Capital Raise."

The text of Section 10(a) ties anti-dilution protection only to a single, defined event: "all or any portion of the up to $8,000,000 capital raise currently contemplated by D2 (the 'Initial Capital Raise')." Section 10(a) then limits the time in which that capital raise may occur, stating that "in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date." Finally, Section 10(a) clarifies, "for the avoidance of doubt," that the Engels have anti-dilution rights only during the "period of the Initial Capital Raise" and that they are "subject to any dilution consequences in any future capital raises after the Initial Capital Raise."

Read as a whole, Section 10(a) does three things. First, it defines the Initial Capital Raise as the only event that triggers anti-dilution protection. Second, it limits how long that defined event may occur. Third, it explains how dilution applies to that event and after that event during and after that specific event. Nothing in the text of Section 10(a) refers to a separate six-month period of absolute protection or to anti-dilution rights that exist apart from the Initial Capital Raise.

Ignoring the other portions of Section 10.a, Claimants isolate the phrase stating that "Kenny

[1] Per its terms, the Settlement Agreement is to be construed under Missouri law. (Ex. 39 at § 30.)

and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise." Claimants argue that this language creates a fixed six-month protected period during which no dilution of any kind may occur. But Section 10(a) never uses the term "protected period" or any similar language. Instead, Section 10.a's reference to six months describes only a maximum time limit for the Initial Capital Raise to occur. That reference to six months makes no reference to a grant of separate or stand-alone protection from dilution caused by other events.

The specific phrase Claimants rely upon ties anti-dilution protection to the "period of the Initial Capital Raise." That is the same defined capital-raise event that governs every other part of Section 10(a). The text does not tie anti-dilution protection to a fixed six-month period of time, and it does not state that anti-dilution protection applies beyond the Initial Capital Raise.

The "for the avoidance of doubt" sentence Claimants rely upon also cannot be read to expand the scope of anti-dilution protection. As commonly used, "for the avoidance of doubt" introduces clarifying language. It does not signal the creation of new or different contractual rights.

Although the plain language of Section 10(a) resolves the issue, Claimants' interpretation also conflicts with Missouri rules of contract interpretation. Claimants' reading creates a conflict between the agreement's express language granting anti-dilution protection only for the Initial Capital Raise and their claim that all dilution is prohibited for six months. Missouri law provides that when a contract provision addresses a specific situation, it controls over more general language. *Five Star Quality Care-MO, L.L.C. v. Lawson*, 283 S.W.3d 811, 815 (Mo.App.W.D. 2009). Here, Section 10(a)'s specific limitation of anti-dilution protection to the "up to $8,000,000 capital raise currently contemplated by D2" controls over the general "for the avoidance of doubt"

sentence that identifies no separate event triggering anti-dilution protection.

Finally, the Settlement Agreement's "Entire Agreement" provision confirms this reading. The parties agreed that the Settlement Agreement, together with the documents it references, contains their entire understanding. (Ex. 39 § 35.) The Settlement Agreement expressly refers to the Letter of Intent executed one day earlier. (*Id.* §§ 6.a., 7.b.) The Letter of Intent states that the parties would prepare a definitive agreement "reflecting the terms of this Letter of Intent". (Ex. 36.) The Letter of Intent limits anti-dilution protection to "all or any portion of the up to $8 million capital raise currently contemplated by D2." (*Id.*) The Settlement Agreement reflects – and does not expand upon – the understanding in the Letter of Intent.[2]

2. *Settlement Agreement Does Not Provide Anti-Dilution for Non-Capital Raises After Six Months*.

Section 10.a. likewise does not provide anti-dilution protection for non-capital raises after six months. For their position, Claimants rely on the second half of the "for the avoidance of doubt sentence". That sentence states Engels' units "shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise." From this language, Claimants argue by negative implication that after six months, the Engels' units are not subject to dilution for *non*-capital raise issuances.

That reading finds no support in the text. At no point does any portion of Section 10.a.

[2] Claimants rely on a single email of extrinsic evidence purportedly relaying statements from a former D2 employee suggesting that units were, at one time, administratively added for the Engels in connection with one of the issuances occurring within the first six months. Even if credited, any such conduct cannot alter or override the unambiguous terms of the Settlement Agreement. Missouri law is clear that after-the-fact actions or interpretations inconsistent with a contract's plain language are legally irrelevant. *Melson v. Traxler*, 356 S.W.3d 264, 273 (Mo.App.W.D. 2011) ("[a]cts done by the parties to a contract after its making, tending to show an interpretation by them, or by one of them, at variance with the plain terms written in the contract, will not control; but the contract is to be construed as written.")

affirmatively grant anti-dilution protection after the Initial Capital Raise for any type of issuance. Instead, the provision addresses only one event receiving anti-dilution protection, the Initial Capital Raise, and explains how dilution applies during and after that event. Again, Claimants attempt to treat the "for the avoidance of doubt" sentence as expanding anti-dilution rights, but the plain text of that sentence does not support that reading.

Claimants' argument also depends on the incorrect assumption that the first part of the "for the avoidance of doubt" sentence creates absolute anti-dilution protection for six months. It does not. Because there is no absolute six-month protection, it is entirely consistent for the sentence addressing dilution "after the Initial Capital Raise" to refer only to dilution caused by capital raises.

