Exhibit
9

IN THE MATTER OF ARBITRATION BETWEEN

KENNETH MARK ENGELS )
and UNHA ENGELS, and )
WORKUP, INC., )
)
Claimants, )
)
) Case No.: 5335000098
)
D2 PHARMA CONSULTING LLC , )
n/k/a D2 SOLUTIONS HOLDCO )
LLC, )
)
Respondent. )

PROCEEDINGS HELD

FEBRUARY 9, 2026

BEFORE HONORABLE JUDGE RONNIE WHITE

JAMS

190 CARONDELET PLAZA

SUITE 1450

ST. LOUIS, MO 63105

beginning at 9:00 a.m. on the 9th of February, 2026, before Carrie Easton Logback, CCR, RPR, CRR, Certified Shorthand Reporter.



35f7b069-9178-4a46-ab94-933a23c79a83

APPEARANCES

ARBITRATOR:

Honorable Judge Ronnie White
JAMS
190 Carondelet Plaza, Suite 1450
St. Louis, Missouri 63105

ON BEHALF OF THE CLAIMANTS:

Todd R. Legon, Esq.
William Rhodes, Esq. (via videoconference)
Legon, Fodiman & Sudduth, P.A.
3225 Aviation Avenue, Suite 301
Miami, Florida 33133
(305)444-9991

ON BEHALF OF THE RESPONDENT:

Tyler C. Schaeffer, Esq.
David Stoeberl, Esq.
Carmody MacDonald
St. Louis, Missouri
(314)854-8600
tcs@carmodymacdonald.com

ALSO PRESENT:

Kenneth Mark Engels

Dean Erhardt



35f7b069-9178-4a46-ab94-933a23c79a83

# I N D E X


| | PAGE |
|---|---|
| OPENING STATEMENT BY MR. LEGON | 7 |
| OPENING STATEMENT BY MR. SCHAEFFER | 12 |


## W I T N E S S E S

ON BEHALF OF THE CLAIMANTS:

KENNETH MARK ENGELS


| | |
|---|---|
| Direct Examination by Mr. Legon | 16 |
| Cross-Examination by Mr. Schaeffer | 65 |
| Redirect Examination by Mr. Legon | 90 |


ON BEHALF OF THE RESPONDENT:

DEAN P. ERHARDT


| | |
|---|---|
| Direct Examination by Mr. Schaeffer | 101 |
| Cross-Examination by Mr. Legon | 147 |
| Redirect Examination by Mr. Schaeffer | 167 |


## E X H I B I T S

JOINT EXHIBITS:


| | | |
|---|---|---|
| Exhibit 4 | Settlement Agreement | 32 |
| Exhibit 9 | Schedule K-1, 2021 | 51 |
| Exhibit 10 | Letter from Rucker, 10/3/22 | 58 |
| Exhibit 11 | Email with investment schedules, financials, cap table, 9/19/22 | 54 |
| Exhibit 15 | Asset Purchase Agreement, July 2019 | 23 |
| Exhibit 28 | Financial Statements and Auditor's Report, 12/31/20 | 62 |
| Exhibit 31 | Email and D2 VCP Terms Sheet | 163 |
| Exhibit 33 | Letter of Intent for Settlement Agreement between D2 and WorkUp | 106 |

EXHIBITS (cont'd.)


| | | |
|---|---|---|
| Exhibit 34 | Letter of Intent for Separation Agreement with D2 Pharma/WorkUp | 114 |
| Exhibit 35 | Letter of Intent, red-lined | 115 |
| Exhibit 36 | Letter of intent, 12/23/20 | 66 |
| Exhibit 37 | First draft of Settlement Agreement 12/24/20 | 70 |
| Exhibit 39 | Settlement Agreement, executed | 118 |
| Exhibit 40 | Reservation of Rights email | 44 |
| Exhibit 42 | IC Agreement, D2 and G. Schoffelen | 126 |
| Exhibit 43 | IC Agreement, I. Baig | 126 |
| Exhibit 44 | Stock Award Letter | 125 |
| Exhibit 45 | Advisory Board Agreement | 125 |
| Exhibit 48 | Joinder Agreement, K. Eng | 127 |
| Exhibit 49 | Board Agreement, R. Propper | 128 |
| Exhibit 51 | Fifth Amended and Restated Operating Agreement | 43 |
| Exhibit 52 | Amended and Restated Operating Agreement of D2 Pharma Consulting | 164 |
| Exhibit 55 | Cap tables | 142 |
| Exhibit 56 | Class D Incentive Award Agreements | 141 |
| Exhibit 57 | Email correspondence | 154 |


NOTE: Exhibits were provided to the Arbitrator and retained by counsel.

(Proceedings commenced at 9:02 a.m.)

JUDGE WHITE: We're in session. Go ahead.

MR. SCHAEFFER: The first issue is, as I believe you're aware, there was a dismissal of the Third Amended Statement of Claim about a month ago, and the Claimants had reverted back to the original Statement of Claim that was filed in December of 2022. That original Statement of Claim, the only Claimants involved in that claim were Kenneth and Unha Engels. WorkUp had not yet been added at that time. And we wanted a clarification of whether WorkUp has also asserted claims in this matter under that original Statement of Claim or not, since they're not named in that claim.

MR. LEGON: We believe that WorkUp is. We don't think that they need to be a party to this case, because the stock that has been diluted that's at issue is owned individually by Kenny and Unha Engels, who are individuals, not by WorkUp. But they had originally raised the --

COURT REPORTER: You're going to have to slow down for me, Counsel.

MR. LEGON: I'm sorry.

And as a consequence, they suffered the



35f7b069-9178-4a46-ab94-933a23c79a83

direct damages that we are claiming caused by the dilution. They raised the issue standing in their original moving papers, and so our position is that WorkUp should be a part of it, but in the end, I don't think it alters or changes whether relief is viable or not.

JUDGE WHITE: Does that answer your question?

MR. SCHAEFFER: So long as we're clear on the record that WorkUp is a party in making this claim in this proceeding, we are good.

JUDGE WHITE: I think he said it about as clear as it could be.

MR. SCHAEFFER: Yeah.

JUDGE WHITE: So they're a party.

If we're ready to proceed, Mr. Legon, you can call your first witness.

MR. LEGON: Your Honor, we had discussed doing opening statements, very briefly. I think you said we would have ten minutes.

JUDGE WHITE: I forgot about that. Okay. I'm familiar with the case, but if you want to give an opening statement, go right ahead.

MR. LEGON: I will, Your Honor. And I will be brief, and I'll try to be slow.

First of all, Your Honor, on behalf of my clients and on behalf of the Respondents and their clients, thank you for taking the time to focus on this matter. We know that you are familiar with it. We've had hearings with you, and it's evident that you spent time on this matter, so I don't want to overburden you with repetitiveness in terms of what you already know, I'm sure.

But I want to point out that we believe this is a very simple matter, and I don't know that the other side would disagree. And it really boils down to the interpretation of Section 10.a. of the Settlement Agreement, which specifically addresses the dilution provision, or antidilution provision, that we have in this case. This is it. You're going to either interpret this the way we see it, or you're going to interpret it the way they see it, and that's going to dictate who wins or loses this dispute. The rest of the facts for the most part --

JUDGE WHITE: How about we interpret it as written.

MR. LEGON: As written; that's exactly right.

JUDGE WHITE: Okay. Well, keep going.

MR. LEGON: Yeah. And I think that's

significant, and I'm glad you brought that up, Your Honor, because we don't believe it's ambiguous by any stretch of the imagination. And, indeed, if you read their pretrial brief, or prehearing brief, they take the position that they view it as unambiguous in terms of how it should be interpreted. But if you were to accept our version of it, then you should find somehow that it's ambiguous.

And I would respectfully submit, Your Honor, you can't have it both ways. You either have to maintain it's ambiguous or it's not. But you can't say, well, it's ambiguous if you're going to rule in our favor potentially. So I put that out there for your consideration, Judge, to look at that.

And so there's really two questions that need to be resolved in this arbitration, based upon your interpretation of paragraph 10.a. One is that there's this six-month window that I'm sure you're familiar with from your review of the document that says that there was going to be a capital raise within six months following the execution of the Settlement Agreement, and that if that capital raise indeed happened, there would be no dilution for that capital raise for the Engels' shares. And so the first question is --

JUDGE WHITE: That's the protected



35f7b069-9178-4a46-ab94-933a23c79a83

period?

MR. LEGON: That's correct, the protected period. Correct, Your Honor.

And so the question becomes will whether or not they could dilute the Engels during the protected period for any reason whatsoever. And we know from during the protective period that, in fact, they did grant shares of stock to service providers within that six-month protected period. And it's undisputed, Judge, that that in fact occurred; okay? And it's not a dispute today that my clients were in fact diluted by that.

It's our position that under Section 10.a., and in particular, the second sentence, Your Honor, which is the sentence that really dictates what this document says, and for at least to answer this question, okay, it says, The Parties hereby acknowledge and agree that the Units issued as Closing Equity Issuance shall not be diluted by all or any portion of up to the $8 million capital raise contemplated by D2. Okay? And then it talks about the extended -- the protected period.

So our position is that there is an antidilution provision in here. It says they "shall not be diluted." Okay. They shall not be diluted by



35f7b069-9178-4a46-ab94-933a23c79a83

the capital raise and that they shall not be diluted for any reason whatsoever. And that's the only interpretation we believe this provision can have, because it says that there's to be -- it says, "shall not be diluted;" okay?

So our position is, even if you were to just look at that sentence, the issuances of stock during that period for these vendors, which again isn't in dispute, is a violation of the nondilution provision.

And then the second question that comes into being in this case, which is significant, in our view, is what happens after the expiration of that six-month protected period? And can they issue shares of stock after that period to dilute the Engels, for any reason whatsoever? And indeed we know from the third paragraph of paragraph 10.a. that indeed it's very clear in terms of what is supposed to happen after that six-month period. And it says, "For the avoidance of doubt, the anti-dilution provision set forth in this section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent of the outstanding Units of D2 during the period of the Initial Capital Raise."

Okay? So they're going to have that 3.5 percent during the initial capital raise period. They shall hold that, and that's significant for the



35f7b069-9178-4a46-ab94-933a23c79a83

first question that we addressed, Your Honor. It couldn't be any clearer. Kenny and Unha shall each own three and one-half percent of the outstanding units during the period of the initial capital raise.

So that means they can't be diluted for any reason for that point. During the initial capital raise, they're required to maintain 3.5 percent.

But it says, "But shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises."

And that's the distinction that's significant here, capital raises.

JUDGE WHITE: And we're getting close to 10 minutes, and I'm sure you will present all this in the next few hours or days --

MR. LEGON: We will, Your Honor.

JUDGE WHITE: -- and we'll have clear understanding.

Mr. Schaeffer, would you like to make an opening statement?

MR. SCHAEFFER: Briefly, I would.

JUDGE WHITE: Sure. Go ahead.

MR. SCHAEFFER: Some of this was going to be reserved for closing, but I will also be brief.

The interpretation -- first of all, I will

say, Mr. Legon is correct. We do believe this is a simple breach of contract case, we do think the plain language controls, and we do think our interpretation is what's demanded by the plain language in the contract. We obviously disagree on that point. Mr. Legon's walking you through why he thinks he's correct.

The interpretation that they're advancing is that the Engels would receive perpetual antidilution rights for noncapital raises, and they would receive antidilution protection for the initial capital raise, but not capital raises after that fact. And we're saying the plain language -- no reasonable person would interpret the plain language to require that type of more complicated antidilution protection than what's written on the page.

First, there is not a single word in entirety of 10.a. that was just recited to you by Mr. Legon that speaks to any sort of capital raise antidilution protection for non -- I'm sorry, antidilution protection for a noncapital raise. It's simply silent on that issue. It only speaks in terms of what could trigger antidilution. It refers to capital raise.

As far as talking about any rights after the initial capital raise period, again, it's completely

silent on that provision. Mr. Legon is trying to suggest that the provision that states a limitation on antidilution, that the Engels would be, quote, subject to any dilution consequences in any future capital raises, that by emphasizing a limitation on antidilution there's an implied perpetual and sweeping antidilution protection for noncapital raises. It's simply not in the plain language.

And one other fundamental misstatement -- and it's been said multiple times, and I noticed Mr. Legon skipped over this part of 10.a. when he read -- there is no fixed six-month protective period, this sacrosanct six months. What the provision says, which was omitted by Mr. Legon, it says, "Provided, however, that in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six months after the Closing Date." So that period is not a fixed period. It's a maximum amount of time.

So when you go to the next sentence that talks about the Initial Capital Raise, period of the Initial Capital Raise, again, it's qualifying the antidilution protection not to a time period, but it's qualifying it back to the Initial Capital Raise, which could have took place on the first day --

JUDGE WHITE: But can you do both at the same time? I mean, can you say it in one part and then qualify it in the next? Is that what you --

MR. SCHAEFFER: I'm saying when the -- if we're looking at the plain language of that sentence, when it's talking about period, it's not talking about a fixed six months. It's qualifying it back to a capital raise.

JUDGE WHITE: Okay.

MR. SCHAEFFER: And that's the point. They're trying to say there's an inherent fixed six-month window. That's not what the plain language says. They're saying we have rights beyond six -- beyond this time to have a capital raise. There's not a single word that speaks of affirmatively about granting an antidilution right beyond that period. And there's not a single word in that 10.a. that talks about what would be a triggering event outside of a capital raise that would receive antidilution protection.

So we, again, think the plain language supports that this was a single-purpose antidilution protection for the Initial Capital Raise. And as cautious lawyers, we also look at the canons of construction, which also support that, which create so

that there's not a contradiction, because their interpretation inherently requires there to be a contradiction, but in the words in Section 10. Their suggestion would contravene the letter of intent, which is incorporated and referred to as part of the parties' understanding in the Settlement Agreement that does not include that provision.

And, again, even though the parties may deem the contract is unambiguous, that's a question of law for you. And so we reserve the ability to show that there's not a single conversation, email or otherwise, that would suggest that the parties' intent, which is ultimately the goal here, ever contemplated antidilution protection beyond the single capital raise.

So that's our position. I don't know if Mr. Legon was attempting to get to it and didn't get to it, the second issue in this case, and we'll --

JUDGE WHITE: And you're getting close to ten minutes as well.

MR. SCHAEFFER: Well, I will wrap it up then and we'll see what they present as far as the issue of damages and the bad acts that they've alleged in this case.

JUDGE WHITE: Mr. Legon, you may call



35f7b069-9178-4a46-ab94-933a23c79a83

your first witness.

MR. LEGON: Your Honor, I'd like to call Mr. Ken Engels to the stand, if I might.

JUDGE WHITE: Mr. Engels, will you come to the seat in the center of the room.

THE WITNESS: Let me turn this off.

JUDGE WHITE: Mr. Engels, will you raise your right hand and be sworn.

(The witness was duly sworn in by the judge.)

JUDGE WHITE: Will you give your name to the court reporter.

THE WITNESS: Kenneth Engels.

JUDGE WHITE: Mr. Legon, you may proceed.

MR. LEGON: Thank you, Your Honor.

KENNETH MARK ENGELS,

called as a witness on behalf of the Claimants, being first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. LEGON:

**Q. Mr. Engels, where do you currently reside?**

A. Brooklyn.

**Q. Brooklyn, New York?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. Yes.

**Q. And how long have you resided in Brooklyn, New York, or thereabouts?**

A. About 25 years.

**Q. Where are you originally from?**

A. Miami.

**Q. And how long did you live in Miami for?**

A. 18 years.

**Q. Did you go to school in Miami?**

A. High school? Yeah, I went to high school in Miami.

**Q. Did you graduate high school?**

A. Yes.

**Q. And after high school, what education did you obtain, if any?**

A. I got a political science degree.

**Q. From where?**

A. Amherst College.

**Q. And after Amherst, did you ever attend any graduate or other programs?**

A. I've got a JD from New York University School of Law.

**Q. Are you a member of the New York bar or any bar for that matter?**

A. Yes.

**Q. Which bar?**
A. New York bar.
**Q. And for how long have you been a member of the New York bar?**
A. Recently, for about three years.
**Q. Are you a member in good standing of the New York bar?**
A. Yes.
**Q. Are you a practicing lawyer?**
A. No.
**Q. Have you ever been a practicing lawyer?**
A. Yes. When I got out of law school, I was a practicing lawyer for about a year and a half.
**Q. And what type of work did you do?**
A. Entertainment law.
**Q. Is there any particular firm that you did that with?**
A. Beldock Levine & Hoffman.
**Q. Now, after you stopped working I guess presumably at Beldock Levine & Hoffman, can you describe, generally, for the judge what it is you did?**
A. Sure. So I am a technology-oriented entrepreneur. I'm a product person, called in my industry a product person. I discover products. I discover needs in different industries. So we're

talking about digital, digital -- digital products, like applications, websites, digital services. I'm a designer. I discover the problem, I design a solution. I take the risk of hiring the people to build it, and then I go out, I market it, I find the customers, and I try to design and make a company.

So I do the product and I do the company, and then I try to make the company successful and/or sell it for a multiple. So I'm a technology entrepreneur.

**Q. Okay. And prior to WorkUp, Inc., which we'll talk about in a moment, can you describe generally the types of businesses that you were involved in or the entrepreneurial efforts you were engaged in?**

A. Okay. I had -- I was part of a company that was one of the first to make mobile games for phones that involved music. That was what I did right out of Beldock Levine & Hoffman. It was a great little company called Sonic Branding. After that, I started an agency that built apps for big brands. So we built apps for FedEx and WebMD and companies like that. That was my basically pre-Workup experience, those two -- those two companies.

**Q. Okay. So let's start cutting to the chase here. What is WorkUp, Inc.?**

A. WorkUp, Inc., is and was a healthcare



35f7b069-9178-4a46-ab94-933a23c79a83

technology play that was based on the idea that patients needed better ways of communicating with their doctors and the pharmacists than the telephone. And at the time that we started it, texting and using digital to talk between patients and nurses and doctors was very uncommon and there were barriers to be crossed and there were gains to be had if you could solve that problem.

So that's what WorkUp was about. It was about creating an efficient way for patients and their caregivers to communicate about complex matters that were personal to them, and to use automation to help the care teams on the provider's side be able to manage all this influx of information. That was the main insight that we had that was needed.

**Q. Okay. And when is it -- well, who founded WorkUp?**

A. Myself, my wife, who is also a designer, and a doctor in California who helped us with the initial idea, a guy named Eisenberg.

**Q. Okay. What's your wife's name?**

A. Unha.

**Q. And did Unha and you work at WorkUp, Inc.?**

A. Yeah. I mean, this was our life for -- well, since 2013 to around 2022. I mean, it was -- that was



35f7b069-9178-4a46-ab94-933a23c79a83

our whole focus was making it -- making it work. It was a tough slog and it was all hands on deck all the time.

**Q. And at the end of the day, was WorkUp a successful company?**

A. That depends how you look at it. You know, we thought we had struck a very wonderful relationship with D2, it didn't turn out that way, so I guess you could say it was not a success.

**Q. Okay. We'll get -- I don't want to jump too far ahead here. So at some point in time, did you sell WorkUp, Inc.?**

A. Yes.

**Q. Okay. To whom did you sell it to?**

A. D2.

**Q. And D2 is the Respondent in this case, D2 Pharma LLC and D2 Solutions Holdco LLC?**

A. We sold it to D2, the Respondent in this case.

**Q. Okay. And what is the reasons why you sold it to D2?**

A. We -- two reasons. We wanted a capital partner and we wanted someone who had funding and could finance the development of the company and technology further. We -- at that point we were self-financing

and financing with investors, and we wanted to get out of that. So capital was one piece.

And the really key piece that made it an exciting deal was the distribution that D2 had, or allegedly had, which was, you know, hooks and relationships into a very specific type of healthcare business, specialty pharmacies and pharma companies that for outsiders like us it was nearly impossible to get into from the ground floor. So we were a marriage of our tech and their distribution. That was the idea.

That was why we did the deal, was to use the connections and insights of Dean and his partner to take the technology that was working really, really well in the customers that we had stood up. We had customers. We had proven the product. We had some paying customers and we wanted a larger -- larger market.

**Q. How was it that you and WorkUp, Inc., were introduced to D2 of all the different companies that are out there?**

A. We had a shared consultant, a gentleman named Kirby. Kirby Eng said we should meet D2; D2 might be the answer to our problems.

**Q. Okay. And did you ultimately meet with someone from D2 to discuss potential acquisition?**

A. Yeah.
**Q. Who did you meet with?**
A. Dean, and I remember -- vaguely remember some other people at the meeting, but I just basically remember it was Dean and I.
**Q. When you say Dean, is that the gentleman sitting to the right of you right now?**
A. It indeed is.
**Q. Okay. And when you first met with Dean about potentially selling WorkUp, Inc., to D2, what, if anything, did he tell you about D2's ability to satisfy the two issues that you testified about a few moments ago?**
A. Said he had it. Said that he had a strong business, had the capital and had -- I don't remember whether the number was a hundred or two hundred, but there was a large number of customers that were held out.
**Q. And ultimately did you elect to sell WorkUp, Inc., to D2?**
A. Yes, we did.
**Q. I'd like to direct your attention to Exhibit 15. It's in binder number 1, Your Honor. It's in front of you, binder number 1, Mr. Engels.**
**Okay, sir, you should have before you what's**

**been marked as Joint Exhibit 15 for purposes of this arbitration. What is this document?**

A. This is the original Asset Purchase Agreement for the initial deal that we did with D2 in July of 2019.

**Q. Okay. And just so we're clear, this is the original acquisition agreement by D2 to acquire WorkUp, Inc.; correct?**

A. Yeah, to acquire us and have us come work for them full-time.

**Q. Okay. So I don't want to go into all of the specifics of this document, simply because it's really not the reason why we're here, but can you describe generally for the Court, what were the terms of this deal?**

A. The terms were around $2 million of cash consideration over a four-year period, a 30 percent stake in the upside of a sale of the combined company. It was a -- conceived as a 70/30 deal. And a coming together of the teams where Unha and I would work full-time at D2, and two of our consultants, including -- and also Kirby, would come on board at D2 to make the joint effort work.

**Q. Okay. Now, the $2 million of cash, or the cash component of the deal you indicated was paid over**

**four years, how was that structured, if you can remember?**

A. There was a small payment of $80,000 on signing. There was an $850,000 payment on the year anniversary. And then the balance was divided up over three other payments over the succeeding three years.

**Q. I'd like to direct your attention to Page -- excuse me -- Page 13 of this document, and in particular, Section 6.2.**

A. Yeah.

**Q. Do you see it, sir?**

A. Yes.

**Q. It says, "As Consideration for entering into this agreement and as a condition precedent thereto, as of the Closing, Buyer represents and warrants to Seller as following." What is your understanding of what this section of the agreement was for?**

A. This section -- this section is about blessing the due diligence that was done before the deal, and asserting that what was given to us to assess D2's finances and capital structure before the deal, that that becomes those promises and -- become warranties to the deal; that the things that they said about D2 before we entered the agreement, that the audits that they showed us or the financials that they



35f7b069-9178-4a46-ab94-933a23c79a83

showed us, the representations of who owned what on the D2 side, was that it was intact and that, therefore, they had the authority to make the deal that they were making and it was the deal we were expecting.

**Q. Okay. If you turn to the next page, Page 14, sir, in particular, Section 6.2.6.**

A. Yeah.

**Q. You can see that one of the representations is that Buyer shall not require financing to pay the purchase price?**

A. Yeah.

**Q. Was that an important representation to you, sir?**

A. It was huge.

**Q. Why?**

A. Because the purpose of the deal was to join with a company that had the finances to develop our tech together. I mean, there's a number of reasons why this is important. I mean, that's the main thing. The other has to do with equity. The 70/30 split that we made was premised on the standing of the companies before entering the deal. So if you've gotta pay WorkUp out of money raised post-acquisition, money that you raise from somebody and you give them equity, that's diluting us, and that would change the 70/30

split.

So the whole deal, in a sense, is -- on the stock and the equity is embodied in that paragraph.

**Q. Okay. Now, ultimately, sir, we can tell by looking at this document that this was signed. Did the deal close for the purchase of the assets of WorkUp, Inc., by D2?**

A. Yes. Sure.

**Q. And was that $80,000 initial closing fee paid?**

A. Yes, it was.

**Q. All right. Did WorkUp, Inc., and you and your wife perform under the terms of the Asset Purchase Agreement subsequent to its closing?**

A. Did we ever.

**Q. Can you please describe how you did that, generally. I don't need you to go into specifics.**

A. Sure. We proceeded to close major, major new business with D2's contacts, some of the contacts that we brought in beforehand, but we proved -- continued to prove that the technology worked and that people would pay for it, that enormous companies with great reputations would pay for it. Yeah. I mean, that's -- performance was -- was that; it's does the tech work as a matter of just functionality and people buying it.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. Now, subsequent to the closing of the Asset Purchase Agreement that we've marked as Joint Exhibit 15, sir, did D2 continue to perform its financial obligations under the agreement?**

A. No.

**Q. Will you please describe for the arbitrator what happened.**

A. So without going into too much of a side bar, so there's a couple things that stand out that are relevant to this proceeding. So three months after the deal was signed, three months into it, D2 announced that a co-owner that they had not previously disclosed to us, a co-owner of 50 percent of their company, a prior investor that had never been disclosed to us and so they owed money to and that also controlled the destiny of D2, because it was a 50 percent owner, they called me out of the blue in September and they said, Ken, can you guys go easy on the payroll? Like can you skip payroll for a couple of weeks? We have a problem. I said, What's the problem? They said, Well, let me show you the documents, let me show you what happened; oh, I'm sorry.

And this was the first we'd ever heard of this co-owner, the sort of jilted partner that they had named Vistria that owned half the company, and that

they owed about a million dollars to, that they had not disclosed to us in their financials. So that was the first sort of financial explosion, problem, you know, subterfuge, you know, exposed. That was the first problem.

The second was that July 19th is coming around --

**Q. What's the significance of July 19th, just so the arbitrator knows?**

A. That was the first anniversary -- actually July 1st, I think, was the first -- was the technical anniversary number one of the deal when we would get this $835,000 payment that was not just for Unha and I. This is an important wrinkle to understand. We had investors. We told the investors based on this deal that they would get half of that money, half of that 835.

So July 1 is coming along, and I'm asking Dean every day, every week, are we okay? Do we have that 835? Is that coming? Because my investors are asking me. And of course we have an interest, too. We finally want to get some money after this ten years of doing this. We were looking forward to that money. But it was also I had people that were relying on me, my word, that had come along with us through this deal,

the investors in WorkUp. They were going to get half of that money.

So the money did not come. And the announcement that it wasn't coming was last-minute, and the reasons for it were bogus. What happened was that all of a sudden, no, Kenny, we can't pay you, there's no money, we're not going to pay you, we don't have the money. And then they manufactured a reason why they didn't have to pay us that we had never heard of before. They said that they had given --

JUDGE WHITE: Excuse me. Mr. Legon, would you just have your witness answer your question and not speculate about what happened and did happen.

MR. LEGON: Sure. Yeah.

**Q. (By Mr. Legon) Just so we're clear, so you understand what the arbitrator is saying is that I'm going to ask you questions. You don't need to go into a whole narrative. Answer my questions to the best of your ability, and to the extent I think you need to move on, you can do it.**

A. Sure.

**Q. I understand you want to tell your story, and that's --**

A. Yeah. You know --

**Q. I'm sure the arbitrator wants to hear it, but**



35f7b069-9178-4a46-ab94-933a23c79a83

**there are certain rules we all must abide by; okay?**

A. Cool. And I will. I just want to say this is nuanced and it's a complex situation. So that's trying to answer it in that sense, but I'll do my best.

JUDGE WHITE: I get where you're going with this, and I know you want to explain your story, and there's been a lot of back and forth, back and forth. But we're just trying to determine whether or not the Settlement Agreement was breached.

THE WITNESS: Sure.

JUDGE WHITE: Okay.

THE WITNESS: Yeah.

**Q. (By Mr. Legon) So ultimately after --**

A. Yeah.

**Q. -- D2 didn't pay that $835,000, what, if anything, did you and Unha do about it?**

A. Well, we gave them a cure period under the agreement, we kept talking, and then we sued.

**Q. Okay. Where was that lawsuit filed?**

A. Delaware.

**Q. Okay. And what happened after you brought that lawsuit?**

A. We settled.

**Q. How soon after you brought that lawsuit did you settle?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. About 20, 30 days.

**Q. And how did that settle? Was it as a result of a mediation or was it informal discussions between you and perhaps Dean, or did it go through counsel? How did the deal get struck?**

A. There were a couple of phases. There was a kind of informal mediation with some investors that were waiting in the wings that were friends of the company, friends of Dean; they handled the initial discussion. And then the lawyers hammered out terms.

**Q. Okay. I'd like to direct your attention to Joint Exhibit 4, which is in binder 1, Your Honor.**

**What is Exhibit 4?**

A. The settlement.

**Q. Okay. Is this the Settlement Agreement that was ultimately reached to resolve the dispute you had regarding the non-payment and perhaps other issues under the Asset Purchase Agreement?**

A. Yes.

**Q. And do you know who drafted this document?**

A. D2.

**Q. Okay. When you say D2, do you mean by their attorneys?**

A. Carmody.

**Q. Okay. Now, this document, I'd like to direct**

**your attention to Paragraph 35 of the agreement, which is CL 63 in the lower right-hand corner, Bates number.**

A. Yeah.

**Q. Do you see that?**

A. Yeah.

**Q. It says, Paragraph 35, "Entire Agreement. This Agreement, including the other documents referred to in here, contains the entire understanding of the Parties with respect to the subject matter contained herein and therein?"**

A. Yes.

**Q. What's your understanding of what -- why that language was included?**

A. This language is important to draw a distinction between documents and negotiations leading up to it, and promises or things that were said or not said, and to have a clear line and say, well, this is our agreement now. There's -- this is it. Going forward, this is our deal.

**Q. Okay. Now let's get to where the rubber meets the road here, which I'm sure we're all interested in. If you could turn to CL 58, in particular Paragraph 10 entitled Equity Grant.**

JUDGE WHITE: Did you say CL 60?

MR. LEGON: CL 58, sir. Sorry. All

right. This is what you saw in the opening statement, we have put up on the board, and this is really where we believe this case is.

**Q. (By Mr. Legon) Was this -- Section 10.a. and 10.b., but let's focus on 10.a. now. Was 10.a. important to you when you signed this agreement?**

A. This was the most important aspect of the deal.

**Q. Okay. And before we talk specifically as to why, what is it, if anything, that changed between the terms of the Asset Purchase Agreement on the one hand and the terms of the Settlement Agreement on the other when this agreement was executed?**

A. The terms of the asset and the terms of the settlement?

**Q. Yeah. What changed or what did you give up?**

A. Yeah. So we gave up a year in which we were going to start receiving significant money for ourselves and to pay back the investors. The clock started over in terms of the cash consideration. The amount of cash that we would be able to get out of that tranche of value of consideration, that changed, it went down.

The amount of potential upside of the deal, it changed, the 70/30 changed. Stock was restructured.



35f7b069-9178-4a46-ab94-933a23c79a83

It went from being a phantom equity grant to a actual unit ownership in D2.

**Q. Okay. Let's talk about that, because I want to make sure we're all clear understanding of what you mean by when you say a phantom equity grant between -- as opposed to an actual unit holder. What's the distinction there, Mr. Engels?**

A. Well, there's discretion involved with phantom equity. It's not directly tied to the cap table. It can be sort of moved around and changed, and the majority has I think more control over how phantom equity is treated, but stock is more of a property right. Phantom equity is -- look up the word phantom. It's not solid. Stock is property.

**Q. Okay. And as you can see in Section 10, it talks about an actual equity grant as a unit holder; is that correct?**

A. Yeah.

**Q. Okay. So can you please describe for the arbitrator what Section 10.a. was supposed to do.**

A. Yeah, I will. And I'm going to be as brief as possible, but I've gotta give a teeny bit of context, so bear with me.

JUDGE WHITE: Proceed.

THE WITNESS: Thank you.



35f7b069-9178-4a46-ab94-933a23c79a83

There's several tranches of consideration in this deal. It was, in theory, a potentially very rich deal. There was, for instance, bonuses. We're looking right now at the equity piece, which has two subpieces. There's A and B; okay? There was a lot of different types of consideration. There's the 10.a. stock. There's the 10.b. stock. There's a promissory note. There's bonuses that are short-term. There's bonuses that are long-term.

The importance of this -- I think that was your question, Todd?

**Q. (By Mr. Legon) Yes. Absolutely.**

A. -- is that overall, to get to a settlement, we needed, as business owners, to separate what was contingent consideration from what was rock solid. We couldn't do everything on the come-again, everything just based on trust, based on what had happened with the breach. We wanted to lock up as much solid, sort of whim-free, if you will, consideration as possible.

So the importance of 10.a. is that it's intended to be whim-free. There's rules that are objectively measurable that control how much we have and what dilutes it. So this, to us, was noncontingent consideration -- like the promissory note, nothing variable about it -- whereas 10.b. is plenty variable.



35f7b069-9178-4a46-ab94-933a23c79a83

Now, when -- last piece of nuance. When we went into the deal, Unha got hired. That was one of the considerations. I left. I had to -- I had to resign. But Unha stayed on. If Unha was employed for a full year, she could earn 10.b. It's a nice piece of stock, it's a point a year, but it's contingent. It depends on whether she's allowed to be -- to stay employed. 10.a. is removed from any variable like that. It's property.

**Q. Okay. So, and just so we're clear, why is it that you wanted it to be, as you described it, whim-free, 10.a.? Why did you need to have that to be rock solid?**

A. Because look at the -- because we -- we were used to D2 at that point. We were -- we knew who we were dealing with, who were people that are unpredictable and often say things and then change their mind later. I want to be as nice and as sort of, you know, noninflammatory as possible, but that was why I went into the business about what happened before. You know, it is what it is. This is who they are. They say one thing, they do another. They promise one thing and then it turns out not to be true. They apologize and then take it back --

JUDGE WHITE: Hold on. Just continue to



35f7b069-9178-4a46-ab94-933a23c79a83

answer the question that was put before you.

THE WITNESS: You know, it's been painful, so. But go ahead.

MR. LEGON: I appreciate that. And I know the arbitrator does as well.

THE WITNESS: I don't appreciate the laughter. I don't think it's funny.

MR. LEGON: But, again, we have rules we gotta stick to here, so let me ask the questions, and you get to answer; okay?

**Q. (By Mr. Legon) So just so I'm clear, this talks about that each of you, meaning you were issued three and a half percent of the outstanding units of D2 and your wife, Unha, was issued three and a half percent of the outstanding units of D2?**

A. Yeah.

**Q. What is your understanding of what would happen with that in total 7 percent of units after the execution of this agreement in terms of potential dilution?**

A. What was our expectation of what would happen?

**Q. Yeah. Once this agreement was signed and you got your three and a half percent and Unha got her three and a half percent, did you have any**



35f7b069-9178-4a46-ab94-933a23c79a83

**understanding of what would happen in the future in terms of that ownership interest potentially being reduced or not being reduced?**

A. Yeah. Well, our understanding was that under no circumstances would it be reduced during the first six months. There was an investment that was waiting in the wings and about to close, and we -- when that closed, we would remain at 7 percent. Our expectation when we closed the deal was that an investment would close like immediately after, because the company was so short on money and there were these investors in our negotiation, and the whole goal of settling was to put aside our differences and grow the company. So our first expectation was that money would come in and we would remain at 7 percent.

And our next expectation was that after that happened, if the company ever raised money again, at that point we would be at sort of pari passu, equal rights level with the other founders. At the time, it was just Dave, Dean, and us. We were the only founders. We all had Class A stock, and that we would -- like them, we would be diluted for capital raises and that was it.

**Q. Okay. So just, again, so we're clear, it was your understanding that during the six -- first six**

**months after the execution of the agreement, you couldn't be diluted for anything; correct?**

A. Anything, that's right.

**Q. And that after the expiration of that period, then you and Unha could only be diluted as to the 7 percent that you owned, as addressed in Paragraph 10.a --**

A. Yeah.

**Q. -- for capital risks?**

A. Yeah. And, you know, the thing is that when we -- when business people talk about dilution from capital raise, that's like protection against the entirety -- that's like the biggest influx of value you can get to give shares to an outside party. So to say that we were protected from a capital raise was protected from anything. You know?

**Q. Okay. Let's talk about 10.b., if we can, Mr. Engels. And what does 10.b. of Joint Exhibit 4 address?**

A. 10.b. is about Unha's contingent stock.

**Q. Okay. And I want to focus your attention to the last sentence of 10.b., where it says, "For the avoidance of doubt, the potential one percent Unit awards which are the subject of this subsection b. shall not have the antidilution protection as is**



35f7b069-9178-4a46-ab94-933a23c79a83

**provided in subsection a. above."**

**Do you see that, sir?**

A. Yes.

**Q. So, let me -- hang on. Section 10.b. says that Unha can earn 1 percent of the outstanding units of D2 for fiscal years 2021, 2022, and 2023; is that correct?**

A. That's correct.

**Q. And it also goes on to say that she's only eligible for that 1 percent if she's continuously employed for a full calendar year; is that right?**

A. Yeah.

**Q. So all of these 1 percent outstanding units that she might be eligible for, she wouldn't be eligible for them until one year after the execution of the Settlement Agreement, because she would need to be employed for a year; is that right?**

A. Yeah. She wouldn't be eligible for it until the beginning of the following year.

**Q. Right. So at the end of 2021 -- and just to put it in, when was the Settlement Agreement signed, sir?**

A. December 30, 2020.

**Q. On 2020. So she wouldn't be eligible for her first 1 percent until the end of calendar year 2021 --**

A. Right.

**Q. -- because she needed to be employed for a year?**

**So now let's go back down to the last sentence?**

A. Yeah.

**Q. And it says, For the avoidance of doubt, the potential one percent Unit award which are subject to this section b above shall not have the antidilution protection as is provided in subsection a above.**

A. Yeah.

**Q. Why is that there?**

A. Because the -- her stock wasn't to have the antidilution protection.

**Q. And what antidilution protection are you referring to?**

A. Only being diluted by capital raises.

**Q. Right.**

A. You know, the thing is that we were aware of -- you know, two things. One, D2 wanted to protect their right to dilute her. That's why they added that sentence in 10.b. This stock was different than 10.a. And in 10.a., we're like, look, if this stock is going to have value, you can't just be able to grant units to anybody. I mean, you could grant units to yourselves.

