Exhibit
10

**JAMS ARBITRATION**

| | | |
|---|---|---|
| KENNETH MARK ENGELS and UNHA ENGELS, and WORKUP, INC. | ) | |
| Claimants, | ) | |
| v. | ) | Case No. 5335000098 |
| D2 PHARMA CONSULTING, LLC, n/k/a D2 SOLUTIONS HOLDCO LLC, | ) | |
| Respondent. | ) | |

**DEFENDANT D2 PHARMA'S MOTION TO AMEND, MODIFY, OR CLARIFY INTERIM AWARD**

D2 respectfully moves the Arbitrator to amend, modify, or clarify the Interim Award[1] so that the Final Award conforms to (i) the Arbitrator's evidentiary rulings barring Claimants from presenting valuation evidence due to their failure to timely disclose requisite expert opinion on fair market value; and (ii) the evidentiary record at the Hearing.

Throughout this proceeding, the Arbitrator consistently enforced Procedural Order No. 6 by barring Claimants' attempts to end-run their obligation to timely disclose expert opinion and establish the "value" of Engels' units through the mere selection of numbers from D2's documents. The Arbitrator correctly ruled – both before and during the Hearing – Claimants' valuation attempts necessarily involve the "interpretation, selection, and/or judgment" as to D2's documents (and numbers within them), which therefore constitutes expert opinion requiring advance

[1] Because the Award is designated as "Interim" – rather than a "Final Award" or "Partial Final Award" – the Arbitrator retains continuing authority under the JAMS Rules to amend, modify, or clarify the Interim Award to ensure the Final Award conforms to the evidentiary rulings already made and enforced, as well as the Arbitrator's Orders requiring expert disclosures. See JAMS Rule 24(d), (e), (j). The Arbitrator's Report of Preliminary Hearing and Procedural Order No. 6 agreed to by the parties likewise contemplate the issuance of an "Interim Award" followed by a "Final Award," confirming that the Arbitrator's jurisdiction and corrective authority remain ongoing at this stage. *See* Procedural Order No. 6 § 9(f).

disclosure and an opportunity for rebuttal. Simply put, while the documents Claimants relied on may contain data supporting an opinion of fair market value, they do not, standing alone, supply one.

Notwithstanding those rulings, the Interim Award awards monetary damages by adopting Claimants' valuation theory first raised after the record had closed that the defined "Class A-1 Issue Price" of **$142.397** in two operating agreements represents the value of the Engels' units. That theory was never disclosed, never admitted into evidence, never tested at the Hearing, and never subjected to rebuttal. Instead, it appears for the very first time in Claimants' post-hearing brief, when D2 had no opportunity to respond.

Not only was Claimants' post-hearing interpretation of D2's documents precisely the type of expert opinion the Arbitrator repeatedly barred, the operating agreements Claimants cite also contradict that position on their face. The defined "Class A-1 Issue Price" is class-specific and is used to calculate certain distribution rights unique to Class A-1 units, not to define fair market value. The Engels never held Class A-1 units, but instead held Class B units. The same operating agreement further defines a separate and substantially lower "Class A-2 Issue Price" of **$73.39**, used for calculating distribution rights for that class of units. The existence of multiple issue prices alone undermines Claimants' valuation theory that there is a single per-unit issue price that can be used to ascertain the value of all classes of D2's units – much less to the Engels' Class B units.

The Interim Award cannot be reconciled with the Arbitrator's evidentiary rulings or the expert disclosure requirements of Procedural Order No. 6. D2 relied on those rulings in deciding what evidence to present, which objections to make, and how to frame its closing argument. Claimants then introduced a barred valuation theory only after the record closed, which the Interim Award adopted, leaving D2 with no opportunity to test, rebut, or respond to Claimants' erroneous

valuation theory that ultimately decided the case. This was not a harmless procedural error, but a denial of the due process rights of notice and fairness to D2 that the Arbitrator repeatedly recognized and enforced at all points up to the Interim Award.

This motion is not asking to revisit liability or any factual findings regarding the breach. D2 asks only that the Interim Award be corrected so that the Final Award is consistent with the evidentiary record and the Arbitrator's evidentiary rulings on valuation evidence by eliminating reliance on "Class A-1 Issue Price" as the basis for fair market value and, as a result, vacating the portion of the Award granting monetary damages on that basis. Stated another way, the only remaining potential remedy on the evidentiary record as submitted would be the restoration of the Engels' units caused by the dilution, not money damages.

