Exhibit
11

| | | |
|---|---|---|
| Kenneth Engels, et al., | ) | |
| | ) | |
| Claimants, | ) | |
| | ) | |
| v. | ) | JAMS # 5335000098 |
| | ) | |
| D2 Pharma Consulting, LLC n/k/a | ) | |
| D2 Solutions HoldCo LLC, | ) | |
| | ) | |
| Respondents. | ) | |

# ORDER ON RESPONDENT'S MOTION TO AMEND, MODIFY, OR CLARIFY INTERIM AWARD

THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration provision of the parties' Settlement Agreement[1], and having examined the submissions, proofs, and allegations of the parties, now finds, concludes, and issues this Order.

In preparing this Order, the Arbitrator has thoroughly considered the arguments raised and evidence presented by Respondent D2 Pharma's Motion to Amend, Modify, or Clarify Interim Award[2] (the "Motion"), the Claimant's Letter to Arbitrator[3] (deemed Claimant's Response to Respondent's Motion), and Respondent's Letter to Arbitrator[4] (deemed Respondent's Reply). The Arbitrator has determined the merits thereof, and discusses herein only those facts, arguments, and/or factors that he considers relevant for the resolution of

[1] Settlement Agreement with Arbitration Provision, Doc. 380371; Hearing Exhibit 39.
[2] D2 Pharma's Motion to Amend Modify or Clarify Interim Award, Doc. No. 1655743.
[3] Letter to Arbitrator White, Doc. No. 1661184, May 01, 2026.
[4] D2 - Letter to Arbitrator, Doc. No. 1662922, May 04, 2026.

Respondent's present Motion.

Having considered the submissions of the parties and the fulsome record of this arbitration, the Arbitrator **retains** the findings and judgments of the Interim Award, and below, clarifies the Interim Award in light of arguments raised by Respondent in its current Motion.

---

## *I. Relevant Procedural Background*

---

Claimants are represented by Todd R. Legon and William F. Rhodes of Legon Fodiman & Sudduth, P.A., 121 Alhambra Plaza, Suite 1505, Coral Gables, Florida 33134.

Respondent is represented by Tyler c. Schaeffer and David Stoeberl, of Carmody Macdonald P.C., 120 South Central Avenue, Suite 1800, St. Louis Missouri 63105.

On April 02, 2026, the undersigned issued an Interim Award, granting Claimants damages in the amount of $637,182.44 as well as their attorneys' fees and costs related to this arbitration. Now, Respondent has moved the Arbitrator to Amend, Modify, or Clarify that Interim Award. Claimant submitted a Letter to Arbitrator White in response to the Motion, and Respondent submitted a Letter in reply. The Arbitrator communicated to the parties that their respective letters would be deemed Claimants' Response to the Motion, and Respondent's Letter would be deemed its Reply.[5]

### A. Respondent's Arguments

Respondent submitted this Motion referencing allowance to do so by JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), specifically

---

[5] Information RE Pending Motion and Final Award, JAMS ACCESS Message.

Rules 24(d), (e), and (j) regarding Awards. Respondent argued that the Interim Award "awards monetary damages by adopting Claimants' "valuation theory" first raised after the record had closed, that Claimants' "valuation theory" assigning a price to Claimants' units "was disclosed after the final hearing, never admitted into evidence, never tested at the Hearing, and never subjected to rebuttal,"[6] thus was considered in violation of JAMS Rule 22(h). Respondent also stated that Claimants' awarded damages were based on Class A-1 issue price of its shares when Claimants owned Class B units.

Respondent further argued that the Interim Award "cannot be reconciled with the expert disclosure requirements of Procedural Order No. 6, and that Respondent relied on those rulings in deciding what evidence to present, which objections to make, and how to frame its closing argument." Respondent asserted that Claimants introduced a barred valuation theory after the record was closed and a denial of the due process rights of notice and fairness to Respondent. Respondent stated:

> This motion is not asking to revisit liability or any factual findings regarding the breach. D2 asks only that the Interim Award be corrected so that the Final Award is consistent with the evidentiary record and the Arbitrator's evidentiary rulings on valuation evidence by eliminating reliance on "Class A-1 Issue Price" as the basis for fair market value and, as a result, vacating the portion of the Award granting monetary damages on that basis. Stated another way, the only remaining potential remedy on the evidentiary record as submitted would be the restoration of the Engels' units caused by the dilution, not money damages.[7]

