Exhibit
15

**JAMS ARBITRATION**

| | | |
|---|---|---|
| In the Matter of the Arbitration Between:<br>KENNETH MARK ENGELS<br>and UNHA ENGELS, and WORKUP, INC.,<br><br>Claimants,<br><br>against<br><br>D2 PHARMA CONSULTING LLC,<br>n/k/a D2 SOLUTIONS HOLDCO LLC<br><br>Respondent. | ) | Case No.: 5335000098 |

**CLAIMANTS' POST-HEARING BRIEF**

Dated: March 6, 2026

Respectfully submitted,

LEGON FODIMAN & SUDDUTH, P.A.
Attorneys for Claimants
121 Alhambra Plaza, Suite 1505
Coral Gables, Florida 33134
Tel: (305) 444-9991
Fax: (305) 444-9937
Primary email: tlegon@lpflaw.com
Primary email: wrhodes@lpflaw.com
Secondary email: respinosa@lpflaw.com
Secondary email: eservice@lpflaw.com

By: */s/ Todd R. Legon*
TODD R. LEGON
Fla. Bar No. 814415
WILLIAM F. RHODES
Fla. Bar No. 0188808

## TABLE OF CONTENTS

**Preliminary Statement** .......... 1

**Relevant Facts** .......... 3

*A. Parties and Agreements* .......... 3

*B. Administration of the Closing Equity Issuance After the Settlement* .......... 4

*C. Departure from Respondent's Initial Application of § 10(a)* .......... 5

*D. Class D Issuances and Subsequent Dilution* .......... 6

**Argument** .......... 8

*A. Failure to Issue Corrective Units Following 4Engs et al. Issuances Breached § 10(a)* .......... 8

*B. The December 23 LOI and December 24 Settlement Draft Do Not Limit § 10(a)'s Anti-Dilution Protection* .......... 10

*C. Failure to Issue Corrective Units After Class D Issuances Breached § 10(a)* .......... 11

*D. Respondent's Own Conduct Confirms the Proper Reading of §10(a)* .......... 13

**Damages** .......... 15

*A. Calculation of Damages for the 4Engs et al. Issuances* .......... 15

B. *Calculation of Damages for the Class D Issuances* .......... 18

*C. Total Compensatory Damages* .......... 19

**Request for Relief** .......... 20

Claimants Kenneth Mark Engels ("Ken") and Unha Engels ("Unha") (collectively, the "individual Claimants" or the "Engels") and WorkUp, Inc. ("WorkUp") (together with the individual Claimants, "Claimants"), by and through undersigned counsel, hereby submit their Post-Hearing Brief and state as follows:

## Preliminary Statement

1. This dispute turns on the application of Section 10(a) of the parties' settlement agreement (the "Settlement") (Ex. 4) and not its interpretation, which is clear and unambiguous. Specifically, Section 10(a) provides Claimants anti-dilution protections for the 7% ownership interest received in D2 Pharma Consulting LLC ("D2" or "Respondent") for accepting the Settlement.

2. Section 10(a) of the Settlement defined two protections for the Engels' 7%: (i) no reduction in ownership percentage for the six months from December 30, 2020 to June 30, 2021 (the "Initial Capital Raise Period") and (ii) thereafter, no reduction in ownership percentage except in connection with a capital raise.

3. When applied to Respondent's capitalization tables, operating agreements, and defenses in this dispute, the evidence shows that Respondent breached the anti-dilution provisions in two separate phases, resulting in more than $630,000 in lost equity value for Claimants.

4. First, both Claimants and Respondent agree beyond doubt that Section 10(a) prohibits Respondent from diluting Ken Engels' and Unha Engels' ownership interests in Respondent during the Initial Capital Raise Period (*see* infra ¶ 56), and it is undisputed that Respondent diluted the Engels' units during that period. (Ex. 10). As discussed below, 10(a) expresses this obligation through the repeated use of the mandatory term "shall," language Missouri law treats as creating a binding requirement.

5. Respondent's Vice President of Finance, Judith Rumpler, initially applied § 10(a) to the Engels' ownership interests in the same manner advanced by Claimants here. (Ex. 57.) Around November 2021, Respondent reversed that approach in secret for over 18 months, including while closing an $8 million investment.

6. Application of § 10(a) to the uncorrected dilution caused by the January 2023–December 2024 employee option issuances shows a separate breach. After the Initial Capital Raise Period, § 10(a) permits dilution of the Engels' ownership interests only in connection with a capital raise. (Hearing Tr. 94:20–95:15.) Respondent nonetheless created an employee option pool and issued options to employees—issuances unrelated to any capital raise. (Ex. 56.) Missouri law therefore requires enforcement of the Settlement according to its plain terms, restoring the value of the ownership interests Claimants lost from this second breach.