Claimants' reliance on Section 10.b. does not change this conclusion. Section 10.b. expressly states that potential unit awards to Ms. Engels "shall not have the anti-dilution protection as is provided in subsection a. above." That language does not expand the scope of Section 10.a. Instead, it merely confirms that Section 10.b. awards are excluded from whatever anti-dilution protection Section 10.a. provides. Moreover, the record establishes that the Initial Capital Raise could occur within the six-month maximum specified in Section 10.a., while units for that raise could be issued thereafter. As a result, the timing of issuances for the Initial Capital Raise could overlap with the timing of Section 10(b) awards. (Tr. 171–72.)

**B. Claimants Have Not Proven an Available Remedy for The Alleged Breach**.

Even if Claimants had established a breach of the Settlement Agreement, they failed to prove an available remedy. Under Missouri law, a plaintiff asserting breach of contract must prove both the existence of damages and the amount of those damages with reasonable certainty. *Timberland Forest Prods., Inc. v. Franks*, 419 S.W.3d 806, 810 (Mo.App.S.D. 2013).

1. Claimants Impermissibly Seek a Remedy Putting Them in a Better Position Than But for The Alleged Breach.

In their pre-hearing brief, Claimants asserted that their requested remedy is to compel D2 to purchase all of the Engels' units. That remedy does not place Claimants in the position they would have occupied absent the alleged breach and is not a recognized remedy for breach of contract. *Pepsi MidAmerica v. Harris*, 232 S.W.3d 648, 653 (Mo.App.S.D. 2007). Claimants' testimony likewise reflects that their grievance is grounded in perceived unfairness, not in a contractually defined measure of damages.

Claimants also presented no evidence of the value of the units they contend should be repurchased.[3] Without competent valuation evidence, the requested buyout remedy cannot be awarded.

2. Claimants Failed to Prove Contractual Damages.

Claimants also have not proven entitlement to any alternative remedy. To the extent Claimants seek damages for alleged dilution, they presented no evidence quantifying the value of any purportedly improper dilution.

Additionally, Claimants admit that damages are personal to Kenny and Unha Engels:

Q. [Todd Legon] Who were issued shares of stock pursuant to that agreement?

A. [Kenneth Engels] Unha and I.

Q. Individually; correct?

A. Individually.

Q. All right. So to the extent that any damages have been suffered as a result of the dilution of the shares, who suffered those damages?

[3] In violation of Report of Preliminary Hearing and Procedural Order No. 6, Claimants attempted to belatedly introduce expert opinion as to valuation through Mr. Engels, which the Arbitrator struck in his February 4, 2026, Order.

A. Unha and I.

(Tr. 90) The Settlement Agreement is between D2 and WorkUp, defined therein as the "Parties", and provides that "[n]othing expressed or implied in this Agreement is intended or shall be construed to confer or give any person other than the Parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby." (Ex. 39 § 33.) Claimants did not present evidence establishing that WorkUp incurred damages from the alleged breach. Nor did Claimants establish a contractual basis under which Kenneth or Unha Engels, as non-parties to the Settlement Agreement, may recover damages for its alleged breach.

3. Specific Performance Is Not Available on This Record

To the extent Claimants seek specific performance[4], they failed to present evidence that money damages would be inadequate. Under Missouri law, specific performance is unavailable where an adequate remedy at law exists or where the claimant fails to prove inadequacy of damages. *Asbury v. Crawford Elec. Co-op., Inc.*, 51 S.W.3d 152, 158 (Mo. App. S.D. 2001). When seeking specific performance for the award of stock in a company, a party must present evidence that damages are inadequate. *Becker v. Tower Nat. Life Ins. Co.*, 406 S.W.2d 553, 559 (Mo. 1966) ("Furthermore, there was no evidence offered to show the plaintiff's remedy at law for damages was inadequate. Cases which have granted specific performance of a contract to sell shares of stock have made such evidence a requirement. Consequently, we will not consider equitable relief in the form of specific performance, but will award damages instead.")

Claimants likewise failed to establish the terms necessary for the arbitrator to award specific performance. Claimants offered no evidence identifying the number of units that allegedly should have been issued under the anti-dilution provision or the methodology by which such units

[4] Mr. Engels testified that he did not want the D2 stock anymore. (Tr. 62.)

would be calculated. Anti-dilution adjustments are not self-executing and require evidence of formulas, inputs, and assumptions. Without such evidence, Claimants have deprived the arbitrator of the evidence needed to fashion a Final Award sufficiently definite to be enforceable. *See Superlube Inc. of Camdenton v. Innovative Real Estate, Inc.*, 94 S.W.3d 480, 484 (Mo. App. S.D. 2003) (a "judgment must adjudicate the controversy to a conclusion which permits issuing and processing of executions or other court orders seeking to enforce the judgment, without the need for external proof and another hearing.")

**Conclusion**

Because Claimants failed to establish either a breach of the Settlement Agreement or a recoverable remedy, D2 respectfully requests that the Arbitrator enter an Award in D2's favor.

Respectfully submitted,

CARMODY MacDONALD P.C.

By: /s/ *Tyler C. Schaeffer*
David P. Stoeberl, #46024
Tyler C. Schaeffer, #60847
Ryan M. Prsha, #70307
120 South Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600 Telephone
(314) 854-8660 Facsimile
dps@carmodymacdonald.com
tcs@carmodymacdonald.com
rmp@carmodymacdonald.com

Attorneys for Respondent

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 6, 2026, a true and accurate copy of the foregoing was filed electronically with JAMS to be served by operation of their electronic filing system upon all counsel of record.

/s/ *Tyler C. Schaeffer*