So it has to be fully protected.
**Q. So then under 10.b., Unha could be diluted down --**
A. Yeah.
**Q. -- for any 1 percent grant for any reason whatsoever --**
A. That's right.
**Q. -- would that be a fair statement?**
A. That's right.
**Q. Okay. Now I'd like to direct your attention to what's been marked as Joint Exhibit 51, which, yes, Your Honor, it's going to be in the second binder.**
**Sir, do you have Exhibit 51 before you?**
A. Yes.
**Q. What is Exhibit 51?**
A. This is the Fifth Amended and Restated Operating Agreement that followed the settlement.
**Q. Okay. And what is your understanding of what the purpose is or was of this agreement?**
A. To formalize the grant of the equity in 10.a.
**Q. And are there any other equity grants in this document?**
A. I don't think so, no.
**Q. Okay. Now, did you consent to the execution of this agreement, or consent to this fifth amendment,**

**sir?**

A. I consented to it with the reservation of rights, yes.

**Q. Okay. And before we get to that reservation, I want to have you take a look at Exhibit A, which is the last page of Exhibit 51.**

A. You got it. I'm there.

**Q. Okay. And it says the members as of January 1, 2021. What does this page show?**

A. This is the cap table of the company as of the signing.

**Q. When you say cap table, what do you mean?**

A. Who owns what and what percentage does it represent.

**Q. And how many units of shares of stock did, at least I guess at this time, D2 claim you and Unha owned as of January 1st, 2021?**

A. 7,000 each.

**Q. And that's consistent with the terms of the Settlement Agreement; correct?**

A. Yeah, because it maps to the 3.5 percent in the second column.

**Q. Okay. Now if we could go to Exhibit 40, which is the first exhibit of the second binder, Your Honor.**

**Is this the reservation that you're referring to, sir?**

A. Yeah.

**Q. Okay. Can you please explain this email to the arbitrator?**

A. So when D2 sent us the fifth, we were expecting a formal, perfunctory follow-up to the settlement closing that just unambiguously allowed us to receive the unit grant in this form. Like, we had buried the hatchet, the settlement was done. We didn't expect any kind of gamesmanship or anything complicated.

They sent this. Our lawyers -- they sent the fifth, the thing we just looked at. Our lawyers read it and said, you know, there's something a little fuzzy about this, we don't feel great about it. There's a little wiggle room. I don't know, I don't like it. It's weird. Call Dean. Have them change paragraph X, paragraph Y, whatever it was. I did. Asked him to change it. He said, I don't want to, I'm not going to hurt you, don't have anything -- you know, everything is fine. Don't be paranoid. Just sign it.

I took that back to our lawyers and they said, well, you can sign it --

**Q. Hang on a second. Don't disclose what your**



35f7b069-9178-4a46-ab94-933a23c79a83

**lawyers may have told you. That would be protected by the attorney-client privilege, sir.**

A. Okay. Well, someone gave me advice to sign it with this note that said to clear up any ambiguity, want to reserve rights around the antidilution.

**Q. And why did you think it was important to express that you were reserving your rights as to the antidilution at this point?**

A. Because, again, there was concern that there was wiggle room in the fifth that would allow them to dilute it, and like I said, the stock was our pride and joy. That was main thing that we were getting out of this deal that we were excited about.

**Q. Now, at this point in time, and this email is dated January 12, 2021, which is less than a month after you executed the Settlement Agreement; correct?**

A. This is like a week later, yeah.

**Q. Or a week later. At any point in time did Dale or --**

A. Dean.

**Q. Dean, I'm sorry. Excuse me.**

**-- Dean or anyone from D2 or D2's lawyers tell you that it was considering giving additional stock grants to vendors or employees?**

A. No.

**Q. Had that ever been mentioned to you prior to the execution of the Settlement Agreement?**

A. Entrepreneurs always talk about granting shares to employees, granting shares to board members. So, sure, that was discussed, in general. Its effect on our shares was never discussed, no. So it's -- you see it's -- in general, yes. But specifically with regard to 10.a., no.

**Q. All right. Now, after you sent this reservation to Dean on January 12, 2021, did he respond in any way saying he disagreed with that?**

A. No.

**Q. I want to go back to the Settlement Agreement again, which is Exhibit 4 in the first binder. I'm sorry for bouncing around. And in particular, I'd like you to take a look at Section 15 and CL 59.**

A. CL 59?

**Q. Yes, sir. And you can see there's a section entitled 15, Financial Reporting. Do you see that, sir?**

A. Yes.

**Q. What was the purpose of this provision?**

A. The purpose of this provision was twofold: to give us a general kind of visibility into how the company was doing, how this stock that we now owned was

performing; and critically, the most important thing was to allow us to enforce objectively the part of 10.a. about this raise. We wanted to watch for when that raise would happen, when that -- because if it happened outside of the six months, we could be diluted. If it happened during the six months it wouldn't. So we wanted to make sure that we knew when that raise, which was like happening at any minute, was going to happen. These reports would show us that, because you'd see a big influx of money.

**Q. All right. And did D2 provide you with the financial reporting required under Paragraph 15 of the Settlement Agreement?**

A. Without apology or explanation, they never provided us with a single one.

**Q. Did you ask for the information?**

A. Zillions of times.

**Q. What were you told in response?**

A. It's coming. And then -- you know, we were told actually by Carmody, It's coming. Carmody told us, The CFO will send them to you. They acknowledged that they were missing and they told us and our lawyer, You will get them, Judy will send them.

**Q. Who is Judy?**

A. The CFO.

**Q. What's her name?**

A. Judy Rumpler.

**Q. Judy Rumpler.**

**Did Ms. Rumpler ever provide you --**

A. No. We were in effect strung along by that. We never got them.

**Q. Now, subsequent to the execution of the Settlement Agreement, were you and Unha still employed at WorkUp/D2?**

A. Unha was.

**Q. Okay. And what was life like for you and Unha after the execution of the Settlement Agreement vis- -vis D2?**

A. It was amazing at first. It was incredible. It was the story that we were told, and we were loving it. It was originally, you know, Unha, you're going to be promoted, we want you to lead --

MR. SCHAEFFER: Judge, sorry to interrupt. We have a stipulation that Unha would not be testifying today and that Mr. Engels would not be testifying about things Unha spoke about in exchange for us not deposing Mrs. Engels. So --

JUDGE WHITE: And that is your objection?

MR. SCHAEFFER: It is.

JUDGE WHITE: Sustained.

MR. LEGON: Very good. That's not really where I wanted to go with it, so let me address this.

**Q. (By Mr. Legon) We don't want to hear about Unha. We want to hear about you; okay?**

A. Yeah.

**Q. So, subsequent to the execution of the Settlement Agreement, what was your relationship like with D2?**

A. So after that reservation of rights email was sent, I don't think I -- I never heard from D2 formally about anything once. Like there was no update, no updates to the operating agreement were sent to me, no just sort of general updates on how things were going. It was silent, and it was as if everything was okay. I mean, it was weird to not hear from them, but there was just no contact. And it was very puzzling whatever happened to that 8 million investment. We were always wondering about it.

So right after the deal, it was I guess things are good, but it's weird to not hear from them. And then as we gradually start to --

JUDGE WHITE: Hold on, Mr. Engels. There's not a question before you. Mr. Legon will ask

another question and then you'll get to speak.

**Q. (By Mr. Legon) So I understand your testimony here, sir, that there were some -- shall we call them communication issues at that point in time --**

A. Yeah.

**Q. -- subsequent to the execution of the Settlement Agreement. Now, we all know, because it's not disputed, that there were dilutions that were occurring during the time frame after the execution of the Settlement Agreement. When is it that you first learned that you and Unha's stock had been diluted?**

A. Yeah. When we received K-1's in late 2022 and we saw that we had less than 3.5 percent each.

**Q. Okay. So I'd like to have everybody move on to Exhibit 9 in the first binder. Okay, and what is Exhibit -- Joint Exhibit 9, sir?**

A. It looks like the first page of the K-1 for 2021 that we received around October 2022.

**Q. Okay. If you look at the next page, CL 147, you can see there's correspondence from Hauk, H-a-u-k, Kruse, K-r-u-s-e, and Associates, LLC, and there's a letter to you dated August 29th, 2022.**

A. Uh-huh.

**Q. Approximately how long after the Settlement Agreement was this?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. It looks like about 16, 17 months.

**Q. Okay. And if we look at the next page, CL 148, there's a Schedule K-1 form --**

A. Yeah.

**Q. -- do you see that?**

A. Yeah.

**Q. Can you please describe for the arbitrator what that is?**

A. Yeah. It's a form that, among other things, shows, at number 12, it shows our beginning balances of stock, 3.5 percent, hers look just like mine, and then it goes to 2.42.

**Q. Yeah. So just so the arbitrator can follow along, and all of us can, if you take a look in the left side of the page of the K-1, a little more than halfway down, you can see subparagraph J and it says, Partner's shares of profit, loss, and capital. Do you see that, sir?**

A. Yes.

**Q. And what do those columns reflect?**

A. Where are you?

**Q. CL 148.**

A. Yeah.

**Q. Left-hand column.**

A. Yeah.

**Q. Three quarter of the way down.**
A. It reflects the beginning balance and the ending balance.
**Q. Right. And so what was the beginning balance?**
A. 3.5 percent.
**Q. And that's consistent with the Settlement Agreement, in particular Paragraph 10.a.; correct?**
A. Yeah, and the fifth amended.
**Q. And when it says ending, where it says 2.426, what does that represent?**
A. That represents our ownership percentage as of the end of 2021.
**Q. Okay. Similarly, if we go to CL 150, we can see that the same package has been sent to Unha?**
A. Yeah.
**Q. And at CL 152 with the exact same K-1 except with her name on it showing the same dilution; correct?**
A. Yes. Correct.
**Q. Okay. After you received these K-1s, what did you do?**
A. We were baffled. We just thought this -- I mean, at first we just thought this must be a mistake. We just handled it like it was a clerical error and we contacted D2 and said is there -- did you guys -- like

what happened? I mean, this can't be right, because we never heard of an investment. The only thing that could have diluted us was an investment. It had never been announced. No investment was discussed, told to us, so we were just like this is a mistake. First we thought it was like an innocent, sloppy mistake.

**Q. Did you call Dean to discuss this?**

A. Yeah.

**Q. And what did Dean say about it?**

A. He said -- he said, Oh, well, we did raise money. We did raise money. We raised the 8 million. That's what he said. I said, Why didn't you tell me? He said, Oh, I thought I told you. That's what happened.

**Q. And do you know when that raise occurred?**

A. Yeah, we know now that it occurred in about November 2021.

**Q. Okay. Now, did you subsequently learn that there were stock grants that occurred during the six-month protected period?**

A. Yes. We learned that when Dean sent me the first financials package since the close of the settlement. There was a cap table in there that contained and showed us for the first time these January and February grants that are half of what we



35f7b069-9178-4a46-ab94-933a23c79a83

are discussing here today.

**Q. All right. So if we could move to Exhibit 11, Joint Exhibit 11.**

A. Yeah.

**Q. Okay. Is this the document you're referring to, sir?**

A. This is it, yes.

**Q. So on the first page there's an email from Dean Erhardt to you, with a cc to Judy Rumpler, who I believe you identified as the CFO of D2; is that correct?**

A. Yes.

**Q. And this is dated September 19th, 2022?**

A. Yes.

**Q. Which is, again, how long after the execution of the Settlement Agreement?**

A. This is now like, what is it, 18 months or something.

**Q. All right. And you testified this is where you first learned that stock had been granted during the protected period. Can you please show the arbitrator where in here you saw that information.**

A. So if you go to this foldout, which was the fourth tab in the spreadsheet that Dean sent, you see that -- go to January 2021. It's on the second half of

this -- it's the last page of the foldout.

**Q. All right.**

A. Yeah, that's the one. And if you go to January '21 and Feb. '21.

JUDGE WHITE: I got it.

THE WITNESS: Yeah. So line -- from lines 5 -- 5, 6, 7, 8, 9, 10, and 11, you see that there are grants to those parties in January and February of '21.

**Q. (By Mr. Legon) So just so we're clear, we're talking about everybody beneath Unha Engels?**

A. Everybody beneath Unha and above VCP, LLC. Dever, Liberman, GCS, Baig, Engs, and Revokable and Curegrail, those are all grants. If you follow the line, you see that they get -- they're issued stock, and that each time they're issued, our 3.5 percent goes down.

So like if you look at the number for Unha, row 4 for -- in January, she has 3.4. So does Ken, which I'm noted as MK Engels. Line 3, you got 3.4 and 3.4. But then we have these new shareholders we hadn't seen before: Liberman with 1 percent, GCS with 1 percent, Baig with .24, Revokable with .24, and Curegrail with .53. So those grants are what brought us down to 3.4. Then there's other grants in February

that bring us down to 3.03 each.

**Q. And we can see if we follow along, and we'll just use you as an example, we can see that you started here in January of '21 at 3.4 percent, and then it continued to decline to 3.03 percent, it maintained at 3.03 percent in September; October it went down to 3.01 percent; in November it went down again to 2.43 percent, which it maintained until January -- December of 2021; correct?**

A. Correct.

**Q. All right. Now, at any point in time, did anyone from D2 contact you to ask you if you approved of this dilution of your shares of stock?**

A. No.

**Q. Would you have consented to it if they did?**

A. No.

**Q. So once you realized after receiving the K-1s and this cap table that's been marked as Joint Exhibit 11, what did you do?**

A. Yeah. So like I said, initially we thought it was a clerical mistake. When we just had the K-1, we were like this just can't be. Then when we saw this cap table we said what's going on here? And we called -- then it escalated to lawyers and we said how can you do this, in the face of what 10.a. says,

particularly at sentence 3, where it says, For the avoidance of doubt, Kenny and Unha own 3.5 percent for a six-month period. This is illogical, guys. What are you doing? And we're here, three, four years later because of the dispute over that.

**Q. And if we turn to Exhibit 10, there's a letter dated October 3rd, 2022, from --**

A. Yeah.

**Q. -- Ronald Rucker, Carmody MacDonald?**

A. Yeah.

**Q. Is this the correspondent that you're referring to that --**

A. Yeah. This is a very important letter.

**Q. Why do you say it's important?**

A. Because first of all, it has the acknowledgment that we had not yet been provided the financial reports, that, you know, Judy Rumpler, D2's VP, will separately provide the unaudited quarterly and year end financial statements. That's a response to our lawyer following up for us and saying, in addition to sorting out this share issue, can you please give us our reports. So that's one.

Two, right here you see that D2 starts to introduce this theory that they can dilute us for service providers, and they say we do not believe that



35f7b069-9178-4a46-ab94-933a23c79a83

you're protected from that, and they sort of set up this fight.

**Q. Now, just so we're clear, in the second page, CL 164, Carmody, presumably on behalf of D2, acknowledges that these issuances in fact occurred?**

A. Yeah.

**Q. They're not disputed; correct?**

A. Right. And can I -- I want to add one thing. I really -- and one latitude. I recall when I got this letter being blown away that they would give us this paragraph back to us as a defense for what they had done, the paragraph from the agreement.

**Q. So once you got this letter from Carmody where they indicated that, for lack of a better term, they think you're all wet, that you don't have a claim here for this dilution, what did you do?**

A. Well, obviously we ended up here. I think our lawyer at the time made -- you know, I remember two things. First of all, we tried. You know, we tried to keep talking. We also contacted the auditor for D2 behind the K-1s and said I don't care what they're saying, this is clearly a mistake. So we escalated to the auditors as well as to Carmody, and then when talks didn't go anywhere, we filed this petition.

**Q. All right. And just so we're clear and to**

**put a wrap on at least what you claim to be the breaches are of the Settlement Agreement --**

A. Yeah.

**Q. -- it would be the dilution during the six-month protected period?**

A. Yes.

**Q. All right. Well, let me ask you another question.**

A. Yeah.

**Q. Do you have any concerns that there will be future dilution of your shares of stock if D2 continues to issue shares of stock through employment agreements or through giving to vendors or wherever whom they may be giving them in the future?**

A. Yes.

**Q. I mean, what do you think is -- what's the value -- from your perspective, not as an experiment witness, okay, but, I mean, what does this stock mean to you and Unha at this point, given everything that's transpired to this date?**

MR. SCHAEFFER: I'm just going to object to the extent he's going to try and offer an opinion as to the actual dollar value of the stock.

JUDGE WHITE: He hasn't asked that question. Overruled. He can answer the question

that's asked.

A. What's the value --

**Q. (By Mr. Legon) What's this worth to you now? I mean, you've gone through this whole thing. You've sold your company to D2. They breached the first agreement.**

A. Yeah.

**Q. We're here fighting about whether they breached the second agreement.**

A. First and foremost, the value is the principle, the principle of this. I don't want to have gone through all this trouble of selling the company to them, entering two deals, going through this arbitration, and having -- not having the agreement held up. So, I mean, the first thing is just it's the principle of the matter. That is -- that's number one.

Be honest? What is the value today, financially? It is impossible to say. To me, it's impossible to say, because the financials are so -- the way the financials are treated --

JUDGE WHITE: Mr. Engel, I believe you've answered the question.

THE WITNESS: I'm done. You're right, I did. Thank you. I'm good. I'm good.

**Q. (By Mr. Legon) And I guess maybe I'm not**

**being clear, but I'm sure it's because I'm being inarticulate. But what I'm really trying to get at is this stuff worth anything to you? Forget about monetizing. I'm not asking from a dollar perspective. I mean, you're a super minority shareholder now in an entity, and you're getting diluted whenever they want to at their whim. Does that have any value to you? Do you want this stock anymore?**

A. No.

MR. LEGON: Okay. Now, I'd like to direct your attention to Exhibit 31. Hang on. Yeah, I'm sorry. I want to go to 28, if I can. Forgive me, Your Honor.

JUDGE WHITE: 28.

MR. LEGON: Yeah. I'm going to be wrapping up shortly.

**Q. (By Mr. Legon) Sir, you should have before you Joint Exhibit 28. Have you seen this document before?**

A. Yes, many times.

**Q. What is this document?**

MR. SCHAEFFER: Judge, I just want to interpose. We have an objection on our list, and this is a document referring to -- depending on the purpose of the questioning, but to the extent they're trying to



35f7b069-9178-4a46-ab94-933a23c79a83

use this document again to establish some sort of valuation for the units, we object based on the arbitrator's order of last week.

MR. LEGON: Your Honor, this is their document, it was prepared by their accountants, and it reflects on Page 1528 that the company valued the Engels' units in D2 as being worth $3,460,000. That's the value of the 7 percent. It couldn't be any clearer. My client's not doing any type of an analysis. This is a fact. It's an admission --

JUDGE WHITE: But my ruling was that he was not going to be allowed to talk about the value, because that's expert testimony. Now, if you wanted to call an expert to explain this document, or whoever wrote this document, we could get there, but we can't get there through him.

MR. LEGON: I would say, Your Honor, this is really an admission by them as to what the value is. There's no expert testimony needed when they say -- they valued it. They value -- let me finish, please. They valued this as being worth $3.5 million, roughly, Judge. We don't need an expert to do that when they performed the valuation themselves. It's an admission against interest.

JUDGE WHITE: Just address the admission

part. Is it admission against interest, or not?

MR. SCHAEFFER: Well, two things. First, this isn't our document. This is a Hauk Kruse document, so that's a third party.

JUDGE WHITE: But it was submitted to Carmody MacDonald; correct?

MR. SCHAEFFER: No. It's an audit performed by our auditors, a CPA.

JUDGE WHITE: In conjunction with the law firm?

MR. SCHAEFFER: No. No --

JUDGE WHITE: Did the law firm request that they prepare this document on behalf of your client?

MR. SCHAEFFER: No. No. It is part of their ordinary financial reporting. This is a third-party CPA that's prepared this. D2 didn't prepare this. The numbers in this, D2 wouldn't be able to explain the underlying methodology. There's no admission here. This is something a third-party CPA has prepared.

JUDGE WHITE: Okay.

MR. LEGON: It's their auditor, Judge. I mean, how could they hire a company to perform an audit on their company and then say, Oh, gee. That's

nonsense.

JUDGE WHITE: I'm going to sustain the objection as to the information contained in -- what is this, 15?

MR. LEGON: It's Joint Exhibit 28, Your Honor.

JUDGE WHITE: Joint Exhibit 28.

MR. LEGON: Thank you. I have no further questions at this time.

JUDGE WHITE: Would you like to take a break before we begin cross-examination? It's 10:15. We can come back at 10:30.

MR. SCHAEFFER: A short break would be great.

JUDGE WHITE: Okay.

(Recess.)

JUDGE WHITE: We are back on the record. Mr. Schaeffer, you may proceed.

MR. SCHAEFFER: Thank you, Judge.

CROSS-EXAMINATION

BY MR. SCHAEFFER:

**Q. Mr. Engels, you testified this morning about the different phases that went through as far as what led up to the Settlement Agreement; do you remember that?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. Yes.

**Q. I want to talk about that a little bit. You remember discussing with Dean Erhardt antidilution protection in the Settlement Agreement; right? Is that correct?**

A. Yes.

**Q. Okay. You also negotiated -- the parties, WorkUp and D2, negotiated a Letter of Intent that you signed dated December 23rd, 2020; correct?**

A. Yes.

**Q. Let's flip to Joint Exhibit 36.**

MR. LEGON: So the first binder.

**Q. (By Mr. Schaeffer) All right, Mr. Engels, if you could, describe what Joint Exhibit 36 is.**

A. It's a Letter of Intent.

**Q. All right. Is this the executed Letter of Intent that you and Mrs. Engels signed?**

A. Yes.

**Q. And is it dated December 23rd, 2020?**

A. Yep.

**Q. And this Letter of Intent preceded the Settlement Agreement; correct?**

A. Yep.

MR. LEGON: Once again, Your Honor, I just want to express my objection that this is parol

evidence for a fully integrated agreement. I know you've ruled on this already, but you did drop a footnote to say that you were reserving the right to change that ruling. And I think, respectfully, based upon the testimony that's been provided and a simple review of the agreement, it is an integrated, unambiguous agreement, and parol evidence should be inadmissible.

JUDGE WHITE: Overruled.

MR. LEGON: Thank you, Judge.

**Q. (By Mr. Schaeffer) Mr. Engels, I'm going to direct your attention to Section 4. It's on D2_12385. It's the last section. Let me know when you're there.**

A. Yeah.

**Q. All right. I'm going to read this section, Equity, that involves what the LOI specified the parties' intentions what the equity related to.**

**Mr. and Mr. Engels jointly will be issued 7 percent of the outstanding units in D2. An additional 3 percent of the outstanding units at a rate of 1 percent per calendar year for the next three years will be provided to Unha Engels provided she is employed by D2 continuously during the applicable calendar year. This additional equity will be earned through the calendar year and issued January 1 of the**



35f7b069-9178-4a46-ab94-933a23c79a83

**following calendar year. For example, in 2021, 1 percent will be earned for the 12 months and issued on January 1st, 2022. The last award will be awarded January 1st, 2024, based upon ongoing employment with D2 through December 31st, 2023.**

**The above 7 percent will not be diluted by all or any portion of the up to $8 million capital raise currently contemplated by D2. On the date the agreement is signed, the parties will execute a joinder to the D2 operating agreement and amended thereto to reflect the issuance of the above equity interest and such other document necessary to confirm such equity arrangement.**

**Did I read that correctly?**

A. Yep.

**Q. And you agree that this Letter of Intent does not contain any plain language providing antidilution protection beyond the contemplated $8 million capital raise; correct?**

A. Yeah, it's ambiguous, I agree.

**Q. I'm sorry, that wasn't my question.**

A. I agree that it's not there. It's ambiguous on that point.

**Q. Okay. So let's stick with my question. You agree that the plain language of the Letter of Intent**



35f7b069-9178-4a46-ab94-933a23c79a83

**limits antidilution only to the $8 million capital raise; correct?**

A. Yeah, I agree that in this Letter of Intent that's all that it says.

**Q. Thank you. This Letter of Intent was turned into a formal Settlement Agreement; correct?**

A. Right, by lawyers.

**Q. All right. And the Letter of Intent was also drafted by lawyers; right?**

A. And by laymen, yeah.

**Q. And to be clear, you were represented by lawyers throughout the negotiation of the Letter of Intent and the Settlement Agreement; correct?**

A. Yeah, but --

**Q. Yes?**

A. Yeah. But letters of intent are just letters of intent.

**Q. Thank you. So I'm going to direct your attention now to D2. It's the first page of the Letter of Intent. It's D2_012383. And on the first paragraph, the second-to-last sentence reads, "The parties will prepare and sign a definitive agreement reflecting the terms of this Letter of Intent on or before the Closing," and it's defined as the Agreement.**

**Did I read that correctly?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. Yeah. Good reading.

**Q. Thank you. And you agreed with that purpose of the Letter of Intent; correct?**

A. Yeah.

**Q. All right. Let's turn to Joint Exhibit 37. Do you recognize Joint Exhibit 37?**

A. I sure do.

**Q. What is it?**

A. The settlement.

**Q. All right. If you look at the top, is there a draft date on there?**

A. Yeah.

**Q. And what is that?**

A. 24th.

**Q. All right. Is this, to your knowledge, the first draft of the Settlement Agreement that was received after the December 23rd, 2020, Letter of Intent was signed?**

MR. LEGON: Just before we go, Your Honor, I just want to repeat, same objection that I made to Exhibit 36. This is parol evidence.

THE WITNESS: I have no way of knowing --

JUDGE WHITE: Overruled.

MR. LEGON: Thank you, Judge.

JUDGE WHITE: Counsel, can we talk about what it made into the actual Settlement Agreement? Because you're treading back on parol evidence that would require somebody else to come in and say, oh, he didn't mean that. I mean, if it's the Letter of Intent and it didn't make it into the final draft, we can't use it to interpret anything.

MR. SCHAEFFER: Okay. We're setting forth these phases as testified to that how we got here, and just to be clear, the structure of how the Letter of Intent made its way to the Settlement Agreement. That's all I'm getting at, and I'll move quickly. And I also want to address the statement that Mr. Engels made about who drafted these agreements.

**Q. (By Mr. Schaeffer) So I'm being encouraged to move on, so I'm going to quickly direct your attention to Page 5 of Exhibit 37. If you look at the antidilution language in Section 10.a., is this the same antidilution language that appeared in the final Settlement Agreement?**

A. Yeah, it looks like it is.

**Q. And earlier you testified, just earlier this morning, that Carmody MacDonald drafted the Settlement Agreement; is that right?**

A. You controlled the final copy. We both

drafted, and I know that we both took responsibility for that, but you were controlling this final draft. That's what I meant, yeah.

**Q. Well, I'm a little confused. So you admit that your attorneys also assisted in drafting this document?**

A. Absolutely, yes.

**Q. Absolutely, yes?**

A. Yeah.

**Q. Okay. So we've clarified that. Thank you.**

**Let's go to Joint Exhibit 4. All right. You've seen this before today already; right?**

A. Yeah.

**Q. So this is the executed Settlement Agreement; correct?**

A. Indeed.

**Q. So we're going to talk about the language of what made it into the executed Settlement Agreement. Your counsel has already gone through Section 10.a. We've looked at that. Let's look at some other sections.**

**Let's start with who are the parties to the Settlement Agreement? It's WorkUp and D2 Pharma; correct?**

A. Uh-huh.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. You and your wife, Mrs. Engels, are not parties to the Settlement Agreement; true?**

A. We signed it. We owned WorkUp and I signed it, so, and I'm a party in that sense; I own the company.

**Q. You signed it in your capacity as an officer of WorkUp; right?**

A. Yeah.

**Q. Did you sign it individually? No; right?**

A. I signed the fifth individually.

**Q. Hold on. Let's --**

A. This is both, you know.

**Q. Hold on. Slow down. We're talking about --**

A. The settlement contains a joinder and the operating agreement, so I'm just answering your question fully.

**Q. Well, thank you. Let's slow it down. So this Settlement Agreement, the first section says Settlement Agreement is agreement made and entered into as of December 30th, 2020, the effective date, by and between D2 Pharma Consulting LLC --**

A. Yeah.

**Q. -- a Delaware Limited Liability Company, and WorkUp, Inc., a Delaware corporation. D2 and WorkUp are sometimes referred to herein as collectively the**



35f7b069-9178-4a46-ab94-933a23c79a83

**parties and each a party; correct?**
A. Yes, you've read that correctly.
**Q. Okay. You agree that the language of this document says that the Settlement Agreement is between WorkUp and D2; correct?**
A. No. I disagree.
**Q. Okay. Well, we'll let the document speak for itself.**
A. Well, I'd like to explain myself. May I?
JUDGE WHITE: Hold on. If there's an explanation needed, your lawyer can ask you.
**Q. (By Mr. Schaeffer) So let's skip on down to CL 64 and 65. Let me know when you're there.**
A. Okay. I'm there.
**Q. These are the counterpart signature pages to the Settlement Agreement, and there's a line for D2 and a line for WorkUp; do you see that?**
MR. LEGON: Excuse me, what exhibit are we at? I apologize.
MR. SCHAEFFER: Exhibit 4.
MR. LEGON: Same exhibit?
MR. SCHAEFFER: Yes, CL 64, CL 65.
MR. LEGON: I'm sorry.
**Q. (By Mr. Schaeffer) Do you see the counterpart signature page to the Settlement Agreement,**



35f7b069-9178-4a46-ab94-933a23c79a83

**Mr. Engels?**

A. Yes.

**Q. And there are signature lines for D2 and WorkUp only; correct?**

A. Yes.

**Q. And not a signature line for you and Mrs. Engels?**

A. There's a signature line for us on Page -- let me find it, bear with me -- CL 104. We're not there, but these are individually signed and where our counterparts signature page is, but I'm just illustrating that we also signed the settlement in individual capacity. We had to, because under the Fourth, we signed as members, and we were joined as members. So there's an individual component to the settlement as well, by definition and structure.

**Q. Okay. So you're referring to the Fourth Amended and Restated Operating Agreement, and you've acknowledged on CL 104 that your signature isn't on that document either; correct?**

A. I don't know where the counter -- yeah. Maybe it's missing.

**Q. All right. Let me direct your attention to CL 63, back to the Settlement Agreement. All right, Section 33 reads, "Rights of third parties. Nothing**

**expressed or implied in this agreement is intended or shall be construed to confer upon or give any person other than the Parties hereto any rights or remedies under or by reason of this agreement or any transaction contemplated hereby."**

**Read that correctly?**

A. Yeah.

**Q. And the word "parties" in that section is capitalized; correct?**

A. Uh-huh.

**Q. And WorkUp agreed to that; correct?**

A. Yeah. I don't understand where you're going, but yeah.

**Q. All right. And we looked at the first page of the Settlement Agreement where Party, capitalized, was defined as D2 and WorkUp; do you see that on Page CL 53?**

A. Yeah.

**Q. Now, as mentioned, your attorney already went over Section 10.a. talking about the equity grant and antidilution in this agreement; correct?**

A. In part, yes. There wasn't enough time in the opening to go through all of it, but, yes, we did part of it.

**Q. Okay. And you personally don't believe that**



35f7b069-9178-4a46-ab94-933a23c79a83

**the Settlement Agreement contains any rights as to antidilution that are beyond the rights stated in the Letter of Intent; correct?**

A. No. I mean, the Settlement Agreement clarifies rights in the way that it's not clarified in the Letter of Intent. So --

**Q. Here's my question. You don't believe that the Settlement Agreement contains rights as to antidilution that are beyond the rights contained in the Letter of Intent; correct? It's a yes or no.**

A. No, not the way that you're putting it. I don't like the way you're putting it.

**Q. All right. I'm going to hand you your binder. Do you recall sitting for a deposition about a month ago, on January 7th --**

A. Yes. And I remember --

**Q. -- 2026?**

A. -- the spirit of what I said.

JUDGE WHITE: Mr. Engels, just answer the questions asked, and wait until the question is asked.

MR. SCHAEFFER: Thank you.

**Q. (By Mr. Schaeffer) Do you recall sitting for a deposition about a month ago?**

A. Yep.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. Do you recall being under oath during that deposition?**

A. Yeah.

**Q. I'm going to direct you -- I've handed you a binder with the transcript from that deposition in there. I want to direct you to Page 131, Lines 16 through 20. Let me know when you're there.**

A. I see it goes up to like -- I don't find what you're looking for.

**Q. Sure. The page numbers are in fours. We're looking for Page 131, and Lines 16 through 20.**

A. Yeah.

**Q. All right. "Question: What I'm trying to get at is whether you think a Settlement Agreement contains rights as to antidilution that are beyond the rights specified in the Letter of Intent."**

**And you answered, "I don't." Correct?**

A. Yeah. I meant something by that.

**Q. All right. Well, I just wanted to remind everybody of what you testified to before. Thank you.**

**Okay. Let's turn to Joint Exhibit 40. Now, you identified Joint Exhibit 40 before as a reservation of rights email you sent to Mr. Erhardt; correct?**

A. Yes.

**Q. And that email that you sent to Mr. Erhardt**

**on January 12th, 2021, reads, "Dean, here it is. As just discussed, to clear up any ambiguity, we note that this is with a reservation of rights around the antidilution piece in connection with the raise as contemplated in the Settlement Agreement and Exhibit A."**

**Did I read that correctly?**

A. Uh-huh.

**Q. And you said that you received advice of counsel in crafting that email; correct?**

A. I don't remember who advised me, but yeah.

**Q. You don't remember your father advising you?**

A. No.

**Q. And earlier you testified that this dilution was the most important aspect of the deal, and you provided a very long explanation of your understanding of what that dilution meant; right?**

A. I don't remember providing a very long explanation. I'd like to talk about it more. But, yes, it's the most important part of the deal.

**Q. And the explanation you provided about that dilution piece having perpetual rights and rights related outside of the capital raise, you did not state this in your reservation --**

A. Because it wasn't relevant --



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. Excuse me. Let me finish.**

A. I didn't.

MR. LEGON: You gotta let him finish speaking, Kenny, before you answer.

JUDGE WHITE: We can only talk one at a time so that the court reporter can get down what you're saying. So listen to the question, give your answer, and then wait for the next question.

Mr. Schaeffer.

MR. SCHAEFFER: Thank you.

**Q. (By Mr. Schaeffer) Your explanation you gave this morning about your understanding about the most important aspect of the Settlement Agreement and the perpetual antidilution rights and the rights to noncapital raises and the specific rights about six months, you didn't state that in this reservation of rights email that you received advice of counsel on and provided to clear up any ambiguity to Mr. Erhardt; correct?**

A. Correct --

**Q. Thank you.**

A. -- on January 12th I did not state that.

**Q. And you mentioned on this date you didn't state that. Besides your wife, Mrs. Engels, telling you that she had asked Mr. Erhardt about whether there**

**were capital raises, you don't recall any specific conversations you had with D2 regarding your antidilution rights after this January 2021 email until August/September 2022; correct?**

A. Correct.

**Q. You've testified about this this morning about at the time of the Settlement Agreement you agreed to no longer be an employee of D2; correct?**

A. Correct.

**Q. And, in fact, even at the time of the Settlement Agreement, you were on administrative leave from your employment with D2; is that right?**

A. Correct.

**Q. So after December 30th, 2020, your role with D2 was that of a 3.5 percent minority owner; correct?**

A. And I owed a noncompete, but, yeah, my role was to not compete against D2 and to own 3.5 percent.

**Q. I just want to make sure we're all understanding what your role was after that time.**

**You looked at some exhibits earlier today that you received your K-1 on August -- and this is the K-1 for 2021, you received that on August 29th, 2022; right?**

A. Uh-huh.

**Q. And we also looked at Joint Exhibit 11. Turn**

**to that. All right. So sometime between August 29th, 2022, when Hauk Kruse emailed or mailed to you your K-1, you had a conversation with Mr. Erhardt, and you testified about that this morning, asking about the dilution of your units; right?**

A. Uh-huh.

**Q. And then Mr. Erhardt sends you this email, it looks like it must have been within a week or two or maybe a day, it doesn't know when you had the conversation, but soon after you received your K-1s you get this email on September 19th, 2022; right?**

A. Yeah.

**Q. And in it, Mr. Erhardt writes, Attached please find the Excel file with the information we discussed. And that Excel file contained the 2022 financials, as well as the cap table that you talked about with your counsel this morning; right?**

A. Yeah, but that was not what we had discussed.

**Q. All right. Note at the bottom Mr. Erhardt is explaining to you about what is going on with the 2021 financials. It says, "Note that, again, as we discussed, these are unaudited as our 2021 audit is not yet complete due to issues outside of our control."**

**Did I read that correctly?**

A. Yeah.

**Q. So right here on this date they're informing you about the audit that is taking a delay for 2021; correct? Yes?**

A. Okay. Yes.

**Q. All right. And then we can look. As you pointed out, there's the 2022 financials. And we turn to the end, Page 4 of 4, this is the page that folds out. You've got this cap table that Mr. Erhardt has provided you within a week or two after you've inquired about this dilution; right?**

A. Yes.

**Q. And you've already went through this. This cap table provided you a specific explanation of every single issuance of units, the percentage and number of units that were issued, the date they were issued, and the dilutive effect that had occurred on all unit members, including yourself, immediately upon your request for that information; right?**

A. No. We had been -- we didn't -- we shouldn't have had to request. We were entitled to this information quarterly. So, no, it's not immediately after --

JUDGE WHITE: Mr. Engels, just answer the question that was put before you.

THE WITNESS: Okay. That was my answer.

**Q. (By Mr. Schaeffer) You don't dispute that Mr. Erhardt sent this to you -- cap table to you on September 19th, 2022; correct?**
A. No. But I do dispute that it was what we discussed.
**Q. And you talked about Exhibit 10; remember that?**
A. Yeah.
**Q. And this letter, Carmody MacDonald, is dated a few weeks later, on October 3rd, 2022; correct?**
A. Yes.
**Q. And it's sent to the Gibbons law firm, Peter Flagel. He was an attorney for you and WorkUp; right?**
A. Yeah.
**Q. And on Page 2 of this letter, Carmody MacDonald provides in this letter an explanation again that mirrors that explanation in the cap table of every single issuance of units that occurred in 2021; correct?**
A. Yes.
**Q. All right. And in this letter, Carmody MacDonald also explains the reason why D2 issued the units for each one of these issuances in 2021; correct?**
A. It explains its reason for doing that and not issuing us new shares, yes.

**Q. And, in fact, right, the letter also explains D2's position as to the antidilution dispute where you're on -- where in this letter, the last paragraph on CL 64, all of the issuances of equity relate to service providers, see A through E above, or to a new capital raise occurring after the six-month period described in Section 10.a. of the Settlement Agreement expired. Thus none of those equity issuances triggered the antidilution provisions in the second sentence of Section 10.a. of the Settlement Agreement. The K-1's do not, therefore, need to be amended.**

**Now, I know you disagree with that, but the point is, within a week or two of you raising this issue, D2 explained to you its position as to why it diluted the units for these particular issuances; correct?**

A. Correct. And it was already late in doing that.

**Q. And as we fast-forward here three years later, you don't dispute the reasons Carmody MacDonald provided in this October 2022 letter as to the amount of units, the date of the units, who the units were issued to, or why the units were issued to those people; correct?**

A. I think that's correct, yeah.

**Q. You testified a bit this morning about a company, Vistria; do you remember that?**

A. Yeah.

**Q. And it's your position or your belief, I guess, that Vistria was an owner of D2 at the time of the signing of the Asset Purchase Agreement in 2019; right?**

A. Yes, because I saw the documents.

**Q. And I think you also testified that you learned of the existence of Vistria three months after signing the APA, so well in a year advance of the Settlement Agreement; correct?**

A. Yes.

**Q. And you're a licensed attorney; right?**

A. Yeah.

**Q. You know what a release is; correct?**

A. Yeah.

**Q. Do you agree there's a general mutual release in the Settlement Agreement as well?**

A. Yeah.

**Q. Another thing you brought up this morning I wanted to touch on was you were talking about how the original deal was a 30 percent phantom equity, which was, in your words, effectively a 70/30 deal. Do you remember saying that?**

A. Sure.

**Q. One thing I wanted to clarify, because I don't think you mentioned it, you and your wife didn't own any phantom equity or units in D2 as of the APA; correct?**

A. Started vesting on the APA. So if you mean when we signed the APA, did we own anything as of the date of the APA? What's your question?