Separately, clarification is required regarding who is eligible to receive a remedy under the Settlement Agreement. Section 33 of the Settlement Agreement, which D2 raised consistently in this proceeding, contractually limits rights and remedies to only D2 and WorkUp – not Kenneth or Unha Engels individually. Yet, the Interim Award does not address Section 33 and awards undifferentiated damages collectively to "Claimants" without determining which Claimant is eligible for which remedy. At the hearing, Claimants admit that because the units were issued to the Engels, all damages are personal to the Engels individually. WorkUp made no independent claim for damages and the record does not support compensatory damages for WorkUp. The Final Award should therefore limit available relief to ordering restoration of **4,474.69**[2] Class B units to offset dilution and place WorkUp in the position it would have occupied absent any breach.

---

[2] Claimants assert that a total of **4,474.69** units is required to restore the Engels' ownership percentage, consisting of 2,350.14 units attributable to the "4Engs et al." issuance and 2,124.55 units attributable to the Class D unit issuance, as stated in Claimants' Post-Hearing Brief. (Claimants' Post-Hearing Brief, **<u>Ex. E</u>** ¶¶ 59, 70.)

## BACKGROUND

### 1. The February 4 Order Struck Undisclosed Valuation Opinion Evidence.

On January 20, 2026, D2 filed its Motion to Strike Claimants' Undisclosed Valuation Expert. ("**Motion to Strike**" attached as **Ex. A**.)[3] In that motion, D2 requested an order to strike Mr. Engels' undisclosed anticipated testimony regarding the value of his units by utilizing documents D2 produced during discovery. (*Id.*) D2 cited Missouri law holding that valuation of a business or portion of a business is beyond the understanding of ordinary layperson and necessitates expert testimony. (*Id.* at 2.)

On February 4, 2026, the Arbitrator entered his Order granting D2's Motion to Strike. ("**February 4 Order**", attached as **Ex. B.**) The Arbitrator acknowledged that Claimants had not timely disclosed Mr. Engels as an expert as required under Procedural Order No. 6 nor sought an extension of the expert disclosure deadline to name him. (*Id.* at 7-8; "**Procedural Order No. 6**" at 3-4, attached as **Ex. C**.)

In the February 4, Order, the Arbitrator rejected Claimants' characterization that "Mr. Engels' testimony is admissible because it is rightly characterized as 'lay testimony' relying on D2's own documents produced in discovery . . . ." (**Ex. B** at 7-8.) Specifically, the Arbitrator concluded that Mr. Engels' testimony of valuation – even when relying on D2's own documents or using simple math – constituted expert opinion that was not properly disclosed. The Arbitrator explained that Mr. Engels' use of D2's documents to establish valuation must be excluded because:

> firstly, Mr. Engels' potential testimony appears to **rely on his interpretation, selection, and/or judgment** regarding pertinence of Respondent's financial information and documents produced in discovery, regardless of how complex the mathematical processes utilized in final calculations regarding financial damages; secondly, any expert opinion that would have been timely and properly disclosed, thus affording Respondent its right to examine and conduct discovery, would have

[3] All Exhibits in this Motion are either filings in this proceeding or Exhibits admitted as evidence at the hearing. They are attached hereto simply for ease of reference.

also been based upon the financial documents produced in this Arbitration.

(**Ex. B** at 8.) (emphasis added).

2. **The Arbitrator Enforced the Evidentiary Ruling Barring Valuation Evidence at Hearing**.

At the Hearing, Claimants never requested damages or suggested a basis on which they would present evidence of valuation. Claimants' presentation of evidence at the Hearing included only two attempts to introduce valuation evidence. On both occasions, the Arbitrator sustained D2's objections based on his prior ruling.

First, Claimants attempted to elicit valuation testimony from Mr. Engels based on statements in D2's audited financial statements. When Claimants argued that those statements constituted admissions rather than expert opinion, the Arbitrator sustained D2's objection and clarified, "But my ruling was that he was not going to be allowed to talk about the value, **because that's expert testimony**. Now, **if you wanted to call an expert to explain this document**, or whoever wrote this document, we could get there, but we can't get there through him." (Hearing Transcript at 63, attached as **Ex. D**.) (emphasis added).