Respondent has also sought clarification regarding which Claimant is eligible for which remedy under Section 33 of the parties' Settlement Agreement as the Interim Award did not address Section 33 and "awarded undifferentiated damages collectively to "Claimants."" Respondent stated that since "WorkUp

---

[6] D2 Pharma's Motion to Amend, Modify, or Clarify Interim Award, Doc. 1655743, p. 2.
[7] *Id.*, p. 3.

made no independent claim for damages... The Final Award should therefore limit available relief to ordering restoration of 4,474.692 Class B units to offset dilution and place WorkUp in the position it would have occupied absent any breach."

Respondent denied Claimants' allegations below, and stated that new evidence must not be allowed to be presented in Claimants' Post-Hearing Brief, that it did not misstate where the unit issue prices appear or that multiple classes of units and prices exist. Respondent also denied that its Motion misquoted the Interim Award on "fair market value," mischaracterized the nature of Claimants' breach of contract claim, nor that it misstated Missouri law.[8]

## B. Claimants' Arguments

Claimants requested that Respondent's Motion be stricken from the JAMS record, and that sanctions under JAMS Rule 29 be imposed for its submission because Respondent's Motion

> "cites no rule that authorizes it, misapplies the rules it cites, and introduces into the record false factual assertions that have no bearing on any relief this tribunal can grant. A filing that breaks the very rules it purports to invoke should not be permitted to occupy a place in this record. Under Rule 11(a), which vests the Arbitrator with authority to resolve disputes about the interpretation and applicability of the Rules, Claimants respectfully submit that this is precisely such a dispute and that the Submission should be stricken."[9]

Claimants address each JAMS Rule and sub-Rule cited by Respondent in turn. (*See fn. 11.*)

Next, Claimants argued that Respondent's Motion knowingly introduces new false assertions into the record: (1) Respondent's referred Class of units held by Claimants are misrepresented and cite to the wrong documents albeit each was authored by Respondent; and (2) Respondent falsely states that Claimants held only Class B units when they held Class A units at the time of the transaction

---

[8] Respondent's Letter Reply Brief, Doc. No. 1662922, pp. 3-4.
[9] Claimants' Response Letter Brief, Doc. 1661184, pp. 1-2.

that diluted the value of Claimants' units, which is the transaction applied by the Arbitrator to establish the price of the units.[10]

Claimants next two arguments are presented here in their entirety[11] to avoid summary that may be inadequate to the discussion in this Order:

> 3. **Respondent misquotes the Arbitrator's damages standard**. On page 9 of the Submission, Respondent states that the Arbitrator "recognized that to prove damages Claimants had to establish for the Engels' units 'fair market value.'" The Arbitrator said no such thing. The Award states that "*the standard in Missouri* is 'fair market value'" and that it "is not confined to a single rigid formula, and may be established using the method best supported by the record."6 The Award does not impose on Claimants a burden to establish fair market value through any particular form of evidence. Respondent's truncated quotation inverts the meaning of the passage and omits the sentence that is the direct authority for the damages methodology applied.
>
> 4. **Respondent misstates the original Statement of Claim.** The Submission states that "Claimants asserted a single claim for breach of Section 10(a)" in the Statement of Claim. As Respondent well knows, the Statement of Claim also requested an order forbidding future dilutive issuances — specifically the contemplated issuance of 42,135.6 Class D units — which became the second prong of the breach adjudicated at the February 9 Hearing and the basis for $302,529.55 of the damages award. The characterization of this arbitration and the Final Hearing as involving only one claim of breach is false. Notably, Respondent repeats this misstatement in its simultaneously filed *Response to Claimants' Application for Attorneys' Fees, Costs, Non-Attorney Enforcement Costs, and Pre-Award Interest* of April 30, where it refers to "the sole breach-of-contract claim that preceded to the Hearing" in order to argue that Claimants achieved only "partial success".7 Yet the Class D issuance claim alone produced over $300,000 of the award.