7. Accordingly, because D2's breaches are clear, the Arbitrator should provide the most complete relief possible to Claimants by awarding them, as requested in their original Statement of Claim of December 07, 2022[1]: a) $637,182.44 in compensatory damages; or, b) alternatively, an equitable solution such as restoring the Engels to their proper Settlement ownership interest in D2's LLC. Claimants also seek attorneys' fees, costs and interest. Claimants respectfully note the arbitration is the second major litigation regarding the same 2019-2024 technology acquisition; and, that Respondent controlled drafting and, as the majority, post-execution reporting and LLC governance, in both major underlying agreements, including the Settlement.

[1] *See* Relief Requested: "(3) Enter an award of damages against D2 and in favor of the Engels for, among other things, the loss in value to the Engels resulting from the wrongful deprivation of their ownership interests in D2 in an amount to be determined through this arbitration; (4) In the alternative to damages, enter an award determining the correct percentage of ownership that the Engels should each have in D2 without the improper dilutive grants, and order that the Engels be restored to their correct percentage ownerships in D2." (JAMS ID 380361, Ex. 1 at 11.)

## Relevant Facts

### *A. Parties and Agreements*

8. WorkUp, Inc., the corporate Claimant, formerly held the intellectual property and software assets comprising the mobile patient engagement platform known as "WorkUp," which it sold to D2 in July 2019. Under that agreement (Ex. 15), WorkUp, Inc. received $2 million and a 30% vesting phantom equity interest in Respondent in exchange for the transfer of Claimants' intellectual property, software code, customer relationships, and related services associated with the WorkUp business.

9. In July 2020, Respondent failed to make a required acquisition payment of $835,000 under the First Agreement.[2] After negotiations failed and the contractual cure period expired, Claimants filed suit in Delaware on November 23, 2020.

10. A Settlement (Ex. 4) was reached that resolved the litigation and reset the parties' economic relationship through equity ownership in Respondent. For Claimants—who had transferred their platform and continued to build it within Respondent—that ownership interest was the principal vehicle through which they would participate in the venture's future value.

11. Subsection 10(a) establishes a Closing Equity Issuance as a percentage-based allocation effective upon execution. It provides:

> a. D2 shall issue three and one-half percent (3.5%) of the outstanding Units of D2 to each of Kenny and Unha (the "Closing Equity Issuance")
> (Ex. 4 § 10(a), sentence 1)

12. The next sentence addresses dilution in connection with raising capital—an event the parties expressly planned at the time and addressed in the Settlement:

> The Parties hereby acknowledge and agree that the Units issued as the Closing Equity Issuance shall not be diluted by all or any portion of the up to Eight Million and 00/100

[2] See Respondent's Pre-Hearing Brief, JAMS ID 1522693 at 3 (acknowledging nonpayment of July 2020 installment).

> Dollars ($8,000,000.00) capital raise currently contemplated by D2 (the "Initial Capital Raise").
> (Id., sentence 2)

13. The same sentence limits the duration of that level of protection:

> in no event shall the Initial Capital Raise for purposes of this undertaking extend for a period longer than six (6) months after the Closing Date
> (Id., sentence 2)

14. The third and final sentence of subsection (a) integrates and defines the anti-dilution provision in full, clarifying the before-and-after structure of protection across the six-month Initial Capital Raise window:

> For the avoidance of doubt, the anti-dilution provision set forth in this Section 10.a. shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise, but shall, consistently with other Unit Holders, be subject to any dilution consequences in any future capital raises after the Initial Capital Raise.
> (Id., sentence 3)

15. Subsection 10(b) provides Unha a conditional opportunity to earn additional units and expressly excludes those units from the anti-dilution protection of subsection (a). It states:

> b. Unha shall have the opportunity to earn one percent (1%) of the then outstanding Units of D2 per fiscal year during each of the Company's 2021, 2022 and 2023 fiscal years. To be eligible for such one percent (1%) Unit award for each calendar year, Unha must be continuously employed for the full calendar year (i.e., no pro-rations for a partial year of employment). For the avoidance of doubt, the potential one percent (1%) Unit awards which are the subject of this subsection b. shall not have the anti-dilution protection as provided in subsection a. above.
> (Id., § 10(b).)

16. The Fifth Updated and Amended Operating Agreement of D2, effective January 1, 2021 (the "Fifth"), reflected the Claimants' Closing Equity Issuance as 14,000 units out of 200,000 total outstanding units—precisely 7% of the Company, or 3.5% each. (Ex. 8, Ex. A.)

### *B. Administration of the Closing Equity Issuance After the Settlement*

17. After execution of the Settlement, Respondent issued 1,083.5 units to 4Engs Consulting LLC, an entity operated by Kirby Eng, a former WorkUp consultant who continued working with Respondent after the acquisition. (Exs. 10, 47-48.)