**Q. Well, yeah, let me rephrase.**

A. Yeah.

**Q. As of the signing of the APA, would you agree with me that you and your wife personally did not own or have any entitlement personally and individually to phantom stock at that time?**

A. Agree.

**Q. Because it was WorkUp that owned that phantom stock; correct?**

A. I don't remember.

**Q. Well, let me refresh your memory.**

A. But we owned WorkUp, so -- okay. I agree with you, Tyler. If the APA was in WorkUp's name, and WorkUp signed the phantom agreement, then, yes, you're right, the co-owner -- you got it. Sure.

**Q. We're in hearing, so let's be precise. Let's go to Joint Exhibit 15, on Page 6, CL 006. Let me know**

**when you're there.**

A. I'm here.

**Q. All right. Section 3.3, Equity consideration. "Pursuant to the Seller's phantom equity plan, WorkUp will/shall be eligible to earn up to 30 percent of phantom equity in the Buyer."**

**Did I read that first part of that sentence correctly?**

A. Absolutely.

**Q. Do you trust that it wasn't you and your wife individually that had any entitlement to this potential 30 percent phantom equity?**

A. I trust it. I don't understand the relevance. But, yes, I trust it, sir.

**Q. Okay. Well, you testified how significant it was for you to get these units in the Settlement Agreement, and especially given that it was a 30 percent phantom equity in the APA. One thing I wanted to make sure the arbitrator understood is you and your wife individually didn't have rights to the phantom equity. WorkUp did; correct?**

A. Yeah.

**Q. We've established that?**

A. Yeah.

**Q. And I think you'd mentioned WorkUp also had**



35f7b069-9178-4a46-ab94-933a23c79a83

**investors outside of yourself and your wife --**

A. Yeah.

**Q. -- right?**

A. Yes.

**Q. And, in fact, they had, what, over 20 investors?**

A. Yeah.

**Q. Who all would have a stake in this phantom equity?**

A. That's right. We wanted them to, yes.

**Q. So when we're talking phantom equity, we're not really talking apples to apples when we're talking about you and your wife having individual units in the Settlement Agreement; are we?**

A. Completely agree.

**Q. Thank you.**

**You also talked about this morning D2 having issues with payment under the first APA. Has D2 made all of its payments under the Settlement Agreement to WorkUp?**

A. Yes.

MR. SCHAEFFER: All right. Thank you, Mr. Engels. That's all the questions I have.

JUDGE WHITE: Redirect?

MR. LEGON: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. LEGON:

**Q. Mr. Engels, I'd like you to go back to Exhibit 4, which is the Settlement Agreement. And you were asked some questions regarding I guess who was party to that agreement. So in the first instance, was WorkUp issued any shares of stock as a unit holder pursuant to the Settlement Agreement marked as Exhibit 4?**

A. No.

**Q. Who were issued shares of stock pursuant to that agreement?**

A. Unha and I.

**Q. Individually; correct?**

A. Individually.

**Q. All right. So to the extent that any damages have been suffered as a result of the dilution of the shares, who suffered those damages?**

A. Unha and I.

**Q. Okay. Now, you were asked a question; you said, well, we signed it at some place. Now, appended to the Settlement Agreement is -- hang on a second, just so I'm clear -- is the Fourth Operated -- Amended and Restated Operating Agreement, which was CL 075; is that correct?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. Yes.
**Q. Right. And if you take a look at Exhibit 5, which is following it, you can see there's a joinder agreement?**
A. Yeah.
**Q. And that's a joinder agreement to the Fourth Amended Operating Agreement which was appended to the Settlement Agreement; is that correct?**
A. Yes.
**Q. And if you take a look at the signature block on CL 113, and let's let everybody get there, did you sign that in your individual capacity or in your capacity as a member of WorkUp?**
A. I signed it individually.
**Q. Okay. Did Unha sign a similar document?**
A. Yes.
**Q. Okay. Now, to the extent that -- and I think what Mr. Schaeffer is getting at here is this standing question, WorkUp is a party to this case; correct?**
A. Yes.
**Q. All right. So WorkUp would have the ability to enforce your rights under the agreement in this litigation?**
A. Yes.
**Q. All right. Now, you were shown on**

**Exhibit 36 -- and I don't need everybody to run to it. Well, we might as well go to it. I really don't want to waste any more time on this parol evidence that's already been wasted. But if we take a look at the signed LOI -- forgive me. Exhibit 36 is the signed Letter of Intent that Mr. Schaeffer was asking you questions about, particularly with regard to the antidilution provision; is that correct, sir?**

A. Uh-huh.

**Q. I'd like to draw your attention to the very first sentence of that signed Letter of Intent. It says, This letter serves as -- and it's DL 383, in the lower right-hand corner. It says, "This letter serves as our mutual nonbinding Letter of Intent to resolve the issues of the APA."**

**Did I read that correctly; sir?**

A. Yes, it says that.

**Q. What is your understanding of nonbinding?**

A. That there's still work to do. This captures our intent about the deal, but there's still work to do to make it into an agreement that's signable.

**Q. Right. And something changed between the time that you signed the nonbinding Letter of Intent and the execution of the actual Settlement Agreement with regard to the language surrounding antidilution;**



35f7b069-9178-4a46-ab94-933a23c79a83

**correct?**

A. Correct.

**Q. What changed?**

A. Either Carmody or our lawyer, some lawyer, clearly said, as drafted, the Letter of Intent paragraph isn't clear enough ending at that sentence and we need a third sentence. And a third sentence was devised that says, For the avoidance of doubt, this whole paragraph means such-and-such. And such-and-such meant that Kenny and Unha have 3.5 percent during that protected period, and that after that, we're diluted for capital raises. Clearly, something happened between the lawyers, because that sentence didn't fall from the sky.

**Q. Okay. So let's go back to the Settlement Agreement that's been marked as Joint Exhibit 4, and in particular, the equity grant Section 10, which is CL 58, Your Honor. CL 58, Your Honor. Lower right-hand corner, and Paragraph 10.**

**In particular, I would like to address your attention to that third sentence, which starts with -- let me get to the beginning -- starts with -- it's the fifth line from the bottom of 10.a., and it reads as follows: "For the avoidance of doubt, the antidilution provision set forth in Section 10.a. shall mean that**



35f7b069-9178-4a46-ab94-933a23c79a83

**Kenny and Unha" -- not WorkUp -- "Kenny and Unha shall each own three and one half percent of the outstanding units of D2 during the period of the Initial Capital Raise."**

**All right, stop right there. Okay. Three and a half percent during the period of the Initial Capital Raise, you're going to -- shall own three and a half percent. What does that mean to you?**

A. Can't be diluted for any reason; no grant to service provider, no grant to a capital investor. We own that percentage during that period.

**Q. And then it goes on to read -- and just so we're clear, the Initial Capital Raise, the protected period, the six months?**

A. Six months.

**Q. All right. So you're -- according to this clean reading, three and a half percent you shall own during the period of the protected period?**

A. Yes.

**Q. Then it goes on. "But thereafter, but shall consistently with other unit owners be subject to any dilution consequences in any future capital raises after the Initial Capital Raise."**

**What does that mean to you, sir?**

A. That after that six-month period, we can be



35f7b069-9178-4a46-ab94-933a23c79a83

diluted for capital raises, and only for capital raises, and not on a whim; not because of a grant to a manager or a service provider of anybody else. The reason we can be diluted after that period is for a capital raise.

**Q. All right. Do you believe that -- let's start with the protected period -- that during that period you could be diluted down for anything whatsoever in the world?**

A. No, I don't think that during the protected period I could be diluted for anything in the world.

**Q. And after the protected period, if I understand your testimony correctly, the only thing you could be diluted for is a capital raise?**

A. Right.

**Q. And the grants that we've seen here that are undisputed that we've shown and that Carmody acknowledged in the letter that we reviewed, were any of those for capital raises?**

A. No.

**Q. Now, Mr. Schaeffer asked you about some deposition testimony, and as the judge correctly pointed out when you tried to expand your answer on it, you said you had something you wanted to say, and he said it would be up to me to get it out of you. And**

**Mr. Schaeffer asked you the following question.**

**What I'm trying to get at is whether you think the Settlement Agreement contains rights as to antidilution that are beyond the rights specified in the Letter of Intent.**

A. Yeah.

**Q. And you said, I don't, and you said it meant something to you. Can you please explain what it meant to you.**

A. So what I meant when I said that is that the intent captured by the parties, as we were negotiating it at that time, pre-lawyers, we're thinking about what's important to us, what's right in front of us. The main thing was that we wouldn't be diluted from the capital raise. That was the most pressing thing. This is something that was -- we were all looking forward to that capital raise. It was in the wings, and that was what was front and center.

But the intent of the parties was that that -- that was a special class of stock, too. It was going to be special, no matter what. That's why Unha's was different.

So when I'm asked is -- did the scope change? No, the scope didn't change. It just was clarified, and ambiguity around the way it was written at first

was clarified in the settlement. But that intent that that stock be sacrosanct, and not dilutable by whim, that was already there. That's what I meant.

**Q. And so getting back to that, and once again going back to Section 10 of the Settlement Agreement marked as Exhibit 4, on Page CL 58, there's a Section 10.b. dealing with Unha's distribution -- or potential future grants?**

A. Yeah.

**Q. Can you explain to the arbitrator what those future grants -- how that would work for her under this?**

A. Yeah. She would be employed for a year; the entitlement to that first point would vest. She'd be employed for another year; that entitlement would vest. But clearly we were told -- and we accepted -- not to expect the same treatment for that stock as for the 10.a. stock. It's expressly agreed to, and we agreed.

**Q. If Unha could be diluted at any time in calendar year 2021, 2022, and 2023, which was way after the prospective period -- or the protected period, why would the following language have been included in Section 10.b.? The last sentence, Your Honor. It says, "For the avoidance of doubt, the potential 1 percent unit awards which are subject of this**

**subsection b shall not have the antidilution protection as provided in subsection A above."**

**Their position is, they could be diluted at any time, except for during that protected period, only in relation to that capital raise. After the protected period, why on earth did Unha need to be excluded from the antidilution provision?**

A. Because the protection we would have under the 10.a. stock was still running, and they didn't want to have it on hers.

**Q. And they needed to make that clear; correct?**

A. They needed to remove the ambiguity around that.

**Q. Correct. So once the "for the avoidance of doubt" language went in in 10.a., presumably by your lawyers, Carmody, or whoever was representing D2, put in "for the avoidance of doubt" in 10.b.; correct?**

A. The lawyers did 10.a. and 10.b., did those two "for the avoidance of doubt" provisions, and that's a good -- probably makes sense if it happened that way, sure.

**Q. All right. Let's take a look at Exhibit 40, which is the first exhibit in binder 2, Your Honor. Mr. Schaeffer asked you some questions about this.**

A. Yeah.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. And he asked you some questions regarding what you stated or what you didn't. At this point in time, on January 12th, 2021, were you aware that stock had been issued to anyone other than you and Unha?**

A. No.

**Q. Post Settlement Agreement?**

A. We were unaware.

**Q. First time you learned about that is when you received the K-1; is that correct?**

A. Correct.

**Q. All right. So during the period of time that these issuances of stock were being made up until you received the K-1, you were never in a position to send another email complaining about it, because you didn't know it was happening?**

A. That's right.

MR. LEGON: All right. That's all I have.

JUDGE WHITE: Do you have any other witnesses?

MR. LEGON: I do not, Your Honor. The Claimant rests.

JUDGE WHITE: Would you like to start your case now?

MR. SCHAEFFER: We can. Defer to

everyone else if people wanted to take a break.

MR. LEGON: Whatever you want. If you want to take a break for a few minutes just to get ready, that's fine.

JUDGE WHITE: We'll be in recess for ten minutes, coming back about 11:25.

(Recess.)

JUDGE WHITE: Mr. Schaeffer, are you ready to proceed?

MR. SCHAEFFER: I am, Judge.

JUDGE WHITE: We're back on the record. You may present your case.

MR. SCHAEFFER: Thank you. Respondent calls Dean Erhardt. Mr. Erhardt, welcome.

JUDGE WHITE: Please raise your right hand.

(The witness was duly sworn in by the judge.)

DEAN P. ERHARDT,

called as a witness on behalf of the Respondent, being first duly sworn, testified under oath as follows:

JUDGE WHITE: Please state your name for the record.

THE WITNESS: Dean P. Erhardt.



35f7b069-9178-4a46-ab94-933a23c79a83

DIRECT EXAMINATION

BY MR. SCHAEFFER:

**Q. Mr. Erhardt, where are you employed?**

A. D2 Pharma Consulting LLC. We do business as D2 Solutions.

**Q. I'm going to refer to the company as D2; is that all right?**

A. That's fine.

**Q. What's your position at D2?**

A. I am one of the original founders. I currently serve as president and CEO.

**Q. Are you a co-owner of D2?**

A. Yes.

**Q. And how do you own D2? Is it through yourself individually or through an entity?**

A. My shares are held in my LLC, my personal LLC, which is Bio Launch Strategies. Bio Launch Strategies is an LLC technically owned by my wife and myself.

**Q. Thank you for that. When did you co-found D2?**

A. October of 2008.

**Q. If you could, generally, I think we know somewhat, but if you could, describe D2's business.**

A. We are generally a consulting and technology

company servicing the healthcare industry, predominantly serving pharmaceutical manufacturers, pharmacies, and hospitals.

**Q. And there was testimony this morning about D2 acquiring WorkUp through an Asset Purchase Agreement in 2019; do you remember that?**

A. Yes.

**Q. I want to -- I think that was covered, so I want to fast-forward a little bit past that. After acquiring WorkUp in 2019, did D2 ever make efforts to seek capital from a new investor?**

A. Yes.

**Q. And about what time did D2 start seeking to raise capital from a new investor?**

A. In our world, we continually get approached by third parties who are looking to do rollups and other activities, so we've kind of always got our ears open, but in the 2018, 2019, 2020 period, we were actively looking for an investment to grow the company.

**Q. And about how much money was D2 looking to seek as a capital raise?**

A. Between 8 and 10 million.

**Q. And you touched on it, but I just want to make sure the record is clear. What were the reasons why D2 was seeking that 8 to $10 million?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. To really convert from a traditional consulting company to a technology-based company, so to be able to invest in technology and grow the company.

**Q. As of 2019 and 2020, after WorkUp was purchased by D2, did D2 advise the Engels or make the Engels aware that D2 was seeking an investor?**

A. They were aware that we were seeking an investment, yes.

**Q. Were the Engels tasked with or did they offer to help at all with D2 in seeking a new investor at that time around 2020?**

A. They were involved in some cases in discussions and presentations with potential investors.

**Q. All right. In the 2020 time frame, leading up to the Settlement Agreement that's at issue here, what were some of the efforts D2 was making to seek a new investor?**

A. We had engaged just a couple of consultants, notably Steven Kirchof, Jim Dever, and Jim Liberman.

**Q. Besides engaging consultants to assist in the seeking of an investor, was D2 doing -- have any other plans for what it intended to do with the company in order to position it to be attractive to a new investor?**

A. We had, you know, created a presentation, a

investor presentation, and in that presentation, it outlined use of funds, future board members, an employee stock program, et cetera.

**Q. Mr. Engels testified this morning about certain phases that WorkUp and D2 went through to revise the Asset Purchase Agreement. I want to talk about that next. Mr. Engels testified that under the APA there was an annual payment due in July of 2020; do you remember that testimony?**

A. Yes.

**Q. Was D2 able to make that payment in July of 2020 under the APA?**

A. We were not.

**Q. And one of the things Mr. Engels raised was a representation and warranty in the original APA about the financial wherewithal of D2 and its ability to make the initial payment under the APA. Did D2 make the initial payment under the APA?**

A. Yes.

**Q. As of this year calendar -- year later payment, what were some of the reasons that caused D2 to miss that payment?**

A. Well, keeping in mind that we did bring Mr. and Mrs. Engels, as well as two of their consultants, on board as full-time employees, so that

cost was probably in the range of three quarters of a million dollars. We had also anticipated that with WorkUp we would be capturing significantly new business, which we did not capture during that period. In fact, WorkUp -- the WorkUp unit did not bring on one new client during that period of time. So we were investing heavily into the technology without seeing that return, which did give us a cash strapped situation.

**Q. And my recollection was Mr. Engels testified that even when WorkUp was acquired, it brought in several customers at the beginning. Is that consistent with your memory?**

A. As I recall, there was just one customer, one active customer.

**Q. Did there ever become -- well, do you agree with Mr. Engels that there became a time that WorkUp and D2 started negotiations about amending that Asset Purchase Agreement?**

A. Yes. As we approached a period of time when we could not make that $832,000 payment, we started negotiating a Settlement Agreement.

**Q. And just generally, who was involved in those negotiations over revising the Asset Purchase Agreement?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. From the D2 side, it would have been myself, our finance person at that point, Judy Rumpler, as well as the advisors Steven Kirchof, Jim Dever, and Jim Liberman.

**Q. I think we talked about earlier --**

A. Also, Carmody, by the way.

**Q. Okay. And then on the WorkUp side, who would it have been?**

A. I believe it was predominantly Kenny, the Gibbons law firm, and Kenny's dad.

**Q. And do you understand, was Kenny's dad acting as a counsel for Kenny at that point?**

A. I am not sure if I would describe it as counsel, but in some form of advisory.

**Q. We saw earlier this morning about an executed LOI. Was there ever a point in time where you first proposed a resolution of the Asset Purchase Agreement and a proposed LOI to WorkUp?**

A. Yes.

**Q. I want to direct your attention to Joint Exhibit 33. All right. If you could, please describe what Joint Exhibit 33 is.**

A. Joint Exhibit is a Letter of Intent for the Settlement Agreement between D2 and WorkUp.

**Q. And so we're all tracking, the Letter of**

**Intent starts on D2_006299; is that right?**

A. Which section are you in?

**Q. The Letter of Intent itself, or the proposed Letter of Intent itself starts on D2_007299; is that right?**

MR. STOEBERL: Same exhibit.

THE WITNESS: Okay.

MR. SCHAEFFER: Sorry. Exhibit 33.

A. Yes.

MR. LEGON: Your Honor, just before we begin, I once again assert my objection that any parol evidence should be excluded on the basis that the agreement is unambiguous.

JUDGE WHITE: Overruled.

MR. LEGON: Thank you, Judge.

**Q. (By Mr. Schaeffer) And before we even look at that, I actually want to direct your attention to a couple of pages back, on 7293. Let me know when you are there.**

A. I am here.

**Q. Okay. So this email that you're sending to Mr. Engels, is this dated November 20th, 2020?**

A. Yes, it is.

**Q. And we see this cap table and pro forma cap table on this Page 007293; do you see that?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. Yes.

**Q. And what is this proposed cap table? Why are you sending this to Mr. Engels?**

A. We were in discussions at that point with an organization called Revere for potential financing, and this was the proposed cap table post-financing, assuming that financing would close.

**Q. And I want to go through some of this. So if we look at existing cap table prefinancing, it says D2 100 percent. Who owns D2 as of this November 20th, 2020, date?**

A. At that point in time, myself, through my LLC, and David Suchanek, who is the minority partner from the original founding of the organization, through his LLC.

**Q. And this pro forma cap table explains how that 100 percent is now going to be divided into several categories; is that right?**

A. That is correct.

**Q. So at D2 it says 64.35 percent; is that supposed to be you and Mr. Suchanek's --**

A. Yes.

**Q. And then capital raise at 9.19 percent; what was that supposed to reflect?**

A. That would have been the amount of equity

provided to Revere for the investment in the company.

**Q. And the next line says board, et al., 10 percent proposed for future board members. What is that line?**

A. The intent was to be able to reserve certain equity that we could provide to future board members as well as key employees as we knew we would have to hire a couple of senior level executives to be able to support the growth of the company.

**Q. The next line says Revere for raise.**

A. That was for the two advisors, Jim Dever and Jim Liberman, who were advising us on the Revere raise.

**Q. And then we have another line for employee stock plan of 10 percent; what was that for?**

A. You know, long-term -- just like public companies, we wanted to create long-term equity for employees, not necessarily executives, but other employees for the company, so we wanted to reserve some stock to be able to provide those incentives.

**Q. And then, lastly, it says Unha and Kenny Engels, both at 3 percent. Is this part of your proposed --**

A. That was the proposed settlement at this point in time, yes. And then they had additional 1 percent that they could -- that was reserved.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. Okay. So, yeah, there's an explanation here that it's actually 2 percent upfront and then 1 percent reserved. Was that the original?**

A. That was the original proposal, yes.

**Q. All right. And these categories for the capital raise itself, as well as the board, the consultants at Revere, the employee stock plan, was this all consistent with the plan you talked about a little bit earlier that you were implementing to help finalize or attract investors, including Revere?**

A. Our goal was to restructure the company for long-term growth, take equity to -- take capital in order to be able to do that, and this was the proposed structure of how that would look.

**Q. And was D2 trying to hide from the Engels its plan to issue units to board members and issue units for employee stock option plans and to issue units for consultants as explained in this pro forma cap table?**

A. No.

**Q. And, in fact, this email here you're expressly telling Mr. Engels that --**

A. Expressly sharing what we were proposing at the time, yes.

**Q. I don't want to belabor this too much, but when we go back to the Letter of Intent that was**

**proposed back on November 20th, 2020, we go to D2_7300, there's an equity paragraph 2 at the top of that page. Let me know --**

MR. LEGON: Which exhibit are you on?

MR. SCHAEFFER: I'm sorry. I'm still on Exhibit 33.

MR. LEGON: Oh, 33. I'm sorry. Thank you.

**Q. (By Mr. Schaeffer) So just so we're all on the same page, on this D2_007300, this is a November 20th, 2020, letter that you had sent Mr. Engels; is that right?**

A. Yes.

**Q. And is this form the initial proposed Letter of Intent?**

A. Yes.

**Q. And as of this date, if we look at the equity paragraph, I won't make you read the whole thing, but at this point, was D2 offering any antidilution protection to the Engels for the proposed units?**

A. No.

**Q. And just so -- I don't know that this has been said yet. Just so we're all speaking the same language, what is your understanding of antidilution?**

A. An antidilution would effectively protect a



35f7b069-9178-4a46-ab94-933a23c79a83

shareholder from a dilution event, such as a capital raise.

**Q. And let me ask it this way. You and Mr. Suchanek, as the founders of D2, do you have antidilution protection?**

A. We do not.

**Q. And is antidilution the exception or is it the rule?**

A. It's the exception.

MR. LEGON: Objection, Your Honor. I don't know what qualifications he has to testify as to whether an antidilution provision is the exception or the rule under business transactions.

JUDGE WHITE: Sustained.

**Q. (By Mr. Schaeffer) Within the company of D2, is antidilution protection something all unit members automatically receive, or is it an exception to what the normal rule is for the D2 members?**

A. In the context of D2 as an organization, it would be an exception to normal operating processes.

**Q. To your knowledge, is that concept unique to D2?**

A. I don't really know the answer to that in terms of how other organizations do that.

**Q. Okay. So if D2 were to issue units to**



35f7b069-9178-4a46-ab94-933a23c79a83

**Mr. and Mrs. Engels as part of the Settlement Agreement, would that have the effect of diluting your and Mr. Suchanek's units?**

A. Yes, it would, and it did.

**Q. Even though you didn't include antidilution in this Letter of Intent, that issue gets raised at some point; correct?**

A. Correct.

**Q. All right. Did you and Mr. Engels ever discuss the concept of antidilution prior to reaching a Settlement Agreement?**

A. Yes.

**Q. And if you could, to the best of your memory, describe that conversation.**

A. As I recall, we had talked about the fact that effectively we were talking to Revere about a raise, and if in fact that raise happened in very short order post the separation agreement, it wouldn't be fair or appropriate for the Engels to get diluted if we closed a deal with Engels today and a month later we closed a deal, knowing we were working on a deal. So that antidilution was specific to if we closed this deal with Revere in the next period of time, we would protect them from a dilution perspective.

**Q. And did WorkUp agree to that solution?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. Yes.

**Q. Did you ever have a conversation, to your memory, about -- with Mr. Engels about antidilution protection outside of that contemplated capital raise you just described with Revere?**

A. Outside of the Revere raise, not that I recall.

**Q. I want to go to Joint Exhibit 34. It's the next one. And if we flip to the 7459 -- well, let me -- I don't know that this has been identified yet. If you could identify what Exhibit 34 is.**

A. Exhibit 34 is the Letter of Intent for the Separation Agreement between D2 Pharma and WorkUp.

MR. LEGON: Your Honor, once again, I'd object on the basis of parol evidence.

JUDGE WHITE: Overruled.

**Q. (By Mr. Schaeffer) And you're cc'd on this email; correct?**

A. Correct.

**Q. If we look to Paragraph 4, Equity, on 7459, at this point -- and we're at December 17th, 2020; is that right?**

A. Correct.

**Q. At that point in time, we're back to the equity paragraph. Is there any antidilution protection**



35f7b069-9178-4a46-ab94-933a23c79a83

**specified in the Letter of Intent at this point?**

A. There is not.

**Q. So let's go to Tab 35. If you could, identify what Exhibit -- Joint Exhibit 35 is.**

A. 35 was the Letter of Intent red-lined by Gibbons law firm on behalf of Mr. Engels.

**Q. Okay. And if we look here, this is on December 18th, 2020; so this is the next day?**

A. Can I clarify?

**Q. Yes.**

A. And it had additional red lines from Mark Hillis from Carmody.

**Q. Okay. Thank you. And so now when we turn to Section 4, Equity, we can see now there is language related to an antidilution. Do you see that towards the bottom?**

A. Yes.

**Q. And just reading the couple of sentences on that, you can see a red line -- or it's really just one sentence -- right at the bottom of Page D2_000115. It says, The above 7 percent will not be diluted by any -- or by all or any portion of the up to $8 million capital raise currently contemplated by D2. Do you see that?**

A. Yes.



35f7b069-9178-4a46-ab94-933a23c79a83

MR. LEGON: Same objection, Your Honor, parol evidence.

JUDGE WHITE: Overruled.

**Q. (By Mr. Schaeffer) And we can see that it looks like D2 had made a couple of red lines to that sentence. Do you see that?**

A. Yes.

**Q. And if you could, the first red line looks like the plus 3 percent was red-lined out. Do you see that?**

A. Yes.

**Q. Do you know what that's referring to?**

A. That was referring to the potential additional 3 percent that could potentially be awarded to Unha Engels.

**Q. So WorkUp had originally asked for that, and D2 red-lined that out; is that your understanding?**

A. That is my understanding, yes.

**Q. And then there's also a small change to instead of $8 million it says up to $8 million?**

A. There was no guarantee that we would get the full 8 million, so it was up to 8 million, yes.

**Q. All right. And then eventually, we already looked at it earlier today, that particular sentence, as red-lined, makes it into the final signed Letter of**

**Intent; is that your understanding?**

A. Yes.

**Q. That signed, executed Letter of Intent is dated December 23rd, 2020; is that right?**

A. Yes.

**Q. At the time of signing that Letter of Intent, was there any urgency in getting the settlement complete?**

A. There was in that it was the Christmas season and the end of the year, and we were trying to have all of this wrapped up prior to the end of the year.

**Q. And we looked at earlier -- turn to it quickly on Joint Exhibit 37. That was identified earlier as the first draft of the Settlement Agreement from December 24th, 2020; do you remember that?**

A. Yes.

**Q. So this is just a day after the Letter of Intent was executed; is that right?**

A. Yes.

**Q. So in this 24-hour time frame between the Letter of Intent being executed -- well, let me back up.**

**Would you be part of the decision maker for D2 on all settlement discussions related to this Settlement Agreement?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. Yes, I would.

**Q. And this 24 hours between the execution of the Letter of Intent and this Settlement Agreement, were you part of any discussion with anyone from WorkUp about changing the terms of the Letter of Intent?**

A. Not that I recall.

**Q. All right. At any time after the signing of the Letter of Intent, were you ever informed that WorkUp was changing the terms of the Letter of Intent?**

A. Not that I recall.

**Q. And if we go to Joint Exhibit 39, that's the actual Settlement Agreement itself. And before I move on to that, we had read the Letter of Intent. Did the language in the Letter of Intent comport with your understanding of what the agreement was with respect to antidilution?**

A. Yes.

MR. LEGON: Same objection, Your Honor.

JUDGE WHITE: Overruled.

**Q. (By Mr. Schaeffer) And when we look at Section 10.a., on D2_13, did Section 10.a. also comport with that same understanding you had with the Letter of Intent?**

A. Yes.

**Q. From your perspective, the "for the avoidance**



35f7b069-9178-4a46-ab94-933a23c79a83

**of doubt" sentence that's been referenced by Mr. Engels and his counsel, did that expand the antidilution protection, as you understood it?**

A. It was simply clarification.

**Q. And clarification as to what?**

A. As to the fact that Unha's potential additional shares would not be included in any future antidilution activity.

**Q. And on 10.a., as far as the clarification point with the dilution consequences of future capital raises, what was that clarification?**

A. Which sentence are you on? Help me find it. I want to make sure I read it.

**Q. The last sentence in Section 10.a.**

MR. LEGON: Fifth line from the bottom.

THE WITNESS: Got it.

No. This was specific -- the antidilution, again, was specific to the Revere raise which was, you know, being contemplated at that time. Again, you know, for sake of clarity, our goal was if we closed the Separation Agreement with Engels and then closed a Revere deal two weeks later, that they would not get diluted in that process. If we closed an investment deal a year later, two years later, five years later, that was not contemplated as part of this discussion.

**Q. And how come -- you'd mentioned the contemplated capital raise related to Revere, a particular company. Why didn't the Settlement Agreement, to your knowledge, include the name Revere?**

A. Well, the way it works, at least in my experience, when those type of organizations put money into a company, they create a specific LLC for that investment. So we were cautious to not name a specific entity, knowing that that entity would likely be named, if and when they came in with some money, as a separate legal entity.

**Q. And were Mr. and Mrs. Engels aware that Revere was the entity that was the then currently contemplated capital raise?**

A. Yes.

**Q. And how were they made aware of that?**

A. Well, they were in discussions with Jim Dever and Jim Liberman, who were representing Revere.

**Q. And Section 10.a. also refers to a maximum time limit of up to six months for this Initial Capital Raise to occur. Why was that up to six-month period --**

A. It was an arbitrary length of time, if I recall correctly, that Kenny and I had discussed just given the fact that these things can take longer than you anticipate, and we wanted to give it plenty of time

to be able to close, as we were anticipating it to close at that point and just wanting to be cautious.

**Q. Did you ever discuss with Mr. Engels at any point antidilution protection for capital raises outside of this potential deal with Revere?**

A. Not that I recall.

**Q. Did you have any other discussions with Mr. Engels about any antidilution protection for any of the issuances outside of the Revere capital raise?**

A. No.

**Q. For example, the board percentages that you had told Mr. Engels about in November, or the employee compensation plan, were those discussed?**

A. I don't recall that we ever discussed those specific activities being part of his antidilution agreement.

**Q. During the drafting of the Settlement Agreement, were you ever provided any information from WorkUp or its attorneys showing that WorkUp was seeking antidilution protection greater than what you had discussed with Mr. Engels?**

A. No.

**Q. Have you ever seen a red-line of any of the Settlement Agreement or communications from the Gibbons law firm that was representing WorkUp reflecting any**

**changes to the antidilution protection that you agreed to with Mr. Engels?**

A. No.

**Q. Did you ever discuss with Mr. Engels antidilution rights provided under the Settlement Agreement after the Settlement Agreement was signed?**

A. Just prior to signing the fifth operating agreement, we had a discussion to make sure that they were comfortable that the fifth operating agreement wouldn't suddenly dilute them, which it couldn't. The whole point of the fifth operating agreement was to insert them as owners in D2.

**Q. During this conversation with Mr. Engels, we saw a reservation of rights email that he sent to you after that; do you recall that?**

A. Yes.

**Q. During that phone call do you have any recollection of Mr. Engels talking about him reserving rights for antidilution rights beyond those related to the capital raise as he described it in his email?**

A. No.

**Q. I think you just mentioned, why did D2 have the Engels sign the Fifth Amended Operating Agreement?**

A. Because it inserted them as individual owners within the construct of the organization.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. Was the Fifth Amended Operating Agreement related to the proposed Revere investment at all?**

A. It was not.

**Q. And why not?**

A. Because it hadn't been closed at that point. So by inserting them as owners, then presumably if we did the Revere raise, they were already reflected within the cap table as owners of the company.

**Q. Was the investment with Revere ever completed?**

A. It was not.

**Q. And why not?**

A. We just couldn't come to terms.

**Q. All right. I want to turn to these issuances within the first six months that are at issue in this arbitration. And maybe one of the easier ways to do this is if we go to joint Exhibit 11.**

**So this is the email you sent Mr. Engels back in September of 2022 providing the cap table. So if we go to the cap table on Page 404 -- this is the page that folds out again -- there doesn't appear to be any dispute in this case that these issuances in the first six months do not relate to the contemplated $8 million capital raise, but I wanted to at least provide some information to the arbitrator about them.**

**So if we start at the top, there's Bio Launch, which I think you testified earlier that's your --**

A. This is my LLC, my holding company, yes.

**Q. So that reflects your percentage ownership in D2. That existed as of January. The next one is Teth RXCVV; what -- whose ownership is reflected --**

A. Teth RX is the LLC owned by David Suchanek, the other partner.

**Q. And then I think we've already covered, we've got MK Engels and Unha Engels; that's Mr. and Mrs. Engels; correct?**

A. Yes.

**Q. The next one is J Dever. Who is J Dever?**

A. J Dever was one of the advisors we were using for the Revere agreement.

**Q. All right. And the next one is J Liberman. Who is J Liberman?**

A. Jim Liberman is also an advisor we were using during that period of time.

**Q. And why did D2 issue units to Jim Dever and Jim Liberman?**

A. As part of helping to negotiate the settlement with WorkUp as also part of their facilitation in our discussions with Revere, which we



35f7b069-9178-4a46-ab94-933a23c79a83

were anticipating moving forward with a financing option.

**Q. And, again, Revere never did make a capital raise?**

A. Did not.

**Q. To speed things up, what I'd like to do is -- Exhibit 44 and Exhibit 45 reflect the stock award letter to Jim Dever and Jim Liberman and the advisory board agreement between those two?**

A. Yes.

**Q. Those exhibits haven't been objected to. I was just going to admit them and then move on since the --**

MR. LEGON: What exhibits are you referring to? Forgive me.

MR. SCHAEFFER: 44 and 45.

JUDGE WHITE: 44 and 45. If you haven't objected to them, you can do so now. If not, they're in.

MR. LEGON: No, I have no objection.

**Q. (By Mr. Schaeffer) All right. So the next one on the list here is GCS Consulting, LLC. Do you know what GCS Consulting LLC is?**

A. That is Grant Schoffelen, who is an individual that was a -- worked with -- worked for us

as part of our initial WorkUp acquisition.

**Q. Okay. And why did D2 issue units to Grant Schoffelen?**

A. As part of the Separation Agreement, we had agreed with Grant Schoffelen that he would be an equity holder in D2.

**Q. All right. And then, similarly, I'm going to just admit Exhibit 42, which is the independent contractor agreement between D2 and Grant Schoffelen, assuming there's no objection?**

MR. LEGON: No objection.

**Q. (By Mr. Schaeffer) Next one on the list is I Baig?**

A. Irfan Baig. Same structure as Grant in that he was one of the employees as part of the D2 acquisition, and as part of this separation, we agreed to give him an equity position in D2.

**Q. Okay. And then, similarly, we have Joint Exhibit 43, which is the independent contractor agreement for Irfan Baig.**

MR. LEGON: No objection.

JUDGE WHITE: 43 is admitted.

**Q. (By Mr. Schaeffer) Next on the list is 4Engs Consulting LLC.**

A. That is the LLC held by Kirby Eng. Kenny had



35f7b069-9178-4a46-ab94-933a23c79a83

referenced that Kirby Eng was actually the person that had originally introduced us. Kirby Eng had an investment, he was an investor in WorkUp, and as part of this transition we agreed to give him some equity in D2 to both offset his investment, as well as to reward him for being an employee of D2 at that point in time.

**Q. To your understanding, was that part of his ability to receive equity in D2, is that something provided specifically in the Settlement Agreement?**

A. Yes.

MR. SCHAEFFER: For Mr. Eng, there was -- I think there was actually an objection on 47, so that's fine. We'll do 48 is Kirby Eng's joinder agreement. We'll move to admit that, unless there's an objection.

JUDGE WHITE: 48?

MR. LEGON: No objection, Your Honor.

JUDGE WHITE: 48 is admitted.

**Q. (By Mr. Schaeffer) Okay. Revokable Propper Family Trust. What is the Revokable Propper Family Trust?**

A. Dr. Richard Propper we invited to be a board member as we were trying to restructure the company. He was also -- he's also very, very well-known in the industry, and we thought it would be advantageous to



35f7b069-9178-4a46-ab94-933a23c79a83

have him on the board as we were, you know, looking for investors, including Revere. So that is Dr. Propper's trust.

**Q. And besides being a board member, was Mr. Propper provided units for any other reason?**

A. No.

**Q. Has Dr. Propper invested capital into D2?**

A. No.

MR. SCHAEFFER: Exhibit 49 is the board agreement with Richard Propper. We would move to admit unless there's an objection.

MR. LEGON: No objection.

JUDGE WHITE: 49 is admitted.

**Q. (By Mr. Schaeffer) The last one before we get to the ones that fall outside of six months is Curegrail. What is Curegrail?**

A. Curegrail is the holding company owned by Steven Kirchof.

**Q. And why did D2 issue units to Steven Kirchof?**

A. A couple of different reasons. Mr. Kirchof was acting as an executive advisor to the organization for approximately two years prior to the WorkUp settlement, but he also helped to negotiate and he also introduced us to Jim and Jimmy, which led us to Revere.

**Q. And did each of the issuances of units we just described dilute all of the unit holders of D2?**

A. Yes.

**Q. And why was the Engels' antidilution protection nonapplicable to these first issuances in this six months?**

A. Because it wasn't -- their antidilution agreement was specific to the raise with Revere, and this was not part and parcel to the raise with Revere.

JUDGE WHITE: Was that written in the final contract?

THE WITNESS: It said this capital raise.

JUDGE WHITE: But did it say Revere?

THE WITNESS: No, because we didn't -- we chose not to mention Revere.