Later, Claimants attempted again to introduce evidence of valuation by questioning D2's corporate representative as to statements made in a draft term sheet between D2 and an investor. D2's counsel objected again and Claimants' counsel argued that he merely intended to ask D2's representative as a fact witness "what the value of his company was, as contained in this document that he is familiar with." (*Id.* at 164.) The Arbitrator questioned Claimants' counsel, "**So you're trying to get the valuation out of an adverse witness … that that's evidence of what it was worth**?" (*Id.*) (emphasis added). Claimants' counsel answered, "Correct", and the Arbitrator ruled, "**Sustained**." (*Id.*) (emphasis added).

The Hearing concluded with no evidence elicited as to the fair market value of the Engels'

units in D2 at the time of the dilution events (or any other time).

### 3. Claimants First Advanced the "Class A-1 Issue Price" Theory in Post-Hearing Briefing.

Under JAMS Rule 22(h), post-hearing briefs are limited to closing arguments and do not constitute evidence. In their Post-Hearing Brief, Claimants argued for the first time ever that the value of their units could be ascertained through the "Class A-1 Issue Price" of **$142.397** per unit provided in the definition section of two of D2's operating agreements. For this point, Claimants' entire argument consisted of four thin sentences:

> The appropriate per-unit issue price is defined in Respondent's governing documents. Both the Sixth and the Seventh Amended and Restated Operating Agreements define a "Class A-1 Issue Price" of $142.397 per unit. (Ex. 52 §1.1(n); Ex. 53 §1.1(s).) The Class D issuances occurred between January 2023 and December 2024, during which the company-defined issue price remained unchanged at $142.397. That price therefore supplies a consistent and objective valuation benchmark for the withheld units.

(Claimants' Post-Hearing Brief at 18-19, attached as **Ex. E**.) Claimants do not – and could not – cite language in the operating agreements or any other record evidence that define the "Class A-1 Issue Price" as the fair market value of the Engels' units at or around the events of dilution. Rather, through argument alone, Claimants did what the Arbitrator forbade and applied their own "selection, interpretation, and judgment" – *i.e.*, expert opinion of value – to assert that "Class A-1 Issue Price" "supplies a consistent and objective valuation benchmark" for the Engels' units.

Claimants had never previously disclosed this theory in an expert disclosure, at deposition, at the Hearing, or otherwise. In fact, the term "Class A-1 Issue Price" was not discussed at the Hearing at all. As a result, D2 had no opportunity to address that theory, rebut it, or explain why it does not represent fair market value of the Engels' units. Given that the Arbitrator had already barred such an opinion as an evidentiary matter all the way through the close of the Hearing, D2 had no need to object further to Claimants' post-hearing brief since D2's own simultaneously filed

brief already expressly stated that "[t]o the extent Claimants seek damages for alleged dilution, they presented no evidence quantifying the value of any purportedly improper dilution."

Finally, Claimants represented in their post-hearing brief that their valuation theory did not run afoul the February 4 Order because that Order pertained only to barring valuation evidence based on third-party prepared documents. Specifically, Claimants stated that the "[e]xcluded testimony concerned a valuation of the company as a whole based on a third-party audit, whereas the damages here rely only on Respondent's own corporate records of unit price." (**Ex. E** at 19.)

That is simply incorrect. To the contrary, in their Opposition to the Motion to Strike, Claimants specifically contended that their valuation evidence should come in specifically *because* it derived from D2's own documents. Claimants argued their valuation intended to "rely exclusively on Respondent's *own* K-1s, audited financial statements, and transaction documents . . . ." (Opposition to Motion to Strike as **Ex. F**.) (emphasis in original). Likewise, nothing in the February 4 Order barred expert valuation evidence based on the fact that Claimants were intending to rely on third-party documents. The Arbitrator made clear the issue was lack of notice to D2, not which documents were being utilized. (*See* **Ex. B**.) To this point, the Arbitrator rejected Claimants argument on the grounds that "any expert opinion that would have been timely and properly disclosed, thus affording Respondent its right to examine and conduct discovery, would have also been based upon the financial documents produced in this Arbitration." (*Id.* at 8.) Likewise, as stated above, the Arbitrator barred at the Hearing Claimants attempt to introduce valuation based on a D2 term sheet.