Claimants request sanctions under JAMS Rule 29 for citing Rules incorrectly, misstating the record including the original Petition, and for compensating Claimants for the time and expense of responding to Respondent's unauthorized submission, and request the Motion be stricken from the JAMS record of this arbitration proceeding.

---

[10] *Id.*, p. 2.
[11] Claimants' Letter Response to Respondent's Motion, Doc. No. 1661184, p. 3.

## *II. Governing JAMS Rules, Legal Standards*

### A. The Governing JAMS Rules

The following JAMS Comprehensive Arbitration Rules & Procedures,[12] in numerical order, have been referenced in the parties' submissions, and which the parties agree are applicable to this proceeding:

> **Rule 11. Interpretation of Rules and Jurisdictional Challenges**
>
> (a) Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.
>
> (b) Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.
>
> (c) Disputes concerning the appointment of the Arbitrator shall be resolved by JAMS.
>
> (d) The Arbitrator may, upon a showing of good cause or sua sponte, when necessary to facilitate the Arbitration, extend any deadlines established in these Rules, provided that the time for rendering the Award may be altered only in accordance with Rules 22(i) or 24.
>
> **Rule 22. The Arbitration Hearing**
>
> (h) When the Arbitrator determines that all relevant and material evidence and arguments have been presented, and any interim or partial Awards have been issued, the Arbitrator shall declare the Hearing closed. The Arbitrator may defer the closing of the Hearing until a date determined by the Arbitrator in order to permit the Parties to submit post-Hearing briefs, which may be in the form of a letter, and/or to make closing arguments. If post-Hearing briefs are to be submitted or closing arguments are to be made, the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs or at the conclusion of such closing arguments, whichever is later.

---

[12] Comprehensive Arbitration Rules and Procedures | JAMS Mediation, Arbitration, ADR Services, Effective June 1, 2021; Rules 11, 22, 24, and 29.

…

(i) The requesting Party shall bear the cost of such stenographic record. If all other Parties agree to share the cost of the stenographic record, it shall be made available to the Arbitrator and may be used in the proceeding.

…

**Rule 24. Awards**

…

(d) In addition to a Final Award or Partial Final Award, the Arbitrator may make other decisions, including interim or partial rulings, orders and Awards.

(e) Interim Measures. The Arbitrator may grant whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods. Such interim measures may take the form of an interim or Partial Final Award, and the Arbitrator may require security for the costs of such measures. Any recourse by a Party to a court for interim or provisional relief shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

…

(j) Within seven (7) calendar days after service of a Partial Final Award or Final Award by JAMS, any Party may serve upon the other Parties and file with JAMS a request that the Arbitrator correct any computational, typographical or other similar error in an Award (including the reallocation of fees pursuant to Rule 31(c) or on account of the effect of an offer to allow judgment), or the Arbitrator may sua sponte propose to correct such errors in an Award. A Party opposing such correction shall have seven (7) calendar days thereafter in which to file and serve any objection. The Arbitrator may make any necessary and appropriate corrections to the Award within twenty-one (21) calendar days of receiving a request or fourteen (14) calendar days after his or her proposal to do so. The Arbitrator may extend the time within which to make corrections upon good cause. The corrected Award shall be served upon the Parties in the same manner as the Award.

…

**Rule 29. Sanctions**

The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

### B. The Governing Legal Standards

The parties agree that this arbitration is governed by the substantive laws of the state of Missouri, and in their briefing cited and discussed the following relevant legal standard in Missouri: a "fair market value" is the price property would bring between a willing seller and a willing buyer at the time. *Chadwick v. Huntoon*, 634 S.W.3d 832, 842 (Mo. App. S.D. 2021). It is not confined to a single rigid formula, and may be established using the method best supported by the record. *Id.*

Not discussed or cited directly by the parties, but relevant here, are the following legal standards previously noted and discussed in the Interim Award: (1) Missouri law recognizes "money compensation" as the primary remedy for breach of contract as more practical. *Finch v. Campbell*, 541 S.W.3d 616, 634 (Mo. App. W.D. 2017); and (2) when compensatory damages are ascertainable at the time of the breach, and are capable of exact computation, Missouri law permits prejudgment interest where damages are liquidated or readily ascertainable. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. App. W.D. 2008); *Mo. Rev. Stat.* § 408.020 (providing for interest at nine percent per annum).[13]

---

## *III. Undisputed Timeline of Events*[14]

---

The following facts of record developed through the parties' submissions and testimony during the Final Hearing, and exhibits admitted into evidence.