18. Because the Closing Equity Issuance was defined as a fixed percentage—7% of the outstanding units—and because it was still February, within the six-month Initial Capital Raise period, any increase in total units required a corresponding increase in Claimants' units in order to maintain that percentage. (Supra ¶ 14.)

19. Respondent's Vice President of Finance, Judith Rumpler, prepared and circulated a capitalization table reflecting that adjustment. (Ex. 57.) The table shows:

Issuance to 4Engs Consulting, LLC: 1,083.5
Claimants' combined ending units: 14,075.84
Total units outstanding: 201,083.5

20. The increase results in Claimants holding 7% of the total outstanding units:

14,075.84 / 201,083.5 = precisely 7%

That calculation by Rumpler was Respondent's first implementation of § 10(a) as applied to the Closing Equity Issuance.

*C. Departure from Respondent's Initial Application of § 10(a)*

21. In November 2021, Respondent adopted the Sixth Amended and Restated Operating Agreement (the "Sixth"), which included an updated capitalization table. (Ex. 52, Ex. A.) Like the February 2021 table prepared by Rumpler (Ex. 57), the Sixth reflects unit issuances made during the January–February 2021 period. Unlike Rumpler's table, however, it does not increase Claimants' units to preserve their 7% ownership. The Sixth reflects the previously issued 1,083.5 units to 4Engs Consulting LLC and six additional issuances during that period

(collectively, the "4Engs et al. Issuances"), totaling 31,223.3 new units[3], while leaving Claimants at 7,000 units each despite the increase in total outstanding units to 231,223.3.

22. Claimants were not informed of the January–February 2021 issuances at the time they were made. The Sixth, executed November 16, 2021, together with its capitalization table reflecting the 4Engs et al. Issuances (Ex. 52, Ex. A), was not provided to Claimants until late October 2022. (*See* infra ¶ 31.)

23. Claimants first became aware of the 4Engs et al. Issuances in September 2022 upon receiving their 2021 K-1 tax documents (Ex. 9) from Respondent's auditor reflecting ownership percentages below 3.5% each. They then requested additional information from Respondent.

24. In October 2022, after Claimants raised the dilution and escalated the matter to Respondent's counsel, Respondent, which had controlled the full drafting process for the Settlement, including its preceding letter of intent, asserted for the first time that it "did not believe" issuances to "service providers" were subject to §10(a)'s anti-dilution provision during the Initial Capital Raise period. (Ex. 10.)

25. Claimants notified Respondent's auditors by letter dated November 7, 2022 that the K-1s would require amendment in light of the dilution. (Ex. 13.) They initiated this arbitration in December 2022. (Statement of Claim, JAMS ID 380361.)

*D. Class D Issuances and Subsequent Dilution*

26. At the time the arbitration began, the only *known* dilution at issue was from the January–February 2021 4Engs et al. Issuances. The Statement of Claim identifies those issuances and seeks relief with respect to them. (Id. at 8.)

---

[3] The January–February 2021 issuances reflected in the Sixth are grants to 4Engs Consulting LLC, J. Dever, J. Liberman, GCS Consulting LLC, I. Baig, the Revokable Propper Family Trust, and Curegrail.

27. The Statement of Claim also referenced a separate dilution concern: Respondent's authorization of a Class D unit pool in the Sixth as part of a proposed reorganization. At that time, those units had been authorized but not yet issued. Claimants sought to preserve their rights with respect to any future dilution resulting from that pool. They requested relief "forbidding future dilutive issuance … of Class D Units as contemplated by the Sixth Amended and Restated Operating Agreement" and that the "threatened reorganization … be stayed until the Claimants' rights as alleged herein have been adjudicated." (Id. at 11, Requests (5) and (7).)

28. By December 31, 2024—the most recent capitalization reflected in the record—55,096 Class D units had been issued and vested. (Ex. 55, tab "D-Unit Schedule.") The first such issuance reflected in the record is a grant of 2,500 units to David Saunders dated January 20, 2023. (Ex. 56 at 305–316.) Respondent did not issue additional units to Claimants to maintain their §10(a) Closing Equity Issuance percentage in connection with those issuances to Saunders and the other Class D employee grantees.

29. At the Hearing, Respondent's counsel stated that 10(a) is "simply silent" as to protection from "a noncapital raise" such as the employee-incentive Class D units. (Hearing Tr. 12:17–23.) Section 10(a), however, provides that Ken and Unha "shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise," and thereafter "be subject to any dilution consequences in any future capital raises after the Initial Capital Raise." (Ex. 4 § 10(a), sentence 3.) The word "after" means 10(a) is not silent during the relevant period, as Respondent claims.

30. Because the Class D pool awards units for services, not capital, and Respondent contends that those issuances fall outside 10(a)'s protections, the history of the Class D pool's authorization and disclosure to Claimants is important.