**Q. (By Mr. Schaeffer) And just to clarify that, so we've got a definition in the Settlement Agreement talking about a currently contemplated capital raise. It doesn't use -- doesn't specify the name Revere?**

A. For the reason I explained.

**Q. And if you could, just explain again why you didn't use the name Revere.**

A. Because typically once an investment is made, they create an LLC specific to that investment. So the

investment would have been -- not been named Revere; it would have been named -- and I'm making up a name, obviously -- Revere D2 Investment LLC. But they would have created a name specific for this investment, which is what we saw Viewside do, which is pretty standard when you take an investor on.

**Q. And just to recap, the Engels were made aware that Revere was that contemplated capital?**

A. Yes.

**Q. Okay. You just mentioned Viewside. And these second two entities on the cap table on 404, who is Viewside?**

A. Viewside Capital Partners is a special -- they're an investment firm that's considered a special purpose vehicle, which I can get into or not get into, but they are ultimately the entity that we did end up taking an investment from.

**Q. And how was that investment structured?**

A. That was structured with an original loan, quote, unquote, of a half million dollars, and then we closed the deal for a total of 8 million.

**Q. And the loan, do you recall when the loan was issued?**

A. It was issued about three months prior to the actual closing of the deal.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. Does October 2021 --**
A. Sounds about right, yeah, because I think we closed in December of '21.
**Q. Was the bridge loan after six months after the Settlement Agreement?**
A. Long after six months after the Settlement Agreement.
**Q. The investment, and as we look at the cap table here, we can see an issuance to a JW SR VCP, LLC, and you see it appears in the October 2021 column. Do you see that?**
A. Yes.
**Q. Was that for the bridge loan?**
A. That was for the bridge loan.
**Q. And then the next issuance, VCP D2, LP, a much larger issuance, almost 19.47 percent, issued in November of 2021; what was that for?**
A. That was for the equity investment into D2.
**Q. And how much was the equity investment --**
A. 8 million.
**Q. And, again, the Viewside bridge loan and capital raise, those also diluted all of the unit holders equally in D2; is that right?**
A. All on a prorated basis, yes.
**Q. And why did those issuances dilute the**



35f7b069-9178-4a46-ab94-933a23c79a83

**Engels?**

A. Because they weren't part of the capital raise that was contemplated as part of the exit when we were exiting with the Engels, and it was also outside the six-month window.

**Q. Mr. Engels testified earlier that he came to you in around September 2022 asking about dilution that he saw in his K-1s. Do you remember that?**

A. Yes.

**Q. And after Mr. Engels called you about that, what did you do?**

A. We forwarded him financials and basically an outline of all of the investment schedules that we had had up until that point.

**Q. And, in fact, this Joint Exhibit 11 we're looking at is those investment schedules --**

A. Correct.

**Q. -- and financials; correct?**

**Did you also explain in Exhibit 11 in your email that the 2021 financials, that there was an audit being completed that had not been completed yet?**

A. Yes.

**Q. And was there a delay in completing that audit?**

A. Yes, there was a delay. We had switched to a



35f7b069-9178-4a46-ab94-933a23c79a83

new auditor, and the new auditor did not believe that the previous auditor had followed appropriate GAAP practices, and we were anticipating that certain elements need to be restated. So we were waiting for the final restated, hopefully accurate documents before they would go out.

**Q. And did anyone besides Mr. and Mrs. Engels have to wait for those 2021 financials?**

A. Everyone had to wait.

**Q. Back on 11, Joint Exhibit 11, this cap table, just so we're all understanding what this cap table is, is this the document D2 maintains to illustrate all of the issuances that D2 has made?**

A. Yes.

**Q. I direct your attention to Joint Exhibit 10. Do you recognize Joint Exhibit 10?**

A. Yes.

**Q. Is this the letter D2's attorney sent to WorkUp's attorneys?**

A. Yes.

**Q. And this was discussed earlier today in this proceeding, and there's an explanation provided on Page 2 of all of the issuances in the first six months that you just testified to. Do you see that?**

A. Yes.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. Is the testimony you just gave a moment ago consistent with what you had your lawyers tell WorkUp in October of 2022?**

A. Yes.

MR. SCHAEFFER: Mr. Schaeffer, it's after 12:00 now. I think we need to take a break for lunch and you can come back and continue.

MR. SCHAEFFER: Sure.

JUDGE WHITE: So we will take a break until 12:45 and come back and resume the proceedings.

MR. LEGON: Very good, Your Honor.

JUDGE WHITE: We're in recess.

(Recess.)

JUDGE WHITE: We're back on the record. Mr. Schaeffer, you may continue.

MR. SCHAEFFER: Thank you.

**Q. (By Mr. Schaeffer) Mr. Erhardt, if you could, please turn to Joint Exhibit 39. It's the executed Settlement Agreement, and we're going to turn to Page 13, which has Section 10.a. on it.**

**Okay, one thing that we were discussing and I wanted to close the loop on was this currently contemplated capital raise. So when we look up in the 10.a., there's the section that says, The parties hereby acknowledge and agree that the units issued as**



35f7b069-9178-4a46-ab94-933a23c79a83

**the closing equity issuance shall not be diluted by all or any portion of the up to $8 million capital raise currently contemplated by D2, and then that's defined as Initial Capital Raise.**

**And that currently contemplated capital raise up to $8 million, I just wanted to be clear, as we're referring to it in this Settlement Agreement, was that the Revere potential raise?**

A. Yes.

**Q. And as of December 30th, 2020, when this agreement was signed, had Revere committed to a capital raise at that point, or was that still being discussed?**

A. Still in negotiations.

**Q. And I wanted to compare that to Viewside, which is where D2 later did get an $8 million capital raise; is that right?**

A. That is correct.

**Q. Was Viewside also in the picture in December 2020 as a potential contemplated capital raise?**

A. No.

**Q. Do you recall when you were first -- or when D2 was first introduced to Viewside?**

A. I couldn't refer to the initial date, but I want to say it was around August of '20. Yeah, '20 or

'21.

**Q. '21?**

A. '21, yeah. August of '21, we were introduced through one of our existing clients.

**Q. Okay. And August of '21 of course is six months -- or more than six months after the Settlement Agreement; right?**

A. Correct.

**Q. And you said you were introduced by a client. Was that client related to or the consultants that you had at the time, Jim Dever, Jim Liberman, Steven Kirchof, were any of those people part of who introduced D2 to Viewside?**

A. They were not.

**Q. One other bit of testimony that came out earlier related to the interplay between 10.a. and 10.b., so I wanted to ask you a couple questions about 10.b.; okay? 10.b. refers to units that Unha, as an employee, has the ability to earn over a couple of years; is that right?**

A. Yes.

**Q. And I think we saw earlier that we can see specifically in the Letter of Intent the time in which WorkUp was seeking to have those units have antidilution protection, and D2 red-lined that out; is**

**that right?**

A. Yes.

**Q. And one of the provisions back in 10.a. refers to the sentence I just read that says, The closing equity issuance shall not be diluted by all or any portion of the up to $8 million capital raise currently contemplated by D2, and that that needed to occur within a time period no longer than six months; right?**

A. Yes.

**Q. And so I think Mr. Engels is making an argument that because there's a six-month limitation on 10.a., and Mrs. Engels can't earn her units for at least one calendar year, that clearly 10.a. must have contemplated antidilution protection beyond a year. My question to you is, even if a capital raise of up to $8 million from Revere was earned by D2 in six months, does that automatically mean that D2 would have to issue units in that first six months as well?**

A. They don't have to coincide to exactly when a capital raise. So you can do a capital raise and issue shares post the capital raise, depending on what that capital raise agreement looks like.

**Q. And just to be clear, the Revere deal didn't go through?**

A. Correct.

**Q. And even at the time of this agreement, you didn't have terms for a Revere deal?**

A. We did not.

**Q. Would the -- just to put an example to what you said, is the vesting period of the phantom stock in the APA that D2 had with WorkUp, is that another example of a situation in which somebody may have an acquisition on one day, but units don't vest until years or months later?**

A. Yes.

**Q. In fact, I believe we looked at your initial Letter of Intent dated back on November 20th, 2020, where you had specified that the Engels would receive 2 percent upfront and then 1 percent a year later?**

A. Yes.

**Q. Is that another example where you can close a deal like a Settlement Agreement and yet D2 doesn't issue units contemporaneous with the capital raise or the closing of that deal?**

A. Well, there's any number of capital raise and/or equity activities that could happen as a part of that. They don't have to coincide, and it depends on the final structure of the deal. I mean, you can see by that document that at that point it was proposed



35f7b069-9178-4a46-ab94-933a23c79a83

2 percent plus 1 percent. That's not where we ended up. We ended up at 3.5 and 3.5 based on when the APA finally closed.

**Q. And is it fair that the reality of the situation was, as of the time the Settlement Agreement is signed, D2 just doesn't know what type of structure it may have with Revere for this currently contemplated capital raise?**

A. That is correct.

**Q. All right. One other -- I wanted to shift topics a bit and talk about some units outside of those in the 2021 time frame that we talked about before the lunch break. In this case, there's been discussion about Class D units. Are you familiar with Class D units of D2?**

A. Yes.

**Q. And if you could, please explain to the arbitrator what Class D units were for --**

A. Class D units are the units that we're providing for employees, as long-term incentive for employees. Those units have restrictive rights, including no voting rights, and there's a certain waterfall upon an exit event or other financing events where they would be qualified for some sort of a payout, but that's beneath the A, B, and C investors,



35f7b069-9178-4a46-ab94-933a23c79a83

or, rather, stock holders, unit holders.

**Q. Do you recall when about D2 first sought to actually implement that Class D unit employee incentive program?**

A. Well, we talked about it for a couple of years prior to actually implementing it, but I want to say it was implemented in or around 2022, if I recall correctly. Maybe it was 2023. I might have to look, honestly.

**Q. And this employment incentive program in D units and the issuance of units by D2, was that part of the plan that you were referring to back in November of 2020 when you were advising Mr. Engels of what the cap table might look like?**

A. It was referenced in that projected cap table that we would in fact have units available to employees.

**Q. When D2 sought to implement this employee incentive plan, did D2 advise Mr. and Mrs. Engels of that intent?**

A. No.

**Q. Do you know the proposed --**

A. Actually, hold on. We did -- we did advise them of a proposed structure, and they pushed back against that structure.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. Okay. What do you remember about that?**

A. Well, the whole point of the structure was to be able to do it in a way that does not disadvantage employees from a stock perspective; i.e., if we give you a stock, and that stock is worth a dollar, would you have to pay taxes on that dollar today, or can that tax be deferred to some event, which is what we wanted so that at an exit value you would have -- owe tax on whatever income that represented, but you wouldn't have to pay tax on any upfront value of that stock, because you didn't receive actual money.

**Q. Did any other members disagree with that structure?**

A. No.

**Q. Because the Engels wouldn't agree to that structure, did D2 have to do something different?**

A. We did have to go back and re-think about how we structured that so that the employees would not be penalized as part of that initial stock grant, let's call it.

MR. SCHAEFFER: All right. Another joint exhibit that is not objected to is 56, which is the various incentive award agreements for the employees that relate to these Class D units. In the interest of saving time, we were just going to move to



35f7b069-9178-4a46-ab94-933a23c79a83

admit those.

MR. LEGON: No objection.

JUDGE WHITE: Exhibit 56 is admitted.

**Q. (By Mr. Schaeffer) So let's -- instead of 56, let's go ahead and turn to Joint Exhibit 55. And I don't believe this has been identified yet. Do you recognize joint Exhibit 55?**

A. Cap table as of December 2020.

**Q. And then if we keep flipping through, are there more cap tables?**

A. There's a cap table as of January 2021, which included Mr. and Mrs. Engels' ownership units; and then a cap table of November of 2021, which represented both the Viewside Capital Partnership investment, as well as the various other minority shareholders.

**Q. If we keep going, are there more cap tables?**

A. January of 2023 included the total D units; and the D units, again, are for employees. And in December of 2024, it actually demonstrates that those D units were not just authorized, but some of them were actually issued.

**Q. And then is there also a December 2024 cap table at the -- on Page 5 of 6 of that?**

A. Yes. There is a final document as of -- that represented 12/31 of '24, and the then current



35f7b069-9178-4a46-ab94-933a23c79a83

ownership, or equity rather, of all of the various different employees and their unit holdings.

**Q. And is it your understanding whether this comprises of all of the D2's cap tables between December 2020 and present?**

A. That is the most current, yes.

**Q. And these capitalization tables, we've been calling them cap tables, are these the corporate documents D2 maintains to keep record of who owns units and when they were issued?**

A. This is part of our formal corporate records, yes.

**Q. All right. I wanted to point out a couple of specific transactions. If you look at -- it's turned the other way, but it would be 4 of 6, and it's the January 2023 cap table. Let me know when you're there.**

A. Yes.

**Q. Okay. And then in the unit Class A category --**

A. Yes.

**Q. -- you can see VCP D2, LP, and then you see initial funding, and you see the 56181 and it says November 2021 above it; do you see that?**

A. Yes.

**Q. That 56181, are those the units Viewside**



35f7b069-9178-4a46-ab94-933a23c79a83

**received in exchange for the $8 million capital raise you testified about earlier?**

A. Yes.

**Q. And, again, that raise occurred in November of 2021?**

A. Correct.

**Q. And then below that, in the, again, in the unit Class A column, you can see VCP D2, LP, and you can see past the November 2021 columns additional units issued to VCP D2, LP. Do you see that?**

A. Yes.

**Q. What do those unit issuances relate to?**

A. That was a subsequent additional raise.

**Q. All right. And do you recall when about that subsequent additional raise occurred?**

A. I want to say December of '22, somewhere in that range.

**Q. Okay. So we're talking a couple years after the settlement agreement?**

A. Correct.

**Q. And below that, Bio Launch Strategies, LLC, you testified that's your company --**

A. Yes.

**Q. -- and your wife's?**

**There's an issuance listed in that same**



35f7b069-9178-4a46-ab94-933a23c79a83

**column as the VCP D2, LP, the second one?**

A. Yes.

**Q. What does this issuance to Bio Launch Strategies, LLC, relate to?**

A. That was for additional moneys that Bio Launch Strategies, LLC, also put into the company at that point in time.

**Q. So that's another capital raise?**

A. It's the same capital raise as the -- what's represented in the January 2023 stock. So that was all one activity. The additional Viewside, the additional Bio Launch, Druid, and Nimesh (phonetic) Patel Trust, those were all moneys that were raised at the same time, so it was one event.

**Q. And that's in that -- I think you said December 2022-January 2023 time frame?**

A. Yes.

**Q. And if we go to the 2024 cap table, which is on the next page, we see total D2 units -- total D units towards the bottom, below the A, B, C, and then the D units?**

A. Yes.

**Q. And there's an authorized and issued column; do you see that?**

A. Yes.

**Q. Do those relate to the employee incentive program you --**

A. Yes, they do.

**Q. All right. And I think you testified this is the most current cap table?**

A. Yes.

**Q. The last thing I wanted to briefly talk to you about is, Mr. Engels and his attorney talked a bit about this morning about not receiving certain information about the Viewside investment and the timing of when they received that in their K-1. And I just wanted to hear from you, were there certain notices about any of D2's issuance of units, whether it was for board members or the consultants or Viewside, that were issued to the other unit members but not to the Engels?**

A. No.

**Q. Were there financials of D2 that were issued to all other unit holders, but specifically not given to the Engels?**

A. No.

**Q. Has D2 been treating the Engels differently than the other minority shareholders positioned like the Engels?**

A. No.



35f7b069-9178-4a46-ab94-933a23c79a83

MR. SCHAEFFER: That's all the questions I have. Thank you.

JUDGE WHITE: Cross-examination?

CROSS-EXAMINATION

BY MR. LEGON:

**Q. Sir, I'd like you to go back to Exhibit 39, which you should have open before you, and talk about this 10.b. section where you were talking about the grant to Unha Engels and the fact that she had an earn-out of earning 1 percent for each year 2021, 2022, and 2023. Do you remember having conversation with your attorney relating to that provision, sir?**

A. Yes.

**Q. And your provision was -- your position was that even though there's this exception language to the antidilution provision, you put that in there because you don't have any idea really when the stock would be issued if there was a capital raise; is that correct?**

A. Correct.

**Q. So, for example, using calendar year 2021, if somebody put in $8 million, let's say, you might have the benefit of that through a bridge loan, but you may not issue the stock until 2022 or 2023 --**

A. Correct.

**Q. -- is that a fair statement?**

**And so you wanted to be sure that the antidilution provision didn't cover that situation; is that correct?**

A. The antidilution provision was specific to the capital raise with Revere that was under discussions at that point. We didn't feel it was fair, and Kenny and I agreed that it wouldn't be fair if we closed a deal a month after we closed this deal. Now, let's -- let me be clear.

**Q. That's not my question, sir.**

A. All right.

**Q. In fact, I didn't really have a question. So my question is this. Under Section 10.a., we all agree, there's no dispute that there's a six-month period there during which the antidilution provision applies; correct?**

A. Applies to that singular raise, yes.

**Q. Specifically, it says Section 10.a. shall mean that Kenny and Unha shall each own three and one half percent of the outstanding units of D2 during the period of the Initial Capital Raise; is that correct?**

A. Correct.

**Q. But if I accept your testimony the way that you've just described it, according to you, you could structure any deal you wanted where you could take the**

**$8 million, let's say, from Revere or somebody else, and structure it in a way where they get the stock outside the six-month period; correct?**

A. I don't believe so.

**Q. What do you mean? Why not? You said that you have no idea when the stock is ultimately going to be issued in the deal.**

A. That is correct.

**Q. So you could have structured the deal to get out of that provision; couldn't you have?**

A. In theory.

**Q. Yeah. So what's the point of the six months, then? If ultimately that the six months could be vitiated at any time you want by structuring a deal because you're not issuing the stock during that six-month period, you're giving the six-month period no meaning; isn't that true, sir?**

A. I don't -- I do not agree with that.

**Q. How could you not agree with it?**

A. Because the six months was in there specific to a specific raise.

**Q. You said you and Kenny talked about that six-month period and agreed that this was just a six-month period that we picked out. Did you tell Kenny when you were negotiating that six months that**

**you could structure a deal so you could issue the stock maybe a year or two later so you didn't have to satisfy that antidilution provision?**

A. I'm sure that that didn't come up with the intent that both of us had of honoring the six-month window.

**Q. Right. So it was never discussed; isn't that true, sir?**

A. That is true.

**Q. All right. 4Engs Consulting, I want to talk to you a little bit about that. That was one of the entities that got a distribution or -- strike that -- a stock grant during that six-month protected period; isn't that true?**

A. That is true.

**Q. Okay. Now, isn't it a fact -- we talked a little bit earlier, I did with Kenny, about Judy Rumpler. Who's Judy Rumpler?**

A. Judy Rumpler was our bookkeeper and VP of Finance at that point in time.

**Q. Okay. So she would be the person who would know and do the internal accounting and recordkeeping relating to stock distributions; isn't that true?**

A. Correct.

**Q. All right. So isn't it a fact that when the**

**4Engs Consulting stock was distributed, the internal books and records of D2 actually increased the Engels' stock to account for that to make sure they weren't diluted down?**

A. And I think when our future auditor audited those financials, they found that that was a mistake that was made.

**Q. Okay. So let's get to the bottom of this, because now you're right where I -- where I think we need to be. The fact of the matter is even though you are now maintaining and your lawyers are maintaining that the Engels weren't entitled to have antidilution during that period for anything unrelated to the capital raise, your own bookkeeper made an adjustment to increase their stock ownership to adjust for the 4Engs stock grant; isn't that true?**

A. I would have to go back and look, honestly. I don't recall that specifically.

**Q. Well, let's go back.**

MR. LEGON: This hasn't been marked as an exhibit, but I would suggest we mark it for identification, at least, as Exhibit 57, sir.

JUDGE WHITE: 27?

MR. LEGON: 57. Actually, before I get there, and I'm going to share this. I just want to set

something up so this exhibit makes a little bit more sense to everybody.

JUDGE WHITE: Do you have a copy of it?

MR. SCHAEFFER: No. Is this a rebuttal exhibit?

MR. LEGON: It would refresh his recollection. He just said I'd have to review my records, and I'm going to let him review his records.

Here you are, Your Honor.

MR. SCHAEFFER: I'm not sure this is in the scope of what the direct was if we're talking about the financial audits. It changes --

MR. LEGON: It's within the scope.

JUDGE WHITE: He testified to it, and I'm assuming that this is rebuttal to get him the answer to the question.

MR. SCHAEFFER: I mean, the line of questioning, if he's asking about what happened with respect to audits and changes to -- I just -- I'm not --

JUDGE WHITE: He testified that there were changes made by a successor auditor, so that's out. And he'd get a chance to ask him about that.

MR. SCHAEFFER: Okay.

JUDGE WHITE: That's his testimony.

**Q. (By Mr. Legon) Sir, I would like to direct your attention first to Exhibit 51, sir, which is the Fifth Amended Restated Operating Agreement. Do you have that before you, sir?**

A. Yes.

**Q. And this is the document that you testified memorialized the issuance of the shares of stock to both Unha and Kenny pursuant to the terms of the Settlement Agreement; is that correct?**

A. Correct.

**Q. All right. And if we turn to Exhibit A, which is the very last page of the exhibit, we can see there's a cap table there; correct?**

A. Yes.

**Q. And towards the bottom, you can see that for Mark Kenneth Engels it shows the number of units that he owns is 7,000 shares, with a percent of interest of 3.5 percent; correct?**

A. Correct.

**Q. And that was pursuant to the settlement?**

A. Correct.

**Q. Same thing for Unha Engels; isn't that true?**

A. Correct.

**Q. Okay. And according to your theory of the case that you can dilute them down, that amount of**



35f7b069-9178-4a46-ab94-933a23c79a83

**number of units should never increase; correct? It should remain 7,000 or something less in the event of a stock grant; correct?**

A. Correct.

**Q. All right. Now, Exhibit 57 is a series of emails, the first of which on the first page was sent to you from Steve Kirchof on March 2nd, 2021. Do you see that, sir?**

A. Say that again.

**Q. Yeah. Exhibit 57, which we've marked --**

A. Okay.

**Q. -- if you take a look at the first page on top, there's an email from Steve Kirchof to you dated March 2nd, 2021; is that correct, sir?**

A. That is correct.

**Q. And did you receive this email?**

A. I'm sure I did.

**Q. Okay. And if we dig deeper into the email, the third page, you can see there's an email from a Richard Propper, who also received a stock grant, to Steve Kirchof dated February 28th; do you see that?**

A. Yes.

**Q. And the second paragraph reads, One macro question that I have is the corporate structure itself. It is an LLC, an unwieldy instrument if the goal is to**

**go public. In addition, below is what I received from Judy Rumpler re: the present cap table.**

**Did I read that correctly, sir?**

A. Yes.

**Q. Okay. And if you go down to this cap table, you can see at the bottom that Mark Kenneth Engels has now 7,037.92 shares of stock; isn't that true?**

A. Yes.

**Q. And that's because, if you look on the next page, there was a capital raise -- a stock grant to 4Engs Consulting LLC; correct?**

A. Yes.

**Q. So your bookkeeper, recognizing that -- and she was certainly aware of the terms of the Settlement Agreement; isn't that true, sir?**

A. Yes, she was.

**Q. So she made an adjustment to rectify that to ensure that the Engels were not diluted by the 4Engs Consulting LLC stock grant; isn't that true?**

A. Yes.

**Q. So your own internal books and records confirm our position in this case that you can't dilute the Engels down during that six-month period; isn't that true, sir?**

A. No.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. You're saying that this didn't happen?**

A. No. What I'm saying is that Judy Rumpler is not qualified to manage a cap table, and that's one of the many reasons she's no longer with the company.

**Q. Okay. But, meanwhile, at this point in time, she did that; is that correct?**

A. Well, she proposed it.

**Q. Okay. And here's your --**

A. I wouldn't say she did it, because it didn't -- wasn't reflected in further documents. She proposed it; correct?

**Q. Okay. Well, this top email is to you, sir. Do you say anywhere in -- do you respond to Mr. Kirchof anywhere and say, Gee, Judy is a moron, she doesn't know what she's doing and that cap table is all wrong?**

A. Let me ask you a question.

**Q. No, you're not asking me a question. You need to answer mine.**

A. The answer is -- ask your question again. I want to make sure --

**Q. Yeah, sure. Did you respond to Mr. Kirchof and say forget about that cap table, Judy's stupid, she doesn't know what she's doing and that she's wrong, the Engels can be diluted at a whim?**

A. I clearly did not do that in writing on these

emails.

**Q. All right. Thank you.**

**I want to talk very briefly -- I don't want to beat this dead horse -- about the Asset Purchase Agreement, which would be in the first binder, Exhibit 15. I apologize for jumping around in these binders.**

JUDGE WHITE: No problem.

MR. LEGON: I think I should have gotten smaller binders and had more of them.

THE WITNESS: You said 15?

MR. LEGON: Yes, sir, 15.

**Q. (By Mr. Legon) All right. Now, I'd like to direct your attention, this is the Asset Purchase Agreement. Your attorney asked you some questions about the representation contained in here that you wouldn't -- that D2 would not require financing to acquire D2; do you recall that, sir?**

A. Yes.

**Q. Okay. I'd like to turn your attention to CL 014, and in particular, Section 6.2.6. And it says that the buyer -- and this is your representation of warranty. When I say you, I mean your company, sir. It says that the buyer shall not require financing to pay the Purchase Price, which is capitalized; is that**

**correct?**

A. Correct.

**Q. And the Purchase Price is a defined term, and in fact, it's defined on Page CL 005 as being the whole 2 million-plus dollars, as well as everything else required as cash consideration under the terms of this purchase agreement; is that correct?**

A. Correct.

**Q. And ultimately, when the time came for you to make your initial payment after the closing, you were unable to do it; correct?**

A. The one year payment. Not the initial payment after closing.

**Q. I'm not talking about the initial payment. I'm talking about the purchase price. That's everything. That includes the 80,000, it includes every payment after that, sir. You didn't make the first payment, because you didn't have the money; correct?**

A. That's incorrect. I made the first payment. It was the subsequent payment at one year. I want to be clear on that.

**Q. Okay. I'll use your words; okay? You made the payment at closing --**

A. Yes.



35f7b069-9178-4a46-ab94-933a23c79a83

**Q. -- but the first payment due after that you didn't make because D2 didn't have the money; correct?**

A. Correct.

**Q. Even though you represented and warranted in this Asset Purchase Agreement that the buyer didn't require any financing to pay the purchase price?**

A. Correct.

**Q. Okay. That obviously wasn't true when this document was signed; correct?**

A. That may have been true the day we signed that, but subsequently a year later things can change.

**Q. Okay. Let's take a look at Exhibit 11, if we could, please, sir. Now, if I understand correctly you and your counsel's position in this case, it's that the only antidilution that exists under Section 10.a. of the Settlement Agreement relates to distributions for -- strike that -- to stock grants for the capital raise with Revere; correct?**

A. Correct.

**Q. Now, if we take a look at the last page of Exhibit 11, the spreadsheets attached to it, your counsel walked you through all of these transactions and asked you what they were all for; is that correct?**

A. Correct.

**Q. And you testified that the grants that were**

**given to Dever and Liberman were related to the work that they did on the Revere financing; is that correct?**

A. In addition to negotiating the APA.

**Q. Okay. So you were diluting my clients down during the protective period by granting stock to Dever and Liberman for doing work related to the capital raise; correct?**

A. And work related to the APA agreement.

**Q. Right, but it was particular to the capital raise. I mean, you're telling me here and you're telling the judge, the arbitrator, and you're saying, listen, we can dilute them down if we want to for anything but the capital raise. And here you're specifically, by your own admission, diluting them down, at least partially, for work that was related to the capital raise; isn't that true? Yes or no?**

A. I would say I was diluting them down based on consulting advisement.

**Q. Related to financing; correct?**

A. Relating to a variety of things.

**Q. What percentage was related to the Revere deal as opposed to whatever else it is you think it was for?**

A. Good question.

**Q. You didn't bother to figure that out, though;**



35f7b069-9178-4a46-ab94-933a23c79a83

**correct? You didn't?**

A. No.

**Q. Right. And you still diluted my clients down on the cap tables; isn't that true?**

A. We did.

**Q. Sir, I'd like you to take a look at -- back to Exhibit -- it was Exhibit 4 in my binder. Let's use Exhibit 4, because that's the binder we're in and it will be easier for all of us to get there, which is another version of the Settlement Agreement that's been marked twice. I want you to go to 10.a., which is CL 58 of Exhibit 4. And your attorney asked you some questions about the last sentence of Section 10.a., which begins with, "For the avoidance of doubt." Do you remember those questions, sir?**

A. Yes.

**Q. And specifically 10.a. reads, For the avoidance of doubt, the antidilution set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one half percent (3.5 percent) of the outstanding units of D2 during the period of the Initial Capital Raise."**

**And responding to your attorney's questions, you specifically said that you viewed that as a simple clarification; correct?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. Correct.

**Q. Do you still believe that this is a simple clarification of what the deal was with regard to the antidilution?**

A. Yes.

**Q. All right. And in this simple clarification of what the antidilution provision provides, it specifically says that the Engels shall each be entitled to 3.5 percent of the outstanding units of D2 during the period of the Initial Capital Raise; correct?**

A. Correct.

**Q. Thank you.**

**Now, sir, you testified in response to questions from your client that you were engaged in various efforts at raising capital; is that correct?**

A. Correct.

**Q. And ultimately there's two potential financing issues we're talking about here; one was Revere and the other is Viewside; correct?**

A. Correct.

**Q. And it was Viewside that ultimately kicked in the $8 million outside the protected period; correct?**

A. Correct.

**Q. I'd like to direct your attention to**

**Exhibit 31, if we can. All right. Exhibit 31, the first page of which is an email from you to John Wagner, and it attaches what's called the D2 VCP Terms Sheet. Do you see that?**

A. Yes.

**Q. Okay. Are you familiar with the VCP Terms Sheet?**

A. Yes.

**Q. All right. I'd like you to take a look at the terms sheet which is on Page 8862 of this exhibit in the lower right-hand corner, it's been Bates stamped. Is this the Viewside Capital term sheet; sir?**

MR. SCHAEFFER: Judge, we'd just interpose our objection again to the extent he's using this document to try to establish valuation in the company --

COURT REPORTER: Trying to establish valuation what?

MR. SCHAEFFER: Expert opinion as to the valuation of the company. As you already ruled last week, that has been stricken in this case.

MR. LEGON: Judge, when you ruled --

JUDGE WHITE: What is your line -- where are you going with this?

MR. LEGON: That in this document, both



35f7b069-9178-4a46-ab94-933a23c79a83

Viewside and D2 value the company as being worth $40 million, at a minimum, pre-valuation effort. Now, you ruled that Mr. Engles couldn't testify because he wasn't disclosed as an expert, even though I'm just asking him to testify to fact witnesses. You sustained their objections this morning. So I'm going to ask this gentleman right here, whose company it was, what the value of his company was, as contained in this document that he is familiar with.

JUDGE WHITE: So you're trying to get the valuation out of an adverse witness --

MR. LEGON: Correct.

JUDGE WHITE: -- that that's evidence of what it was worth?

MR. LEGON: Correct. It's an admission against interest.

JUDGE WHITE: Sustained.

MR. SCHAEFFER: Thank you.

**Q. (By Mr. Legon) Sir, I'd like to address your attention to Exhibit 52, which is in the second binder. Sir, have you seen Exhibit 52 before?**

A. Yes.

**Q. And this is a document entitled the Sixth Amended and Restated Operating Agreement of D2 Pharma Consulting, sir. What was the purpose of the Sixth**



35f7b069-9178-4a46-ab94-933a23c79a83

**Amended and Restated Operating Agreement?**

A. As I recall, it was to incorporate the ownership of Viewside Capital Partners as part of the organization.

**Q. Okay. And, sir, when this was executed, did you ask either Kenny Engels or Unha Engels to sign a joinder in this agreement?**

A. No.

**Q. Isn't it a fact that all of the Fourth and Fifth Amended Restated Operating Agreements prior to this you actually asked for and received joinder agreements from Kenny and Unha Engels?**

A. I'll take your word for it. I don't recall specifically, but if you say so, I'll take your word for it.

**Q. But in this case you chose not to ask for their joinder; isn't that true, sir?**

A. Correct.

**Q. When this document was signed, you didn't provide them with a copy of it; did you, sir?**

A. No.

**Q. You concealed it from them; didn't you?**

A. I didn't have an obligation to present.

**Q. Well, just -- you didn't have an obligation. They're shareholders in your company. You bought their**



35f7b069-9178-4a46-ab94-933a23c79a83

**company. Unha was an employee. Why do you think that you didn't have --**

COURT REPORTER: Counsel, you are going to have to slow down. I can't keep up with you.

**Q. (By Mr. Legon) Why do you think you didn't have an obligation to give it to them under those circumstances?**

A. Because there's no -- I don't know how to put this -- there's no obligation as the majority shareholders for any minority. So I also did not notify Grant Schoffelen, Kirby Eng, or any of the other minority shareholders.

**Q. Then why did you bother to seek and obtain joinder agreements from Kenny and Unha Engels to the prior ones?**

A. I would have to go back and speak to counsel as to why we were using that exercise. I don't recall off the top of my head.

**Q. Well, you'd certainly agree with me it's a little bit inconsistent for the fourth and fifth amended restated operating agreements you wanted the consent of Kenny and Unha Engels, and then magically the sixth one pops up that's detrimental to them and you don't bother to ask them for that; correct?**

A. Correct.

MR. LEGON: All right. I have no further questions, Judge.

JUDGE WHITE: Redirect?

MR. SCHAEFFER: Thank you, Judge.

REDIRECT EXAMINATION

BY MR. SCHAEFFER:

**Q. Just picking up on Exhibit 52, just directing -- I think you testified to this, but just directing your attention to Page 50, on the signature pages, are there --**

A. Yes.

**Q. Were there signature pages required for the other minority shareholders, like Irfan Baig and Grant Schoffelen and Kirby Engs and Jim Dever and Jim Liberman?**

A. There were not.

**Q. Are you treating the Engels differently than the other minority unit holders in this sixth amended operating agreement?**

A. We are not.

**Q. I wanted to talk a little bit about this Exhibit 57. This is an email from Richard Propper to Steven Kirchof. Counsel talked to you about -- first of all, we went through and I think you testified about all the cap tables adopted by the company that were --**



35f7b069-9178-4a46-ab94-933a23c79a83

**appeared in one of the exhibits we looked at earlier; right?**

A. Yes.

**Q. This listing in Mr. Proper's email of the -- just for the record, that was Joint Exhibit 55 with the cap tables.**

JUDGE WHITE: Okay.

**Q. (By Mr. Schaeffer) This statement by Richard Propper to Steven Kirchof, was that ever included, this breakdown of units, was that ever included in an official D2 cap table?**

A. It was not.

**Q. You had a comment Counsel didn't let you finish that you wanted to say about this and about Judy Rumpler; what was that?**

A. Well, she had -- we had numerous errors with Judy, so we ended up hiring a formal CFO, which, Kenny represented her as the CFO. She was not. She was our VP of Finance. But for sake of clarification, she was never a CFO. And we replaced her with a person subsequently who could act as a CFO, a real CFO.

And as a part of that, we ended up going to another third-party auditor, who came back and corrected some issues we had based on Judy's bookkeeping activities.

**Q. And to be clear, D2's issues with Judy, did they extend beyond just the cap table?**

A. Absolutely.

**Q. Okay. I wanted to then redirect your attention back to our favorite document, Exhibit --**

MR. LEGON: Settlement Agreement?

MR. SCHAEFFER: Yeah.

MR. LEGON: 4.

**Q. (By Mr. Schaeffer) Let's go to 4, 10.a. again, the real heart of the case. Counsel asked you some questions that were pretty animated, and I want to make sure we understood what he was getting at.**

**So back to 10.a., there's two types of questions that were asked in a somewhat accusatory way; one related to Jim Dever and Jim Liberman, who were consulting, and you said they were consulting relating to Revere and other things; right?**

A. Correct.

**Q. The language matters, so let's read it. Shall not -- I'm in 10.a., which is CL 58. Okay. So that sentence, "Shall not be diluted by all or any portion of up to the $8 million capital raise."**

**Did I read that right?**

A. Yes.

**Q. And how many dollars of that $8 million**

**contemplated capital raise did D2 obtain?**
A. All 8 million.
**Q. Well, I'm talking about the contemplated -- the Revere raise.**
A. Oh. The one from Revere? Zero.
**Q. So the contemplated capital raise -- and even if we were thinking of Viewside, it was also outside of the six months, so the clarification in 10.a. resolves that; right?**
A. Yes.
**Q. But just to be crystal clear, did Jim Liberman or Jim Dever contribute a penny of this up to $8 million capital raise as the plain language states in 10.a.?**
A. They did not.
**Q. Okay. The other matter that Counsel accused you of was creating a situation where you could rob Mr. Engels of the value of this by just structuring the issuance of units to occur after the six months; do you remember that?**
A. Yes.
**Q. All right. And what I wanted to do is make sure everyone in the room understands the point being made here. It's the same sentence I just read. It is that any portion of up to the $8 million currently --**



35f7b069-9178-4a46-ab94-933a23c79a83

**capital raise currently contemplated by D2, and then that's defined as Initial Capital Raise; right? Do you see that?**

A. Yes.

**Q. So we're talking about whether the $8 million capital raise is initial -- is defined as Initial Capital Raise, all right. Then it goes on, "Provided, however, that in no event shall the Initial Capital Raise" -- again, just defined as the $8 million -- for purposes of this undertaking extend for a period longer than six months."**

**So when we were talking about this, the distinction I want to be clear about is, is it possible that D2 could raise $8 million from Revere, and the $8 million come in within six months, and that D2 would issue units after the six months for that $8 million?**

A. No. And I would add, if I may, that even if you added them later, the fact that you had signed documents executing the Revere raise within that window would obligate the nondilution activities.

**Q. Right. And the distinction I'm making, just to be clear, is the $8 million can arrive on one day, or the document guaranteeing the $8 million can happen on one day, and the issuance of units could happen after that time?**



35f7b069-9178-4a46-ab94-933a23c79a83

A. Correct.

**Q. And so even if the issuance of units happened after that time, the Initial Capital Raise, as defined by this section, could still occur in the six months?**

A. Correct.

**Q. And there in that situation you were accused of where you could rob Mr. Engels of his antidilution by just structuring the units to be issued later, that really wouldn't deprive the Engels of their antidilution protection because the $8 million was committed in the six months?**

A. That is correct. That would be my understanding.

MR. SCHAEFFER: Thank you. That's all the questions I have.

JUDGE WHITE: Do you have another witness?

MR. SCHAEFFER: We do not. We will rest.

JUDGE WHITE: Well, now we come to -- do you want a closing argument, Mr. Legon, or are you satisfied with your case as submitted?

MR. LEGON: I'm satisfied, but I would just like to make a few points, if I may, Your Honor, if that's acceptable to you and opposing counsel.



35f7b069-9178-4a46-ab94-933a23c79a83

JUDGE WHITE: Mr. Schaeffer?