**4. Sixth and Seventh Amended Operating Agreements Use "Class A-1 Issue Price" to Measure Distribution Rights Granted to Certain Class A-1 Units Only – Not as A Measure of Fair Market Value of All D2 Units.**

The Sixth and Seventh Operating Agreements Claimants rely on do not define "Class A-1

Issue Price" as the fair market value of D2's units. (Joint Exhibits 52 and 53 at 3, attached as **Ex. G** and **Ex. H**.) Rather, the Sixth and Seventh Operating Agreements describe the various classes of D2's units – Classes A-1, A-2, B, C, and D – with each class having materially different rights under the operating agreements. (**Ex. G** at Sections 4.4-4.8 and **Ex. H** at Sections 4.4 - 4.9.) The "Class A-1 Issue Price" is then used to calculate the superior distribution rights granted to the Class A-1 units over the other classes of units. (*See id.* at §5.1.)

Under the Sixth and Seventh Amended Operating Agreements, the Engels held Class B units. (**Ex. G** at 58 and **Ex. H** at 69.) The Operating Agreements contain no "Issue Price" for Class B units nor does it grant them the same, valuable distribution rights. (*See id.*)

Not only does the "Class A-1 Issue Price" have no application to Engels' Class B units, the very definition of "Class A-1 Unit Price" Claimants rely on does not even apply uniformly to all Class A-1 units. Per the definition, "Class A-1 Issue Price" of $142.397 would not apply to Class A-1 units "issued pursuant to Section 2.3(b) of the Securities Purchase Agreement" or the those "issued pursuant to Section 8.12" of the operating agreements. (**Ex. G** at Section 1.1(n) and **Ex. H** at Section 1.1 (s).)

Further, the Seventh Amended Operating Agreement Claimants separately defined "Class A-2 Issue Price" as **$73.39** per unit – which is half of the **$142.397** per unit the Engels used to value their units. (**Ex. G** at Section 1.1(n) and **Ex. H** at Section 1.1 (s),(t).) Notably, Claimants did not point out to the Arbitrator in their post-hearing brief the existence of the separate and much lower "Class A-2 Issue Price". And most importantly, Claimants never offered any evidence of the value of the Class B units – the only class of units at issue.

**5. Interim Award Adopts "Class A-1 Issue Price" Theory Despite Prior Rulings**.

In the Interim Award, the Arbitrator correctly states Missouri's damages standard that

Claimants as "a plaintiff asserting breach of contract must prove both the existence of damages and the amount of those damages with reasonable certainty." (Interim Award, attached as **Ex. I** at 11.) The Arbitrator also correctly recognized to prove damages Claimants had to establish for the Engels' units "'fair market value,' [*i.e.*,] the price property would bring between a willing seller and a willing buyer at the time." (*Id.*)

Yet, when assessing damages, the Arbitrator cited not to evidence, but directly cited to Claimants' Post-Hearing Brief utilizing the "Class A-1 Issue Price" as the basis for the calculation of damages. (*Id.* at 20.) The Arbitrator stated:

> Claimants utilized Respondent's own, undisputed, capitalization schedules and operating agreements to establish both the number of units owed to Claimants, as well as the per-unit issue price(s) set by Respondent at the time the dilution(s) and issuances of units for non-capital raises. *See Claimants' Post-Hearing Brief, pp. 15-19.*

(*Id.*) Despite citing the Claimants' requisite standard of proof, the Arbitrator made no finding that "per-unit issue price" in the operating agreements represented the fair market value of the Engels' units at the time of the dilution events.