[13] Interim Award, Doc. No. 1621180, pp. 10-11.
[14] *Id.*, the entirety of Section III is found in and cited from the Interim Award, pp. ---; emphases added for the purposes of relevance to the discussion in this document.

| | |
|---|---|
| July, 2020 | Respondent failed to make a tranche of required payment of $835,000 for acquisition of Claimants' business under the parties' previous agreement |
| November 23, 2020 | Claimants filed suit in Delaware after the contractual cure period expired |
| December 23, 2020 | Parties executed a Letter of Intent (LOI) to enter into a Settlement Agreement (Ex. 36)<br>• LOI referenced a then-contemplated $8 Million capital raise |
| December 30, 2020 | Parties execute Settlement Agreement<br>• As consideration for Claimant accepting the Settlement Agreement and agreeing to dismiss, without prejudice, Claimants' lawsuit, D2 issued a 3.5% ownership interest to each Kenneth and Unha Engels<br>• Section 10(a) prohibits dilution of Engels' ownership percentage during the Initial Capital Raise Period of six (6) months, until June 30, 2020 |
| January 1st, 2021 | D2's Fifth Updated and Amended Operating Agreement reflected Claimants' equity as 14,000 units out of 200,000 total outstanding units: 7% of the company; 3.5% to each Kenneth and Unha Engels (Ex. 8, Ex. A) |
| February, 2021 | D2 issued 1,083.5 units to 4Engs Consulting LLC (Exs. 10, 47-48)<br>• D2 Vice President of Finance, applying Section 10(a)'s anti-dilution protections to maintain 7% Unit ownership of Claimants, prepared and circulated a capitalization table reflecting an increase in Claimants' total units to 14,075.84 (Ex. 57) |

| | |
|---|---|
| January-February, 2021 | D2 made six additional grants, a total of 31,223.30 new units, for non-capital raises (Exs. 56, 57) |
| November 16, 2021 | D2 adopted the Sixth Amended and Restated Operating Agreement (the "Sixth," Ex. 52) to incorporate the ownership of Viewside Capital Partners as now part of the D2 organization[15]:<br><br>• included an updated capitalization table reflecting the issuance of units to 4Engs Consulting LLC, and reflecting D2's six additional grants of 31,223.3 new units to 4Engs Consulting LLC and others - but did not reflect a commensurate increased number of units to Claimants to maintain a 7% ownership by Claimants<br><br>• The Sixth proposed a reorganization of D2's units, authorizing 42,500 "Class D" units to be awarded for services, not capital<br><br>• Claimants had not been asked to execute Joinders, nor provided a copy of the Sixth when the Sixth was executed<br><br>• Claimants received a copy of the Sixth in October, 2022 |
| September, 2022 | Claimants received their 2021 K-1 tax documents from D2's auditor (Ex. 9), reflecting ownership percentages below 3.5% each |
| October, 2022 | Claimants raised the dilution issue to Respondent's counsel, who asserted Respondent did not believe that issuances to service providers were subject to Section 10(a)'s anti-dilution provision (Ex. 10) |
| November 7, 2022 | Claimants notified D2's auditors by letter that the K-1s would require amendment in light of the dilution (Ex. 13) |

[15] Final Hearing Testimony, Erhardt, 164:23 – 165:23.

| | |
|---|---|
| December, 2022 | Claimants initiated this arbitration.<br><br>Claimants requested relief from future dilution of their ownership percentage by the issuance of new units from the newly authorized unit pool until Claimants' rights under the Settlement Agreement had been adjudicated |
| December 28, 2022 | D2 executed a Seventh Amended and Restated Operating Agreement ("Seventh"), expanding the authorization of Class D units to 72,051 units (Ex. 53) |
| January 20, 2023 | D2 issued 2,500 units to David Saunders (Ex. 56 at 305-316) |
| December, 2024 | D2's most recent capitalization reflected in this arbitral record showed that D2 had issued and vested 55,096 new units (*id.*)<br><br>• D2 did not issue additional units to Claimants to maintain their ownership percentage at 3.5% each<br><br>• Claimants' ownership interest had fallen to 1.83% each |

## *IV. Analysis*

Respondent's invocation of certain JAMS Rules in support of its submission of its Motion, and Claimants' invocation of the same regarding their request for sanctions, are considered here first. Rule 11, in relevant part, states:

> (a) Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.