31. The Sixth authorized 42,500 Class D units. (Ex. 52, § 4.8(a).) The Seventh Amended and Restated Operating Agreement ("Seventh") expanded that authorization to 72,051 Class D units. (Ex. 53 at 1.) Claimants were not provided either agreement at execution. At the Hearing, Respondent's President and CEO, Dean Erhardt, confirmed that Claimants were not asked to execute joinders to the Sixth and were not provided a copy when it was executed. (Hearing Tr. 165:6–8; 165:19–21.) The Sixth, executed November 16, 2021, was provided to Claimants in October 2022. (Ex. 52.) The Seventh, executed December 28, 2022 (Ex. 53), was first provided in Respondent's May 26, 2023 JAMS filing (JAMS IDs 504378, 504380).

## Argument

### *A. Failure to Issue Corrective Units Following 4Engs et al. Issuances Breached § 10(a)*

32. The 4Engs et al. issuances themselves are not disputed. Respondent's 2021 capitalization table (Ex. 54, tab "Cap Table") and its October 3, 2022 letter (Ex. 10) reflect that, in January and February 2021, Respondent issued a total of 31,223.30 new units to 4Engs Consulting LLC and six other grantees.

33. The effect of those issuances is mechanical and straightforward. The same cap table shows that Claimants' units remained at 14,000 during that period. Total outstanding units increased to 231,223.3, and Claimants' ownership percentage declined from 3.5% each to 3.03% each. (Id., tab "Cap Table," rows for "MK Engels" (Ken Engels) and "U Engels," columns Jan.–Feb. 2021).

34. The timing places these issuances squarely within the contract's Initial Capital Raise Period, the 6month window following the December 30, 2020 Closing Date defined by § 10(a).

35. During that period, the Settlement required the 7% Closing Equity Issuance to be maintained. Maintaining that percentage required, in turn, a corresponding increase in Claimants' units following the 4Engs et al. Issuances — the very adjustment Respondent initially made to the Claimants' 14,000-unit holding (*see* supra ¶¶ 17–20), but later reversed. Instead, the reduction below 3.5% each has remained in place for more than five years.

36. Respondent's only answer is that § 10(a) is "simply silent" as to "noncapital" issuances. (Hearing Tr. 12:21–22.) It argues that because the January–February 2021 issuances were made to "service providers," rather than as part of a "capital raise," they did not trigger anti-dilution protection. (Resp. Pre-Hr'g Br. at 6–7.) But §10(a) is not silent. Sentence 3 provides, "[f]or the avoidance of doubt," the anti-dilution provision "shall mean that Kenny and Unha shall each own three and one-half percent (3.5%) of the outstanding Units of D2 during the period of the Initial Capital Raise." (supra ¶ 14.) That clarification makes the cause of dilution irrelevant. The only question is whether 3.5% each was maintained.

37. Missouri law treats an LLC ownership percentage as a protected economic property interest. In *Chadwick v. Huntoon*, 634 S.W.3d 832, 840 (Mo. App. S.D. 2021), the court required compensation for the fair value of a member's ownership interest even after expulsion, confirming that these economic rights are a "member's personal property". Claimants' 7% Closing Equity Issuance is therefore a vested economic stake, not a mere accounting figure.

38. Missouri law gives binding force to the word "shall", which appears in the concluding sentence of the controlling section. In *Pelopidas, LLC v. Keller*, 633 S.W.3d 383, 389–90 (Mo. Ct. App. 2021), the court held that "shall" is the language of obligation and imposes a contractual duty. Section 10(a) provides that Claimants "shall each own" 3.5% during the Initial Capital Raise Period (Ex. 4, § 10(a), sentence 3). That language is mandatory.

39. The 4Engs et al. issuances occurred within the Initial Capital Raise Period. They reduced Claimants' ownership from 3.5% to 3.03% each. Section 10(a) requires that they "shall each own" 3.5% during that period. Respondent therefore breached the Settlement.

*B. The December 23 LOI and December 24 Settlement Draft Do Not Limit § 10(a)'s Anti-Dilution Protection*

40. Respondent attempts to narrow § 10(a) by invoking the December 23, 2020 Letter of Intent ("LOI") (Ex. 36), arguing that because the LOI referenced dilution in connection with the contemplated $8 million capital raise, the later Settlement must be confined to that context. (Resp. Pre-Hr'g Br. at 4).

41. The Settlement Agreement, however, is the operative contract. It was executed after counsel for both parties drafted the final language of § 10(a), including sentence 3. The Settlement contains a merger clause stating that it "contain[s] the entire understanding of the Parties with respect to the subject matter contained herein." (Ex. 4 § 35.) To the extent the LOI differs from the Settlement, the executed agreement controls.