MR. SCHAEFFER: No objection. I may just -- the lawyer in me is probably going to want to make a few points in return, so I just warn you now. But besides that, I'm ready to submit, but --

JUDGE WHITE: You can have it. That's fine. Go ahead.

MR. LEGON: Your Honor, thank you. And just so I'm clear, how much time do you want to give me, so I don't run afoul of it?

JUDGE WHITE: Ten minutes.

MR. LEGON: Very good, Judge. Kenny, start that clock.

All right, Judge, as we said in the beginning and as Mr. Schaeffer said in the beginning, and I think we're all in agreement that where the rubber meets the road in this case is Paragraph 10.a., and that's where your judicial liberty is going to have to work. You've heard a lot of evidence here today surrounding that paragraph, events that transpired after, which for the most part are undisputed. These grants happened, so you don't have to figure that out anymore. We all agree that these grants happened, when the time periods happened, et cetera.

But the most significant thing about 10.a.,

Your Honor, is -- and I'll read it one more time -- is that last sentence, because it couldn't be any clearer, and it's for the avoidance of a doubt. It's a simple clarification, and I agree with that, because this couldn't be any clearer. My clients were settling a dispute because these guys hadn't paid them previously. They wanted to be sure that they're -- whatever they bargained for they were going to get this time. They didn't want to have to wind up here where we are today.

Now, unfortunately, that's exactly where we are. And you want to talk about the recidivist contract breakers, our position is that's exactly what D2 is. And so they didn't comply with the first agreement. They had to sue them and enter into a settlement statement.

So my clients naturally wanted this to be bulletproof. They wanted to ensure that they were going to get the full value of what they bargained for. And so if they didn't, if this wasn't -- if this was dilutable, then they got value that these guys could issue stock tomorrow to officers, to directors, to board members, and turn that 3.5 percent to having almost no value whatsoever, which I respectfully submit they've already done.

But at the end of the day, it says Kenny and

Unha shall each own three and one half percent of the outstanding units of D2 during the period of the Initial Capital Raise. Judge, that could not be any clearer; okay? I don't think that's ambiguous. I don't think there's any ambiguity related to it. I think a third grader could read that and understand exactly what it meant, and I think, Your Honor, that's exactly the finding that you have to make here, that during that initial period, the protected period, their 3.5 percent can't be diluted.

And the best evidence of that, don't take my word for it. Take Judy Rumpler's word for it in Exhibit 57; okay? It's very convenient for them to come in now and say, oh, she was a horrible person, she didn't know what they were doing. But here it is right here in black and white, Judge, in writing from them where they increased my client's shares to ensure that they weren't diluted because of a stock grant that occurred during that protected period; okay?

JUDGE WHITE: Mr. Schaeffer.

MR. SCHAEFFER: We're continuing to agree; it is a simple contract breach, we're simply looking at the plain language, and we're simply trying to figure out what this clarification was about. And we also don't agree on what the word clarification



35f7b069-9178-4a46-ab94-933a23c79a83

apparently means, because they think clarification means a vast expansion of rights that doesn't appear in the sentence it is clarifying. That's not how the plain language works. When you say, "for avoidance of doubt," that phrase has meaning. That is not, by the way, what we just said, ignore that, here's a new, widely expansive definition of the rights that you're going to get.

And what I think is also misguided is this idea -- you see this nomenclature start to appear of the protected period. Those words don't appear in the agreement. It talks about an up to six-month time for Initial Capital Raise, which is the singular and only time the Settlement Agreement refers to any event that can trigger antidilution.

What they're trying to read this as is a sentence that precedes the first two and says you get antidilution for everything, but here are some carve-outs. That sweeping absolute antidilution protection, not in there. It starts off with you get antidilution protection for this singular issue, and during the period of the Initial Capital Raise, not of six months, of a time period that is fluid, dependent on the Initial Capital Raise when it could happen, day one, day three. It is qualified by, again, the event



35f7b069-9178-4a46-ab94-933a23c79a83

that can cause the dilution.

And then it says -- but the clarification is, by the way, in case you're curious what's going to happen after that time period, whether it's day one, day 30, day six month, what's going to happen after that? You get treated like everyone else.

And I think what also just -- again, the heart of this case is what's the parties' intent? All those contractual principles, they all circle back to that piece. It's not about isolating five words and trying to extrapolate meaning out of it that just isn't there. It's about what did the parties really intend, and Mr. Engels --

JUDGE WHITE: As expressed in the agreement.

MR. SCHAEFFER: I agree, as expressed in the agreement.

JUDGE WHITE: So they can have all this intent circle around before they sign that document, but at that point, it's the agreement.

MR. SCHAEFFER: I 100 percent agree.

JUDGE WHITE: Okay. Keep going.

MR. SCHAEFFER: And what I'm saying is you have to look at that intent through the context of the entirety of the agreement, and Mr. Engels testified



35f7b069-9178-4a46-ab94-933a23c79a83

to that. We're all in agreement there's clarifying, there's context, that you have to look at everything. You can't just zoom in on six words and try to say that is the -- you can ignore and contradict the balance of the words used on the page. That's not what the law requires or allows in this case.

So on that basis, we, you know, respectfully believe the plain language in this agreement is clear about that single purpose of the agreement. I think that, again, this extrapolation that there are rights, even they -- they're not arguing that there's a single word affirmatively granting a right beyond this period. They can't. But that's integral to their argument, which is why it fails.

So we believe that the plain language is clear. We believe that the integration clause that says, by the way, the entire understanding includes the documents referred herein, which is the LOI, which Mr. Engels admits is not inconsistent with this document and only provided antidilution protection to the $8 million. He said that, under oath, today.

And that document, per the agreement of the parties, sophisticated parties, sophisticated agreement, we're not going to wall ourselves off to these pages. We're also going to include that LOI.

That's not parol evidence. It's not even contradictory per their admission. That is all crystal clear of what the parties intended, and that's why everything that happened in this case did, and that's why we're asking for an award in our favor.

So we thank you for your time.

JUDGE WHITE: All right. The case will be submitted. How long will it take for you to get a copy of this transcribed?

(Off-the-record discussion.)

JUDGE WHITE: Ten business days. Let's see where that puts us. 23rd or 24th of February? Counsel, what do you think?

MR. LEGON: Tyler, how long do you think you need to do your closing? We'll submit them simultaneously; is that the way you'd like it, Judge.

JUDGE WHITE: Right. You're going to get them simultaneously, but I want to get the testimony transcribed and get it to you and then the clock starts running for you. So she says ten days, and I put that at February 23rd.

MR. SCHAEFFER: Would March 6th, the Friday the following week be? That would work for us.

JUDGE WHITE: How much time would you need after you get the transcript to submit your

post-hearing briefs?

MR. LEGON: Bill, what do you think, can we get it done by the 6th? That's my partner on the Zoom.

MR. RHODES: Yes. Not a problem.

MR. LEGON: We're good with the 6th.

JUDGE WHITE: Mr. Schaeffer?

MR. SCHAEFFER: 6th works.

JUDGE WHITE: 6th of March.

MR. SCHAEFFER: Yep.

JUDGE WHITE: So those are the dates we will work with.

MR. SCHAEFFER: I think you said at our prehearing it's a 20-page maximum?

JUDGE WHITE: 20-page limit.

MR. SCHAEFFER: Which should not be an issue.

JUDGE WHITE: Not small font, either.

MR. ERHARDT: Do you want to specify 14pt?

MR. LEGON: Your Honor, I just want to make sure 57 is a part of the record.

JUDGE WHITE: It's in.

MR. LEGON: Thank you, Judge.

JUDGE WHITE: Well, they do try to make

it smaller to get more in, so.

MR. SCHAEFFER: We wouldn't do that to you, Judge.

JUDGE WHITE: I just thought I'd share.

MR. SCHAEFFER: And just something for a housekeeping, it was in your prehearing -- or in the order from -- order number 6 from back in August, but that the issue of attorneys' fees would be addressed post-award?

JUDGE WHITE: Post-award. You gotta win first before you get attorneys' fees, so there's no need to address it at this point.

MR. SCHAEFFER: Great. Thank you.

MR. LEGON: Very good, Your Honor.

(Proceedings concluded at 1:42 p.m.)



35f7b069-9178-4a46-ab94-933a23c79a83

C E R T I F I C A T E

I, Carrie Easton Logback, a Certified Court Reporter, do hereby certify:

That said proceedings were taken down by me in shorthand at the time and place hereinbefore stated and thereafter reduced to writing by me;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

The original transcript is in the custody of:

Honorable Judge Ronnie White
Arbitrator
JAMS
190 Carondelet Plaza, Suite 1450
St. Louis, Missouri 63105

WITNESS my hand and seal this 23rd day of February, 2026.



Carrie Easton Logback, RPR, CRR, CRC
KS CCR #1430, MO CCR #899

**A**
**a.m** 1:22 5:1
**abide** 31:1
**ability** 15:10 23:11 30:19 91:21 104:16 127:8 136:19
**able** 20:13 34:21 42:24 64:18 103:3 104:11 109:5,8,19 110:13 121:1 141:3
**absolute** 176:19
**Absolutely** 36:12 72:7,8 88:9 169:3
**accept** 8:7 148:23
**acceptable** 172:25
**accepted** 97:16
**account** 151:3
**accountants** 63:5
**accounting** 150:22
**accurate** 133:5
**accusatory** 169:14
**accused** 170:16 172:6
**acknowledge** 9:17 134:25
**acknowledged** 48:21 75:19 95:18
**acknowledges** 59:5
**acknowledgment** 58:16
**acquire** 24:7,9 157:18
**acquired** 105:11
**acquiring** 102:5,10
**acquisition** 22:25 24:7 126:1,16 138:9
**act** 168:21
**acting** 106:11 128:21
**action** 182:10
**active** 105:15
**actively** 102:19
**activities** 102:17 121:15 138:22 168:25 171:20
**activity** 119:8 145:11
**acts** 15:23
**actual** 35:1,6,16 60:23 71:2 92:24 118:12 130:25 141:11
**add** 59:8 171:17
**added** 5:11 42:21 171:18
**addition** 58:20 155:1 160:3
**additional** 46:23 67:20,24 109:24 115:11 116:14 119:7 144:9,13,15 145:5,11,11
**address** 40:19 50:3 63:25 71:13 93:20 164:19 181:12
**addressed** 11:1 40:6 181:8
**addresses** 7:13
**adjust** 151:15
**adjustment** 151:14 155:17
**administrative** 81:11
**admission** 63:10,18 63:24,25 64:1,20 160:14 164:15 179:2
**admit** 72:4 125:12 126:8 127:14 128:10 142:1
**admits** 178:19
**admitted** 126:22 127:18 128:13 142:3
**adopted** 167:25
**advance** 86:11
**advancing** 12:8
**advantageous** 127:25
**adverse** 164:11
**advice** 46:3 79:9 80:17
**advise** 103:5 140:19 140:23
**advised** 79:11
**advisement** 160:18
**advising** 79:12 109:12 140:13
**advisor** 124:19 128:21
**advisors** 106:3 109:11 124:15
**advisory** 4:13 106:14 125:8
**affirmatively** 14:15 178:12
**afoul** 173:10
**agency** 19:19
**ago** 5:6 23:13 77:15 77:24 134:1
**agree** 9:18 68:16,20 68:22,25 69:3 74:3 86:18 87:11,15,20 89:15 105:16 113:25 134:25 141:15 148:14 149:18,19 166:19 173:23 174:4 175:22,25 177:16 177:21
**agreed** 70:2 76:11 81:8 97:18,18 122:1 126:5,16 127:4 148:7 149:23
**agreement** 3:16,20 3:24 4:3,6,8,10,11 4:13,14,15,16,18 7:13 8:21 15:6 24:3 24:7 25:14,17,24 27:14 28:2,4 31:9 31:18 32:15,18 33:1,6,7,18 34:6,11 34:12,13 38:19,23 40:1 41:16,21 43:17,19,25 44:20 46:16 47:2,13 48:13 49:8,12 50:9 50:14 51:7,10,25 53:8 55:16 59:12 60:2 61:6,9,14 65:24 66:4,22 67:1 67:6,7 68:9,10 69:6 69:13,22,24 70:16 71:2,12,20,24 72:14,18,23 73:2 73:15,18,19,19 74:4,16,25 75:18 75:24 76:1,4,15,21 77:1,4,8 78:14 79:5 80:13 81:7,11 85:7 85:10 86:6,12,19 87:22 88:17 89:14 89:19 90:4,6,8,12 90:22,24 91:4,6,7,8 91:22 92:21,24 93:16 96:3 97:5 99:6 102:5 103:15 104:6 105:19,22,25 106:17,24 107:13 113:2,11,18 114:13 117:14,25 118:3,12 118:15 119:21 120:4 121:16,18,24 122:6,6,8,9,11,23 123:1 124:16 125:9 126:4,9,20 127:9 127:14 128:10 129:8,18 131:5,7 134:19 135:7,11 136:7 137:23 138:2 138:18 139:5 144:19 153:3,9 155:15 157:5,15 158:7 159:5,16 160:8 161:10 164:24 165:1,7 167:19 169:6 173:16 174:14 176:12,14 177:15 177:17,20,25 178:1 178:8,9,22,24
**agreements** 4:20 60:12 71:14 141:23 165:10,12 166:14 166:21
**ahead** 5:3 6:23 11:22 21:11 38:3 142:5 173:7
**al** 109:2
**alleged** 15:23
**allegedly** 22:5
**allow** 46:10 48:2
**allowed** 37:7 45:8 63:12
**allows** 178:6
**alters** 6:5
**amazing** 49:14
**ambiguity** 46:4 79:2 80:18 96:25 98:12 175:5
**ambiguous** 8:2,8,11 8:12 68:20,22 175:4
**amended** 4:16,17 5:6 43:16 53:9 68:10 75:18 85:11 90:23 91:7 122:23 123:1 153:3 164:24 165:1 165:10 166:21 167:18
**amending** 105:18
**amendment** 43:25
**Amherst** 17:18,19
**amount** 13:18 34:21 34:24 85:21 108:25 153:25
**analysis** 63:10
**and/or** 19:8 138:22
**animated** 169:11
**anniversary** 25:5 29:10,12
**announced** 28:11 54:4
**announcement** 30:4
**annual** 104:8
**answer** 6:7 9:16 22:23 30:12,18 31:4 38:1,10 60:25 77:19 80:4,8 83:23 83:25 95:23 112:23 152:16 156:18,19
**answered** 61:22 78:17
**answering** 73:15
**anti-dilution** 10:19
**anticipate** 120:25
**anticipated** 105:2
**anticipating** 121:1 125:1 133:3
**antidilution** 7:14 9:24 12:9,11,15,19 12:20,23 13:3,6,7 13:23 14:16,19,22 15:14 40:25 42:9 42:14,15 46:5,8 66:3 68:17 69:1 71:18,19 76:21 77:2,9 78:15 79:4 80:14 81:3 85:2,9 92:8,25 93:24 96:4 98:1,7 111:19,24 111:25 112:5,7,12 112:16 113:5,10,22 114:3,25 115:15 118:16 119:2,8,17 121:4,8,15,20 122:1,5,19 129:4,7 136:25 137:15 147:16 148:2,4,15 150:3 151:12 159:15 161:18 162:4,7 172:7,10 176:15,18,19,21 178:20
**anybody** 42:25 95:3
**anymore** 62:8 173:22
**APA** 86:11 87:4,6,7,8 87:11,21 88:18 89:18 92:15 104:8

104:12,15,17,18 138:7 139:2 160:3 160:8
**apologize** 37:24 74:19 157:6
**apology** 48:14
**apparently** 176:1
**appear** 123:21 176:2 176:10,11
**APPEARANCES** 2:1
**appeared** 71:19 168:1
**appears** 131:10
**appended** 90:21 91:7
**apples** 89:12,12
**applicable** 67:23
**applications** 19:2
**applies** 148:16,17
**appreciate** 38:4,6
**approached** 102:15 105:20
**appropriate** 113:19 133:2
**approved** 57:12
**approximately** 51:24 128:22
**apps** 19:19,20
**arbitrary** 120:22
**arbitration** 1:1 8:16 24:2 61:14 123:16
**arbitrator** 2:2 4:22 28:6 29:9 30:16,25 35:20 38:5 45:5 52:7,13 55:22 88:19 97:10 123:25 139:18 160:11 182:13
**arbitrator's** 63:3
**arguing** 178:11
**argument** 137:12 172:21 178:13
**arrangement** 68:13
**arrive** 171:22
**aside** 39:13
**asked** 45:19 60:24 61:1 77:20,21 80:25 90:5,20 95:21 96:1,23 98:24 99:1 116:16 157:15 159:23 161:12 165:11 169:10,14
**asking** 29:18,21 62:4 82:4 92:6 132:7 152:18 156:17 164:5 179:4
**aspect** 34:7 79:15 80:13
**assert** 107:11
**asserted** 5:13
**asserting** 25:20
**assess** 25:20
**asset** 3:20 24:3 27:13 28:1 32:18 34:11 34:14 86:6 102:5 104:6 105:18,24 106:17 157:4,14 159:5
**assets** 27:6
**assist** 103:20
**assisted** 72:5
**Associates** 51:21
**assuming** 108:7 126:10 152:15
**attached** 82:13 159:21
**attaches** 163:3
**attempting** 15:17
**attend** 17:19
**attention** 23:22 25:7 32:11 33:1 40:21 43:10 62:11 67:12 69:19 71:17 75:23 92:10 93:21 106:20 107:17 133:15 153:2 157:14,20 162:25 164:20 167:9 169:5
**attorney** 76:19 84:13 86:14 133:18 146:8 147:12 157:15 161:12 182:8,9
**attorney's** 161:23
**attorney-client** 46:2
**attorneys** 32:23 72:5 121:19 133:19
**attorneys'** 181:8,11
**attract** 110:10
**attractive** 103:23
**audit** 64:7,25 82:22 83:2 132:20,24
**audited** 151:5
**auditor** 59:20 64:23 133:1,1,2 151:5 152:22 168:23
**Auditor's** 3:22
**auditors** 59:23 64:8
**audits** 25:25 152:12 152:19
**August** 51:22 81:21 81:22 82:1 135:25 136:3,5 181:7
**August/September** 81:4
**authority** 26:3
**authorized** 142:20 145:23
**automatically** 112:17 137:18
**automation** 20:12
**available** 140:16
**Avenue** 2:8
**Aviation** 2:8
**avoidance** 10:18 40:23 42:7 58:2 93:8,24 97:24 98:14,17,19 118:25 161:14,18 174:3 176:4
**award** 4:12,20 42:8 68:3 125:7 141:23 179:5
**awarded** 68:3 116:14
**awards** 40:24 97:25
**aware** 5:5 42:19 99:3 103:6,7 120:12,16 130:7 155:14

**B**

**b** 3:14 36:5 40:24 42:9 98:1 139:25 145:20
**back** 5:7 13:24 14:8 31:7,7 34:19 37:24 42:4 45:23 47:13 59:11 65:12,17 71:3 75:24 90:3 93:15 97:4,5 100:6 100:11 107:18 110:25 111:1 114:24 117:21 123:18 133:10 134:7,10,14 137:3 138:13 140:12,24 141:17 147:6 151:17,19 161:6 166:16 168:23 169:5,13 177:9
181:7
**bad** 15:23
**baffled** 53:22
**Baig** 4:11 56:13,23 126:13,14,20 167:13
**balance** 25:5 53:2,3,5 178:4
**balances** 52:10
**bar** 17:23,24 18:1,2,4 18:7 28:8
**bargained** 174:8,18
**barriers** 20:6
**based** 8:16 20:1 29:15 36:17,17 63:2 67:4 68:4 139:2 160:17 168:24
**basically** 19:21 23:4 132:12
**basis** 107:12 114:15 131:24 178:7
**Bates** 33:2 163:11
**bear** 35:23 75:9
**beat** 157:4
**beginning** 1:22 41:19 52:10 53:2,4 93:22 105:12 173:14,15
**begins** 161:14
**behalf** 2:6,11 3:5,9 7:1,2 16:18 59:4 64:13 100:20 115:6
**belabor** 110:24
**Beldock** 18:18,20 19:17
**belief** 86:4
**believe** 5:5,16 7:9 8:2 10:3 12:1 34:3 55:10 58:25 61:21 76:25 77:7 95:6 106:9 133:1 138:12 142:6 149:4 162:2 178:8,15,16
**beneath** 56:11,12 139:25
**benefit** 147:22
**best** 30:18 31:4 113:13 175:11
**better** 20:2 59:14
**beyond** 14:13,14,16 15:14 68:18 77:2,9 78:15 96:4 122:19 137:15 169:2
178:12
**big** 19:19 48:10
**biggest** 40:13
**Bill** 180:2
**binder** 23:23,24 32:12 43:12 44:24 47:14 51:15 66:12 77:14 78:5 98:23 157:5 161:7,8 164:20
**binders** 157:7,10
**Bio** 101:17,17 124:2 144:21 145:3,6,12
**bit** 35:22 66:2 86:1 102:9 110:9 136:15 139:11 146:8 150:11,17 152:1 166:20 167:21
**black** 175:16
**blessing** 25:19
**block** 91:10
**blown** 59:10
**blue** 28:17
**board** 4:13,15 24:22 34:2 47:4 104:2,25 109:2,3,6 110:6,16 121:11 125:9 127:22 128:1,4,9 146:14 174:22
**bogus** 30:5
**boils** 7:11
**bonuses** 36:3,8,8
**bookkeeper** 150:19 151:14 155:13
**bookkeeping** 168:25
**books** 151:2 155:21
**bother** 160:25 166:13 166:24
**bottom** 82:19 93:23 115:16,20 119:15 145:20 151:8 153:15 155:6
**bought** 165:25
**bouncing** 47:15
**Branding** 19:18
**brands** 19:19
**breach** 12:2 36:18 175:22
**breached** 31:9 61:5,9
**breaches** 60:2
**break** 65:11,13 100:1 100:3 134:6,9 139:13

**breakdown** 168:10
**breakers** 174:12
**bridge** 131:4,13,14 131:21 147:22
**brief** 6:25 8:4,4 11:24 35:21
**briefly** 6:19 11:21 146:7 157:3
**briefs** 180:1
**bring** 57:1 104:23 105:5
**Brooklyn** 16:24,25 17:2
**brought** 8:1 27:20 31:21,24 56:24 86:21 105:11
**build** 19:4
**built** 19:19,19
**bulletproof** 174:17
**buried** 45:10
**business** 22:7 23:15 27:19 36:14 37:20 40:11 101:4,24 105:4 112:13 179:11
**businesses** 19:12
**buyer** 25:15 26:9 88:6 157:22,24 159:5
**buying** 27:25

**C**

**C** 2:12 139:25 145:20 182:1,1
**calendar** 41:11,25 67:21,24,25 68:1 97:20 104:20 137:14 147:20
**California** 20:19
**call** 6:17 15:25 16:2 45:18 51:4 54:7 63:14 122:17 141:20
**called** 16:18 18:23 19:18 28:17 57:24 100:20 108:5 132:10 163:3
**calling** 143:8
**calls** 100:14
**canons** 14:24
**cap** 3:19 4:19 35:9 44:10,12 54:23 57:18,23 82:16 83:8,13 84:2,17 107:24,24 108:2,6 108:9,16 110:18 123:8,19,20 130:11 131:8 133:10,11 140:13,15 142:8,10 142:11,13,16,22 143:4,8,16 145:18 146:5 153:13 155:2 155:5 156:3,15,22 161:4 167:25 168:6 168:11 169:2
**capacity** 73:6 75:13 91:12,13
**capital** 8:20,22,23 9:20 10:1,22,24 11:4,6,10,12 12:11 12:12,19,23,25 13:4,15,21,22,24 14:8,14,19,23 15:14 21:22 22:2 23:15 25:21 39:22 40:9,12,15 42:17 52:17 68:7,18 69:1 79:23 81:1 85:6 93:12 94:3,7,10,13 94:22,23 95:1,1,5 95:14,19 96:15,17 98:5 102:11,14,21 108:23 110:6,12 112:1 114:4 115:23 119:10 120:2,14,20 121:4,9 122:20 123:24 125:3 128:7 129:12,19 130:8,13 131:22 132:2 134:23 135:2,4,5 135:11,15,19 137:6 137:16,21,21,22,23 138:19,21 139:8 142:14 144:1 145:8 145:9 147:18 148:5 148:21 151:14 155:10 159:17 160:6,9,13,16 161:22 162:10,16 163:12 165:3 169:22 170:1,6,13 171:1,2,6,7,8 172:3 175:3 176:13,22,24
**capitalization** 143:7
**capitalized** 76:9,15 157:25
**capture** 105:4
**captured** 96:11
**captures** 92:19
**capturing** 105:3
**care** 20:13 59:21
**caregivers** 20:11
**Carmody** 2:13 32:24 48:20,20 58:9 59:4 59:13,23 64:6 71:23 84:9,15,21 85:20 93:4 95:17 98:16 106:6 115:12
**Carondelet** 1:17 2:4 182:14
**Carrie** 1:23 182:2,21
**carve-outs** 176:19
**case** 1:6 5:18 6:22 7:15 10:11 12:2 15:18,24 21:16,19 34:3 91:19 99:24 100:12 123:22 139:13 153:25 155:22 159:14 163:21 165:16 169:10 172:22 173:17 177:3,8 178:6 179:4,7
**cases** 103:12
**cash** 24:16,24,25 34:20,21 105:8 158:6
**categories** 108:18 110:5
**category** 143:19
**cause** 177:1
**caused** 6:1 104:21
**cautious** 14:24 120:8 121:2
**cc** 55:9
**cc'd** 114:17
**CCR** 1:23 182:21,22 182:22
**center** 16:5 96:18
**CEO** 101:11
**certain** 31:1 104:5 109:5 133:3 139:22 146:9,12
**certainly** 155:14 166:19
**Certified** 1:23 182:2
**certify** 182:3
**cetera** 104:3 173:24
**CFO** 48:21,25 55:10 168:17,18,20,21,21
**chance** 152:23
**change** 26:25 37:17 45:18,20 67:4 96:23,24 116:19 159:11
**changed** 34:10,16,22 34:25,25 35:10 92:22 93:3
**changes** 6:5 122:1 152:12,19,22
**changing** 118:5,9
**chase** 19:23
**chose** 129:16 165:16
**Christmas** 117:9
**circle** 177:9,19
**circumstances** 39:5 166:7
**CL** 33:2,22,24,25 47:16,17 51:19 52:3,22 53:14,17 59:4 74:13,22,22 75:9,19,24 76:17 85:4 87:25 90:24 91:11 93:18,18 97:6 157:21 158:4 161:12 169:20
**claim** 5:6,8,9,10,14 5:15 6:11 44:16 59:15 60:1
**Claimant** 99:22
**Claimants** 1:5 2:6 3:5 5:7,9 16:18
**claiming** 6:1
**claims** 5:13
**clarification** 5:12 119:4,5,9,11 161:25 162:3,6 168:19 170:8 174:4 175:24,25 176:1 177:2
**clarified** 72:10 77:5 96:24 97:1
**clarifies** 77:5
**clarify** 87:2 115:9 129:17
**clarifying** 176:3 178:1
**clarity** 119:20
**class** 4:20 39:21 96:20 139:14,14,18 139:19 140:3 141:24 143:18 144:8
**clause** 178:16
**clean** 94:17
**clear** 6:9,13 10:17 11:17 24:6 30:15 33:17 35:4 37:10 38:11 39:24 46:4 56:10 59:3,25 62:1 69:11 71:10 79:2 80:18 90:23 93:6 94:13 98:11 102:24 135:6 137:24 148:9 158:22 169:1 170:11 171:13,22 173:9 178:8,16 179:2
**clearer** 11:2 63:9 174:2,5 175:4
**clearly** 59:22 93:5,12 97:16 137:14 156:25
**clerical** 53:24 57:21
**client** 64:14 105:6 136:9,10 162:15
**client's** 63:9 175:17
**clients** 7:2,3 9:11 136:4 160:4 161:3 174:5,16
**clock** 34:19 173:13 179:20
**close** 11:13 15:19 27:6,18 39:7,10 54:22 108:7 121:1 121:2 134:22 138:17
**closed** 39:8,9 113:20 113:21,22 119:20 119:21,23 123:5 130:21 131:3 139:3 148:8,8
**closing** 9:18 11:24 13:17 25:15 27:9 27:14 28:1 45:8 69:24 130:25 135:1 137:5 138:20 158:10,13,24 172:21 179:15
**co-found** 101:20
**co-owner** 28:12,13 28:24 87:23 101:12
**coincide** 137:20 138:23
**collectively** 73:25

**College** 17:18
**column** 44:22 52:24 131:10 144:8 145:1 145:23
**columns** 52:20 144:9
**combined** 24:18
**come** 16:4 24:9,22 29:25 30:3 39:14 65:12 71:4 120:1 123:13 134:7,10 150:4 171:15 172:20 175:14
**come-again** 36:16
**comes** 10:10
**comfortable** 122:9
**coming** 24:19 29:6 29:18,20 30:4 48:19,20 100:6
**commenced** 5:1
**comment** 168:13
**committed** 135:11 172:11
**communicate** 20:11
**communicating** 20:2
**communication** 51:4
**communications** 121:24
**companies** 19:20,22 22:7,19 26:21 27:22 109:16
**company** 19:6,7,8,14 19:18 21:5,24 24:18 26:17 28:13 28:25 32:9 39:10 39:13,17 44:10 47:25 61:5,12 63:6 64:24,25 73:5,23 86:2 101:6 102:1 102:19 103:2,2,3 103:22 109:1,9,18 110:11 112:15 120:3,7 123:8 124:4 127:23 128:17 144:22 145:6 156:4 157:23 163:16,20 164:1,7 164:8 165:25 166:1 167:25
**compare** 135:14
**compensation** 121:13
**compete** 81:17
**complaining** 99:14
**complete** 82:23 117:8
**completed** 123:10 132:21,21
**completely** 12:25 89:15
**completing** 132:23
**complex** 20:11 31:3
**complicated** 12:15 45:12
**comply** 174:13
**component** 24:25 75:15
**comport** 118:14,21
**comprises** 143:4
**concealed** 165:22
**conceived** 24:19
**concept** 112:21 113:10
**concern** 46:9
**concerns** 60:10
**concluded** 181:15
**condition** 25:14
**confer** 76:2
**confirm** 68:12 155:22
**confused** 72:4
**conjunction** 64:9
**connection** 79:4
**connections** 22:12
**consent** 43:24,25 166:22
**consented** 44:2 57:15
**consequence** 5:25
**consequences** 11:10 13:4 94:22 119:10
**consideration** 8:14 24:17 25:13 34:20 34:22 36:1,6,15,19 36:24 88:4 158:6
**considerations** 37:3
**considered** 130:14
**considering** 46:23
**consistent** 44:19 53:7 105:12 110:8 134:2
**consistently** 11:8 94:21
**construct** 122:25
**construction** 14:25
**construed** 76:2
**consultant** 22:21
**consultants** 24:21 103:18,20 104:25 110:7,18 136:10 146:14
**consulting** 1:7 4:18 73:21 101:4,25 103:2 125:22,23 126:24 150:10 151:1 155:11,19 160:18 164:25 169:16,16
**cont'd** 4:1
**contact** 50:18 57:12
**contacted** 53:25 59:20
**contacts** 27:19,19
**contain** 68:17
**contained** 33:9 54:24 65:3 77:9 82:15 157:16 164:8
**contains** 33:8 73:14 77:1,8 78:15 96:3
**contemplated** 9:20 15:13 68:8,18 76:5 79:5 114:4 115:23 119:19,25 120:2,14 123:23 129:19 130:8 132:3 134:23 135:3,5,19 137:7 137:15 139:7 170:1 170:3,6 171:1
**contemporaneous** 138:19
**context** 35:23 112:19 177:24 178:2
**contingent** 36:15 37:6 40:20
**continually** 102:15
**continue** 28:3 37:25 134:7,15
**continued** 27:20 57:5
**continues** 60:11
**continuing** 175:21
**continuously** 41:10 67:23
**contract** 12:2,5 15:9 129:11 174:12 175:22
**contractor** 126:9,19
**contractual** 177:9
**contradict** 178:4
**contradiction** 15:1,3
**contradictory** 179:1
**contravene** 15:4
**contribute** 170:12
**control** 35:11 36:22 82:23
**controlled** 28:15 71:25
**controlling** 72:2
**controls** 12:3
**convenient** 175:13
**conversation** 15:11 82:3,10 113:14 114:2 122:13 147:11
**conversations** 81:2
**convert** 103:1
**Cool** 31:2
**copy** 71:25 152:3 165:20 179:9
**corner** 33:2 92:13 93:19 163:11
**corporate** 143:8,11 154:24
**corporation** 73:24
**correct** 9:2,3 12:1,7 24:8 35:17 40:2 41:7,8 44:20 46:16 53:8,18,19 55:11 57:9,10 59:7 64:6 66:5,9,22 68:19 69:2,6,13 70:3 72:15,24 74:1,5 75:4,20 76:9,11,21 77:3,10 78:17,23 79:10 80:19,20 81:4,5,8,9,13,15 83:3 84:3,10,19,23 85:16,17,24,25 86:12,16 87:5,17 88:21 90:14,25 91:8,19 92:8 93:1,2 98:11,14,17 99:9 99:10 108:19 113:7 113:8 114:18,19,23 124:12 132:17,18 135:17 136:8 138:1 139:9 144:6,20 147:18,19,24 148:3 148:16,21,22 149:3 149:8 150:24 153:9 153:10,13,18,19,21 153:23 154:1,3,4 154:14,15 155:11 156:6,11 158:1,2,7 158:8,11,19 159:2 159:3,7,9,18,19,23 159:24 160:2,7,19 161:1,25 162:1,11 162:12,16,17,20,21 162:23,24 164:12 164:15 165:18 166:24,25 169:18 172:1,5,12
**corrected** 168:24
**correctly** 68:14 69:25 74:2 76:6 79:7 82:24 88:8 92:16 95:13,22 120:23 140:8 155:3 159:13
**correspondence** 4:21 51:20
**correspondent** 58:11
**cost** 105:1
**counsel** 4:23 5:23 32:4 71:1 72:19 79:10 80:17 82:17 106:12,14 119:2 159:22 166:3,16 167:23 168:13 169:10 170:16 172:25 179:13 182:8,9
**counsel's** 159:14
**counter** 75:21
**counterpart** 74:15,25
**counterparts** 75:11
**couple** 28:9,19 32:6 103:18 107:18 109:8 115:18 116:5 128:20 136:17,19 140:5 143:13 144:18
**course** 29:21 136:5
**court** 5:22 16:12 24:14 80:6 163:17 166:3 182:2
**cover** 148:2
**covered** 102:8 124:10
**CPA** 64:8,17,20
**crafting** 79:10
**create** 14:25 109:16 120:7 129:25
**created** 103:25 130:4
**creating** 20:10 170:17
**critically** 48:1
**cross-examination** 3:7,11 65:11,20 147:3,4
**crossed** 20:6
**CRR** 1:23 182:21

**crystal** 170:11 179:2
**cure** 31:17
**Curegrail** 56:14,24 128:16,16,17
**curious** 177:3
**current** 142:25 143:6 146:5
**currently** 16:23 68:8 101:11 115:23 120:13 129:19 134:22 135:3,5 137:7 139:7 170:25 171:1
**custody** 182:11
**customer** 105:14,15
**customers** 19:5 22:14 22:15,16 23:17 105:12
**cutting** 19:23

**D**

**D** 3:1 4:20 139:14,14 139:18,19 140:3,10 141:24 142:17,18 142:19 145:19,21
**D2** 1:7,8 3:23,24 4:3 4:10,18 9:20 10:22 21:8,15,16,16,17 21:18,21 22:4,19 22:22,22,25 23:10 23:20 24:4,7,21,22 25:24 26:2 27:7 28:3,11,16 31:15 32:21,22 35:2 37:15 38:13,15 41:6 42:20 44:16 45:6 46:22 48:11 49:13 50:10,12 53:25 55:10 57:12 58:23 59:4,20 60:11 61:5 63:7 64:17,18 66:8 67:19,23 68:5,8,10 69:19 72:23 73:21 73:24 74:5,16 75:3 76:16 81:2,8,12,15 81:17 84:22 85:14 86:5 87:4 89:17,18 94:3 98:16 101:4,5 101:6,9,12,14,21 102:4,10,13,20,25 103:5,5,6,10,16,21 104:5,11,16,17,21 105:18 106:1,24 108:9,10,20 110:15 111:19 112:4,15,18 112:19,22,25 114:13 115:23 116:5,17 117:24 122:12,22 124:6,21 126:2,6,9,15,17 127:5,6,8 128:7,19 129:2 130:3 131:15 131:18,23 133:12 133:13 135:3,15,23 136:13,25 137:7,17 137:18 138:7,18 139:6,15 140:2,11 140:18,19 141:16 143:9,21 144:8,10 145:1,19 146:18,22 148:20 151:2 157:17,18 159:2 161:21 162:9 163:3 164:1,24 168:11 170:1 171:1,14,15 174:13 175:2
**D2's** 23:11 25:21 27:19 46:22 58:17 85:2 101:24 133:18 143:4 146:13 169:1
**D2_000115** 115:20
**D2_006299** 107:1
**D2_007299** 107:4
**D2_007300** 111:10
**D2_012383** 69:20
**D2_12385** 67:12
**D2_13** 118:21
**D2_7300** 111:1
**dad** 106:10,11
**Dale** 46:19
**damages** 6:1 15:23 90:16,18
**date** 13:17 60:20 68:8 70:11 73:20 80:23 83:1,15 85:22 87:8 108:11 111:17 135:24
**dated** 46:15 51:22 55:13 58:7 66:9,19 84:9 107:22 117:4 138:13 154:13,21
**dates** 180:11
**Dave** 39:20
**David** 2:13 108:13 124:8
**day** 13:25 21:4 29:19 82:9 115:8 117:17 138:9 159:10 171:22,24 174:25 176:24,25 177:4,5 177:5 182:17
**days** 11:15 32:1 179:11,20
**dead** 157:4
**deal** 22:4,11 24:4,15 24:19,25 25:20,21 25:23 26:3,4,16,22 27:2,6 28:11 29:12 29:15,25 32:5 33:19 34:8,24 36:2 36:3 37:2 39:9 46:13 50:21 79:15 79:20 86:23,24 92:20 113:20,21,21 113:23 119:22,24 121:5 130:21,25 137:24 138:3,18,20 138:24 148:8,8,25 149:7,9,14 150:1 160:22 162:3
**dealing** 37:16 97:7
**deals** 61:13
**Dean** 2:19 3:10 22:12 23:3,5,6,9 29:19 32:4,9 39:20 45:18 46:20,21,22 47:10 54:7,9,21 55:9,24 66:3 79:1 100:14 100:19,25
**December** 5:8 41:23 57:9 66:9,19 68:5 70:17 73:20 81:14 114:21 115:8 117:4 117:15 131:3 135:10,19 142:8,19 142:22 143:5 144:16 145:16
**decision** 117:23
**deck** 21:2
**decline** 57:5
**deem** 15:8
**deeper** 154:18
**defense** 59:11
**Defer** 99:25
**deferred** 141:7
**defined** 69:24 76:16 135:3 158:3,4 171:2,6,9 172:3
**definition** 75:16 129:18 176:7
**definitive** 69:22
**degree** 17:16
**Delaware** 31:20 73:23,24
**delay** 83:2 132:23,25
**demanded** 12:4
**demonstrates** 142:19
**dependent** 176:23
**depending** 62:24 137:22
**depends** 21:6 37:7 138:23
**deposing** 49:22
**deposition** 77:14,24 78:2,5 95:22
**deprive** 172:9
**describe** 18:21 19:11 24:13 27:16 28:6 35:19 52:7 66:14 101:24 106:13,21 113:14
**described** 37:11 85:7 114:5 122:20 129:2 148:24
**design** 19:3,6
**designer** 19:3 20:18
**destiny** 28:16
**determine** 31:8
**detrimental** 166:23
**develop** 26:17
**development** 21:24
**Dever** 56:13 103:19 106:3 109:11 120:17 124:14,14 124:15,21 125:8 136:11 160:1,5 167:14 169:15 170:12
**devised** 93:8
**dictate** 7:18
**dictates** 9:15
**differences** 39:13
**different** 18:25 22:19 36:5 42:22 65:23 96:22 128:20 141:16 143:2
**differently** 146:22 167:17
**dig** 154:18
**digital** 19:1,1,1,2 20:4
**diligence** 25:19
**dilutable** 97:2 174:20
**dilute** 9:5 10:14 42:21 46:11 58:24 122:10 129:2 131:25 153:25 155:22 160:12
**diluted** 5:18 9:11,19 9:25,25 10:1,5 11:5 39:22 40:2,5 42:17 43:2 48:6 51:11 54:3 62:6 68:6 85:15 93:11 94:9 95:1,4,8,11,14 96:14 97:19 98:3 113:19 115:21 119:23 131:22 135:1 137:5 151:4 155:18 156:24 161:3 169:21 175:10,18
**dilutes** 36:23
**diluting** 26:25 113:2 160:4,14,17
**dilution** 6:2 7:13 8:23 11:9 13:4 38:20 40:11 53:18 57:13 59:16 60:4,11 79:14,17,22 82:5 83:10 90:17 94:22 112:1 113:24 119:10 132:7 177:1
**dilutions** 51:8
**dilutive** 83:16
**direct** 3:7,11 6:1 16:21 23:22 25:7 32:11,25 43:10 62:11 67:12 69:18 71:16 75:23 78:4,6 101:1 106:20 107:17 133:15 152:11 153:1 157:14 162:25
**directing** 167:8,9
**directly** 35:9
**directors** 174:21
**disadvantage** 141:3
**disagree** 7:11 12:5 74:6 85:12 141:12
**disagreed** 47:11
**disclose** 45:25
**disclosed** 28:12,14 29:2 164:4