Further, the Arbitrator independently relied on a statement made in Section 4.4 of the superseded Fourth Amended Operating Agreement that all units issued by D2 are to be "identical to all other Units in all respects." (*Id.*) Neither Claimants nor Respondents put on evidence – or argued – that the Engels' units in D2 were "identical" in all respects. Instead, beginning with the Fifth Amended Operating Agreement, that was signed by the Engels and dated January 1, 2021, D2 issued different classes of units with different rights. (Joint Exhibit 51 attached as **Ex. J** at Section 4.4 and Engels' signatures on page 30.) As such, the Fifth Amended Operating Agreement, as well as Sixth, and Seventh Operating Agreements Claimants rely on, all removed the language in Section 4.4 stating that all units were "identical" and clarified that D2 had several

different classes of units all containing different rights. (**Ex. J** at Section 4.4; **Ex. G** at Section 4.4; and **Ex. H** at Section 4.4).

**6. D2 Consistently Argues the Engels' Lack of Standing to Be Awarded Remedies for Breach of Settlement Agreement.**

The Interim Award also lumps the Engels in with WorkUp in awarding damages. This too fails to reflect that WorkUp made no request for damages during its opening, presentation of evidence, or closing at the Hearing even though WorkUp was the only Claimant with rights to enforce the Settlement Agreement.

Section 33 of the Settlement Agreement provides that "[n]othing expressed or implied in this Agreement is intended or shall be construed to confer or give any person other than the Parties hereto any rights or remedies under or by reason of this Agreement." The defined "Parties" are D2 and WorkUp, not Kenneth or Unha Engels individually.

In their Statement of Claim, Claimants asserted a single claim for breach of Section 10(a) of the Settlement Agreement. (Statement of Claim attached as **Ex. K**.) In its response, D2 asserted in its jurisdictional challenge and affirmative defenses that the Settlement Agreement did not confer rights or remedies to anyone other than D2 and WorkUp. (Response to Statement of Claim and Jurisdictional Challenge attached as **Ex. L** at 2.)[4]

In its Pre-Hearing Brief, D2 asserted again that only WorkUp, not the Engels, had the ability to receive a remedy under the Settlement Agreement:

> Claimants' arguments also ignore another fundamental legal barrier in that the requested relief is not within the jurisdiction of this arbitration. The Settlement Agreement is expressly between D2 and WorkUp and per its language shall not "be

---

[4] Claimants filed a Third Amended Statement of Claims asserting various additional claims. D2 again included its response to the Third Amended Statement of Claim the defense that the Engels had no rights or remedies under the Settlement Agreement. However, the claims in the Third Amended Statement of Claim were, in part, dismissed by the Arbitrator in Order No. 5 entered on July 1, 2025, and, in remaining part, voluntarily dismissed by Claimants who reinstated the claim for their original Statement of Claim on January 5, 2026, through their Notice of Withdrawal of Claims from Arbitration Without Prejudice.

> construed to confer upon or give any person other than D2 and WorkUp any rights or remedies." (**Exhibit C** § 33.)

In its Post-Hearing Brief, D2 asserted once more that Section 33 barred the Engels from receiving a remedy under the Settlement Agreement and that "Claimants did not present evidence establishing that WorkUp incurred damages from the alleged breach." D2 specifically cited to Claimants' admission at the Hearing that the claimed damages were personal to the Engels:

> Q. [Todd Legon] Who were issued shares of stock pursuant to that agreement?
>
> A. [Kenneth Engels] Unha and I.
>
> Q. Individually; correct?
>
> A. Individually.
>
> Q. All right. So to the extent that any damages have been suffered as a result of the dilution of the shares, who suffered those damages?
>
> A. Unha and I.

## <u>ARGUMENT</u>

### 1. The Monetary Damages Award Cannot Be Reconciled with the Arbitrator's Evidentiary Rulings and the Evidentiary Record.

This motion is fundamentally about consistency and fairness. The parties agreed, and the Arbitrator ordered, that Claimants' valuation opinion must be timely disclosed to provide D2 advance notice and a meaningful opportunity to respond. In the three-plus years this arbitration has been pending, Claimants never once disclosed a fair-market-value opinion in compliance with the Arbitrator's scheduling order. The Arbitrator correctly enforced his disclosure requirement by repeatedly barring the Claimants' belated attempts to smuggle undisclosed value and opinion evidence through mere reference to D2's documents that, by themselves, were not opinions of value and required selection, interpretation, and judgment by an expert to establish valuation.