Accordingly, the interpretation and/or applicability of any and all Rules invoked by the parties are interpreted below and therefore shall be deemed final for the duration and remainder of this arbitration proceeding.

Next, this Order considers Respondent's assertion in its Motion that a new "valuation theory" was impermissibly introduced by Claimants in their Post-Hearing Brief and Respondent's allegation that said "new valuation theory" was accepted by the Arbitrator without Respondent having had the opportunity to test or examine the same thereby depriving Respondent of due process.

**A. JAMS Comprehensive Rules & Procedures**

**1. Respondent's Motion**

The parties submitted their respective Post-Hearing Briefs, along with a transcript of the Final Hearing, on March 06, 2026. As of that date, the hearing was considered closed. The Arbitrator issued an Interim Award on April 02, 2026. Twenty-six (26) days later, on April 28, 2026, Respondent submitted its Motion. Claimant responded shortly thereafter, on May 01, 2026. Respondent submitted its reply on May 04, 2026.

If the object of Respondent's Motion were a Partial or Final Award, it would be governed by Rule 24, which in sub-part (j) limits the time within which a party "must serve and file with JAMS a request that the Arbitrator correct any computational, typographical or other similar error in an Award" to seven (7) days from service of the Award (a deadline Respondent did not meet. The express text of Rule 24 does not address the process or timeline for an Interim Award.

Claimant is correct in its argument that the Rules invoked by Respondent to buttress its ability to submit its Motion *do not*, either explicitly or implicitly, allow or authorize a party to engage in motion practice after the respective Post-Hearing Briefs have been submitted and the hearing is deemed closed. However, JAMS Rules *also do not explicitly prohibit* Respondent from submitting the instant motion. The Rules are silent with regard to the scenario at hand.

In the interest of providing Respondent the most fulsome due process under the governing Rules, Respondent's Motion and all associated briefing from

the parties shall remain a part of the arbitral record. The Motion, and relief requested by Respondent and Claimant, are ruled upon herein.

**2. "New Valuation Theory" In Claimants' Post-Hearing Brief**

Respondent has alleged that Claimants impermissibly put forth new evidence and a new "valuation theory" in its Post-Hearing Brief, and that this purported "new valuation theory" was accepted by the Arbitrator without the Respondent having had the opportunity to test or examine Claimants regarding the same. Respondent's argument implicates both Rule 22 *and* the facts in the conduct of this arbitration (discussed further below herein). In this section, the Arbitrator determines the effect of Rule 22 upon Respondent's argument.

Procedurally, Rule 22(h), cited in full above, directs that "[w]hen the Arbitrator determines that all relevant and material evidence and arguments have been presented, and any interim or partial Awards have been issued, the Arbitrator shall declare the Hearing closed" and "[i]f post-Hearing briefs are to be submitted or closing arguments are to be made, the Hearing shall be deemed closed upon receipt by the Arbitrator of such briefs or at the conclusion of such closing arguments, whichever is later."

Here, the parties were given leave to file their respective post-hearing briefs. The Hearing, therefore, was considered closed only once the post-hearing briefs were submitted on March 06, 2026. Any arguments made by either party in the post-hearing briefs were timely, to be evaluated on their merits in the Interim Award and any future award.

**B. Issue Price of Units At The Time Of Dilution**

Respondent has not challenged nor moved to revisit any factual findings, nor the determination of liability, in the Interim Award. Respondent does move to amend, modify, or clarify the amount of, and calculation thereof, the monetary damages awarded to Claimant.