42. Missouri law requires that a contract be read as a whole, applying the plain and ordinary meaning of its terms and "declining to adopt any construction that leaves language without function or sense." *Jimenez v. Cintas Corp.*, 475 S.W.3d 679, 686 (Mo. App. E.D. 2015). Respondent's construction violates that principle by treating the six-month protection as operative against a capital raise while permitting the same ownership percentage to be reduced through discretionary issuances during the identical period, thereby depriving the six-month highest level of ownership protection (e.g., against capital) of operative effect.

43. In any event, the executed Settlement controls. Section 10(a) defines the required ownership condition in mandatory terms: Claimants "shall each own" 3.5% during the Initial

Capital Raise Period. That language governs the parties' rights, regardless of how Respondent now mischaracterizes the earlier LOI discussions and deposition testimony about it.[4]

### *C. Failure to Issue Corrective Units After Class D Issuances Breached § 10(a)*

44. The Class D issuances themselves are not disputed. Beginning in January 2023, continuing through December 2024, Respondent issued 55,096 Class D units to sixteen employees. (Ex. 55, tab "D-Unit Schedule"; Ex. 56.)

45. These issuances were not capital raises. The grant agreements identify the recipients as "employees and service providers," and the accompanying §83(b) elections reflect $0.00 paid for the units, confirming that these issuances were made in exchange for services, not capital.[5] (Ex. 56.)

46. By January 2023, the six-month Initial Capital Raise Period defined in 10(a) had expired. Claimants were from that point forward "subject to any dilution consequences in any future capital raises after the Initial Capital Raise." (Ex. 4 § 10(a).) The subsection does not state that Claimants are subject to dilution from any issuance whatsoever, as Respondent would like it to read. It instead identifies a specific category: future capital raises.

47. The effect of the Class D issuances is undisputed. After issuance of 55,096 Class D units, Claimants' ownership fell from approximately 2.1% each — the post–capital raise baseline

---

[4] Respondent's effort to confine the protection to the capital raise also disregards the commercial context reflected in the testimony. As Mr. Engels explained, when businesspeople speak of "dilution from a capital raise," they are referring to the largest potential influx of equity and therefore to dilution generally; protection against that event would naturally be understood as protection against dilution during the same period. (Hearing Tr. 40:10–16.) The deposition excerpts Respondent isolates do not contradict that understanding when read in context. (Engels Dep. 88:15–89:13; 90:12–22; 130:18–131:22.)

[5] Their names and individual unit counts appear on the "D-Unit Issuances" tab of Ex. 55. The grants are memorialized in separate agreements included in the Ex. 56 group exhibit.

percentage under § 10(a)[6] — to 1.83% each, while their unit count remained fixed at 7,000 apiece. (Ex. 55, tab "December 2024.") No corrective units were issued to restore them to their operative § 10(a) percentage.

48. Respondent's position reduces §10(a) to a nullity after six months. It argues that § 10(a) provides no protection from non-capital issuances once the Initial Capital Raise Period ends, leaving Claimants exposed to dilution from any issuance Respondent chooses to make. That result follows only by characterizing the contract as "silent." In its Pre-Hearing Brief, Respondent asserts that "[t]here is no express language anywhere in the Settlement Agreement that affirmatively grants any rights to anti-dilution protection after the six months other than to state that Claimants will be diluted like all other unit holders for capital raises." (Resp. Pre-Hr'g Br. at 14.) The text says the opposite. Sentence 3 provides that, after six months, Claimants "shall … be subject to any dilution consequences in any future capital raises" (supra ¶ 14).

49. Missouri law does not permit inserting broader permissions into agreements than the parties chose. "[A]n interpretation that inserts language into a contract is forbidden." *Chadwick v. Huntoon*, 634 S.W.3d 832, 840 n.6 (Mo. App. S.D. 2021). Respondent's theory requires insertions of words like "service providers" and "noncapital raises". As *Chadwick* explains, if such an important exception to this critical provision had been intended, "the drafters would have included such language." *Id.* Consider further that Respondent's own counsel controlled the drafting of the Settlement, the LOI, and Section 10.

50. Missouri law recognizes the canon *expressio unius est exclusio alterius*: when a contract expressly specifies one type of event or circumstance, courts infer that other, unwritten

[6] Immediately prior to the Class D issuances, and after giving effect to post–six-month capital raises (including the Viewside and A-2 investments), Claimants held 2.1% each of the outstanding units. (See Ex. 55, tab "Jan 2023", column S.)

types are excluded. In *Lafollette v. Liberty Mutual Insurance Co.*, an insurance policy imposed a deductible on one type of payment, "replacement cost value (RCV)", was silent on another, "actual cash value (ACV)." The court rejected the insurer's attempt to import actual cash value into the parties' relationship when it was absent in the contract and RCV was present.[7] The same reasoning applies here, where the third and concluding sentence of 10(a) expressly identifies just one permitted source of post–six-month dilution—"future capital raises"—and says nothing about Class D Issuances. Under *Lafollette*, Claimants respectfully submit that Respondent's attempt to excuse the Class D Issuances therefore fails. Corrective units should have been issued to Claimants from January 2023 through December 2024.