**discover** 18:24,25 19:3
**discretion** 35:8
**discuss** 22:25 54:7 113:10 121:3 122:4
**discussed** 6:18 47:5,6 54:4 79:2 82:15,18 82:22 84:5 120:23 121:13,14,21 133:21 135:12 150:7
**discussing** 55:1 66:3 134:21
**discussion** 32:10 118:4 119:25 122:8 139:13 179:10
**discussions** 32:3 103:13 108:4 117:24 120:17 121:7 124:25 148:6
**dismissal** 5:5
**dispute** 7:18 9:11 10:9 32:16 58:5 84:1,4 85:2,20 123:22 148:14 174:6
**disputed** 51:8 59:7
**distinction** 11:11 33:15 35:7 171:13 171:21
**distributed** 151:1
**distribution** 22:4,10 97:7 150:12
**distributions** 150:23 159:16
**divided** 25:5 108:17
**DL** 92:12
**doctor** 20:19
**doctors** 20:3,5
**document** 8:19 9:16 24:2,12 25:8 27:5 32:20,25 43:22 55:5 62:18,21,24 63:1,5,14,15 64:3,4 64:13 68:12 72:6 74:4,7 75:20 91:15 133:12 138:25 142:24 153:6 159:9 163:15,25 164:9,23 165:19 169:5 171:23 177:19 178:20,22
**documents** 28:21 33:7,15 86:8 133:5 143:9 156:10 171:19 178:18
**doing** 6:19 29:23 47:25 58:4 63:9 84:24 85:17 103:21 156:15,23 160:6 175:15
**dollar** 60:23 62:4 141:5,6
**dollars** 29:1 105:2 130:20 158:5 169:25
**doubt** 10:19 40:23 42:7 58:2 93:8,24 97:24 98:15,17,19 119:1 161:14,18 174:3 176:5
**Dr** 127:22 128:2,7
**draft** 4:6 70:11,16 71:6 72:2 117:14
**drafted** 32:20 69:9 71:14,23 72:1 93:5
**drafting** 72:5 121:17
**draw** 33:14 92:10
**drop** 67:2
**Druid** 145:12
**due** 25:19 82:23 104:8 159:1
**duly** 16:9,19 100:17 100:21

**E**

**E** 3:1,4,4,14 85:5 182:1,1,21
**earlier** 71:22,22 79:14 81:20 106:5 106:15 110:9 116:24 117:12,14 124:2 132:6 133:21 136:16,22 144:2 150:17 168:1
**earn** 37:5 41:5 88:5 136:19 137:13
**earn-out** 147:10
**earned** 67:24 68:2 137:17
**earning** 147:10
**ears** 102:17
**earth** 98:6
**easier** 123:16 161:9
**Easton** 1:23 182:2
**easy** 28:18
**education** 17:14
**effect** 47:5 49:5 83:16 113:2
**effective** 73:20
**effectively** 86:24 111:25 113:16
**efficient** 20:10
**effort** 24:23 164:2
**efforts** 19:13 102:10 103:16 162:16
**Eisenberg** 20:20
**either** 7:15 8:10 75:20 93:4 165:6 180:18
**elect** 23:19
**elements** 133:4
**eligible** 41:10,14,15 41:18,24 88:5
**email** 3:19,23 4:9,21 15:11 45:4 46:14 50:11 55:8 78:23 78:25 79:10 80:17 81:3 82:7,11 99:14 107:21 110:20 114:18 122:14,20 123:18 132:20 154:13,16,18,19 156:12 163:2 167:22 168:4
**emailed** 82:2
**emails** 154:6 157:1
**embodied** 27:3
**emphasizing** 13:5
**employed** 37:4,8 41:11,17 42:2 49:8 67:23 97:13,15 101:3
**employee** 81:8 104:3 109:13 110:7,17 121:12 127:6 136:19 140:3,18 146:1 166:1 182:7 182:9
**employees** 46:24 47:4 104:25 109:7 109:17,18 126:15 139:20,21 140:17 141:4,18,24 142:18 143:2
**employment** 60:12 68:4 81:12 140:10
**encouraged** 71:15
**ended** 59:17 139:1,2
168:17,22
**enforce** 48:2 91:22
**Eng** 4:14 22:22 126:25 127:1,2,11 166:11
**Eng's** 127:13
**engaged** 19:13 103:18 162:15
**engaging** 103:20
**Engel** 61:21
**Engels** 1:3,4 2:18 3:6 5:10,19 9:5 10:14 12:9 13:3 16:3,4,7 16:13,17,23 23:24 35:7 40:18 49:20 49:22 50:24 56:11 56:20 65:22 66:13 66:17 67:11,18,22 71:14 73:1 75:1,7 77:19 80:24 83:23 89:23 90:3 103:5,6 103:9 104:4,7,14 104:24 105:10,17 107:22 108:3 109:21 110:15,21 111:12,20 113:1,9 113:19,20 114:3 115:6 116:15 119:1 119:21 120:12 121:3,8,12,21 122:2,4,13,18,23 123:18 124:11,11 124:12 130:7 132:1 132:4,6,10 133:7 137:11,13 138:14 140:13,19 141:15 146:8,16,20,22,24 147:9 151:12 153:16,22 155:6,18 155:23 156:24 162:8 165:6,6,12 166:14,22 167:17 170:18 172:7,9 177:13,25 178:19
**Engels'** 8:24 63:7 129:4 142:12 151:2
**Engles** 164:3
**Engs** 56:13 167:14
**enormous** 27:22
**ensure** 155:18 174:17 175:17
**enter** 174:14
**entered** 25:24 73:19
**entering** 25:13 26:22 61:13
**Entertainment** 18:15
**entire** 33:6,8 178:17
**entirety** 12:17 40:13 177:25
**entities** 130:11 150:12
**entitled** 33:23 47:19 83:20 151:12 162:9 164:23
**entitlement** 87:13 88:11 97:14,15
**entity** 62:6 101:15 120:9,9,11,13 130:16
**entrepreneur** 18:23 19:9
**entrepreneurial** 19:13
**Entrepreneurs** 47:3
**equal** 39:18
**equally** 131:23
**equity** 9:18 26:20,24 27:3 33:23 35:1,5,9 35:12,13,16 36:4 43:20,21 67:16,17 67:24 68:11,12 76:20 85:4,8 86:23 87:4 88:3,5,6,12,18 88:21 89:9,11 93:17 108:25 109:6 109:16 110:12 111:2,17 114:20,25 115:14 126:5,17 127:4,8 131:18,19 135:1 137:5 138:22 143:1
**Erhardt** 2:19 3:10 55:9 66:3 78:23,25 80:18,25 82:3,7,13 82:19 83:8 84:2 100:14,14,19,25 101:3 134:17 180:19
**error** 53:24
**errors** 168:16
**escalated** 57:24 59:22
**especially** 88:17
**Esq** 2:7,7,12,13
**establish** 63:1 163:15 163:17

**established** 88:23
**et** 104:3 109:2 173:24
**event** 13:15 14:18 112:1 139:23 141:7 145:14 154:2 171:8 176:14,25
**events** 139:23 173:20
**eventually** 116:23
**everybody** 51:14 56:11,12 78:20 91:11 92:1 152:2
**evidence** 67:1,7 70:21 71:3 92:3 107:12 114:15 116:2 164:13 173:19 175:11 179:1
**evident** 7:5
**exact** 53:17
**exactly** 7:22 137:20 174:10,12 175:7,8
**Examination** 3:7,8 3:11,12 16:21 90:1 101:1 167:5
**example** 57:3 68:1 121:11 138:5,8,17 147:20
**Excel** 82:14,15
**exception** 112:7,9,12 112:17,20 147:15
**exchange** 49:21 144:1
**excited** 46:13
**exciting** 22:4
**excluded** 98:6 107:12
**excuse** 25:8 30:11 46:21 74:18 80:1
**execute** 68:9
**executed** 4:8 34:13 46:16 66:16 72:14 72:18 106:15 117:3 117:18,21 134:19 165:5
**executing** 171:19
**execution** 8:21 38:19 40:1 41:15 43:24 47:2 49:7,12 50:8 51:6,9 55:15 92:24 118:2
**executive** 128:21
**executives** 109:8,17
**exercise** 166:17
**exhibit** 3:16,17,18,19 3:20,21,23,24 4:3,4 4:5,6,8,9,10,11,12 4:13,14,15,16,17 4:19,20,21 23:23 24:1 28:2 32:12,13 40:18 43:11,13,15 44:5,6,23,24 47:14 51:15,16,16 55:3,3 57:19 58:6 62:11 62:18 65:5,7 66:11 66:14 70:5,6,21 71:17 72:11 74:18 74:20,21 78:21,22 79:5 81:25 84:6 87:25 90:4,9 91:2 92:1,5 93:16 97:6 98:22,23 106:21,22 106:23 107:6,8 111:4,6 114:8,11 114:12 115:4,4 117:13 118:11 123:17 125:7,7 126:8,19 128:9 132:15,19 133:10 133:15,16 134:18 141:22 142:3,5,7 147:6 151:21,22 152:1,5 153:2,11 153:12 154:5,10 157:6 159:12,21 161:7,7,8,12 163:1 163:1,10 164:20,21 167:7,22 168:5 169:5 175:13
**exhibits** 3:15 4:1,22 81:20 125:11,14 168:1
**existed** 124:6
**existence** 86:10
**existing** 108:9 136:4
**exists** 159:15
**exit** 132:3 139:23 141:8
**exiting** 132:4
**expand** 95:23 119:2
**expansion** 176:2
**expansive** 176:7
**expect** 45:11 97:17
**expectation** 38:21 39:8,14,16
**expecting** 26:4 45:7
**experience** 19:21 120:6
**experiment** 60:17
**expert** 63:13,14,19 63:22 163:19 164:4
**expiration** 10:12 40:4
**expired** 85:8
**explain** 31:6 45:4 63:14 64:19 74:9 96:8 97:10 129:22 132:19 139:17
**explained** 85:14 110:18 129:21
**explaining** 82:20
**explains** 84:22,24 85:1 108:16
**explanation** 48:14 74:11 79:16,19,21 80:11 83:13 84:16 84:17 110:1 133:22
**explosion** 29:3
**exposed** 29:4
**express** 46:7 66:25
**expressed** 76:1 177:14,16
**expressly** 97:18 110:21,22
**extend** 13:16 169:2 171:10
**extended** 9:21
**extent** 30:19 60:22 62:25 90:16 91:17 163:14
**extrapolate** 177:11
**extrapolation** 178:10

**F**

**F** 182:1
**face** 57:25
**facilitation** 124:25
**fact** 9:7,10,11 12:12 59:5 63:10 81:10 85:1 89:5 105:5 110:20 113:15,17 119:6 120:24 132:15 138:12 140:16 147:9 148:12 150:16,25 151:10 158:4 164:5 165:9 171:18
**facts** 7:19
**fails** 178:14
**fair** 43:8 113:19 139:4 147:25 148:6 148:7
**fall** 93:13 128:15
**familiar** 6:22 7:4 8:18 139:14 163:6 164:9
**Family** 127:20,20
**far** 12:24 15:22 21:11 65:23 119:9
**fast-forward** 85:19 102:9
**father** 79:12
**favor** 8:13 179:5
**favorite** 169:5
**Feb** 56:4
**February** 1:14,22 54:25 56:9,25 154:21 179:12,21 182:18
**FedEx** 19:20
**fee** 27:9
**feel** 45:16 148:6
**fees** 181:8,11
**fifth** 4:16 43:16,25 45:6,14 46:10 53:9 73:10 93:23 119:15 122:7,9,11,23 123:1 153:3 165:10 166:20
**fight** 59:2
**fighting** 61:8
**figure** 160:25 173:22 175:24
**file** 82:14,15
**filed** 5:8 31:19 59:24
**final** 71:6,19,25 72:2 116:25 129:11 133:5 138:24 142:24
**finalize** 110:10
**finally** 29:22 139:3
**finance** 21:24 106:2 150:20 168:19
**finances** 25:21 26:17
**financial** 3:21 28:3 29:3 47:19 48:12 58:17,19 64:16 104:16 152:12
**financially** 61:18 182:10
**financials** 3:19 25:25 29:2 54:22 61:19 61:20 82:16,21 83:6 132:12,18,20 133:8 146:18 151:6
**financing** 22:1 26:9 108:5,7 125:1 139:23 157:17,24 159:6 160:2,19 162:19
**find** 8:7 19:5 75:9 78:8 82:14 119:12
**finding** 175:8
**fine** 45:22 100:4 101:8 127:13 173:7
**finish** 63:20 80:1,3 168:14
**firm** 18:16 64:10,12 84:12 106:10 115:6 121:25 130:14
**first** 4:6 5:4 6:17 7:1 8:24 11:1,25 12:17 13:25 16:1,19 19:15 23:9 28:23 29:3,4,10,11 39:5 39:14,25 41:25 44:24 47:14 49:14 51:10,15,17 53:23 54:5,22,24 55:8,20 58:15 59:19 61:5 61:10,15 64:3 66:12 69:19,20 70:16 73:18 76:14 88:7 89:18 90:6 92:11 96:25 97:14 98:23 99:8 100:21 106:16 116:8 117:14 123:15,22 129:5 133:23 135:22,23 137:19 140:2 153:2 154:6 154:6,12 157:5 158:18,20 159:1 163:2 167:23 174:13 176:17 181:11
**fiscal** 41:6
**five** 119:24 177:10
**fixed** 13:12,18 14:7 14:11
**Flagel** 84:13
**flip** 66:11 114:9
**flipping** 142:9
**floor** 22:9
**Florida** 2:9
**fluid** 176:23
**focus** 7:3 21:1 34:5

40:21
**Fodiman** 2:8
**foldout** 55:23 56:1
**folds** 83:7 123:21
**follow** 52:13 56:14 57:2
**follow-up** 45:7
**followed** 43:17 133:2
**following** 8:21 25:16 41:19 58:20 68:1 91:3 96:1 97:22 179:23
**follows** 16:20 93:24 100:22
**font** 180:18
**footnote** 67:3
**foremost** 61:10
**forget** 62:3 156:22
**forgive** 62:12 92:5 125:15
**forgot** 6:21
**form** 45:9 52:3,9 106:14 111:14
**forma** 107:24 108:16 110:18
**formal** 45:7 69:6 143:11 168:17
**formalize** 43:20
**formally** 50:12
**forth** 10:19 31:7,8 71:9 93:25 161:18
**forward** 29:23 33:19 96:16 125:1
**forwarded** 132:12
**found** 151:6
**founded** 20:16
**founders** 39:19,21 101:10 112:4
**founding** 108:14
**four** 25:1 58:4
**four-year** 24:17
**fours** 78:10
**fourth** 55:24 75:14 75:17 90:23 91:6 165:9 166:20
**frame** 51:9 103:14 117:20 139:12 145:16
**Friday** 179:23
**friends** 32:8,9
**front** 23:24 96:13,18
**full** 37:5 41:11 116:22 174:18
**full-time** 24:10,21 104:25
**fully** 43:1 67:1 73:16
**functionality** 27:25
**fundamental** 13:9
**funding** 21:23 143:22
**funds** 104:2
**funny** 38:7
**further** 21:25 65:9 156:10 167:2
**future** 11:10 13:4 39:1 60:11,14 94:22 97:8,11 104:2 109:3,6 119:7,10 151:5
**fuzzy** 45:15

**G**

**G** 4:10
**GAAP** 133:2
**gains** 20:7
**games** 19:15
**gamesmanship** 45:11
**GCS** 56:13,22 125:22 125:23
**gee** 64:25 156:14
**general** 47:5,7,24 50:15 86:18
**generally** 18:21 19:11 24:14 27:17 101:23,25 105:23
**gentleman** 22:21 23:6 164:7
**getting** 11:13 15:19 46:12 62:6 71:12 91:18 97:4 117:7 169:12
**Gibbons** 84:12 106:10 115:6 121:24
**give** 6:23 16:11 26:24 34:16 35:22 40:14 47:24 58:21 59:10 76:2 80:7 105:8 120:25 126:17 127:4 141:4 166:6 173:9
**given** 25:20 30:10 60:19 88:17 120:24 146:19 160:1
**giving** 46:23 60:13 60:14 149:16
**glad** 8:1
**go** 5:2 6:23 11:22 13:20 17:9 19:5 24:11 27:17 28:18 30:17 32:4 38:3 42:4 44:23 47:13 50:3 53:14 55:23 55:25 56:3 59:24 62:12 70:19 72:11 76:23 87:25 90:3 92:2 93:15 108:8 110:25 111:1 114:8 115:3 118:11 123:17,20 133:6 137:25 141:17 142:5 145:18 147:6 151:17,19 155:1,5 161:11 166:16 169:9 173:7
**goal** 15:13 39:12 110:11 119:20 154:25
**goes** 41:9 52:12 56:16 78:8 94:12 94:20 171:7
**going** 5:22 7:15,16,17 7:24 8:12,20 10:23 11:23 28:8 30:1,7 30:17 31:5 33:18 34:18 35:21 42:23 43:12 45:20 48:9 49:16 50:15 57:23 60:21,22 61:13 62:15 63:12 65:2 67:11,15 69:18 71:16 72:17 76:12 77:13 78:4 82:20 94:7 96:21 97:5 101:6 108:17 125:12 126:7 134:19 141:25 142:16 149:6 151:25 152:8 163:24 164:6 166:3 168:22 173:3,18 174:8,18 176:8 177:3,5,22 178:24 178:25 179:17
**good** 6:11 18:6 50:2 50:22 61:24,24 70:1 98:20 134:11 160:24 173:12 180:6 181:14
**gotta** 26:22 35:22 38:9 80:3 181:10
**gotten** 157:9
**grader** 175:6
**gradually** 50:23
**graduate** 17:12,20
**grant** 9:8 33:23 35:1 35:5,16 42:24,25 43:5,20 45:9 76:20 93:17 94:9,10 95:2 125:24 126:2,5,9 126:14 141:19 147:9 150:13 151:16 154:3,20 155:10,19 166:11 167:13 175:18
**granted** 55:20
**granting** 14:16 47:3 47:4 160:5 178:12
**grants** 43:21 46:24 54:19,25 56:8,14 56:24,25 95:16 97:8,11 159:17,25 173:21,23
**great** 19:17 27:22 45:16 65:14 181:13
**greater** 121:20
**ground** 22:9
**grow** 39:13 102:19 103:3
**growth** 109:9 110:12
**guarantee** 116:21
**guaranteeing** 171:23
**guess** 18:19 21:8 44:16 50:21 61:25 86:5 90:5
**guy** 20:20
**guys** 28:18 53:25 58:3 174:6,20

**H**

**H** 3:14
**H-a-u-k** 51:20
**half** 18:13 28:25 29:16,16 30:1 38:13,15,24,25 54:25 55:25 94:2,6 94:8,17 130:20 148:20 161:20 175:1
**halfway** 52:16
**hammered** 32:10
**hand** 16:8 34:11 77:13 100:16 182:17
**handed** 78:4
**handled** 32:9 53:24
**hands** 21:2
**hang** 41:4 45:25 62:11 90:22
**happen** 10:17 30:13 38:18,22 39:1 48:4 48:9 138:22 156:1 171:23,24 176:24 177:4,5
**happened** 8:22 28:7 28:21 30:5,13 31:21 36:17 37:20 39:17 48:5,6 50:19 54:1,14 93:12 98:20 113:17 152:18 172:2 173:21,23,24 179:4
**happening** 48:8 99:15
**happens** 10:12
**hatchet** 45:10
**Hauk** 51:20 64:3 82:2
**head** 166:18
**healthcare** 19:25 22:6 102:1
**hear** 30:25 50:5,6,17 50:22 146:12
**heard** 28:23 30:9 50:12 54:2 173:19
**hearing** 87:24
**hearings** 7:5
**heart** 169:10 177:8
**heavily** 105:7
**held** 1:13 23:17 61:15 101:16 126:25
**help** 20:12 103:10 110:9 119:12
**helped** 20:19 128:23
**helping** 124:23
**hereinbefore** 182:5
**hereto** 76:3
**hide** 110:15
**high** 17:10,10,12,14
**Hillis** 115:12
**hire** 64:24 109:7
**hired** 37:2
**hiring** 19:4 168:17
**Hoffman** 18:18,20

19:17
**hold** 10:25 37:25 50:24 73:11,13 74:10 140:23
**Holdco** 1:8 21:17
**holder** 35:6,16 90:7 126:6
**holders** 11:9 129:2 131:23 140:1,1 146:19 167:18
**holding** 124:4 128:17
**holdings** 143:2
**honest** 61:17
**honestly** 140:9 151:17
**Honor** 6:18,24 7:1 8:2,9 9:3,14 11:1 11:16 16:2,16 23:23 32:12 43:12 44:25 62:13 63:4 63:17 65:6 66:24 70:20 89:25 93:18 93:18 97:23 98:23 99:21 107:10 112:10 114:14 116:1 118:18 127:17 134:11 152:9 172:24 173:8 174:1 175:7 180:21 181:14
**Honorable** 1:15 2:3 182:13
**honoring** 150:5
**hooks** 22:5
**hopefully** 133:5
**horrible** 175:14
**horse** 157:4
**hospitals** 102:3
**hours** 11:15 118:2
**housekeeping** 181:6
**huge** 26:14
**hundred** 23:16,16
**hurt** 45:21

**I**

**i.e** 141:4
**IC** 4:10,11
**idea** 20:1,20 22:10 147:17 149:6 176:10
**identification** 151:22
**identified** 55:10 78:22 114:10 117:13 142:6
**identify** 114:11 115:4
**ignore** 176:6 178:4
**illogical** 58:3
**illustrate** 133:12
**illustrating** 75:12
**imagination** 8:3
**immediately** 39:10 83:17,21
**implement** 140:3,18
**implemented** 140:7
**implementing** 110:9 140:6
**implied** 13:6 76:1
**importance** 36:10,20
**important** 26:12,19 29:14 33:14 34:6,7 46:6 48:1 58:13,14 79:15,20 80:13 96:13
**impossible** 22:8 61:18,19
**inadmissible** 67:8
**inarticulate** 62:2
**incentive** 4:20 139:20 140:3,10,19 141:23 146:1
**incentives** 109:19
**include** 15:7 113:5 120:4 178:25
**included** 33:13 97:22 119:7 142:12,17 168:9,10
**includes** 158:16,16 178:17
**including** 24:22 33:7 83:17 110:10 128:2 139:22
**income** 141:9
**inconsistent** 166:20 178:19
**incorporate** 165:2
**incorporated** 15:5
**incorrect** 158:20
**increase** 151:15 154:1
**increased** 151:2 175:17
**incredible** 49:14
**independent** 126:8 126:19
**indicated** 24:25 59:14
**individual** 75:13,15 89:13 91:12 122:24 125:25
**individually** 5:19 73:9,10 75:10 87:13 88:11,20 90:14,15 91:14 101:15
**individuals** 5:20
**industries** 18:25
**industry** 18:24 102:1 127:25
**influx** 20:14 40:13 48:10
**informal** 32:3,7
**information** 20:14 48:16 55:22 65:3 82:14 83:18,21 121:18 123:25 146:10
**informed** 118:8
**informing** 83:1
**inherent** 14:11
**inherently** 15:2
**initial** 10:22,24 11:4 11:6 12:11,25 13:15,21,22,24 14:23 20:19 24:4 27:9 32:9 94:3,6,13 94:23 104:17,18 111:14 120:20 126:1 135:4,24 138:12 141:19 143:22 148:21 158:10,12,14 161:22 162:10 171:2,6,6,8 172:3 175:3,9 176:13,22 176:24
**initially** 57:20
**innocent** 54:6
**inquired** 83:9
**insert** 122:12
**inserted** 122:24
**inserting** 123:6
**insight** 20:15
**insights** 22:12
**instance** 36:3 90:6
**instrument** 154:25
**intact** 26:2
**integral** 178:13
**integrated** 67:1,6
**integration** 178:16
**intend** 177:12
**intended** 36:21 76:1 103:22 179:3
**intent** 3:24 4:3,4,5 15:4,12 66:8,15,17 66:21 68:16,25 69:3,5,8,13,16,17 69:20,23 70:3,18 71:5,11 77:3,6,10 78:16 92:6,11,14 92:20,23 93:5 96:5 96:11,19 97:1 106:23 107:1,3,4 109:5 110:25 111:15 113:6 114:12 115:1,5 117:1,3,6,18,21 118:3,5,8,9,13,14 118:23 136:23 138:13 140:20 150:5 177:8,19,24
**intentions** 67:17
**interest** 29:21 39:2 63:24 64:1 68:11 141:25 153:17 164:16
**interested** 33:22 182:10
**internal** 150:22 151:1 155:21
**interplay** 136:16
**interpose** 62:23 163:14
**interpret** 7:16,17,20 12:14 71:7
**interpretation** 7:12 8:17 10:3 11:25 12:3,8 15:2
**interpreted** 8:6
**interrupt** 49:19
**introduce** 58:24
**introduced** 22:19 127:2 128:24 135:23 136:3,9,13
**invest** 103:3
**invested** 128:7
**investing** 105:7
**investment** 3:19 39:6 39:9 50:19 54:2,3,4 102:19 103:8 109:1 119:23 120:8 123:2 123:9 127:3,5 129:24,25 130:1,3 130:4,14,17,18 131:8,18,19 132:13 132:16 142:14 146:10
**investor** 28:14 94:10 102:11,14 103:6,10 103:17,21,24 104:1 127:3 130:6
**investors** 22:1 29:15 29:15,20 30:1 32:7 34:19 39:11 89:1,6 103:13 110:10 128:2 139:25
**invited** 127:22
**involved** 5:10 19:12 19:16 35:8 103:12 105:23
**involves** 67:16
**Irfan** 126:14,20 167:13
**isolating** 177:10
**issuance** 9:19 68:11 83:14 84:18 131:9 131:15,16 135:1 137:5 140:11 144:25 145:3 146:13 153:7 170:19 171:24 172:2
**issuances** 10:7 59:5 84:23 85:4,8,15 99:12 121:9 123:14 123:22 129:1,5 131:25 133:13,23 144:12
**issue** 5:4,19 6:2 10:13 12:22 15:18,23 58:21 60:12 85:14 103:15 110:16,16 110:17 112:25 113:6 123:15 124:21 126:2 128:19 137:19,21 138:19 147:23 150:1 171:16 174:21 176:21 180:17 181:8
**issued** 9:18 38:12,14 56:15,16 67:18,25 68:2 83:15,15 84:22 85:23,23 90:7,11 99:4 130:23,24 131:16

134:25 142:21 143:10 144:10 145:23 146:15,18 147:18 149:7 172:8
**issues** 23:12 32:17 51:4 82:23 89:18 92:15 162:19 168:24 169:1
**issuing** 84:25 149:15

**J**

**J** 52:16 124:14,14,15 124:17,18
**JAMS** 1:16 2:3 182:14
**January** 44:9,17 46:15 47:10 54:25 55:25 56:4,8,19 57:4,8 67:25 68:3,4 77:15 79:1 80:22 81:3 99:3 124:6 142:11,17 143:16 145:10
**JD** 17:21
**jilted** 28:24
**Jim** 103:19,19 106:3 106:3 109:11,12 120:17,18 124:19 124:21,22 125:8,8 128:24 136:11,11 167:14,14 169:15 169:15 170:11,12
**Jimmy** 128:24
**John** 163:2
**join** 26:16
**joinder** 4:14 68:9 73:14 91:3,6 127:13 165:7,11,17 166:14
**joined** 75:14
**joint** 3:15 24:1,23 28:2 32:12 40:18 43:11 51:16 55:3 57:18 62:18 65:5,7 66:11,14 70:5,6 72:11 78:21,22 81:25 87:25 93:16 106:20,22,23 114:8 115:4 117:13 118:11 123:17 126:18 132:15 133:10,15,16 134:18 141:22 142:5,7 168:5
**jointly** 67:18
**joy** 46:12
**judge** 1:15 2:3 5:2 6:7,12,15,21 7:20 7:24 8:14,25 9:10 11:13,17,22 14:1,9 15:19,25 16:4,7,10 16:11,14 18:21 30:11 31:5,11 33:24 35:24 37:25 49:18,23 50:1,24 56:5 60:24 61:21 62:14,22 63:11,22 63:25 64:5,9,12,22 64:23 65:2,7,10,15 65:17,19 67:9,10 70:24,25 71:1 74:10 77:19 80:5 83:23 89:24 95:22 99:19,23 100:5,8 100:10,11,15,18,23 107:14,15 112:14 114:16 116:3 118:19 125:17 126:22 127:16,18 128:13 129:10,14 134:9,12,14 142:3 147:3 151:23 152:3 152:14,21,25 157:8 160:11 163:13,22 163:23 164:10,13 164:17 167:2,3,4 168:7 172:16,20 173:1,6,11,12,14 175:3,16,20 177:14 177:18,22 179:7,11 179:16,17,24 180:7 180:9,11,15,18,23 180:24,25 181:3,4 181:10 182:13
**judicial** 173:18
**Judy** 48:23,24 49:2,3 55:9 58:17 106:2 150:17,18,19 155:2 156:2,14 168:14,17 169:1 175:12
**Judy's** 156:22 168:24
**July** 3:20 24:4 29:6,8 29:11,18 104:8,11
**jump** 21:10
**jumping** 157:6
**JW** 131:9

**K**

**K** 4:14
**K-1** 3:17 51:17 52:3 52:15 53:17 57:21 81:21,22 82:3 99:9 99:13 146:11
**K-1's** 51:12 85:10
**K-1s** 53:20 57:18 59:21 82:10 132:8
**K-r-u-s-e** 51:21
**Kansas** 182:22
**keep** 7:24 59:20 142:9,16 143:9 166:4 177:22
**keeping** 104:23
**Ken** 16:3 28:18 56:19
**Kenneth** 1:3 2:18 3:6 5:10 16:13,17 153:16 155:6
**Kenny** 5:19 10:20 11:2 30:6 58:2 80:4 93:10 94:1,1 106:9 106:12 109:20 120:23 126:25 148:7,19 149:22,25 150:17 153:8 161:19 165:6,12 166:14,22 168:17 173:12 174:25
**Kenny's** 106:10,11
**kept** 31:18
**key** 22:3 109:7
**kicked** 162:22
**kind** 32:7 45:11 47:24 102:17
**Kirby** 22:22,22 24:22 126:25 127:1,2,13 166:11 167:14
**Kirchof** 103:19 106:3 128:18,19,20 136:12 154:7,13,21 156:13,21 167:23 168:9
**knew** 37:15 48:7 109:7
**know** 7:4,7,10 9:6 10:15 15:16 21:6 22:5 29:3,4 30:24 31:6 32:20 37:19 37:21 38:2,5 40:10 40:16 42:19,20 45:15,17,21 48:19 49:16 51:7 54:15 54:16 58:17 59:18 59:19 67:1,13 72:1 73:12 74:13 75:21 78:7 82:9 85:12 86:16 87:25 99:15 101:23 103:25 107:18 109:15 111:3,22 112:11,23 114:10 116:12 119:19,20 125:23 128:1 139:6 140:22 143:16 150:22 156:15,23 166:8 175:15 178:7
**knowing** 70:23 113:21 120:9
**knowledge** 70:15 112:21 120:4
**knows** 29:9
**Kruse** 51:21 64:3 82:2

**L**

**lack** 59:14
**language** 12:3,4,13 12:14 13:8 14:5,12 14:21 33:13,14 68:17,25 71:18,19 72:17 74:3 92:25 97:22 98:15 111:24 115:14 118:14 147:15 169:19 170:13 175:23 176:4 178:8,15
**large** 23:17
**larger** 22:16,16 131:16
**last-minute** 30:4
**lastly** 109:20
**late** 51:12 85:17
**latitude** 59:9
**laughter** 38:7
**Launch** 101:17,17 124:2 144:21 145:3 145:6,12
**law** 15:9 17:22 18:12 18:15 64:10,12 84:12 106:10 115:6 121:25 178:5
**lawsuit** 31:19,22,24
**lawyer** 18:9,11,13 48:22 58:20 59:18 74:11 93:4,4 173:3
**lawyers** 14:24 32:10 45:13,14,23 46:1 46:22 57:24 69:7,9 69:12 93:13 98:16 98:18 134:2 151:11
**laymen** 69:10
**lead** 49:17
**leading** 33:15 103:14
**learn** 54:18
**learned** 51:11 54:21 55:20 86:10 99:8
**leave** 81:11
**led** 65:24 128:24
**left** 37:3 52:15
**Left-hand** 52:24
**legal** 120:11
**Legon** 2:7,8 3:2,7,8 3:11 5:16,24 6:16 6:18,24 7:22,25 9:2 11:16 12:1,18 13:1 13:10,14 15:17,25 16:2,14,16,22 30:11,14,15 31:13 33:25 34:4 36:12 38:4,8,11 50:2,5,25 51:2 56:10 61:3,25 62:10,15,17 63:4 63:17 64:23 65:5,8 66:12,24 67:10 70:19,25 74:18,21 74:23 80:3 89:25 90:2 99:17,21 100:2 107:10,15 111:4,7 112:10 114:14 116:1 118:18 119:15 125:14,20 126:11 126:21 127:17 128:12 134:11 142:2 147:5 151:20 151:24 152:6,13 153:1 157:9,12,13 163:22,25 164:12 164:15,19 166:5 167:1 169:6,8 172:21,23 173:8,12 179:14 180:2,6,21 180:24 181:14
**Legon's** 12:6
**length** 120:22
**let's** 19:23 33:20 34:5 35:3 40:17 42:4 66:11 68:24 70:5

72:11,20,22 73:11 73:17 74:12 78:21 87:24,24 91:11 93:15 95:6 98:22 115:3 141:19 142:4 142:5 147:21 148:9 149:1 151:8,19 159:12 161:7 169:9 169:19 179:11
**letter** 3:18,24 4:3,4,5 4:12 15:4 51:22 58:7,13 59:10,13 66:8,15,16,21 68:16,25 69:3,5,8 69:12,19,23 70:3 70:17 71:5,11 77:3 77:6,10 78:16 84:9 84:15,16,21 85:1,3 85:21 92:6,11,12 92:13,14,23 93:5 95:18 96:5 106:23 106:25 107:3,4 110:25 111:11,14 113:6 114:12 115:1 115:5 116:25 117:3 117:6,17,21 118:3 118:5,8,9,13,14,22 125:8 133:18 136:23 138:13
**letters** 69:16,16
**level** 39:19 109:8
**Levine** 18:18,20 19:17
**Liability** 73:23
**Liberman** 56:13,22 103:19 106:4 109:12 120:18 124:17,18,19,22 125:8 136:11 160:1 160:6 167:15 169:15 170:12
**liberty** 173:18
**licensed** 86:14
**life** 20:24 49:11
**limit** 120:20 180:15
**limitation** 13:2,5 137:12
**Limited** 73:23
**limits** 69:1
**line** 33:17 56:6,15,20 74:16,17 75:6,8 93:23 109:2,4,10 109:13 115:19 116:8 119:15 152:17 163:23
**lines** 56:7 75:3 78:6 78:11 115:11 116:5
**list** 62:23 125:22 126:12,23
**listed** 144:25
**listen** 80:7 160:12
**listing** 168:4
**litigation** 91:23
**little** 19:17 45:15,17 52:15 66:2 72:4 102:9 110:9 150:11 150:17 152:1 166:20 167:21
**live** 17:7
**LLC** 1:7,8 21:17,17 51:21 56:12 73:21 101:4,16,17,18 108:13,15 120:7 124:4,8 125:22,23 126:24,25 129:25 130:3 131:9 144:21 145:4,6 154:25 155:11,19
**loan** 130:19,22,22 131:4,13,14,21 147:22
**lock** 36:18
**Logback** 1:23 182:2 182:21
**LOI** 67:16 92:5 106:16,18 178:18 178:25
**long** 6:9 17:2,7 18:3 51:24 55:15 79:16 79:18 131:6 179:8 179:14
**long-term** 36:9 109:15,16 110:12 139:20
**longer** 13:16 81:8 120:24 137:8 156:4 171:10
**look** 8:14 10:7 14:24 21:6 35:13 37:14 42:23 44:5 47:16 51:19 52:2,11,14 56:18 70:10 71:17 72:20 83:5 91:2,10 92:4 98:22 107:16 108:9 110:14 111:17 114:20 115:7 118:20 131:8 134:23 140:8,14 143:14 151:17 154:12 155:9 159:12,20 161:6 163:9 177:24 178:2
**looked** 45:14 72:20 76:14 81:20,25 116:24 117:12 138:12 168:1
**looking** 14:5 27:5 29:23 36:3 78:9,11 96:16 102:16,19,20 128:1 132:16 175:23
**looks** 51:17 52:1 71:21 82:8 116:5,8 137:23
**loop** 134:22
**loses** 7:18
**loss** 52:17
**lot** 31:7 36:5 173:19
**Louis** 1:19 2:4,14 182:15
**loving** 49:15
**lower** 33:2 92:13 93:18 163:11
**LP** 131:15 143:21 144:8,10 145:1
**lunch** 134:7 139:13