The Interim Award's monetary damages award depends on the very thing the Arbitrator excluded from evidence: an interpretive leap that a definition of "Class A-1 Issue Price" found in a document D2 produced in discovery can be treated as fair market value of the Engels' units at the relevant dilution events. That interpretive leap was never admitted into evidence. It appears only in Claimants' post-hearing argument. That argument never rose to the level of admissible opinion evidence, but even if it had, D2 had no opportunity through either discovery, cross-examination, rebuttal evidence, or closing to address it.

That prejudice is not harmless. The Arbitrator's reason for the disclosure ruling was to ensure notice and fairness. Allowing the excluded valuation methodology to enter the case for the first time after the record closed defeats the purpose of the disclosure requirement and places D2 in a materially worse position than had the Arbitrator allowed Claimants' untimely valuation opinion to be presented at the Hearing and subject to challenge. At least then, Claimants D2 would have had *some* notice and opportunity to respond.

D2 was entitled to rely – and did rely – on the Arbitrator's rulings. The change in course in the Interim Award defies the very notions of notice and fairness the parties agreed to in the scheduling order and that the Arbitrator expressly recognized in his rulings.

**2. There is No Evidence or Finding That "Class A-1 Issue Price" Is Fair Market Value, and the Operating Agreements Confirm That It Is Not.**

In addition to the lack of notice and opportunity to respond, the operating agreements themselves do not support the valuation adopted in the Interim Award. The operating agreements on their face demonstrate that "Class A-1 Issue Price" is not the fair market value of the Engels' units. The Arbitrator's evidentiary rulings expressly acknowledged that a proper valuation opinion requires more than simply pointing to numbers on a page. It requires an actual opinion that those numbers represent the value of the Engels' units at an appropriate time related to the dilution.

The definition of the **$142.397** "Class A-1 Issue Price" contains no statement that it represents the value of the Engels' units at the time of dilution:

- It does not state that "Class A-1 Issue Price" equates to "fair market value".
- It does not state that it applies to all classes of units, much less the Class B units the Engels owned.
- It expressly states that it does not even apply to all Class A-1 Units.
- It does not provide the date it was calculated or whether that date is sufficiently close to the timing of the dilution to accurately represent the value of D2 at that time.
- It does not take into account the plethora of other well-recognized factors included in the valuation of non-public stock, such as lack of marketability or minority discounts, etc.

The rest of the operating agreements further confirm that "Class A-1 Issue Price" does not represent fair market value of the Engels' units:

- The agreements recognize multiple classes of units with different rights.
- "Class A-1 Issue Price" serves as a class-specific benchmark defining valuable distribution rights for Class A-1 units.
- The Engels held Class B units, and the agreements contain no "Issue Price" for Class B units.
- The Seventh Amended Operating Agreement separately defines a "Class A-2 Issue Price" of **$73.39**, which is inconsistent with the premise that a single uniform "issue price" exists to value all classes of D2's units.

Further adding to the prejudice against D2, the Interim Award, itself, supplies some of the missing expert valuation opinion and results in artificially inflating the Engels' unit price. Specifically, the Interim Award appears to acknowledge that Claimants' "Class A-1 Issue Price" valuation theory does not work unless the "issue price" applies uniformly to all of D2's units. (**Ex. I** at 20.) But, Claimants' "Class A-1 Issue Price" valuation theory did not address whether "Class A-1 Issue Price" applied to all of D2's units. So, the Interim Award supplies its own opinion that

"Class A-1 Issue Price" must be uniform to all units because a provision in a prior and superseded Fourth Amended Operating Agreement stated that all units defined in that operating agreement were "identical." (*Id.*) They are not.

Claimants do not even mention the Fourth Amended Operating Agreement in their post-hearing brief as it does not contain the "Class A-1 Issue Price" definition on which they rely. Neither party throughout this entire proceeding ever presented evidence or argued that the Engels' units are "identical" to all other units. The Engels signed a Fifth Amended Operating, dated January 1, 2021 (the day after the Settlement Agreement was signed), acknowledging D2 had different classes of units as well as permitting a Supermajority of D2's members to amend the Operating Agreement. (**Ex. J** at Section 4.4, 4.5, 4.6, and 11.1.)