Respondent has argued and alleged that the per unit price of units Respondent issued to Claimants utilized to calculate the monetary damages amount does not comport with the Class A-1 units issued to Claimants, and the price of said units as reflected in the Sixth Amended and Restated Operation Agreement and the Seventh Amended Operating Agreement. Alas, as Claimants note in their Letter Response to Respondent's Motion, there is no "Class A-1" issue price in the Sixth Amended and Restated Operating Agreement (Joint Exhibit 52): this Agreement defines a single Class A Issue Price. The designations of units as Class A-1 and Class A-2 appear only in the Seventh Amended and Restated Operating Agreement, which Respondent would be expected to know since Respondent drafted both Agreements.

Additionally, the Seventh Amended Operating Agreement further impermissibly diluted the Claimants' equity share by issuance of greater numbers of units, creating more classes of units thereby demoted the value of Claimants' units, which eroded value of Claimants' units to nearly half of their bargained-for equity amount of 3.5% each (for a total of 7%) as provided in the parties' Settlement Agreement. Use of an issue price as set by the Seventh Amended Agreement would, therefore, wrongly depress the value of Claimants' units, and would reflect a price *after* the point in time when Respondent had already diluted the equity value of the units including by creating new classes of units further depressing the value of Claimants' units—and may not be utilized to calculate a "fair market value" of Claimants' units prior to the dilution and devaluation of same. Respondent's argument is unavailing.

### C. Damages Analysis Consistent With Procedural Order No. 6

Respondent has alleged that in the Interim Award, the Arbitrator accepted a calculation method mentioned in Claimants' Post-Hearing Brief that should have been barred by, and is inconsistent with, Procedural Order No. 6 issued previously

in this arbitral proceeding. Respondent also argues that it made its decisions regarding arguments and evidence based on the Arbitrator's continued holdings consistent with Procedural Order No. 6 when the Arbitrator barred Claimants from presenting untimely expert evidence and/or expert testimony regardless of the underlying documents or information upon which that expert opinion may have been based.

Respondent is either mistaken as to the content of Procedural Order No. 6, specifically Section 9(f) which it cited, or Respondent has overlooked the source of the calculation of the damages award. The Arbitrator clarifies both potential scenarios here in demonstration that the Interim Award is consistent with Procedural Order No. 6 because it does not involve an(y) expert opinion.

Procedural Order No. 6, as Claimants' Letter Response Brief points out, states in its entirety that "[t]he Interim and Final Awards shall be prepared in accordance with the Agreement, and the Rules." Perhaps Respondent meant to reference Section 7(e) which references Expert Discovery[16] and sets a schedule for disclosure of experts and disclosure of expert opinions if offered into evidence. Respondent's apparent understanding and argument that the calculation methodology used to ascertain a portion of the monetary damages award is a novel expert opinion presented as a "new valuation theory," advanced by Claimants for the first time in their Post-Hearing Brief—thus unable to have been examined or tested by Respondent—may inform Respondent's apparent understanding and argument that said calculation methodology should have been barred as untimely pursuant to Procedural Order No. 6. However, the facts, evidence, and testimony of record in this proceeding simply do not comport with Respondent's stated view.

The Interim Award recognized, and explained in detail, the source and

[16] Procedural Order No. 6, Doc. No. 1327894, pp. 3-4.

application of the calculation methodology employed in determining a portion of the monetary award were the parties' relevant Amended Operating Agreements in effect at the time of the breach of contract (Respondent's issuance of units that diluted the value of Claimants' share to below the bargained-for amount of 3.5% equity interest each). Each Amended Operating Agreement was drafted by Respondent, entered into evidence without objection, and tested during witness examination during the Final Hearing.

For ease of reference, that section of the Interim Award is recounted below, with emphases added to the parts relevant to the current Motion:

> Missouri law treats an LLC ownership percentage as a protected economic property interest. *Chadwick v. Huntoon*, 634 S.W.3d 832, 840 (Mo. App. S.D. 2021) (compensation for the fair value of a member's ownership interest even after expulsion; economic rights are a "member's personal property".). Claimants' 7% Closing Equity Issuance is therefore a vested economic stake.
>
> Claimants have argued the "[r]estoring the 7% Closing Equity Issuance through additional units would require amendments to capitalization tables and governance documents and would affect approximately thirty-one (31) other unitholders. Missouri law disfavors such disruptive equitable remedies where an adequate remedy at law exists."[17] Respondent has argued that specific performance of the contract, i.e., restoring Claimants' ownership interests to comply with the Settlement Agreement is not available. Missouri law accepts an award of damages in lieu of specific performance of the contract. transaction and price are reflected in the Sixth Amended and Restated Operating Agreement. Missouri law further recognizes "money compensation" as the primary remedy for breach of contract. *Finch v. Campbell*, 541 S.W.3d 616, 634 (Mo. App. W.D. 2017). With consideration of the foregoing, the Arbitrator awards damages as discussed below.
>
> In this dispute, the percentage of ownership interest, when converted to a specific number of units for the purposes of calculating the number of units Claimants' un-diluted ownership