51. Section 10(b) confirms that 10(a) retained operative protection after six months. Section 10(b) provides that Unha's contingent one-percent annual awards "shall not have the anti-dilution protection as is provided in subsection a." That carve-out would be unnecessary if 10(a) provided no post–six-month protection at all. Reading 10(a) as a complete waiver renders 10(b)'s cross-reference without function, contrary to the rule that contracts must be construed to give effect to all provisions. *Pelopidas*, 633 S.W.3d at 395.

52. The Class D issuances were not capital raises. Section 10(a) permits post–six-month dilution only in connection with future capital raises. By issuing 55,096 Class D units without restoring Claimants to their operative § 10(a) percentage, Respondent breached the Settlement a second time. The Seventh and its associated cap tables are proof of the breach.

*D. Respondent's Own Conduct Confirms the Proper Reading of §10(a)*

[7] "The loss settlement provision's silence regarding an ACV deductible in the face of its explicit reference to an RCV deductible suggests the parties did not intend to make the deductible applicable to ACV payments."

53. The parties' own performance under a contract is probative of its meaning. *See, e.g., Phipps v. School Dist. of Kansas City*, s=645 S.W.2d 91, 103 (Mo. App. 1982) (holding the course of performance of the parties after execution of agreement was "cogent evidence of the common meaning" of terminology used). Immediately following execution of the Settlement, Respondent's Vice President of Finance, Judith Rumpler, increased Claimants' units by exactly the number required to maintain their collective 7% ownership when the 4Engs units were issued. (Ex. 57; supra ¶¶ 17–20.) Her February 2021 capitalization table reflects an adjustment precisely consistent with Claimants' reading of 10(a).

54. Respondent offered no substantive explanation for that implementation. When confronted with Exhibit 57 at hearing, Respondent's President, Dean Erhardt, instead sought to discredit Ms. Rumpler:

> Q. So your own internal books and records confirm our position in this case that you can't dilute the Engels down during that six-month period; isn't that true, sir?
> A. No. What I'm saying is that Judy Rumpler is not qualified to manage a cap table, and that's one of the many reasons she's no longer with the company.
> (Hearing Tr. 155:21-156:4)

55. Respondent's theory requires the Arbitrator to conclude that its Vice President of Finance misunderstood 10(a) when she applied it in February 2021 in the same manner Claimants advocate here. More than eighteen months after her supposedly disqualifying error occurred, Respondent and its counsel continued to present Ms. Rumpler to Claimants as the Company's finance authority—identifying her to Claimants as "D2's V.P., Finance," responsible for providing the Company's financial statements. (Ex. 10.)

56. Respondent's President also acknowledged at the February 9 hearing that Sentence 3 of § 10(a) was intended as a simple confirmation of the parties' agreement regarding anti-dilution

protection during the first six months of the Settlement.[8] When presented with the language stating that Ken and Unha "shall each own three and one-half percent (3.5%) of the outstanding units of D2 during the period of the Initial Capital Raise," Mr. Erhardt agreed that it was "a simple clarification" of the anti-dilution provision and confirmed he continues to view it that way today:

> Q. And specifically §10(a) reads, "For the avoidance of doubt, the antidilution set forth in this Section 10(a) shall mean that Kenny and Unha shall each own three and one-half percent (3.5 percent) of the outstanding units of D2 during the period of the Initial Capital Raise." And responding to your attorney's questions, you said you viewed that as a simple clarification?
> A. Correct.
> Q. Do you still believe this is a simple clarification of what the deal was regarding antidilution?
> A. Yes.
> Hearing Tr. 161:17–162:12

**Damages**

*A. Calculation of Damages for the 4Engs et al. Issuances*

57. Under Missouri law, "the goal in awarding damages for breach of contract is to place the injured party in the *same* position as if the contract had been performed." *Amalaco LLC v. Butero*, 593 S.W.3d 647, 652 (Mo. App. 2019). Had Respondent performed under the Settlement, it would have maintained Claimants' required ownership positions of 3.5% each during the Initial Capital Raise Period. When Respondent issued 31,223.3 new units in the 4Engs et al. Issuances without adjusting Claimants' holdings (supra ¶¶ 21, 32), it deliberately failed to issue corresponding new units to Claimants. It overrode its inclination to do so (supra ¶ 56), and reversed Rumpler's initial compliance (supra ¶ 19). This breached 10(a) at sentence three: "shall

[8] Respondent has suggested that a January 12, 2021 "reservation of rights" email (Ex. 44) limits Claimants' anti-dilution protection to the contemplated capital raise. The email did no such thing. It merely reserved Claimants' rights "with regards to antidilution protection from the capital raise as contemplated in the Settlement Agreement." A reservation of rights preserves existing contractual rights; it does not waive or redefine them. Nor could such an email alter the parties' executed Settlement Agreement, which contains an integration clause providing that it "contain[s] the entire understanding of the Parties." (Ex. 4 §35.)

each own 3.5% during" the Initial Capital Raise Period. The remedy is to restore to Claimants the value of the corrective units and corresponding ownership percentages that should have been held since January 2021.