**M**

**MacDonald** 2:13 58:9 64:6 71:23 84:9,16,22 85:20
**macro** 154:23
**magically** 166:22
**mailed** 82:2
**main** 20:14 26:19 46:12 96:14
**maintain** 8:11 11:7
**maintained** 57:5,8
**maintaining** 151:11 151:11
**maintains** 133:12 143:9
**major** 27:18,18
**majority** 35:11 166:9
**maker** 117:23
**making** 6:10 21:1,1 26:4 103:16 130:2 137:11 171:21
**manage** 20:13 156:3
**manager** 95:3
**manufactured** 30:8
**manufacturers** 102:2
**maps** 44:21
**March** 154:7,14 179:22 180:9
**mark** 1:3 2:18 3:6 16:17 115:11 151:21 153:16 155:6
**marked** 24:1 28:2 43:11 57:18 90:8 93:16 97:6 151:20 154:10 161:11
**market** 19:5 22:17
**marriage** 22:9
**matter** 1:1 5:13 7:4,6 7:10 17:24 27:25 33:9 61:16 96:21 151:10 170:16
**matters** 20:11 169:19
**maximum** 13:18 120:19 180:14
**mean** 10:20 14:2 20:24,25 26:18,19 27:23 32:22 35:5 42:25 44:12 50:17 53:23 54:1 60:16 60:18,18 61:4,15 62:5 64:24 71:5,5 77:4 87:6 93:25 94:8,24 137:18 138:24 148:19 149:5 152:17 157:23 160:10 161:19
**meaning** 38:12 149:17 176:5 177:11
**means** 11:5 93:9 176:1,2
**meant** 72:3 78:18 79:17 93:10 96:7,8 96:10 97:3 175:7
**measurable** 36:22
**mediation** 32:3,7
**meet** 22:22,24 23:2
**meeting** 23:4
**meets** 33:21 173:16
**member** 17:23 18:3,6 91:13 127:23 128:4
**members** 44:8 47:4 75:14,15 83:17 104:2 109:3,6 110:16 112:16,18 141:12 146:14,15 174:22
**memorialized** 153:7
**memory** 87:19 105:13 113:13 114:3
**mention** 129:16
**mentioned** 47:1 76:19 80:23 87:3 88:25 120:1 122:22 130:10
**met** 23:9
**methodology** 64:19
**Miami** 2:9 17:6,7,9 17:11
**million** 9:20 24:16,24 29:1 50:19 54:11 63:21 68:7,18 69:1 102:22,25 105:2 115:22 116:20,20 116:22,22 123:23 130:20,21 131:20 135:2,6,15 137:6 137:17 144:1 147:21 149:1 162:23 164:2 169:22,25 170:2,13 170:25 171:5,9,14 171:15,16,22,23 172:10 178:21
**million-plus** 158:5
**mind** 37:18 104:23
**mine** 52:11 156:18
**minimum** 164:2
**minority** 62:5 81:15 108:13 142:15 146:23 166:10,12 167:13,18
**minute** 48:8
**minutes** 6:20 11:14 15:20 100:3,6 173:11
**mirrors** 84:17
**misguided** 176:9
**missing** 48:22 75:22
**Missouri** 2:4,14 182:15
**misstatement** 13:9
**mistake** 53:23 54:5,6 57:21 59:22 151:6
**MK** 56:20 124:11

**MO** 1:19 182:22
**mobile** 19:15
**moment** 19:11 134:1
**moments** 23:12
**monetizing** 62:4
**money** 26:23,23 28:15 29:16,22,23 30:2,3,7,8 34:18 39:11,14,17 48:10 54:11,11 102:20 120:6,10 141:11 158:18 159:2
**moneys** 145:5,13
**month** 5:6 46:15 77:15,24 113:20 148:8 177:5
**months** 8:20 13:13 13:17 14:7 28:10 28:11 39:6 40:1 48:5,6 52:1 55:17 68:2 80:16 86:10 94:14,15 120:20 123:15,23 128:15 129:6 130:24 131:4 131:6 133:23 136:6 136:6 137:8,17,19 138:10 149:12,13 149:20,25 170:8,19 171:11,15,16 172:4 172:11 176:23
**morning** 65:22 71:23 80:12 81:6 82:4,17 86:1,21 89:17 102:4 104:4 106:15 146:9 164:6
**moron** 156:14
**move** 30:20 51:14 55:2 71:12,16 118:12 125:12 127:14 128:10 141:25
**moved** 35:10
**moving** 6:3 125:1
**multiple** 13:10 19:9
**music** 19:16
**mutual** 86:18 92:14

**N**

**N** 3:1,4
**n/k/a** 1:8
**name** 16:11 20:21 49:1 53:18 87:21 100:23 120:4,8 129:20,23 130:2,4
**named** 5:14 20:20 22:21 28:25 120:9 130:1,2
**narrative** 30:18
**naturally** 174:16
**nearly** 22:8
**necessarily** 109:17
**necessary** 68:12
**need** 5:17 8:15 27:17 30:17,19 37:12 41:16 63:22 85:11 92:1 93:7 98:6 133:4 134:6 151:10 156:18 179:15,25 181:12
**needed** 20:2,15 36:14 42:2 63:19 74:11 98:11,12 137:7
**needs** 18:25
**negotiate** 124:23 128:23
**negotiated** 66:7,8
**negotiating** 96:11 105:22 149:25 160:3
**negotiation** 39:12 69:12
**negotiations** 33:15 105:18,24 135:13
**never** 28:14 30:9 47:6 48:14 49:6 50:12 54:2,3 99:13 125:3 150:7 154:1 168:20
**new** 16:25 17:3,21,23 18:2,4,7 27:18 56:21 84:25 85:5 102:11,14 103:10 103:17,23 105:3,6 133:1,1 176:6
**nice** 37:5,18
**Nimesh** 145:12
**nomenclature** 176:10
**non** 12:20
**non-payment** 32:17
**nonapplicable** 129:5
**nonbinding** 92:14,18 92:23
**noncapital** 12:10,21 13:7 80:15
**noncompete** 81:16
**noncontingent** 36:23
**nondilution** 10:9 171:20
**noninflammatory** 37:19
**nonsense** 65:1
**normal** 112:18,20
**notably** 103:19
**note** 4:22 36:7,24 46:4 79:2 82:19,21
**noted** 56:20
**noticed** 13:10
**notices** 146:13
**notify** 166:11
**November** 54:17 57:7 107:22 108:10 111:1,11 121:12 131:17 138:13 140:12 142:13 143:23 144:4,9
**nuance** 37:1
**nuanced** 31:3
**number** 23:16,17,23 23:24 26:18 29:12 33:2 52:10 56:18 61:16 83:14 138:21 153:16 154:1 181:7
**numbers** 64:18 78:10
**numerous** 168:16
**nurses** 20:5

**O**

**oath** 16:19 78:1 100:21 178:21
**object** 60:21 63:2 114:15
**objected** 125:11,18 141:22
**objection** 49:24 62:23 65:3 66:25 70:20 107:11 112:10 116:1 118:18 125:20 126:10,11,21 127:12,15,17 128:11,12 142:2 163:14 173:2
**objections** 164:6
**objectively** 36:22 48:2
**obligate** 171:20
**obligation** 165:23,24 166:6,9
**obligations** 28:4
**obtain** 17:15 166:13 170:1
**obviously** 12:5 59:17 130:3 159:8
**occur** 120:21 137:8 170:19 172:4
**occurred** 9:10 54:15 54:16,19 59:5 83:16 84:18 144:4 144:15 175:19
**occurring** 51:9 85:6
**October** 51:18 57:6 58:7 84:10 85:21 101:22 131:1,10 134:3
**Off-the-record** 179:10
**offer** 60:22 103:9
**offering** 111:19
**officer** 73:6
**officers** 174:21
**official** 168:11
**offset** 127:5
**oh** 28:22 54:10,13 64:25 71:4 111:7 170:5 175:14
**okay** 6:22 7:24 9:10 9:17,21,25 10:5,23 14:9 19:10,14,23 20:16,21 21:10,14 21:20 22:24 23:9 23:25 24:6,11,24 26:5 27:4 29:19 31:1,11,19,21 32:11,15,22,25 33:20 34:9 35:3,15 35:19 36:5 37:10 38:10 39:24 40:17 40:21 43:10,18,24 44:4,8,23 45:4 46:3 49:11 50:6,16 51:14,15,19 52:2 53:14,20 54:18 55:5 60:18 62:10 64:22 65:15 66:7 68:24 71:8 72:10 74:3,7,14 75:17 76:25 78:21 83:4 83:25 87:20 88:15 90:20 91:15,17 93:15 94:5 106:7 107:7,21 110:1 112:25 115:7,13 126:2,18 127:19 130:10 134:21 136:5,18 141:1 143:18 144:18 150:16,21 151:8 152:24 153:24 154:11,18 155:5 156:5,8,12 157:20 158:23,23 159:8,12 160:4 163:6 165:5 168:7 169:4,20 170:16 175:4,13,19 177:22
**omitted** 13:14
**once** 38:23 50:13 57:17 59:13 66:24 97:4 98:14 107:11 114:14 129:24
**one-half** 10:21 11:3
**ones** 128:15 166:15
**ongoing** 68:4
**open** 102:18 147:7
**opening** 3:2,3 6:19 6:23 11:20 34:1 76:23
**Operated** 90:23
**operating** 4:16,17 43:17 50:14 68:10 73:15 75:18 90:24 91:7 112:20 122:7 122:9,11,23 123:1 153:3 164:24 165:1 165:10 166:21 167:19
**opinion** 60:22 163:19
**opposed** 35:6 160:22
**opposing** 172:25
**option** 110:17 125:2
**order** 63:3 103:23 110:13 113:18 181:7,7
**ordinary** 64:16
**organization** 108:5 108:14 112:19 122:25 128:22 165:4
**organizations** 112:24 120:6
**original** 5:7,9,13 6:3 24:3,7 86:23 101:10 104:15 108:14 110:3,4 130:19 182:11

**originally** 5:21 17:5 49:16 116:16 127:2
**outline** 132:13
**outlined** 104:2
**outside** 14:18 40:14 48:5 79:23 82:23 89:1 114:4,6 121:5 121:9 128:15 132:4 139:11 149:3 162:23 170:7
**outsiders** 22:8
**outstanding** 10:21 11:3 38:13,15 41:5 41:13 67:19,20 94:2 148:20 161:21 162:9 175:2
**overall** 36:13
**overburden** 7:6
**Overruled** 60:25 67:9 70:24 107:14 114:16 116:3 118:19
**owe** 141:8
**owed** 28:15 29:1 81:16
**owned** 5:19 26:1 28:25 40:6 44:16 47:25 73:3 87:16 87:20 101:18 124:8 128:17
**owner** 28:16 81:15 86:5
**owners** 36:14 94:21 122:12,24 123:6,8
**ownership** 35:2 39:2 53:12 124:5,7 142:12 143:1 151:15 165:3
**owns** 44:13 108:10 143:9 153:17

**P**

**P** 3:10 100:19,25
**P.A** 2:8
**p.m** 181:15
**package** 53:15 54:22
**page** 3:2 12:16 25:7,8 26:5,5 44:6,9 51:17 51:19 52:2,15 55:8 56:1 59:3 63:6 69:19 71:17 74:25 75:8,11 76:14,17 78:6,10,11 83:7,7 84:15 87:25 97:6 107:25 111:2,10 115:20 123:20,20 133:23 134:20 142:23 145:19 153:12 154:6,12,19 155:10 158:4 159:20 163:2,10 167:9 178:5
**pages** 74:15 107:18 167:10,12 178:25
**paid** 24:25 27:10 174:6
**painful** 38:3
**papers** 6:3
**paragraph** 8:17 10:16,16 27:3 33:1 33:6,23 40:7 45:18 45:19 48:12 53:8 59:11,12 69:21 85:3 93:6,9,19 111:2,18 114:20,25 154:23 173:17,20
**paranoid** 45:22
**parcel** 129:9
**pari** 39:18
**parol** 66:25 67:7 70:21 71:3 92:3 107:11 114:15 116:2 179:1
**part** 6:4 7:19 13:11 14:2 15:5 19:14 48:2 64:1,15 76:22 76:24 79:20 88:7 109:21 113:1 117:23 118:4 119:25 121:15 124:23,24 126:1,4 126:15,16 127:3,7 129:9 132:2,3 136:12 138:22 140:11 141:19 143:11 165:3 168:22 173:21 180:22
**partially** 160:15
**particular** 9:14 18:16 25:9 26:6 33:23 47:15 53:8 85:15 93:17,20 116:24 120:3 157:21 160:9
**particularly** 58:1 92:7
**parties** 9:17 15:8 33:9 56:8 66:7 68:9 69:22 72:22 73:2 74:1 75:25 76:3,8 96:11,19 102:16 134:24 177:12 178:23,23 179:3 182:8
**parties'** 15:5,12 67:17 177:8
**partner** 21:23 22:12 28:24 108:13 124:9 180:3
**Partner's** 52:17
**Partners** 130:13 165:3
**Partnership** 142:14
**party** 5:17 6:10,15 40:14 64:4 73:4 74:1 76:15 90:6 91:19
**passu** 39:18
**Patel** 145:12
**patients** 20:2,5,10
**pay** 26:9,22 27:22,23 30:6,7,9 31:15 34:19 141:6,10 157:25 159:6
**paying** 22:16
**payment** 25:3,4 29:13 89:18 104:8 104:11,17,18,21,22 105:21 158:10,12 158:13,14,17,18,20 158:21,24 159:1
**payments** 25:6 89:19
**payout** 139:25
**payroll** 28:18,19
**penalized** 141:19
**penny** 170:12
**people** 19:4 23:4 27:21,25 29:24 37:16 40:11 85:24 100:1 136:12
**percent** 10:21,24 11:3,7 24:17 28:13 28:16 38:13,15,18 38:24,25 39:8,15 40:6,23 41:5,10,13 41:25 42:8 43:5 44:21 51:13 52:11 53:6 56:16,22,23 57:4,5,6,7,8 58:2 63:8 67:19,20,21 68:2,6 81:15,17 86:23 88:6,12,18 93:10 94:2,6,8,17 97:25 108:10,17,20 108:23 109:3,14,21 109:25 110:2,2 115:21 116:9,14 131:16 138:15,15 139:1,1 147:10 148:20 153:17,18 161:20,20 162:9 174:22 175:1,10 177:21
**percentage** 44:13 53:12 83:14 94:11 124:5 160:21
**percentages** 121:11
**perform** 27:13 28:3 64:24
**performance** 27:24
**performed** 63:23 64:8
**performing** 48:1
**perfunctory** 45:7
**period** 9:1,3,6,7,9,22 10:8,13,14,18,22 10:24 11:4 12:25 13:12,16,18,18,21 13:23 14:6,16 24:17 31:17 40:4 54:20 55:21 58:3 60:5 85:6 93:11 94:3,6,11,14,18,18 94:25 95:4,7,8,11 95:12 97:21,21 98:4,6 99:11 102:18 105:4,6,20 113:23 120:21 124:20 137:8 138:6 148:15,21 149:3,16 149:16,23,24 150:13 151:13 155:23 160:5 161:21 162:10,23 171:10 175:2,9,9 175:19 176:11,22 176:23 177:4 178:12
**periods** 173:23
**perpetual** 12:9 13:6 79:22 80:14
**person** 12:13 18:23 18:24 76:2 106:2 127:1 150:21 168:20 175:14
**personal** 20:12 101:16
**personally** 76:25 87:12,13
**perspective** 60:17 62:4 113:24 118:25 141:4
**Peter** 84:12
**petition** 59:24
**phantom** 35:1,5,9,11 35:13,13 86:23 87:4,14,16,22 88:4 88:6,12,18,21 89:8 89:11 138:6
**pharma** 1:7 4:18 21:17 22:7 72:23 73:21 101:4 114:13 164:24
**Pharma/WorkUp** 4:3
**pharmaceutical** 102:2
**pharmacies** 22:7 102:3
**pharmacists** 20:3
**phases** 32:6 65:23 71:9 104:5
**phone** 122:17
**phones** 19:15
**phonetic** 145:12
**phrase** 176:5
**picked** 149:24
**picking** 167:7
**picture** 135:18
**piece** 22:2,3 36:4 37:1,5 79:4,22 177:10
**place** 13:25 90:21 182:5
**plain** 12:2,4,13,14 13:8 14:5,12,21 68:17,25 170:13 175:23 176:4 178:8 178:15
**plan** 88:5 109:14 110:7,8,16 121:13 140:12,19
**plans** 103:22 110:17
**play** 20:1
**Plaza** 1:17 2:4

182:14
**please** 27:16 28:6 35:19 45:4 52:7 55:21 58:21 63:21 82:14 96:8 100:15 100:23 106:21 134:18 139:17 159:13
**plenty** 36:25 120:25
**plus** 116:9 139:1
**point** 7:9 11:6 12:5 14:10 21:11,25 37:6,15 39:18 46:8 46:14,18 51:4 57:11 60:19 68:23 85:13 97:14 99:2 106:2,12,16 108:4 108:12 109:24 111:19 113:7 114:21,24 115:1 119:10 121:2,4 122:11 123:5 127:6 132:14 135:12 138:25 141:2 143:13 145:7 148:6 149:12 150:20 156:5 170:23 177:20 181:12
**pointed** 83:6 95:23
**points** 172:24 173:4
**political** 17:16
**pops** 166:23
**portion** 9:19 68:7 115:22 135:2 137:6 169:22 170:25
**position** 6:3 8:5 9:13 9:23 10:6 15:16 85:2,14 86:4 98:3 99:13 101:9 103:23 126:17 147:14 155:22 159:14 174:12
**positioned** 146:23
**possible** 35:22 36:19 37:19 171:13
**post** 99:6 113:18 137:22
**post-acquisition** 26:23
**post-award** 181:9,10
**post-financing** 108:6
**post-hearing** 180:1
**potential** 22:25 34:24 38:19 40:23 42:8 88:11 97:8,24 103:13 108:5 116:13 119:6 121:5 135:8,19 162:18
**potentially** 8:13 23:10 36:2 39:2 116:14
**practices** 133:3
**practicing** 18:9,11,13
**pre-lawyers** 96:12
**pre-valuation** 164:2
**pre-Workup** 19:21
**preceded** 66:21
**precedent** 25:14
**precedes** 176:17
**precise** 87:24
**predominantly** 102:2 106:9
**prefinancing** 108:9
**prehearing** 8:4 180:14 181:6
**premised** 26:21
**prepare** 64:13,18 69:22
**prepared** 63:5 64:17 64:21
**present** 2:17 11:14 15:22 100:12 143:5 155:2 165:23
**presentation** 103:25 104:1,1
**presentations** 103:13
**president** 101:11
**pressing** 96:15
**presumably** 18:20 59:4 98:15 123:6
**pretrial** 8:4
**pretty** 130:5 169:11
**previous** 133:2
**previously** 28:12 174:6
**price** 26:10 157:25 158:3,15 159:6
**pride** 46:11
**principle** 61:11,11,16
**principles** 177:9
**prior** 19:10 28:14 47:1 113:10 117:11 122:7 128:22 130:24 140:6 165:10 166:15
**privilege** 46:2
**pro** 107:24 108:16 110:18
**probably** 98:20 105:1 173:3
**problem** 19:3 20:8 28:19,20 29:3,5 157:8 180:5
**problems** 22:23
**proceed** 6:16 16:15 35:24 65:18 100:9
**proceeded** 27:18
**proceeding** 6:11 28:10 133:22
**proceedings** 1:13 5:1 134:10 181:15 182:4
**process** 119:23
**processes** 112:20
**product** 18:23,24 19:7 22:15
**products** 18:24 19:1
**profit** 52:17
**program** 104:3 140:4 140:10 146:2
**programs** 17:20
**projected** 140:15
**promise** 37:22
**promises** 25:22 33:16
**promissory** 36:7,24
**promoted** 49:17
**Proper's** 168:4
**property** 35:12,14 37:9
**proposal** 110:4
**proposed** 106:17,18 107:3 108:2,6 109:3,22,23 110:13 111:1,14,20 123:2 138:25 140:22,24 156:7,11
**proposing** 110:22
**Propper** 4:15 127:19 127:20,22 128:5,7 128:10 154:20 167:22 168:9
**Propper's** 128:2
**prorated** 131:24
**prospective** 97:21
**protect** 42:20 111:25 113:24
**protected** 8:25 9:3,5 9:9,22 10:13 40:15 40:16 43:1 46:1 54:20 55:21 59:1 60:5 93:11 94:13 94:18 95:7,10,12 97:21 98:4,5 150:13 162:23 175:9,19 176:11
**protection** 12:11,15 12:20,21 13:7,23 14:20,23 15:14 40:12,25 42:10,14 42:15 66:4 68:18 98:1,8 111:20 112:5,16 114:4,25 119:3 121:4,8,20 122:1 129:5 136:25 137:15 172:10 176:20,21 178:20
**protective** 9:7 13:12 160:5
**prove** 27:21
**proved** 27:20
**proven** 22:15
**provide** 48:11 49:4 58:18 109:6,19 123:24 165:20
**provided** 4:22 13:14 41:1 42:10 48:15 58:16 67:5,22,22 79:16,21 80:18 83:9,13 85:21 98:2 109:1 121:18 122:5 127:9 128:5 133:22 171:7 178:20
**provider** 94:10 95:3
**provider's** 20:13
**providers** 9:8 58:25 85:5
**provides** 84:16 162:7
**providing** 68:17 79:18 123:19 139:20
**provision** 7:14,14 9:24 10:3,9,19 13:1 13:2,13 15:7 47:22 47:23 92:8 93:25 98:7 112:12 147:12 147:14,16 148:2,4 148:15 149:10 150:3 162:7
**provisions** 85:9 98:19 137:3
**public** 109:15 155:1
**purchase** 3:20 24:3 26:10 27:6,13 28:2 32:18 34:11 86:6 102:5 104:6 105:19 105:24 106:17 157:4,14,25 158:3 158:7,15 159:5,6
**purchased** 103:5
**purpose** 26:16 43:19 47:22,23 62:24 70:2 130:15 164:25 178:9
**purposes** 13:16 24:1 171:10
**pursuant** 88:4 90:8 90:11 153:8,20
**pushed** 140:24
**put** 8:13 34:2 38:1 39:12 41:21 60:1 83:24 98:16 120:6 138:5 145:6 147:16 147:21 166:8 179:21
**puts** 179:12
**putting** 77:11,12
**puzzling** 50:18

**Q**

**qualifications** 112:11
**qualified** 139:24 156:3 176:25
**qualify** 14:3
**qualifying** 13:22,24 14:7
**quarter** 53:1
**quarterly** 58:18 83:21
**quarters** 105:1
**question** 6:8 8:24 9:4 9:17 10:10 11:1 15:9 30:12 36:11 38:1 50:25 51:1 60:8,25,25 61:22 68:21,24 73:16 77:7,20 78:13 80:7 80:8 83:24 87:8 90:20 91:19 96:1 137:16 148:10,12 148:13 152:16 154:24 156:16,17 156:19 160:24
**questioning** 62:25 152:18
**questions** 8:15 30:17

30:18 38:9 65:9 77:20 89:23 90:5 92:7 98:24 99:1 136:17 147:1 157:15 161:13,15 161:23 162:15 167:2 169:11,14 172:15
**quickly** 71:13,16 117:13
**quote** 13:3 130:20

**R**

**R** 2:7 4:15 182:1
**raise** 8:20,22,23 9:20 10:1,22,24 11:4,7 12:11,19,21,23,25 13:15,21,22,24 14:8,14,19,23 15:15 16:7 26:24 40:12,15 48:3,4,8 54:10,11,15 68:8 68:19 69:2 79:4,23 85:6 94:4,7,13,23 95:5,14 96:15,17 98:5 100:15 102:14 102:21 108:23 109:10,12 110:6 112:2 113:17,17 114:4,6 115:23 119:18 120:2,14,21 121:9 122:20 123:7 123:24 125:4 129:8 129:9,13,19 131:22 132:3 134:23 135:2 135:4,5,8,12,16,20 137:6,16,21,21,22 137:23 138:19,21 139:8 144:1,4,13 144:15 145:8,9 147:18 148:5,17,21 149:21 151:14 155:10 159:18 160:7,10,13,16 161:22 162:10 169:22 170:1,4,6 170:13 171:1,2,6,7 171:9,14,19 172:3 175:3 176:13,22,24
**raised** 5:21 6:2 26:23 39:17 54:11 104:14 113:6 145:13
**raises** 11:10,12 12:10 12:12 13:5,7 39:23 42:17 80:15 81:1 93:12 94:22 95:1,2 95:19 119:11 121:4
**raising** 85:13 162:16
**range** 105:1 144:17
**rate** 67:20
**re-think** 141:17
**reached** 32:16
**reaching** 113:10
**read** 8:3 13:11 45:14 67:15 68:14 69:25 74:2 76:6 79:7 82:24 88:7 92:16 94:12 111:18 118:13 119:13 137:4 155:3 169:19 169:23 170:24 174:1 175:6 176:16
**reading** 70:1 94:17 115:18
**reads** 69:21 75:25 79:1 93:23 154:23 161:17
**ready** 6:16 100:4,9 173:5
**real** 168:21 169:10
**reality** 139:4
**realized** 57:17
**really** 7:11 8:15 9:15 22:3,13,13 24:12 34:2 50:3 59:9 62:2 63:18 89:12 92:2 103:1 112:23 115:19 147:17 148:12 172:9 177:12
**reason** 9:6 10:2,14 11:6 24:13 30:8 43:5 76:4 84:22,24 94:9 95:4 128:5 129:21
**reasonable** 12:13
**reasons** 21:20,22 26:18 30:5 85:20 102:24 104:21 128:20 156:4
**rebuttal** 152:4,15
**recall** 59:9 77:14,23 78:1 81:1 105:14 113:15 114:7 118:6 118:10 120:23 121:6,14 122:15 130:22 135:22 140:2,7 144:14 151:18 157:18 165:2,13 166:17
**recap** 130:7
**receive** 12:9,10 14:19 45:9 112:17 127:8 138:14 141:11 154:16
**received** 51:12,18 53:20 70:17 79:9 80:17 81:21,22 82:10 99:9,13 144:1 146:11 154:20 155:1 165:11
**receiving** 34:18 57:17 146:9
**recess** 65:16 100:5,7 134:12,13
**recidivist** 174:11
**recited** 12:18
**recognize** 70:6 133:16 142:7
**recognizing** 155:13
**recollection** 105:10 122:18 152:7
**record** 6:10 65:17 100:11,24 102:24 134:14 143:9 168:5 180:22
**recordkeeping** 150:22
**records** 143:11 151:2 152:8,8 155:21
**rectify** 155:17
**red** 115:11,19 116:5 116:8
**red-line** 121:23
**red-lined** 4:4 115:5 116:9,17,25 136:25
**redirect** 3:8,12 89:24 90:1 167:3,5 169:4
**reduced** 39:3,3,5 182:6
**refer** 101:6 135:24
**referenced** 119:1 127:1 140:15
**referred** 15:5 33:7 73:25 178:18
**referring** 42:16 45:1 55:5 58:12 62:24 75:17 116:12,13 125:15 135:7 140:12
**refers** 12:23 120:19 136:18 137:4 176:14
**reflect** 52:20 68:11 108:24 125:7
**reflected** 123:7 124:7 156:10
**reflecting** 69:23 121:25
**reflects** 53:2 63:6 124:5
**refresh** 87:19 152:6
**regard** 47:8 92:7,25 162:3
**regarding** 32:17 81:2 90:5 99:1
**relate** 85:4 123:23 141:24 144:12 145:4 146:1
**recidivist** 
**related** 67:17 79:23 115:15 117:24 120:2 122:19 123:2 136:10,16 160:1,6 160:8,15,19,21 169:15 175:5
**relates** 159:16
**relating** 147:12 150:23 160:20 169:16
**relation** 98:5
**relationship** 21:7 50:9
**relationships** 22:6
**relative** 182:7,9
**release** 86:16,18
**relevance** 88:14
**relevant** 28:10 79:25
**relief** 6:5
**relying** 29:24
**remain** 39:8,15 154:2
**remedies** 76:3
**remember** 23:3,3,5 23:15 25:2 59:18 65:24 66:3 77:16 79:11,12,18 84:6 86:2,25 87:18 102:6 104:9 117:15 132:8 141:1 147:11 161:15 170:20
**remind** 78:19
**remove** 98:12
**removed** 37:8
**repeat** 70:20
**repetitiveness** 7:7
**rephrase** 87:9
**replaced** 168:20
**Report** 3:22
**reporter** 1:24 5:22 16:12 80:6 163:17 166:3 182:3
**reporting** 47:19 48:12 64:16
**reports** 48:9 58:17,22
**represent** 44:14 53:11
**representation** 26:12 104:15 157:16,22
**representations** 26:1 26:8
**represented** 69:11 141:9 142:13,25 145:10 159:4 168:18
**representing** 98:16 120:18 121:25
**represents** 25:15 53:12
**reputations** 27:23
**request** 64:12 83:18 83:20
**require** 12:14 26:9 71:4 157:17,24 159:6
**required** 11:7 48:12 158:6 167:12
**requires** 15:2 178:6
**reservation** 4:9 44:2 44:4 45:1 47:10 50:11 78:22 79:3 79:24 80:16 122:14
**reserve** 15:10 46:5 109:5,18
**reserved** 11:24 109:25 110:3
**reserving** 46:7 67:3 122:18
**reside** 16:23
**resided** 17:2
**resign** 37:4
**resolution** 106:17
**resolve** 32:16 92:14
**resolved** 8:16
**resolves** 170:8
**respect** 33:9 118:15

152:19
**respectfully** 8:9 67:4 174:23 178:7
**respond** 47:10 156:13,21
**Respondent** 1:9 2:11 3:9 21:16,18 100:13,20
**Respondents** 7:2
**responding** 161:23
**response** 48:18 58:19 162:14
**responsibility** 72:1
**rest** 7:18 172:19
**restated** 4:16,17 43:16 75:18 90:24 133:4,5 153:3 164:24 165:1,10 166:21
**restrictive** 139:21
**restructure** 110:11 127:23
**restructured** 34:25
**rests** 99:22
**result** 32:2 90:17
**resume** 134:10
**retained** 4:23
**return** 105:8 173:4
**Revere** 108:5 109:1 109:10,12 110:7,10 113:16,23 114:5,6 119:18,22 120:2,4 120:13,18 121:5,9 123:2,7,9 124:16 124:25 125:3 128:2 128:25 129:8,9,14 129:16,20,23 130:1 130:3,8 135:8,11 137:17,24 138:3 139:7 148:5 149:1 159:18 160:2,21 162:20 169:17 170:4,5 171:14,19
**reverted** 5:7
**review** 8:19 67:6 152:7,8
**reviewed** 95:18
**revise** 104:6
**revising** 105:24
**Revokable** 56:13,23 127:19,20
**reward** 127:5
**Rhodes** 2:7 180:5
**rich** 36:2
**Richard** 127:22 128:10 154:20 167:22 168:8
**right** 6:23 7:23 14:16 16:8 19:16 23:7,7 27:12 34:1 35:13 36:4 40:3 41:11,17 41:20 42:1,18,21 43:7,9 47:9 48:11 50:21 53:4 54:1 55:2,19 56:2 57:11 58:23 59:8,25 60:7 61:23 66:4,13,16 67:3,15 69:7,8,9 70:5,10,15 71:24 72:11,12 73:7,9 75:23,24 76:14 77:13 78:13,19 79:17 81:12,23 82:1,5,11,17,19 83:1,5,10,18 84:13 84:21 85:1 86:7,14 87:23 88:3 89:3,10 89:22 90:16 91:2 91:21,25 92:22 94:5,5,16 95:6,15 96:13 98:22 99:11 99:16,17 100:15 101:7 103:14 106:21 107:1,5 108:18 110:5 111:12 113:9 114:22 115:20 116:23 117:4,18 118:7 123:14 124:17 125:21 126:7 131:2,23 135:16 136:7,20 137:1,9 139:10 141:21 143:13 144:14 146:4 148:11 150:7,10,25 151:9 153:11 154:5 157:2,13 160:9 161:3 162:6 163:1 163:9 164:7 167:1 168:2 169:17,23 170:9,22 171:2,7 171:21 173:14 175:15 178:12 179:7,17
**right-hand** 33:2
92:13 93:19 163:11
**rights** 4:9 12:10,24 14:13 39:19 44:3 46:5,7 50:11 75:25 76:3 77:1,2,5,8,9 78:15,16,23 79:3 79:22,22 80:14,14 80:15,17 81:3 88:20 91:22 96:3,4 122:5,14,19,19 139:21,22 176:2,7 178:10
**risk** 19:4
**risks** 40:9
**road** 33:21 173:17
**rob** 170:17 172:7
**rock** 36:15 37:13
**role** 81:14,16,19
**rollups** 102:16
**Ronald** 58:9
**Ronnie** 1:15 2:3 182:13
**room** 16:5 45:17 46:10 170:23
**roughly** 63:22
**row** 56:19
**RPR** 1:23 182:21
**rubber** 33:20 173:16
**Rucker** 3:18 58:9
**rule** 8:12 112:8,13,18
**ruled** 67:2 163:20,22 164:3
**rules** 31:1 36:21 38:8
**ruling** 63:11 67:4
**Rumpler** 49:2,3,4 55:9 58:17 106:2 150:18,18,19 155:2 156:2 168:15
**Rumpler's** 175:12
**run** 92:1 173:10
**running** 98:9 179:20
**RX** 124:8
**RXCVV** 124:7

**S**

**S** 3:4,4,4,14
**sacrosanct** 13:13 97:2
**sake** 119:20 168:19
**sale** 24:18
**satisfied** 172:22,23
**satisfy** 23:11 150:2
**saving** 141:25
**saw** 34:1 51:13 55:22 57:22 86:8 106:15 122:14 130:5 132:8 136:22
**saying** 12:13 14:4,13 30:16 47:11 58:20 59:22 80:7 86:25 156:1,2 160:11 177:23
**says** 8:19 9:16,17,24 10:4,4,18 11:8 13:13,14 14:13 25:13 33:6 40:22 41:4 42:7 44:8 52:16 53:10,10 57:25 58:1 69:4 73:18 74:4 82:21 92:12,13,17 93:8 97:24 108:9,20 109:2,10,20 115:21 116:20 134:24 137:4 143:22 148:18 157:21,24 162:8 174:25 176:17 177:2 178:17 179:20
**Schaeffer** 2:12 3:3,7 3:11,12 5:4 6:9,14 11:19,21,23 14:4 14:10 15:21 49:18 49:25 60:21 62:22 64:2,7,11,15 65:13 65:18,19,21 66:13 67:11 71:8,15 74:12,20,22,24 77:22,23 80:9,10 80:11 84:1 89:22 91:18 92:6 95:21 96:1 98:24 99:25 100:8,10,13 101:2 107:8,16 111:5,9 112:15 114:17 116:4 118:20 125:16,21 126:12 126:23 127:11,19 128:9,14 129:17 134:5,5,8,15,16,17 141:21 142:4 147:1 152:4,10,17,24 163:13,19 164:18 167:4,6 168:8 169:7,9 172:14,18 173:1,2,15 175:20 175:21 177:16,21 177:23 179:22 180:7,8,10,13,16 181:2,5,13
**Schedule** 3:17 52:3
**schedules** 3:19 132:13,16
**Schoffelen** 4:10 125:24 126:3,5,9 166:11 167:14
**school** 17:9,10,10,12 17:14,21 18:12
**science** 17:16
**scope** 96:23,24 152:11,13
**seal** 182:17
**season** 117:9
**seat** 16:5
**second** 9:14 10:10 15:18 29:6 43:12 44:22,24 45:25 55:25 59:3 61:9 85:9 90:22 130:11 145:1 154:23 164:20
**second-to-last** 69:21
**section** 7:12 9:13 10:20 15:3 25:9,17 25:18,18 26:6 34:4 35:15,20 41:4 42:9 47:16,18 67:12,13 67:15 71:18 72:19 73:18 75:25 76:8 76:20 85:7,10 88:3 93:17,25 97:5,7,23 107:2 115:14 118:21,21 119:14 120:19 134:20,24 147:8 148:13,18 157:21 159:15 161:13,19 172:4
**sections** 72:21
**see** 7:16,17 15:22 25:11 26:8 33:4 35:15 41:2 47:7,18 47:19 48:10 51:20 52:5,16,18 53:15 55:24 56:7,15 57:2 57:3 58:23 74:17 74:24 76:16 78:8 85:5 91:3 107:24 107:25 115:14,15 115:19,23 116:4,6