The Interim Award reasoning that "Class A-1 Issue Price" can be applied uniformly to all of D2's units is significant not only because it is inconsistent with the provisions of the relevant operating agreements that contain the definition of "Class A-1 Issue Price", it resulted in the value of the Engels' units being vastly overstated.[5] Specifically, Class A-1 Units have valuable distribution rights unique to them. As noted, even Class A-2 Units with lesser rights than Class A-1 had an issue price of about half of Class A-1. The Class B units the Engels own do not have the distribution rights either Class A-1 or A-2 have and are worth far less. How much less begs the question as no opinion evidence exists in this case.[6]

**3. The Proper Remedy on This Record Is Specific Performance by Restoring the Engels' Units, Not Money Damages.**

D2 does not ask to relitigate liability (although it respectfully disagrees with the Interim

[5] In fact, an award of damages here places the Engels' shares above all other shares, including the Class A-1 and Class A-2 units that have taken no money out of D2.

[6] It stands to reason that the Engels' Class B units that have less rights that the Class A-1 and Class A-2 units would be worth less than those units. D2 suspects that Claimants abandoned their valuation expert because the outcome would have been too small to make this case worth it.

Award). It seeks a remedy consistent with evidence and the Arbitrator's rulings. Claimants themselves requested as a remedy alternative to damages "an award determining the correct percentage of ownership that the Engels should each have in D2 without the improper dilutive grants, and order that the Engels be restored to their correct percentage ownerships in D2." Missouri law specifically recognizes specific performance for claims regarding non-public equity where shares are difficult to value or not readily obtainable. *Payne v. Cunningham*, 549 S.W.3d 43, 50 (Mo.App.E.D. 2018).

Once valuation opinion is excluded – as the Arbitrator ruled three times – there is no evidentiary basis for a monetary valuation of the Engels' units at the dilution events. The Final Award should therefore provide relief by ordering restoration of units, rather than awarding money damages based on an excluded valuation methodology.

**4. Clarification Is Required Regarding Who Is Eligible to Receive Any Remedy Under the Settlement Agreement**.

Section 33 of the Settlement Agreement limits rights and remedies to the defined "Parties," which are D2 and WorkUp – not Kenneth or Unha Engels individually. D2 raised this limitation repeatedly, and Claimants' own evidence established that any alleged economic harm from dilution was personal to Mr. and Mrs. Engels. The Interim Award does not address this threshold contractual issue and instead awards damages to "Claimants" collectively without determining whether the Engels are eligible to recover under the Settlement Agreement.

WorkUp is the only Claimant with contractual standing to receive a remedy under the Settlement Agreement, and WorkUp never argued or presented evidence that it incurred any direct, out-of-pocket or measurable damages from dilution because it does not own the D2 units. At most, WorkUp is entitled to have its contract enforced.

As such, the Final Award should clarify claimant eligibility under the contract and limit

any relief accordingly. On this record, the only contract-conforming relief is restoration of **4,474.69** Class B units sufficient to offset dilution and place WorkUp in the position it would have occupied absent any breach.

## CONCLUSION

For the foregoing reasons, D2 respectfully requests that the Arbitrator amend, modify, or clarify the Interim Award so that the Final Award conforms to the evidentiary record, the Arbitrator's rulings excluding undisclosed valuation evidence, and the Settlement Agreement's express limitations on remedies. Specifically, D2 requests that the Arbitrator:

(1) Amend the Interim Award to eliminate reliance on the "Class A-1 Issue Price" as valuation evidence and vacate the portion of the Award granting monetary damages on that basis; and

(2) In the Final Award, limit any relief to WorkUp by ordering restoration of **4,474.69** Class B units to Kenneth and Uhna Engels to offset dilution and place WorkUp in the position it would have occupied absent any breach.

Respectfully submitted,

CARMODY MacDONALD P.C.

By: */s/ Tyler C. Schaeffer*

David P. Stoeberl, #46024
Tyler C. Schaeffer, #60847
120 South Central Avenue, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600 Telephone
(314) 854-8660 Facsimile
dps@carmodymacdonald.com
tcs@carmodymacdonald.com

Attorneys for Respondent

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 28, 2026, a true and accurate copy of the foregoing was filed electronically with JAMS to be served by operation of their electronic filing system upon all counsel of record.

*/s/ Tyler C. Schaeffer*