[17] Claimants' Post-Hearing Brief, Doc. No. 1584962, p. 17.

interest, makes relevant Respondent D2's structure of units of ownership. As cited above and recounted here, attached and incorporated into the Settlement Agreement (as Exhibit A) is D2's Fourth Amended and Restated Operating Agreement[18] ("Operating Agreement"), dated as of October 20, 2020, with an Amended Exhibit A reflecting the Units issued under the Settlement Agreement. The Operating Agreement defines two terms relevant to this dispute[19]: "Percentage Interest" (Article I, Subsection 1.1(aa)); and "Units; Issuance of Units" (Article IV, Subsection 4.4):

**(aa)** ***"Percentage Interest"*** means, for each Unit Owner, a percentage equal to a fraction the numerator of which is the sum of the number of Units owned by such Unit Owner and the denominator of which is the sum of the number of outstanding Units.

...

**4.4 Units; Issuance of Units .** The Company shall have the authority to issue up to 2,000,000 Units. Each Unit shall be identical to all other Units in all respects and shall entitle the holder thereof to the rights, interests, preferences and privileges of a Unit Owner as set forth in this Agreement. The Members hereby grant the necessary authorization to the Board of Managers to authorize and issue the amount of Units necessary to properly issue the Units as contemplated hereunder.

(emphasis added).

Following the above definitions, all units issued by Respondent are to be considered "identical to all other Units in all respects." Consequently, the tribunal considers the two categories of damages articulated by Claimant: (1) damages for Respondent's issuance of non-capital units during the time period subject to Section 10(a) of the Settlement Agreement, and (2) as subject to Section 10(b), damages for Respondent's subsequent issuances of ownership interests/units to employees and/or vendors for non-capital raises.

In its Post-Hearing Brief, Claimants have applied the above definition of "Percentage Interest" to calculate the number of units to which Claimants were entitled but for the impermissible

[18] Settlement Agreement, §17, Subsection (b)(iii), D2 Deliveries; Doc. No. 380371, Hearing Exhibit 39.

[19] Neither term, "Units" nor "Percentage Interest," is differently defined in the Settlement Agreement or the Joinder Agreement.

dilution of their ownership percentage(s) at two points in time corresponding to the end of the anti-dilution period subject to Section 10(a), and the subsequent period of additional non-capital grants and awards of units to employees and/or vendors. Claimants utilized Respondent's own, undisputed, capitalization schedules and operating agreements to establish both the number of units owed to Claimants, as well as the per-unit issue price(s) set by Respondent at the time the dilution(s) and issuances of units for non-capital raises. *See Claimants' Post-Hearing Brief, pp. 15-19.*

Accordingly, Claimants are awarded $334,652.89 in compensatory damages, the economic value of the units withheld from Claimants in violation of 10(a); and Claimants are awarded $302,529.55 in compensatory damages, the economic value of the units withheld from Claimants in violation of Section 10(b).

Claimants argue that because the above damages were ascertainable at the time of dilution and are capable of exact computation, applicable Missouri law permits prejudgment interest where damages are [liquidated or] readily ascertainable. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. App. W.D. 2008); Mo. Rev. Stat. § 408.020 (providing for interest at nine percent per annum). Claimants' position is valid. Claimants are awarded pre-award interest at the applicable statutory rate from the date of each wrongful dilution, and post-award interest until paid.

Respondent appears to have overlooked or disregarded the above analysis underpinning the calculation of damages awarded. Nevertheless, as the record evidence and the Interim Award reflect, Claimants did not introduce, and the Arbitrator did not accept, a(ny) "new," "untested," or "valuation theory" in Claimants' Post-Hearing Brief.