58. The calculation of dilution damages from the 4Engs et al. Issuances is the multiplication of two numbers: the precise number of units Claimants should have received to correct the dilution from those issuances, and an objective price-per-unit reflected in Respondent's books at the time. Since issuance of corrective units increases Claimants' holdings <u>and</u> total outstanding units, the number of additional units required to maintain a 7% ownership interest must be solved algebraically. Since 231,223.3 units were outstanding after the 4Engs et al. Issuances (supra ¶ 33), the equation is:

$$\frac{14,000 + x}{231,223.3 + x} = 0.07$$

59. Solving for *x* yields 2,350.14 units. The remaining questions are value and form of relief.

60. The standard in Missouri is "fair market value", the price property would bring between a willing seller and a willing buyer at the time. *Chadwick v. Huntoon,* 634 S.W.3d 832, 842 (Mo. App. S.D. 2021). It is not confined to a single rigid formula, and may be established using the method best supported by the record. Id. The record contains specific, contemporaneous unit prices of Respondent in the Sixth and Seventh operating agreements, produced by counsel and executed by Respondent and unitholders. The prices were used in connection with actual arm's-length sales of units to outside investors.

61. That standard is satisfied here. In November 2021, Viewside Capital Partners ("Viewside") purchased $8 million of Respondent Class A units at $142.397 per unit. The

transaction and price are reflected in the Sixth Amended and Restated Operating Agreement. (Ex. 52 at 1, §1.1(n).)

62. Applying the unit price from the Sixth, 2,350.14 units × $142.397 per unit equals $334,652.89 in compensatory damages—the economic value of the units withheld from Claimants in violation of 10(a).

63. The remaining issue for the Arbitrator is form of relief. While an equitable remedy, such as forcing an issuance of corrective units and their associated percentages, is theoretically available, Missouri law recognizes "money compensation" as the primary remedy for breach of contract. *Finch v. Campbell*, 541 S.W.3d 616, 634 (Mo. App. W.D. 2017). It is more practical.

64. Restoring the 7% Closing Equity Issuance through additional units would require amendments to capitalization tables and governance documents and would affect approximately 31 other unitholders. Missouri law disfavors such disruptive equitable remedies where an adequate remedy at law exists.[9]

65. The record also reflects that Respondent has consistently challenged JAMS' jurisdiction over matters involving internal LLC. (Respondent's Memorandum in Support of Jurisdictional Challenge to Request for Relief No. 6 at 3, JAMS ID 504378.) Arbitrator Reagan agreed and struck that request for relief. (Order dated July 27, 2023, JAMS ID 553167.) This further complicates an equitable solution.

66. In light of the authorities and procedural history, a monetary award of $334,652.89 provides the most direct means of placing Claimants in the position they would have occupied had 10(a) been honored at the time of the 4Engs et al. Issuances.

---

[9] *Amalaco, LLC v. Butero*, 593 S.W.3d 647, 653 (Mo. App. E.D. 2019). Courts therefore routinely award the cash value of an ownership interest rather than compel corporate restructuring. *Chadwick v. Huntoon*, 634 S.W.3d 832, 837 (Mo. App. S.D. 2021); *Heifetz v. Apex Clayton Inc.*, 2017 Mo. App. LEXIS 280, at *13 (Mo. App. E.D. 2017).

B. *Calculation of Damages for the Class D Issuances*

67. Beginning in January 2023, D2 issued 55,096 Class D units to 16 employees. (Ex. 55; Ex. 56.) Because those issuances were not capital raises, they did not fall within the category of permissible post–six-month dilution under § 10(a). After issuance, Claimants' ownership fell while their holdings remained fixed at 7,000 units each. (Ex. 55, tab "December 2024"; column F)

68. Immediately prior to the Class D Issuances, Respondent's own capitalization schedule reflected Claimants' collective ownership at 4.2% (2.1% each). (Ex. 55, tab "January 2023.") That figure provides the operative baseline against which the incremental dilution from the Class D issuances must be measured.[10]

69. After the Class D issuances, total units outstanding increased to 381,779. (Ex. 55, tab "December 2024.") Because 10(a) protects a percentage, not a static unit count, the number of corrective units required to maintain 4.2% in the expanded capital structure must be determined with the same formula used for 4Engs:

$$\frac{14,000 + x}{381,779 + x} = 0.042$$

70. Solving for *x* yields 2,124.55 units—the corrective units that should have been issued to prevent dilution from the Class D Issuances.