116:9 131:9,10,11 133:24 136:22 138:24 143:21,21 143:22,23 144:8,9 144:10 145:19,24 153:12,15 154:8,19 154:21 155:6 163:4 171:3 176:10 179:12
**seeing** 105:7
**seek** 102:11,21 103:16 166:13
**seeking** 102:13,25 103:6,7,10,21 121:19 136:24
**seen** 56:22 62:18 72:12 95:16 121:23 164:21
**self-financing** 21:25
**sell** 19:8 21:11,14 23:19
**Seller** 25:15
**Seller's** 88:4
**selling** 23:10 61:12
**send** 48:21,23 99:13
**sending** 107:21 108:3
**sends** 82:7
**senior** 109:8
**sense** 27:2 31:4 73:4 98:20 152:2
**sent** 45:6,13,13 47:9 50:12,14 53:15 54:21 55:24 78:23 78:25 84:2,12 111:11 122:14 123:18 133:18 154:6
**sentence** 9:14,15 10:7 13:20 14:6 40:22 42:5,22 58:1 69:21 85:9 88:7 92:11 93:6,7,7,13,21 97:23 115:20 116:6 116:24 119:1,12,14 137:4 161:13 169:21 170:24 174:2 176:3,17
**sentences** 115:18
**separate** 36:14 120:10
**separately** 58:18
**separation** 4:3 113:18 114:13
119:21 126:4,16
**September** 28:17 55:13 57:6 82:11 84:3 123:19 132:7
**series** 154:5
**serve** 101:11
**serves** 92:12,13
**service** 9:8 58:25 85:5 94:10 95:3
**services** 19:2
**servicing** 102:1
**serving** 102:2
**session** 5:2
**set** 10:19 59:1 93:25 151:25 161:18
**setting** 71:8
**settle** 31:25 32:2
**settled** 31:23
**settlement** 3:16,24 4:6,8 7:12 8:21 15:6 31:9 32:14,15 34:12,15 36:13 41:16,21 43:17 44:20 45:8,10 46:16 47:2,13 48:13 49:8,12 50:9 51:7,10,24 53:7 54:23 55:16 60:2 65:24 66:4,22 69:6 69:13 70:9,16 71:2 71:11,20,23 72:14 72:18,23 73:2,14 73:18,19 74:4,16 74:25 75:12,16,24 76:15 77:1,4,8 78:14 79:5 80:13 81:7,11 85:7,10 86:12,19 88:16 89:14,19 90:4,8,22 91:8 92:24 93:15 96:3 97:1,5 99:6 103:15 105:22 106:24 109:23 113:1,11 117:7,14 117:24,25 118:3,12 120:3 121:17,24 122:5,6 124:24 127:9 128:23 129:18 131:5,6 134:19 135:7 136:6 138:18 139:5 144:19 153:9,20 155:14 159:16
161:10 169:6 174:15 176:14
**settling** 39:12 174:5
**share** 58:21 151:25 181:4
**shared** 22:21
**shareholder** 62:5 112:1
**shareholders** 56:21 142:15 146:23 165:25 166:10,12 167:13
**shares** 8:24 9:8 10:13 40:14 44:15 47:4,4 47:6 52:17 57:13 60:11,12 84:25 90:7,11,18 101:16 119:7 137:22 153:7 153:17 155:7 175:17
**sharing** 110:22
**She'd** 97:14
**sheet** 3:23 163:4,7,10 163:12
**shift** 139:10
**short** 39:11 65:13 113:17
**short-term** 36:8
**shorthand** 1:24 182:5
**shortly** 62:16
**show** 15:10 28:21,21 44:9 48:9 55:21
**showed** 25:25 26:1 54:24
**showing** 53:18 121:19
**shown** 91:25 95:17
**shows** 52:10,10 153:16
**side** 7:11 20:13 26:2 28:8 52:15 106:1,7
**sign** 45:22,24 46:3 69:22 73:9 91:12 91:15 122:23 165:6 177:19
**signable** 92:21
**signature** 74:15,25 75:3,6,8,11,19 91:10 167:9,12
**signed** 27:5 28:11 34:6 38:23 41:21 66:9,17 68:9 70:18
73:3,3,6,10 75:10 75:12,14 87:7,22 90:21 91:14 92:5,5 92:11,23 116:25 117:3 122:6 135:11 139:6 159:9,10 165:19 171:18
**significance** 29:8
**significant** 8:1 10:11 10:25 11:11 34:18 88:15 173:25
**significantly** 105:3
**signing** 25:4 44:11 86:6,11 87:11 117:6 118:7 122:7
**silent** 12:21 13:1 50:16
**similar** 91:15
**similarly** 53:14 126:7 126:18
**simple** 7:10 12:2 67:5 161:24 162:2,6 174:3 175:22
**simply** 12:21 13:8 24:12 119:4 175:22 175:23
**simultaneously** 179:16,18
**single** 12:17 14:15,17 15:11,14 48:15 83:14 84:18 178:9 178:11
**single-purpose** 14:22
**singular** 148:17 176:13,21
**sir** 23:25 25:11 26:6 26:13 27:4 28:3 33:25 41:2,22 43:13 44:1 45:2 46:2 47:18,20 51:3 51:16 52:18 55:6 62:17 88:14 92:8 92:16 94:24 147:6 147:12 148:10 149:17 150:8 151:22 153:1,2,4 154:8,14 155:3,15 155:24 156:12 157:12,18,23 158:17 159:13 161:6,15 162:14 163:12 164:19,21 164:25 165:5,17,20
**sitting** 23:7 77:14,23
**situation** 31:3 105:9 138:8 139:5 148:2 170:17 172:6
**six** 8:20 13:13,17 14:7,13 39:6,25,25 48:5,6 80:15 94:14 94:15 120:20 123:15,23 128:15 129:6 131:4,6 133:23 136:5,6 137:8,17,19 149:12 149:13,20,25 170:8 170:19 171:11,15 171:16 172:4,11 176:23 177:5 178:3
**six-month** 8:18 9:9 10:12,18 13:12 14:12 54:20 58:3 60:5 85:6 94:25 120:21 132:5 137:12 148:14 149:3,16,16,23,24 150:5,13 155:23 176:12
**sixth** 164:23,25 166:23 167:18
**skip** 28:19 74:12
**skipped** 13:11
**sky** 93:14
**slog** 21:2
**sloppy** 54:6
**slow** 5:23 6:25 73:13 73:17 166:4
**small** 25:3 116:19 180:18
**smaller** 157:10 181:1
**sold** 21:18,20 61:5
**solid** 35:14 36:15,18 37:13
**solution** 19:3 113:25
**Solutions** 1:8 21:17 101:5
**solve** 20:7
**somebody** 26:24 71:4 138:8 147:21 149:1
**somewhat** 101:24 169:14
**Sonic** 19:18
**soon** 31:24 82:10
**sophisticated** 178:23 178:23
**sorry** 5:24 12:20

28:22 33:25 46:21 47:15 49:18 62:12 68:21 74:23 107:8 111:5,7
**sort** 12:19 28:24 29:3 35:10 36:18 37:18 39:18 50:15 59:1 63:1 139:24
**sorting** 58:21
**sought** 140:2,18
**Sounds** 131:2
**speak** 51:1 74:7 166:16
**speaking** 80:4 111:23
**speaks** 12:19,22 14:15
**special** 96:20,21 130:13,14
**specialty** 22:7
**specific** 22:6 80:15 81:1 83:13 113:22 119:17,18 120:7,8 121:15 129:8,25 130:4 143:14 148:4 149:20,21
**specifically** 7:13 34:9 47:7 127:9 136:23 146:19 148:18 151:18 160:14 161:17,24 162:8 165:14
**specifics** 24:12 27:17
**specified** 67:16 78:16 96:4 115:1 138:14
**specify** 129:20 180:19
**speculate** 30:13
**speed** 125:6
**spent** 7:5
**spirit** 77:18
**split** 26:20 27:1
**spoke** 49:21
**spreadsheet** 55:24
**spreadsheets** 159:21
**SR** 131:9
**St** 1:19 2:4,14 182:15
**stake** 24:18 89:8
**stamped** 163:12
**stand** 16:3 28:9
**standard** 130:5
**standing** 6:2 18:6 26:21 91:18
**start** 19:23 34:18 50:23 72:22 95:7 99:23 102:13 124:1 173:13 176:10
**started** 19:18 20:4 34:20 57:3 87:6 105:18,21
**starts** 58:23 93:21,22 107:1,4 176:20 179:20
**state** 79:23 80:16,22 80:24 100:23
**stated** 77:2 99:2 182:5
**statement** 3:2,3 5:6,8 5:9,14 6:23 11:20 34:1 43:8 71:13 147:25 168:8 174:15
**statements** 3:21 6:19 58:19
**states** 13:2 170:13
**stay** 37:7
**stayed** 37:4
**Steve** 154:7,13,21
**Steven** 103:19 106:3 128:18,19 136:11 167:23 168:9
**stick** 38:9 68:24
**stipulation** 49:19
**stock** 4:12 5:18 9:8 10:7,13 27:3 34:25 35:12,14 36:6,7 37:6 39:21 40:20 42:13,22,23 44:15 46:11,24 47:25 51:11 52:11 54:19 55:20 56:15 57:13 60:11,12,18,23 62:8 87:14,17 90:7 90:11 96:20 97:2 97:17,18 98:9 99:3 99:12 104:3 109:14 109:19 110:7,17 125:7 138:6 140:1 141:4,5,5,10,19 145:10 147:17,23 149:2,6,15 150:1 150:13,23 151:1,3 151:15,16 153:7 154:3,20 155:7,10 155:19 159:17 160:5 174:21 175:18
**Stoeberl** 2:13 107:6
**stood** 22:14
**stop** 94:5
**stopped** 18:19
**story** 30:22 31:6 49:15
**strapped** 105:8
**Strategies** 101:17,18 144:21 145:4,6
**stretch** 8:3
**stricken** 163:21
**strike** 150:12 159:17
**strong** 23:14
**struck** 21:7 32:5
**structure** 25:21 71:10 75:16 110:14 126:14 138:24 139:6 140:24,25 141:2,13,16 148:25 149:2 150:1 154:24
**structured** 25:1 130:18,19 141:18 149:9
**structuring** 149:14 170:18 172:8
**strung** 49:5
**stuff** 62:3
**stupid** 156:22
**subject** 11:9 13:3 33:9 40:24 42:8 94:21 97:25
**submit** 8:9 173:5 174:23 179:15,25
**submitted** 64:5 172:22 179:8
**subparagraph** 52:16
**subpieces** 36:4
**subsection** 40:24 41:1 42:10 98:1,2
**subsequent** 27:14 28:1 49:7 50:8 51:6 144:13,15 158:21
**subsequently** 54:18 159:11 168:21
**subterfuge** 29:4
**succeeding** 25:6
**success** 21:9
**successful** 19:8 21:5
**successor** 152:22
**such-and-such** 93:9 93:9
**Suchanek** 108:13 112:4 124:8
**Suchanek's** 108:21 113:3
**sudden** 30:6
**suddenly** 122:10
**Sudduth** 2:8
**sue** 174:14
**sued** 31:18
**suffered** 5:25 90:17 90:18
**suggest** 13:2 15:12 151:21
**suggestion** 15:4
**Suite** 1:18 2:4,8 182:14
**super** 62:5
**support** 14:25 109:9
**supports** 14:22
**supposed** 10:17 35:20 108:21,24
**sure** 7:8 8:18 11:14 11:22 18:22 27:8 27:18 30:14,21,25 31:10 33:21 35:4 47:5 48:7 62:1 70:7 78:10 81:18 87:1 87:23 88:19 98:21 102:24 106:13 119:13 122:8 134:8 148:1 150:4 151:3 152:10 154:17 156:20,21 169:12 170:23 174:7 180:22
**surrounding** 92:25 173:19
**sustain** 65:2
**sustained** 50:1 112:14 164:5,17
**sweeping** 13:6 176:19
**switched** 132:25
**sworn** 16:8,9,19 100:17,21

**T**

**T** 3:4,14 182:1,1
**tab** 55:24 115:3
**table** 3:19 35:10 44:10,12 54:23 57:18,23 82:16 83:8,13 84:2,17 107:24,25 108:2,6 108:9,16 110:18 123:8,19,20 130:11 131:9 133:10,11 140:14,15 142:8,11 142:13,23 143:16 145:18 146:5 153:13 155:2,5 156:3,15,22 168:11 169:2
**tables** 4:19 142:10,16 143:4,7,8 161:4 167:25 168:6
**take** 8:4 19:4 22:13 37:24 44:5 47:16 52:14 65:10 91:2 91:10 92:4 98:22 100:1,3 110:12,12 120:24 130:6 134:6 134:9 148:25 154:12 159:12,20 161:6 163:9 165:13 165:14 175:11,12 179:8
**taken** 182:4
**talk** 19:11 20:5 34:9 35:3 40:11,17 47:3 63:12 66:2 71:1 72:17 79:19 80:5 104:6 139:11 146:7 147:7 150:10 157:3 167:21 174:11
**talked** 82:16 84:6 89:17 106:5 110:8 113:15 139:12 140:5 146:8 149:22 150:16 167:23
**talking** 12:24 14:6,7 19:1 31:18 56:11 59:20 73:13 76:20 86:22 89:11,12,12 113:16 122:18 129:19 144:18 147:8 152:11 158:14,15 162:19 170:3 171:5,12
**talks** 9:21 13:21 14:17 35:16 38:12 59:23 176:12
**tasked** 103:9
**tax** 141:7,8,10
**taxes** 141:6
**tcs@carmodymac...** 2:15
**teams** 20:13 24:20

**tech** 22:10 26:18 27:24
**technical** 29:11
**technically** 101:18
**technology** 19:9 20:1 21:24 22:13 27:21 101:25 103:3 105:7
**technology-based** 103:2
**technology-oriented** 18:22
**teeny** 35:22
**telephone** 20:3
**tell** 23:11 27:4 30:22 46:23 54:12 134:2 149:24
**telling** 80:24 110:21 160:10,11
**ten** 6:20 15:20 29:22 100:5 173:11 179:11,20
**term** 59:14 158:3 163:12
**terms** 3:23 7:7 8:5 10:17 12:22 24:14 24:16 27:13 32:10 34:11,12,14,14,20 38:19 39:2 44:19 69:23 112:24 118:5 118:9 123:13 138:3 153:8 155:14 158:6 163:3,6,10
**testified** 16:19 23:12 55:19 65:22 71:9 71:22 78:20 79:14 81:6 82:4 86:1,9 88:15 100:21 104:4 104:7 105:10 124:2 132:6 133:24 144:2 144:22 146:4 152:14,21 153:6 159:25 162:14 167:8,24 177:25
**testify** 112:11 164:3 164:5
**testifying** 49:20,21
**testimony** 51:3 63:13 63:19 67:5 95:13 95:22 102:4 104:9 134:1 136:15 148:23 152:25 179:19
**Teth** 124:7,8
**texting** 20:4
**thank** 7:3 16:16 35:25 61:24 65:8 65:19 67:10 69:5 69:18 70:2,25 72:10 73:17 77:22 78:20 80:10,21 89:16,22 100:13 101:20 107:15 111:7 115:13 134:16 147:2 157:2 162:13 164:18 167:4 172:14 173:8 179:6 180:24 181:13
**theory** 36:2 58:24 149:11 153:24
**thereabouts** 17:3
**thereto** 25:14 68:10
**thing** 26:19 37:22,23 40:10 42:19 45:14 46:12 48:1 54:2 59:8 61:4,15 86:21 87:2 88:18 95:13 96:14,15 111:18 134:21 146:7 153:22 173:25
**things** 25:23 28:9 33:16 37:17 42:20 49:21 50:15,22 52:9 59:19 64:2 104:14 120:24 125:6 159:11 160:20 169:17
**think** 5:17 6:5,12,19 7:25 12:2,3 14:21 29:11 30:19 35:11 36:10 38:7 43:23 46:6 50:12 59:15 59:17 60:16 67:4 78:14 85:25 86:9 87:3 88:25 91:17 95:10 96:3 101:23 102:8 106:5 122:22 124:2,10 127:12 131:2 134:6 136:22 137:11 145:15 146:4 151:5,9 157:9 160:22 166:1 166:5 167:8,24 173:15 175:4,5,6,7 176:1,9 177:7 178:9 179:13,14 180:2,13
**thinking** 96:12 170:7
**thinks** 12:6
**third** 5:6 10:15 64:4 75:25 93:7,7,21 102:16 154:19 175:6
**third-party** 64:17,20 168:23
**thought** 21:7 53:22 53:23 54:6,13 57:20 127:25 181:4
**three** 10:21 11:3 18:5 25:6,6 28:10,11 38:13,14,24,25 53:1 58:4 67:21 85:19 86:10 94:2,5 94:7,17 105:1 130:24 148:19 161:20 175:1 176:25
**tied** 35:9
**time** 5:11 7:3,6 13:19 13:23 14:2,14 20:4 21:3,11 39:19 44:16 46:14,18 51:4,9 54:24 56:16 57:11 59:18 65:9 76:22 80:6 81:7,10 81:19 86:5 87:14 92:3,23 96:12 97:19 98:4 99:3,8 99:11 102:13 103:11,14 105:6,17 105:20 106:16 108:12 109:24 110:23 113:23 114:24 117:6,20 118:7 119:19 120:20,22,25 124:20 127:6 136:11,23 137:8 138:2 139:5,12 141:25 145:7,14,16 149:14 150:20 156:5 158:9 171:25 172:3 173:9,23 174:1,8 176:12,14 176:23 177:4 179:6 179:24 182:5
**times** 13:10 48:17 62:20
**timing** 146:11
**today** 9:11 49:20 55:1 61:17 72:12 81:20 113:20 116:24 133:21 141:6 173:19 174:9 178:21
**Todd** 2:7 36:11
**told** 29:15 46:1 48:18 48:20,20,22 49:15 54:4,13 97:16 121:12
**tomorrow** 174:21
**top** 70:10 111:2 124:1 154:13 156:12 166:18
**topics** 139:11
**total** 38:18 130:21 142:17 145:19,19
**touch** 86:22
**touched** 102:23
**tough** 21:2
**tracking** 106:25
**traditional** 103:1
**tranche** 34:22
**tranches** 36:1
**transaction** 76:4
**transactions** 112:13 143:14 159:22
**transcribed** 179:9,19
**transcript** 78:5 179:25 182:11
**transition** 127:4
**transpired** 60:20 173:20
**treading** 71:3
**treated** 35:12 61:20 177:6
**treating** 146:22 167:17
**treatment** 97:17
**tried** 59:19,19 95:23
**trigger** 12:23 176:15
**triggered** 85:8
**triggering** 14:18
**trouble** 61:12
**true** 37:23 73:2 149:17 150:8,9,14 150:15,23 151:16 153:22 155:7,15,19 155:24 159:8,10 160:16 161:4 165:17
**trust** 36:17 88:10,13 88:14 127:20,21 128:3 145:12
**try** 6:25 19:6,8 60:22 163:15 178:3 180:25
**trying** 13:1 14:11 31:4,8 62:2,25 78:13 96:2 110:15 117:10 127:23 163:17 164:10 175:23 176:16 177:11
**turn** 16:6 21:8 26:5 33:22 58:6 70:5 78:21 81:25 83:6 115:13 117:12 123:14 134:18,19 142:5 153:11 157:20 174:22
**turned** 69:5 143:14
**turns** 37:23
**twice** 161:11
**two** 8:15 19:21,22 21:22 23:12,16 24:21 36:4 42:20 58:23 59:18 61:13 64:2 82:8 83:9 85:13 98:19 104:24 109:11 119:22,24 125:9 128:22 130:11 150:2 162:18 169:13 176:17
**twofold** 47:23
**Tyler** 2:12 87:21 179:14
**type** 12:14 18:14 22:6 63:9 120:6 139:6
**types** 19:12 36:6 169:13
**typically** 129:24

U

**Uh-huh** 51:23 72:25 76:10 79:8 81:24 82:6 92:9
**ultimately** 15:13 22:24 23:19 27:4 31:13 32:16 130:16 149:6,13 158:9 162:18,22
**unable** 158:11

**unambiguous** 8:5 15:9 67:7 107:13
**unambiguously** 45:8
**unaudited** 58:18 82:22
**unaware** 99:7
**uncommon** 20:6
**underlying** 64:19
**understand** 29:14 30:16,22 51:2 76:12 88:13 95:13 106:11 159:13 175:6
**understanding** 11:18 15:6 25:16 33:8,12 35:4 38:17 39:1,4 39:25 43:18 79:16 80:12 81:19 92:18 111:24 116:17,18 117:1 118:15,22 127:7 133:11 143:3 172:13 178:17
**understands** 170:23
**understood** 88:19 119:3 169:12
**undertaking** 13:16 171:10
**undisputed** 9:9 95:17 173:21
**unfortunately** 174:10
**Unha** 1:4 5:10,19 10:20 11:2 20:22 20:23 24:20 29:13 31:16 37:2,4,4 38:14,24 40:5 41:5 43:2 44:16 49:8,10 49:12,16,19,21 50:6 53:15 56:11 56:12,18 58:2 60:19 67:22 90:13 90:19 91:15 93:10 94:1,1 97:19 98:6 99:4 109:20 116:15 124:11 136:18 147:9 148:19 153:8 153:22 161:19 165:6,12 166:1,14 166:22 175:1
**Unha's** 40:20 51:11 96:21 97:7 119:6
**unique** 112:21
**unit** 11:9 35:2,6,16 40:23 42:8 45:9 83:16 90:7 94:21 97:25 105:5 112:16 129:2 131:22 140:1 140:3 143:2,18 144:8,12 146:15,19 167:18
**units** 9:18 10:21 11:3 38:13,15,18 41:5 41:13 42:24,25 44:15 63:2,7 67:19 67:20 82:5 83:14 83:15 84:18,23 85:15,22,22,22,23 87:4 88:16 89:13 94:3 110:16,16,17 111:20 112:25 113:3 124:21 126:2 128:5,19 129:1 134:25 136:18,24 137:13,19 138:9,19 139:11,14,15,18,19 139:19,21 140:11 140:11,16 141:24 142:12,17,18,20 143:9,25 144:9 145:19,20,21 146:13 148:20 153:16 154:1 161:21 162:9 168:10 170:19 171:16,24 172:2,8 175:2
**University** 17:21
**unpredictable** 37:17
**unquote** 130:20
**unrelated** 151:13
**unwieldy** 154:25
**update** 50:13
**updates** 50:14,15
**upfront** 110:2 138:15 141:10
**upside** 24:18 34:24
**urgency** 117:7
**use** 20:12 22:11 57:3 63:1 71:7 104:2 129:20,23 158:23 161:7

**V**

**vaguely** 23:3
**valuation** 63:2,23 163:15,18,20 164:11
**value** 34:22 40:13 42:24 60:17,23 61:2,10,17 62:7 63:8,12,19,20 141:8,10 164:1,8 170:18 174:18,20 174:23
**valued** 63:6,20,21
**variable** 36:25,25 37:8
**variety** 160:20
**various** 141:23 142:15 143:1 162:16
**vast** 176:2
**VCP** 3:23 56:12 131:9,15 143:21 144:8,10 145:1 163:3,6
**vehicle** 130:15
**vendors** 10:8 46:24 60:13
**version** 8:7 161:10
**vest** 97:14,15 138:9
**vesting** 87:6 138:6
**viable** 6:5
**videoconference** 2:7
**view** 8:5 10:11
**viewed** 161:24
**Viewside** 130:5,10,12 130:13 131:21 135:14,18,23 136:13 142:14 143:25 145:11 146:10,14 162:20 162:22 163:12 164:1 165:3 170:7
**violation** 10:9
**vis** 49:13
**vis-** 49:13
**visibility** 47:24
**Vistria** 28:25 86:2,5 86:10
**vitiated** 149:14
**voting** 139:22
**VP** 58:18 150:19 168:19

**W**

**W** 3:4
**Wagner** 163:3
**wait** 77:20 80:8 133:8,9
**waiting** 32:8 39:6 133:4
**walked** 159:22
**walking** 12:6
**wall** 178:24
**want** 6:22 7:6,9 21:10 24:11 29:22 30:22 31:2,6 35:3 37:18 40:21 44:5 45:20 46:5 47:13 49:17 50:5,6 59:8 61:11 62:6,8,12,22 66:2,25 70:20 71:13 78:6 81:18 92:2 98:9 100:2,3 102:8,9,23 104:6 106:20 107:17 108:8 110:24 114:8 119:13 123:14 135:25 140:6 144:16 149:14 150:10 151:25 156:20 157:3,3 158:21 160:12 161:11 169:11 171:13 172:21 173:3,9 174:9,11 179:18 180:19,21
**wanted** 5:12 21:22 21:23 22:1,16 36:18 37:11 42:20 48:3,7 50:3 63:13 78:19 86:22 87:2 88:19 89:10 95:24 100:1 109:16,18 120:25 123:24 134:22 135:6,14 136:17 139:10 141:7 143:13 146:7 146:12 148:1,25 166:21 167:21 168:14 169:4 170:22 174:7,16,17
**wanting** 121:2
**wants** 30:25
**warn** 173:4
**warranted** 159:4
**warranties** 25:23
**warrants** 25:15
**warranty** 104:15 157:23
**wasn't** 30:4 42:13 68:21 76:22 79:25 88:10 129:7 156:10 159:8 164:4 174:19
**waste** 92:3
**wasted** 92:4
**watch** 48:3
**waterfall** 139:23
**way** 7:16,17 20:10 21:8 47:11 53:1 61:20 70:22 71:11 77:5,11,12 96:25 97:20 98:20 106:6 112:3 120:5 141:3 143:15 148:23 149:2 169:14 176:6 177:3 178:17 179:16
**ways** 8:10 20:2 123:16
**we'll** 11:17 15:18,22 19:10 21:10 57:2 74:7 100:5 127:13 127:14 179:15
**we're** 5:2 6:9,16 11:13 12:12 14:5 18:25 24:6,13 30:7 30:15 31:8 33:21 35:4 36:3 37:10 39:24 42:23 56:10 56:10 58:4 59:3,25 61:8 71:8 72:17 73:13 75:9 78:10 81:18 87:24 89:11 89:11,12 93:11 94:13 96:12 100:11 106:25 111:9,23 114:21,24 132:15 133:11 134:12,14 134:19 135:6 139:19 144:18 152:11 161:8 162:19 171:5 173:16 175:21,22 175:23 178:1,24,25 179:4 180:6
**we've** 7:4 28:2 72:10 72:20 88:23 95:16 95:17 102:17 124:10,10 129:18 143:7 154:10
**WebMD** 19:20
**websites** 19:2
**week** 29:19 46:17,18

63:3 82:8 83:9 85:13 163:21 179:23
**weeks** 28:19 84:10 119:22
**weird** 45:18 50:17,22
**welcome** 100:14
**well-known** 127:24
**went** 17:10 34:23 35:1 37:2,20 57:6,7 65:23 76:19 83:12 98:15 104:5 167:24
**weren't** 132:2 151:3 151:12 175:18
**wet** 59:15
**whatsoever** 9:6 10:2 10:15 43:6 95:9 174:23
**wherewithal** 104:16
**whim** 62:7 95:2 97:2 156:24
**whim-free** 36:19,21 37:12
**white** 1:15 2:3 5:2 6:7,12,15,21 7:20 7:24 8:25 11:13,17 11:22 14:1,9 15:19 15:25 16:4,7,11,14 30:11 31:5,11 33:24 35:24 37:25 49:23 50:1,24 56:5 60:24 61:21 62:14 63:11,25 64:5,9,12 64:22 65:2,7,10,15 65:17 67:9 70:24 71:1 74:10 77:19 80:5 83:23 89:24 99:19,23 100:5,8 100:11,15,23 107:14 112:14 114:16 116:3 118:19 125:17 126:22 127:16,18 128:13 129:10,14 134:9,12,14 142:3 147:3 151:23 152:3 152:14,21,25 157:8 163:23 164:10,13 164:17 167:3 168:7 172:16,20 173:1,6 173:11 175:16,20 177:14,18,22 179:7 179:11,17,24 180:7 180:9,11,15,18,23 180:25 181:4,10 182:13
**widely** 176:7
**wife** 20:18 27:13 38:14 73:1 80:24 87:3,12 88:10,20 89:1,13 101:18
**wife's** 20:21 144:24
**wiggle** 45:17 46:10
**will/shall** 88:5
**William** 2:7
**win** 181:10
**wind** 174:9
**window** 8:18 14:12 132:5 150:6 171:19
**wings** 32:8 39:7 96:17
**wins** 7:18
**witness** 6:17 16:1,6,9 16:13,18 30:12 31:10,12 35:25 38:2,6 56:6 60:18 61:23 70:22 83:25 100:17,20,25 107:7 119:16 129:12,15 157:11 164:11 172:17 182:17
**witnesses** 99:20 164:5
**wonderful** 21:7
**wondering** 50:20
**word** 12:17 14:15,17 29:25 35:13 76:8 165:13,14 175:12 175:12,25 178:12
**words** 15:3 86:24 158:23 176:11 177:10 178:3,5
**work** 18:14 20:23 21:1 24:9,20,23 27:24 92:19,20 97:11 160:1,6,8,15 173:18 179:23 180:12
**worked** 27:21 125:25 125:25
**working** 18:19 22:13 113:21
**works** 120:5 176:4 180:8
**WorkUp** 1:4 3:24 5:11,12,16,20 6:4 6:10 19:10,24,25 20:9,17,23 21:4,12 22:18 23:10,19 24:7 26:23 27:6,12 30:1 66:8 72:23 73:3,7,24,24 74:5 74:17 75:4 76:11 76:16 84:13 87:16 87:20,22 88:5,21 88:25 89:20 90:7 91:13,19,21 94:1 102:5,10 103:4 104:5 105:3,5,5,11 105:17 106:7,18,24 113:25 114:13 116:16 118:4,9 121:19,19,25 124:24 126:1 127:3 128:23 134:2 136:24 138:7
**WorkUp's** 87:21 133:19
**WorkUp/D2** 49:9
**world** 95:9,11 102:15
**worth** 61:3 62:3 63:7 63:21 141:5 164:1 164:14
**wouldn't** 41:14,18,24 48:7 64:18 96:14 113:18 122:10 141:9,15 148:7 156:9 157:17 172:9 181:2
**wrap** 15:21 60:1
**wrapped** 117:11
**wrapping** 62:16
**wrinkle** 29:14
**writes** 82:13
**writing** 156:25 175:16 182:6
**written** 7:21,22 12:16 96:25 129:10
**wrong** 156:15,23
**wrote** 63:15

**X**

**X** 3:1,14 45:18

**Y**

**Y** 45:19
**yeah** 6:14 7:25 17:10 20:24 23:1 24:9 25:10 26:7,11 27:23 30:14,24 31:12,14 33:3,5 34:16,17 35:18,21 38:16,23 39:4 40:8 40:10 41:12,18 42:6,11 43:4 44:21 45:3 46:17 50:7 51:5,12 52:4,6,9,13 52:23,25 53:9,16 54:8,16 55:4 56:3,6 57:20 58:8,10,13 59:6 60:3,9 61:7 62:11,15 67:14 68:20 69:3,10,14 69:16 70:1,4,12 71:21 72:3,9,13 73:8,22 75:21 76:7 76:12,13,18 78:3 78:12,18 79:11 81:16 82:12,18,25 84:8,14 85:25 86:3 86:15,17,20 87:9 87:10 88:22,24 89:2,7 91:5 96:6 97:9,13 98:25 110:1 131:2 135:25 136:3 149:12 154:10 156:21 169:7
**year** 18:13 25:4 34:17 37:5,6 41:11 41:15,17,19,25 42:3 58:19 67:21 67:24,25 68:1 86:11 97:13,15,20 104:20,20 117:10 117:11 119:24 137:14,15 138:15 147:10,20 150:2 158:12,21 159:11
**years** 17:4,8 18:5 25:1,6 29:22 41:6 58:4 67:21 85:19 119:24,24 128:22 136:20 138:10 140:6 144:18
**Yep** 66:20,23 68:15 77:25 180:10
**York** 16:25 17:3,21 17:23 18:2,4,7

**Z**

**Zero** 170:5
**Zillions** 48:17
**zoom** 178:3 180:4

**0**

**005** 158:4
**006** 87:25
**007293** 107:25
**014** 157:21
**075** 90:24

**1**

**1** 23:23,24 29:18 32:12 41:5,10,13 41:25 43:5 44:9 56:22,23 67:21,25 68:2 97:25 109:25 110:2 138:15 139:1 147:10
**1:42** 181:15
**10** 3:18 11:14 15:3 33:23 35:15 56:7 58:6 84:6 93:17,19 97:5 102:22,25 109:3,14 133:15,16
**10.a** 7:12 8:17 9:13 10:16,20 12:18 13:11 14:17 34:4,5 34:5 35:20 36:6,20 37:8,12 40:7 42:22 42:23 43:20 47:8 48:3 53:8 57:25 71:18 72:19 76:20 85:7,10 93:23,25 97:18 98:9,15,18 118:21,21 119:9,14 120:19 134:20,24 136:16 137:3,13,14 148:13,18 159:15 161:11,13,17,19 169:9,13,20 170:8 170:14 173:17,25
**10.b** 34:5 36:7,25 37:5 40:17,18,20 40:22 41:4 42:22 43:2 97:7,23 98:17 98:18 136:17,18,19 147:8
**10/3/22** 3:18
**10:15** 65:11
**10:30** 65:12
**100** 108:10,17 177:21
**101** 3:11
**104** 75:9,19

**106** 3:24
**11** 3:19 55:3,3 56:7 57:19 81:25 123:17 132:15,19 133:10 133:10 159:12,21
**11:25** 100:6
**113** 91:11
**114** 4:3
**115** 4:4
**118** 4:8
**12** 3:3 46:15 47:10 52:10 68:2
**12/23/20** 4:5
**12/24/20** 4:7
**12/31** 142:25
**12/31/20** 3:22
**12:00** 134:6
**12:45** 134:10
**125** 4:12,13
**126** 4:10,11
**127** 4:14
**128** 4:15
**12th** 79:1 80:22 99:3
**13** 25:8 134:20
**131** 78:6,11
**14** 26:5
**141** 4:20
**142** 4:19
**1430** 182:22
**1450** 1:18 2:4 182:14
**147** 3:11 51:19
**148** 52:3,22
**14pt** 180:20
**15** 3:20 23:23 24:1 28:3 47:16,19 48:12 65:4 87:25 157:6,11,12
**150** 53:14
**152** 53:17
**1528** 63:6
**154** 4:21
**16** 3:7 52:1 78:6,11
**163** 3:23
**164** 4:17 59:4
**167** 3:12
**17** 52:1
**17th** 114:21
**18** 17:8 55:17
**18th** 115:8
**19.47** 131:16
**190** 1:17 2:4 182:14
**19th** 29:6,8 55:13 82:11 84:3
**1st** 29:11 44:17 68:3 68:4

**2**

**2** 24:16,24 84:15 98:23 110:2 111:2 133:23 138:15 139:1 158:5
**2.42** 52:12
**2.426** 53:10
**2.43** 57:8
**20** 32:1 78:7,11 89:5 135:25,25
**20-page** 180:14,15
**2008** 101:22
**2013** 20:25
**2018** 102:18
**2019** 3:20 24:5 86:6 102:6,10,18 103:4
**2020** 41:23,24 66:9 66:19 70:17 73:20 81:14 102:18 103:4 103:11,14 104:8,12 107:22 108:11 111:1,11 114:21 115:8 117:4,15 135:10,19 138:13 140:13 142:8 143:5
**2021** 3:17 41:6,20,25 44:9,17 46:15 47:10 51:18 53:13 54:17 55:25 57:9 68:1 79:1 81:3,22 82:20,22 83:2 84:18,23 97:20 99:3 131:1,10,17 132:20 133:8 139:12 142:11,13 143:23 144:5,9 147:10,20 154:7,14
**2022** 5:8 20:25 41:6 51:12,18,22 55:13 58:7 68:3 81:4,22 82:2,11,15 83:6 84:3,10 85:21 97:20 123:19 132:7 134:3 140:7 147:10 147:23
**2022-January** 145:16
**2023** 41:6 68:5 97:20 140:8 142:17 143:16 145:10,16 147:11,23
**2024** 68:4 142:19,22 145:18
**2026** 1:14,22 77:17 182:18
**20th** 107:22 108:10 111:1,11 138:13
**21** 56:4,4,9 57:4 131:3 136:1,2,3,3,5
**22** 144:16
**23** 3:20
**23rd** 66:9,19 70:17 117:4 179:12,21 182:17
**24** 56:23,23 118:2 142:25
**24-hour** 117:20
**24th** 70:14 117:15 179:12
**25** 17:4
**27** 151:23
**28** 3:21 62:12,14,18 65:5,7
**28th** 154:21
**29th** 51:22 81:22 82:1
**2nd** 154:7,14

**3**

**3** 56:20 58:1 67:20 109:21 116:9,14
**3,460,000** 63:7
**3.01** 57:7
**3.03** 57:1,5,6
**3.3** 88:3
**3.4** 56:19,20,21,25 57:4
**3.5** 10:24 11:7 44:21 51:13 52:11 53:6 56:16 58:2 63:21 81:15,17 93:10 139:2,2 153:18 161:20 162:9 174:22 175:10
**30** 24:17 32:1 41:23 86:23 88:6,12,18 177:5
**301** 2:8
**305)444-9991** 2:9
**30th** 73:20 81:14 135:10
**31** 3:23 62:11 163:1,1
**314)854-8600** 2:14
**31st** 68:5
**32** 3:16
**3225** 2:8
**33** 3:24 75:25 106:21 106:22 107:8 111:6 111:7
**33133** 2:9
**34** 4:3 114:8,11,12
**35** 4:4 33:1,6 115:3,4 115:5
**36** 4:5 66:11,14 70:21 92:1,5
**37** 4:6 70:5,6 71:17 117:13
**383** 92:12
**39** 4:8 118:11 134:18 147:6
**3rd** 58:7 84:10

**4**

**4** 3:16 32:12,13 40:18 47:14 56:19 67:12 72:11 74:20 83:7,7 90:4,9 93:16 97:6 114:20 115:14 143:15 161:7,8,12 169:8,9
**40** 4:9 44:23 78:21,22 98:22 164:2
**404** 123:20 130:11
**42** 4:10 126:8
**43** 4:11,16 126:19,22
**44** 4:9,12 125:7,16,17
**45** 4:13 125:7,16,17
**47** 127:12
**48** 4:14 127:13,16,18
**49** 4:15 128:9,13
**4Engs** 126:23 150:10 151:1,16 155:11,18

**5**

**5** 56:7,7 71:17 91:2 142:23
**50** 28:13,16 167:9
**51** 3:17 4:16 43:11,13 43:15 44:6 153:2
**52** 4:17 164:20,21 167:7
**53** 56:24 76:17
**5335000098** 1:6
**54** 3:19
**55** 4:19 142:5,7 168:5
**56** 4:20 141:22 142:3 142:5
**56181** 143:22,25
**57** 4:21 151:22,24 154:5,10 167:22 175:13 180:22
**58** 3:18 33:22,25 93:18,18 97:6 161:12 169:20
**59** 47:16,17

**6**

**6** 56:7 87:25 142:23 143:15 181:7
**6.2** 25:9
**6.2.6** 26:6 157:21
**60** 33:24
**62** 3:21
**63** 33:2 75:24
**63105** 1:19 2:4 182:15
**64** 74:13,22 85:4
**64.35** 108:20
**65** 3:7 74:13,22
**66** 4:5
**6th** 179:22 180:3,6,8 180:9

**7**

**7** 3:2 38:18 39:8,15 40:6 56:7 63:8 67:19 68:6 115:21
**7,000** 44:18 153:17 154:2
**7,037.92** 155:7
**70** 4:6
**70/30** 24:19 26:20,25 34:25 86:24
**7293** 107:18
**7459** 114:9,20
**7th** 77:15

**8**

**8** 9:20 50:19 54:11 56:7 68:7,18 69:1 102:22,25 115:22 116:20,20,22,22 123:23 130:21 131:20 135:2,6,15 137:6,17 144:1 147:21 149:1 162:23 169:22,25 170:2,13,25 171:5 171:9,14,15,16,22

171:23 172:10 178:21
**80,000** 25:3 27:9 158:16
**832,000** 105:21
**835** 29:17,20
**835,000** 29:13 31:15
**850,000** 25:4
**8862** 163:10
**899** 182:22

**9**

**9** 1:14 3:17 51:15,16 56:7
**9.19** 108:23
**9/19/22** 3:19
**9:00** 1:22
**9:02** 5:1
**90** 3:8
**9th** 1:22