The Interim Award grounded its finding of liability on a thorough analysis of the record under agreed governing law, undisputed facts, joint exhibits in evidence, and witness testimony of record including testimony during the Final Hearing. The analysis, conclusions, and damages calculations in the Interim Award, are retained.

### D. Monetary Damages Versus Specific Performance

The governing legal standards, iterated in the Interim Award and reiterated above in this Order, have not been disputed by the parties. Missouri law favors monetary damages when ascertainable and as based on the fair market value at the time of the breach. *See above, Section --.*

Nevertheless, Respondent's requests that the Arbitrator (1) [a]mend the Interim Award to eliminate reliance on the issue price found it its relevant Operating Agreement, and vacate the portion of the Award granting money damages to Claimants, and (2) issue a Final Award limiting any relief to Claimants ordering specific performance by restoration of a particular Class and number of units to Claimants to offset the dilution of their equity interests.

Respondent's objections to the component parts of a monetary damages, i.e., calculation of monetary damages, including fair market value of Claimants' equity interest at the time Respondent breached the parties' Settlement Agreement, have been considered above and found unsupportable by the facts, evidence, and testimony of record in this proceeding. Respondent also has cited no opposing or inapposite case law, or competing disparate legal standard(s), in support of its request to abandon the existent legal standards under the governing law. Respondent's request are duly to be denied.

### E. Monetary Damages Directed In Specific

Respondent argued that "[c]larification is required regarding who is eligible to receive any remedy under the Settlement Agreement."[20] Clarification is provided by the terms of the parties' Settlement Agreement, subsequent and amended agreements, witness testimony, and Joint Exhibit 4 presented during the Final Hearing:[21] under the terms of the parties' Settlement Agreement,

---

[20] D2 Pharma's Motion to Amend Modify or Clarify Interim Award, Doc. No. 1655743, p. 3.
[21] Transcript of Final Hearing, Doc. No. 1584981, pp. 90-91.

Claimants Kenneth Engels and Una Engels were issued shares of stock of equal measure, valued at 3.5% equity each. The corporate entity, WorkUp Inc., which is a party to this arbitration, was issued no shares of stock pursuant to the Settlement Agreement. Accordingly, the monetary damages awarded for dilution of the value of their equity interest are directed to the holders of said equity interest, Claimants Kenneth and Una Engels, each in equal measure.

### F. Claimants' Request of Attorneys' Fees and Costs Related to Respondent's Motion

The parties' governing Agreements and legal standards[22] direct an award to Claimants, as the prevailing party in this Motion and this arbitral proceeding, reasonable attorneys' fees and costs related to responding to this Motion. Claimants are requested to submit said fees and costs incurred within 14 days of the date of this Order.

---

## *V. Conclusions and* ***ORDER***

---

Upon consideration of the relevant undisputed facts, the parties' submissions, testimony of record, the governing agreements, JAMS Rules, and the governing law, the Arbitrator finds:

**ORDER**

Pursuant to the foregoing and conclusions,

(i) Respondent's Motion to Amend, Modify, or Clarify the Interim Award is **GRANTED IN PART** and **DENIED IN PART*;***

(ii) Respondent's Request to Amend the Interim Award to vacate monetary damages awarded to Claimants is **DENIED**;

(iii) Respondent's Request to Modify the Interim Award such that a(ny)

[22] See Interim Award, Doc. No. 1621180, pp. 7-12.

Final Award is limited to restoration of units to Claimants to offset dilution of their equity is **DENIED**;

(iv) Respondent's Request to Clarify the Interim Award to specify the Claimants to whom the damages are directed is **GRANTED:** monetary damages ordered in the Interim Award are directed to Claimants Kenneth Engels and Una Engels respectively and in equal measure;

(v) Claimants request for reasonable attorneys' fees and costs related to this Motion are **GRANTED.** Claimants are requested to submit such fees and costs within 7 days of service of this Order. Respondent may submit a response within 7 days if it so chooses.

***SO ORDERED.***

Dated: May 29, 2026

*/s/: Ronnie L. White*
Hon. Ronnie L. White (Ret.)
JAMS Arbitrator