71. The appropriate per-unit issue price is defined in Respondent's governing documents. Both the Sixth and the Seventh Amended and Restated Operating Agreements define a "Class A-1 Issue Price" of $142.397 per unit. (Ex. 52 §1.1(n); Ex. 53 §1.1(s).) The Class D issuances occurred between January 2023 and December 2024, during which the company-defined

[10] The 4.2% collective figure reflects Respondent's January 2023 capitalization table after giving effect to the Viewside financing and subsequent A-2 capital raises, and incorporates the prior 4Engs dilution for which separate relief is sought.

issue price remained unchanged at $142.397. That price therefore supplies a consistent and objective valuation benchmark for the withheld units.

72. Applying straightforward multiplication, 2,124.55 units × $142.397 per unit = $302,529.55. The Class D Issuances therefore caused economic harm of $302,529.55. For the reasons discussed above, a monetary award provides the most direct and administrable means of restoring Claimants to the ownership position 10(a) requires. (supra ¶¶ 63-66.)

### *C. Total Compensatory Damages*

73. The two phases of wrongful dilution—the 4Engs et al. Issuances and the Class D Issuances—caused combined economic damages of $637,182.44.

74. The figure is derived directly from Respondent's capitalization tables and operating agreements. All calculations comply with the Arbitrator's February 4, 2026 Order (JAMS ID 1542509) striking Claimants' business valuation testimony as impermissible expert opinion. Excluded testimony concerned a valuation of the company as a whole based on a third-party audit, whereas the damages here rely only on Respondent's own corporate records of unit price.

75. The per-unit price applied—$142.397—is the issue price contained in Respondent's operating agreements before, during and after the $8 million Viewside transaction.

76. Because these damages were ascertainable at the time of dilution and are capable of exact computation, Claimants respectfully request pre-award interest at the applicable statutory rate from the date of each phase of dilution, together with post-award interest until paid. Missouri law permits prejudgment interest where damages are liquidated or readily ascertainable. *Columbia Mut. Ins. Co. v. Long*, 258 S.W.3d 469, 480 (Mo. App. W.D. 2008); Mo. Rev. Stat. § 408.020 (providing for interest at nine percent per annum).

77. Section 24 of the Settlement provides that the prevailing party in a proceeding to enforce the Settlement shall recover reasonable attorneys' fees, costs, and expenses of enforcement and collection. (Ex. 4, § 24.). If Claimants prevail, they are entitled under § 24 to recover their reasonable attorneys' fees, arbitration costs, and related expenses.[11]

78. Claimants released their prior claims under the First Agreement and transferred their intellectual property to Respondent in reliance on the equity protections set forth in the Settlement. Section 10(a)—drafted by Respondent's counsel—required preservation of those ownership interests. The requested awards restore what § 10(a) requires.

**Request for Relief**

79. For the reasons set forth above, Claimants respectfully request that the Arbitrator:

a. Enter an award finding that Respondent breached Section 10(a) of the Settlement Agreement by failing to preserve Claimants' contractually protected ownership interests;

b. Enter an award in favor of Claimants and against Respondent in the amount of $637,182.44 in compensatory damages;

c. Award pre-award interest at the applicable statutory rate from the date of each wrongful dilution, and post-award interest until paid;

d. Award Claimants their reasonable attorneys' fees, arbitration costs, and expenses pursuant to Section 24 of the Settlement Agreement;

e. Grant Claimants leave to file a limited post-hearing submission (not to exceed ten pages) addressing Respondent's Rule 17 violations (discussed supra ¶¶ 27-31) and any resulting request for sanctions; and

f. Grant such other and further relief as the Arbitrator deems just and proper.

---

[11] WorkUp is a party to the Settlement, and Ken and Unha Engels are expressly identified in §10(a) and executed written joinders to the Settlement on December 30, 2020

Dated: March 6, 2026

Respectfully submitted,

LEGON FODIMAN & SUDDUTH, P.A.
Attorneys for Claimants
121 Alhambra Plaza, Suite 1505
Coral Gables, Florida 33134
Tel: (305) 444-9991
Fax: (305) 444-9937
Primary email: tlegon@lpflaw.com
Primary email: wrhodes@lpflaw.com
Secondary email: respinosa@lpflaw.com
Secondary email: eservice@lpflaw.com

By: *\/s/ Todd R. Legon*
TODD R. LEGON
Fla. Bar No. 814415
WILLIAM F. RHODES
Fla. Bar No. 0188808

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 6, 2026, I electronically filed the foregoing with JAMS to be served by operation of their electronic filing system upon all counsel of record.

By: */s/ Todd R. Legon*
TODD R. LEGON